E-FILED
Friday, 30 June, 2017  12:47:49 PM
Clerk, U.S. District Court, ILCD

IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS
SPRINGFIELD DIVISION

| | | |
|---|---|---|
| CHERYL L. JOHNSON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No.  14 cv 3001 |
| | ) | |
| THE ILLINOIS DEPARTMENT OF | ) | |
| CENTRAL MANAGEMENT SERVICES, | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM OF CHERYL L. JOHNSON IN OPPOSITION
TO THE DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

## I.  INTRODUCTION

In November of 2006 Cheryl Johnson ["Johnson"] began working for the Illinois

Department of Central Management Services ["CMS"] in its Bureau of Communications and

Computer Services ["Bureau"].  Johnson, an African-American female, brought over twenty

years of information technology experience with her to CMS.

During the nearly six years she worked in the Bureau, she was classified as a Public

Service Administrator ["PSA"] and supervised a team of subordinate employees.  Johnson was

one of only a few black PSAs that worked in the Bureau and its only female African-American

manager.

Initially, Johnson supervised a software group.  The individuals she reported to gave her

favorable feedback on her work and she received a fully satisfactory performance review.

All of this changed when Rod Nance ["Nance"] began actively supervising Johnson in

2008.  Shortly following Nance becoming her supervisor, Johnson was reassigned as the

manager of the hardware unit.  She had no prior hardware experience.  Ed Gordon ["Gordon"], a male Caucasian, was her predecessor in that position.  He too reported to Nance.

While working as the hardware manager, Nance assigned work to Johnson which, because of its nature and the manner she was directed to perform it, could not reasonably be completed as he directed.  Nance's assignments to Johnson were significantly more burdensome than the work he required of Gordon while he was the hardware manager.  He also denied Johnson's requests for hardware training even though such training had been provided Gordon.

When Johnson was unable to complete her work in the manner directed by him, Nance began a campaign of continuously criticizing her performance.  This led to the assessment of discipline and her eventual termination from employment with CMS.

In the wake of her termination Johnson filed a pro se complaint against CMS. Essentially, she is claiming that CMS discriminated against her because she was an African-American female when it terminated her employment in August of 2012.  She asserts that its conduct violated her rights under both Title VII of the "Civil Rights Act of 1964" ["Act"] (42 U.S.C. 2000e et.al.) and the Equal Protection Clause of the Fourteenth Amendment to the Constitution [42 U.S.C. §1983].

In this summary judgment proceeding CMS advances two contentions.  First, it asserts that Johnson in October of 2012, signed a "Resolution Prior to Arbitration" ["Resolution"] releasing any claims she has against CMS and is accordingly barred from pursuing this lawsuit. Second, it argues that Johnson does not have sufficient evidence of unlawful discrimination to warrant a trial.

As will be more fully developed, CMS has not made a sufficient showing of its entitlement to summary judgment.

Because it failed to comply with its obligations under the Resolution, it should not be able to use it to bar Johnson's claims in this lawsuit.  Furthermore, Johnson has presented sufficient evidence to permit a reasonable jury to conclude that had she been a male Caucasian CMS would not have ended her employment.

## II.  STATEMENT OF FACTS

### A.  CMS' Undisputed Material Facts.

### 1)  Material facts which are undisputed.[1]

With respect to the material facts claimed to be undisputed by CMS, Johnson agrees that the following facts are undisputed and material except as otherwise shown: 1, 2, 3, 4, 5, 6, 7, 8 (in part), 9 (to the extent it refers to the *pro se* complaint), 10, 11, 12, 14, 15 (to the extent it states some, but not all the reasons she was treated differently), 16, 17, 18, 19, 20, 21 (in part [see ¶5,6,8-10 of Johnson's Statement]), 22, 23, 24, 25, 26, 27, 31, 32 (only to the extent that she did not meet Nance's demands [See ¶71,72 of Johnson's Statement]), 33 (except there was no agreement made.  Nance made demands on Johnson [see ¶71,72 of Johnson's Statement].), 35 (to the extent Nance took notes they were never shared with Johnson), 36 (that was so because of Nance's requirement that tickets in the Hardware Group were assigned to her name regardless of who would work on them [¶20 of Johnson's Statement]), 37 (only to the extent that each of them satisfied the work requirements established for them by Nance), 39 (only to the extent Nance

---

[1]  As used in this instrument, the term "Johnson's Statement" refers to the statement of additional undisputed facts set forth in subsection B of this section.

imposed demands on Johnson, 42 (only to the extent that Johnson was unable to satisfy the unreasonable demands of Nance, 44, 45 (Johnson was suspended because she could not satisfy Nance's demands), 47 (Nance's remark arose because Johnson did not satisfy his demands directed to her), 48, 49, 50, 51, 52, 53 [see ¶71,72 of Johnson's Statement], 54, 55 (Nance initiated all of the discipline [see ¶73 of Plaintiff's Statement], 56, 58 (except Wasilewski's analysis was directed toward assignments made to units, not individuals), 60, 61, 63, 64 (only to the extent that Johnson was relocated) .

### 2) Material facts which are disputed.

With respect to the CMS statement of material facts, Johnson disputes: 13 (with respect to hardware training [see ¶68 of Johnson's Statement]), 28 [see ¶8 of Johnson's Statement], 30 [see ¶71,72 of Johnson's Statement], 31 (Johnson was assigned to the hardware unit in May of 2008), 38 (the objectives for Gordon while he supervised the Hardware Group were significantly different than those given Johnson by Nance [see ¶45-48,50-62 of Johnson's Statement]), 39 (Johnson had significantly more job responsibilities than did Gordon [see ¶20-25,27,28,30-35,37 of Johnson's Statement]), 40 (see ¶20-35,37 of Johnson's Statement], 41 [see ¶68 of Johnson's Statement], 43 (Gordon who managed the Hardware Group immediately prior to Johnson and was supervised by Nance was given less demanding work requirements than Johnson [see ¶45-48,50-62 of Johnson's Statement]), 59 [see ¶38-40,53-55,63-67 of Johnson's Statement], 62 [see ¶69 of Johnson's Statement],  65 [see ¶92-103,106-109 of Johnson's Statement],

### 3) Facts which are immaterial.

Johnson asserts that the following facts are irrelevant to the resolution of any material issue in the instant summary judgment proceeding: 34 (while in the Hardware Group Johnson

was directly supervised by Nance.  All information Rademacher and Warner received concerning

Johnson's performance in the Hardware Group came from Nance [see ¶73 of Johnson's

Statement], 46, 57 (Spencer began her position after Johnson's discharge), 60, 61, 62, 66

    **4)  Facts which are objectionable**.

    34 (this paragraph is objectionable hearsay under Rules 801 and 802 of the Federal Rules

of Evidence).

    **B.  <u>Johnson's Statement of Additional and Material Undisputed Facts.</u>**

**Johnson's Initial Employment at CMS**

1.    Johnson, an African-American female, holds an Associate Degree in electronic data

    processing from Lincoln Land Community College and a Bachelor of Science degree in

    computer science from the University of Illinois at Springfield [Johnson Affidavit ¶1, 2].

2.    On November 1, 2006 Johnson began working for CMS in the Bureau [Johnson Affidavit

    ¶3].

3.    Prior to working for CMS, Johnson had worked for over twenty years in various

    information technology positions in both the public and private sector [Johnson Affidavit

    ¶4].

4.    Initially, Johnson was a team leader supervising eight on site staff members and one off

    site staff member.  She was classified as a Public Service Administrator ["PSA"]

    [Johnson Affidavit ¶5].

5.    While Johnson worked in the Bureau, it was headed by Kevin Rademacher

    ["Rademacher"], a Caucasian male.  Don Warren ["Warren"], a Caucasian male, worked

in the Bureau as the Data Center Manager.  He reported to Rademacher.  Nance, a
Caucasian male, served the Bureau as the Midrange Wintel Manager [Johnson Affidavit
¶6].

6.      Although Nance was designated on paper as Johnson's supervisor, in reality she reported
to Warren when she began her CMS employment.  While she worked under Warren, the
work of her unit involved software issues [Johnson Affidavit ¶7].

7.      While Johnson worked in the Bureau, it had approximately fifty individuals who held
positions at the PSA level or higher.  In addition to Johnson, there were only two
African-American PSAs in the Bureau.  Johnson was the only African-American female
manager in the Bureau [Johnson Affidavit ¶8].

8.      Although Nance signed Johnson's annual performance evaluations during the time she
worked under Warren, her 2006/2007 performance evaluation was done by Warren since
he effectively supervised her and was aware of her work.  That evaluation rated Johnson
as fully acceptable [Johnson Affidavit ¶10]

**Johnson's Relationship with Nance Prior to Being assigned to the Hardware Unit**

9.      While Johnson worked under Warren she seldom saw Nance and they had limited email
communication with one another [Johnson Affidavit ¶9].

10.     In early 2008 Nance became more involved in supervising Johnson.  Prior to that time,
she had received no criticisms concerning the manner in which she was performing her
job duties from either Warren or Rademacher.  She had prepared special assignments
given to her by Rademacher and several special assignments for Warren.  Both
Rademacher and Warren commented favorably to her upon the work she had done for

them [Johnson Affidavit ¶11].

**The Hardware Group**

11.    The mission of the hardware unit was to maintain computer components such as hard

drives for servers for twelve state agencies under the jurisdiction of the Governor as well

as a number of boards and commissions.  There were 500 servers located at the Data

Center.  The remainder were at remote locations throughout the state where state

agencies had offices.  There were over 3,000 servers throughout the state [Johnson

Affidavit ¶13].

12.    In May of 2008 Johnson was reassigned to manage the hardware group in the Bureau.

Gordon was her immediate predecessor as hardware unit manager [Johnson Affidavit

¶12].

13.    At the time Johnson was moved to the hardware group, she was informed by Warren and

Rademacher, that her reassignment was due to a restructuring within the Bureau [Johnson

Affidavit ¶ 14].

14.    After Johnson became the Hardware Manager, she had no further direct work

involvement with Warren and Rademacher [Johnson Affidavit ¶17].

15.    At the time Johnson was assigned to the hardware unit, she supervised a staff of four

technicians.  Later, her staff was reduced to three technicians [Johnson Affidavit ¶16].

16.    A Help Desk was located at the CMS Communications Center near the Data Center.  It

received requests for assistance from persons working for the agencies, boards and

commissions.  The Help Desk staff would field calls and attempt to resolve the problem.

If it could not resolve the problem the Help Desk would refer hardware issues to the

hardware unit and software issues to other units.  It directed requests for assistance to a unit by issuing a ticket.  The tickets were transmitted and stored electronically in a data system commonly called " the Remedy System."  The Remedy System is a software system which manages both Help Desk tickets, Change tickets, and Task tickets.  It records to whom the ticket is assigned, the various work required with the ticket and when the work required of the ticket is completed.   A ticket also identifies the location of the hardware, the name of the contact person, how that person could be reached and a description of the problem [Johnson Affidavit ¶ 21, Foster Dep.16, 17, 30-31, 37-40, 42-43].

17.    The Help Desk provided phone support for about twelve agencies under the jurisdiction of the Governor in dealing with computer problems.  When customers called in with a printer or computer problem, a ticket was created.  The Help Desk staff would attempt to resolve the problem over the phone.  If the staff was unsuccessful the ticket was sent to another unit at the Bureau [Foster Dep.8-9].

18.    The manager of a unit receiving the ticket normally would assign it to the appropriate staff person [Foster Dep.16].

19.    The hardware unit was also given Change tickets.  A Change ticket relates to work which involves making changes in a piece of hardware.  A common Change ticket would be to update storage space in a server.  Change tickets were issued and recorded in the Remedy System [Johnson Affidavit ¶ 28].

**Johnson Work Assignments in the Hardware Group**

20.    When Johnson became manager of the hardware unit, Nance changed the assignment

process so that all Help Desk tickets directed to the hardware unit had to be assigned by

Johnson to her name.  Johnson then had to assign a task ticket to the technician who

would do the actual work by duplicating the information on the original ticket.  She was

then required to prepare a series of tasks for the technician who would work on the ticket.

She also had to create a task for herself to verify the work of the technician. It could take

as much as 15 to 20 minutes for Johnson to go through the process of transferring the

work on the Help Desk ticket to the technician.  This was work which was not required of

Gordon while he supervised the unit.  The hardware unit received approximately 50 Help

Desk tickets a day and it was not unusual for it to receive as many as 75 to 100 tickets.

All of those tickets were assigned in Johnson's name [Johnson Affidavit ¶ 23].

21.     When Help Desk tickets were assigned in her name, Johnson, rather than the technician,

        had the responsibility for all Help Desk tickets assigned to the hardware unit.

        Accordingly, Johnson had to assign herself a task for monitoring and making sure that

        each ticket was completed.  In this respect she had to review each Help Desk ticket given

        to the hardware unit to make sure that the task required of the ticket had been completed

        and then she had to verify that it had been completed.  When Gordon supervised the

        hardware unit, this work was not required of him because the tickets were not assigned in

        his name [Johnson Affidavit ¶24].

22.     Nance's manner of assigning tickets in Johnson's name required significant additional

        work for her and required her to remain responsible for the ticket until it had closed.

        Unlike Gordon, she had to monitor tickets assigned in her name which were worked on

        by technicians to verify that the information on the ticket was updated.  She also to verify

that the task had been successfully completed [Johnson Affidavit ¶25] .

23.   Periodically, the person assigned a ticket would have to enter into the Remedy System the status of work associated with the ticket.  Because all tickets were assigned in her name in the hardware unit, Johnson, rather than the technician, had to make entries concerning the status of the ticket in the Remedy System.  To do this, she had to confer with the technician to ascertain the status and then make the entry herself [[Johnson Affidavit ¶26].

24.   The person in whose name a ticket was assigned became personally accountable for the completion of the work required by the ticket.  Because all tickets in the hardware unit were assigned in her name, it was Johnson, rather than the technician who worked on the ticket, that was personally accountable for the completion of the ticket [Johnson Affidavit ¶ 27].

25.   When Johnson became hardware manager, all Change tickets were entered in the Remedy System in her name [Johnson Affidavit ¶28] .  Johnson had to create several tasks that needed to be performed to complete the assignment.  Units other than the hardware unit might have to perform some of the tasks.  Johnson was personally responsible for not only the Change ticket but all of the tasks associated with it.  That meant that she not only had to assign the task to each group working on a ticket, but also had to verify the completion of the task at the end.  She had to manage the entire ticket. If another person or group did not complete a task, the responsibility for the non-completion became hers.  It could take 10 to 30 minutes to create the tasks for a Change ticket.  Typically, the hardware group would receive 10 to 30 Change tickets a day.  She

could not close a ticket until all the tasks associated with performing the work required of the ticket was completed.  If a ticket remained open, that became her responsibility rather than the responsibility of the person or unit that had been assigned the uncompleted task [Johnson Affidavit ¶ 29].

26.  Because of the manner in which Nance required all tickets to be assigned in her name, it was impossible for Johnson to perform her job in a 40 hour work week.  Typically, she would work as much as 60 hours a week [Johnson Affidavit ¶ 30].

27.  When a Help Desk ticket was received by the hardware group, Johnson had to assign the task and ticket within a day.  When she verified that a Help Desk ticket had been completed, she had to do that by contacting the customer and confirming that the work was completed properly.  Johnson had to prepare a note documenting the details of that conversation [Johnson Affidavit ¶ 31].

28.  Nance required that Johnson submit a weekly report to him detailing the status of each open ticket that had been assigned in her name.  This would be all tickets given to the hardware unit regardless of who was performing the work required of the ticket.  In an average week it would not be unusual to have 500 or more open tickets in the hardware unit.  It was impossible for Johnson to prepare a weekly report identifying the status of each of those tickets.  When she could not report on the status of all of those tickets, Nance would inform her that she had not satisfied that job requirement [Johnson Affidavit ¶ 32].

29.  Nance required Johnson to pass along tasks related to Help Desk tickets that were assigned in her name to technicians within one day of when she received the ticket.  At

various points in time, Johnson was away from work on excused absences.  Nonetheless,

Nance on those days would not only assign tickets in her name, but would later inform

her that she was not fulfilling her duties because she had not passed those tickets along to

subordinate employees within the one day time period he had established.   On one

occasion when Johnson was away from work for a period of two days in October of 2010

because of her Aunt's death, Nance assigned in her name 65 Help Desk tickets [Johnson

Affidavit ¶ 33].

30.     Nance assigned Johnson a job objective that involved planning for the increase in storage

space of servers.  Each week the WUG Monitoring System would issue a report

identifying the space availability on servers which were low on disk space.  On average

500 servers or more would be included on each report.  The report would identify the

name of the server, the agency where it is located, the space available on the server, the

space used on the server and the percentage of low disk space.  Johnson was required in a

two day time frame to prepare a report setting forth a plan for upgrading storage space on

those servers.  The report had to include whether the space of the server needed to be

increased or the server needed to be rebuilt. Johnson then had to complete the upgrade

within seven days [Johnson Affidavit ¶ 34].

31.     Because Johnson only had three technicians working under her supervision and those

technicians had tasks in addition to dealing with server space issues, there was a limit to

the number of servers that a technician could work on per week.  Typically, she could

schedule only four or five servers a week for upgrade work.  Much of the time the work

had to be done at the situs of the server.  It would take a day or two of technician time to

complete the assignment.  Accordingly, Johnson had to coordinate the work schedule of the technician with the time the agency could have the server down for the upgrading.  It was impossible to complete the report within the time span directed by Nance.  It was also impossible to schedule and complete the upgrading within the time period directed Nance [Johnson Affidavit ¶ 35].

32.     Among the objectives given to her by Rod Nance, Johnson was to complete the decommissioning of a server within 35 days.  A server is normally decommissioned when:  a) it goes out of service; b) the facility where it is located closes; c) it is replaced with a new server; or d) there is an upgrade in applicable technologies.  Through the Remedy System, a ticket was issued to the hardware group when a server needed to be decommissioned.  It would not be unusual to receive 30 decommissioning tickets a week. In the decommissioning process there are as many as ten tasks which must be completed. The change ticket to decommission a server was, pursuant to Nance's direction, assigned in Johnson's name.  The work in decommissioning a server cannot be fully performed by the hardware group.  It would not be unusual for as many as 8 different work units being involved in decommissioning of a server.  Johnson was required to issue an assignment identifying each task.  Many of the tasks were performed by other units.  She had to coordinate the work of the hardware unit with other units involved in the decommissioning process.  The ability to complete the task depended not only upon the availability of the technicians in the hardware unit, but also on the availability of other units as well.  Before a ticket could be closed, a technician in the hardware unit would have to travel to the situs of the server, pick it up and return it to the Data Center.  Given

the work required, the need to coordinate the work with other units it was extremely difficult to complete the decommissioning process and close the ticket within 35 days [Johnson Affidavit ¶ 36].

33.     When Johnson became the hardware manager, Nance assigned her the responsibility of reviewing and preparing asset management forms.  When Gordon was a hardware manager, that task was assigned to the hardware unit and members of the unit shared that responsibility [Johnson Affidavit ¶ 38].

34.     One of Johnson's responsibilities for the asset management form occurred when new pieces of hardware were received at the Data Center.  She would have to physically examine each piece of equipment and compare the equipment and its serial number with the corresponding listing on the asset management form.  When equipment left the Data Center, she was required to prepare an asset management form identifying the specific equipment, its serial number and the location where it was being sent.  Equipment came in an out of the Data Center daily.  It was not unusual to have over 50 pieces of equipment that had to be accounted in this manner daily [Johnson Affidavit ¶ 39].

35.     Each month Johnson would also have to conduct an inventory of equipment located at both the Data Center and at remote locations.  In doing it at remote locations she requested the customer at the location to verify that the equipment was still there and provide her with the serial number of each piece of equipment located at its facility.  The process of preparing the monthly report involved a significant amount of time on her part [Johnson Affidavit ¶ 40].

36.     Because some of the equipment was old, it was oftentimes difficult to accurately discern

its serial number.  In situations where Johnson wrongly transcribed a serial number on
the asset management form because she could not read it or received inaccurate serial
number information from the customer, Nance would inform her that monthly objective
in that task was not met by her [Johnson Affidavit ¶ 41].

37.     The hardware unit had to install pieces of equipment commonly known as an ILO in
older servers.  In doing that a technician would have to go to the location of the server.
Every three months Nance would give her a quota for the number of servers that should
be equipped with an ILO during the next three month period.  On average it worked out
to about 20 servers a month.  To install ILO equipment a technician would have to travel
to the situs of the server.  Because there are only three technicians working in the
hardware unit and there was an abundance of other work expected of the unit, the
objective established by Nance was impossible to achieve [Johnson Affidavit ¶ 42].

38.     The total number of Help Desk tickets assigned in the name of Johnson between
November 1, 2008 and August 7, 2012 was 2744.  The total number of related tasks
assigned in her name was 1846 [Johnson Affidavit ¶ 48, Ex.G].

39.     The total number of Task tickets assigned in the name of Johnson between November 1,
2008 and August 7, 2012 was 3,727 [Johnson Affidavit ¶ 50, Ex.I].

40.     The total number of Change and Related Task tickets assigned in the name of Johnson
between November 1, 2008 and August 7, 2012 was 1245 Change tickets and 2100
Related Task tickets [Johnson Affidavit ¶ 53, Ex.L].

**Gordon's Work Assignments**

41.     Gordon began employment with CMS in 2007.  He has always worked in the Midrange

Wintel Group [Gordon Dep.7].

42.     During the time period Johnson was in the Bureau she had frequent contact with Gordon. He also was a manager of a Group that reported to Nance.  In working around Gordon Johnson became aware of the tasks and reports he had to do [Johnson Affidavit ¶18].

43.     Initially Gordon worked as the hardware manager.  He supervised four individuals.  In April of 2008 he left the hardware group and assumed software related duties. Johnson took his place in the hardware group [Gordon Dep.10-11].

44.     When Gordon was in the hardware group Nance was his supervisor [Gordon Dep.12].

45.     When Gordon headed the hardware unit tickets were assigned in the name of the technician who would do the work rather than in Gordon's name.  The technician assigned the ticket was responsible for addressing and resolving the problem and then closing the ticket [Johnson Affidavit ¶24] .

46.     While Gordon supervised the hardware unit, Help Desk tickets were not assigned in his name.  He had no responsibility for either preparing tasks for the technician in the unit who would work on the ticket nor did he remain responsible for the ticket [Johnson Affidavit ¶ 25].

47.     Because tickets were not assigned in his name, Gordon when he was the hardware manager did not have to make status entries.  Instead, those entries were made by the technician in whose name the ticket was assigned [Johnson Affidavit ¶ 26].

48.     While Gordon was the manager of the hardware unit, Help Desk tickets would be equally divided among the staff.  A ticket was electronically sent to the technician to do the actual work.  The tickets were assigned in the name of that technician [Johnson Affidavit

¶ 22].

49.  In his performance evaluation covering the period from May 1, 2007 to May 1, 2008 an
     objective for Gordon for the next reporting period included attending two classes
     regarding a Windows 2003 Server Infrastructure and an HP Blade System Administration
     course [Gordon Dep.Ex.1].

50.  As the hardware manager, Gordon would assign tickets to subordinate technicians.
     Normally, he did not make any entry into the Remedy System when he made the
     assignment.  Typically, the technician rather than Gordon would make entries into the
     Remedy System with respect to work performed on a ticket [Gordon Dep.33-34, 37-39].

51.  Gordon did not have to engage in the verification process required of Johnson to confirm
     that a Help Desk ticket had been completed, but rather just confirm in the Remedy
     System that the technician acknowledged that the ticket had been completed [Johnson
     Affidavit ¶ 31].

52.  While Gordon managed the hardware unit, Change tickets were entered in the Remedy
     System in the name of the technician assigned to perform the work.  On rare occasions a
     Change ticket would be issued in Gordon's name [Johnson Affidavit ¶ 28].

53.  Under the Remedy System, the Change request tickets assigned in Gordon's name
     between November 1, 2006 and December 31, 2008 totaled 41.  The total Task tickets
     assigned in the name of Ed Gordon during that time period was ten [Gordon Dep.Ex.4, 7,
     [Johnson Affidavit ¶ 52, Ex. K].

54.  A task is a part of work required in order to respond and complete a ticket.  It is a subset
     of a ticket [Gordon Dep.94-96].  The Task Remedy report for the time period between

November 1, 2006 and December 31, 2008 identifies a total of 75 task tickets assigned to Gordon.  This includes time both before and after Gordon was the hardware manager [Gordon Dep.97-98; Dep.Ex.5, [Johnson Affidavit ¶ 49, Ex.H and H1].

55.     During the time period between November 1, 2006 and December 31, 2008, the Help Desk Remedy Report identifies a total of 70 help desk tickets assigned to Gordon. This would include time both after Gordon left the hardware group.  Gordon acknowledges that during the time period he supervised the hardware group there were many more tickets than that assigned to it [Gordon Dep.104-107; Dep.Ex.6, Johnson Affidavit ¶ 47, Ex.F].

56.     While he worked as a help desk manager, Gordon was not assigned all tickets in his name and required to thereafter transfer it to subordinate staff [Gordon Dep.116-117].  While he was a hardware manager, Gordon was not required to verify completion of Help Desk tickets with the customer within one day of  closure.  He did not have to verify the completion of Help Desk tickets [Gordon Dep.118-120].

57.     Gordon was not required to provide a weekly status report for all Remedy Help Desk tickets that remained open for the hardware unit [Gordon Dep.122-123; Dep.Ex.8]. Gordon was not required to develop a detailed plan for each server that was on the low hard drive space report [Gordon Dep.128-129; Dep.Ex.8].

58.     Gordon was not required to prepare a weekly decommission list for servers [Gordon Dep.130-131; Dep.Ex.8].

59.     When Gordon was the hardware unit manager, he was allowed 30 days to assign a server decommission and another 30 days to complete the decommission.  Johnson was given 3

days by Nance to begin the decommission and 35 days thereafter to complete it [Johnson Affidavit ¶ 37].

60.   Gordon was not required to develop or implement any report or plan for upgrading remote office ILO servers [Gordon Dep.137; Dep.Ex.8].

61.   Gordon was not required to prepare a Wintel Management report concerning the status of all Remedy Help Desk Tasks and ESR tickets that remained open for the hardware unit [Gordon Dep.139; Dep.Ex.8].

62.   Gordon was not required to document all DES servers at remote locations when he was the hardware manager.  He believes that there were probably 70 remote office locations for DES [Gordon Dep.139-140; Dep.Ex.8].

63.   The total number of Help Desk tickets assigned in Gordon's name between November 1, 2008 and August 7, 2012 was 180.  No related tasks were assigned in Ed Gordon's name [Johnson Affidavit ¶ 46, Ex.E].

64.   The total number of Help Desk tickets assigned in Gordon's name between November 1, 2006 and December 31, 2008 was 70.   During the time period he was the hardware manager 57 of those tickets were assigned in his name. No related tasks were assigned in his name [Johnson Affidavit ¶ 47, Ex.F]

65.   The total number of Task tickets assigned in the name of Gordon between November 1, 2006 and August 7, 2012 was 125.  Between November 1, 2006 and December 31, 2008 a total of 75 task tickets were assigned in his name.  Only 28 of those tickets related to the hardware group.  [Johnson Affidavit ¶ 49, Ex.H, H1].

66.    The total number of Change and Related Task tickets assigned in the name of Gordon

between November 1, 2008 and August 7, 2012 was 47 change tickets and 12 related

Task tickets were assigned in his name [Johnson Affidavit ¶ 51, Ex.J].

67.     The total number of Change and Related Task tickets assigned in Gordon's name

between November 1, 2006 and December 31, 2008 was 41 Task tickets and 10 Related

Tasks assigned to his name.  Only 28 Change tickets and 6 Tasks related to the hardware

group  [Johnson Affidavit ¶ 52, Ex.K].

**Nance's supervision of Johnson in the Hardware Group**

68.     At the time Johnson was assigned to manage the hardware unit her work experience had

been as a manager or participant on software application teams.  She had no prior

hardware experience.  While working as a hardware manager, she made several requests

to Nance that she be allowed to attend technical training relating to hardware issues.

Each time her request for training was denied by Nance [Johnson Affidavit ¶15].

69.     Shortly after Johnson became the Hardware Group manager Nance removed her from her

office and relocated her to the work location where her technicians worked.  All other

unit managers had private offices.  Nance no longer allowed her to attend meetings that

she formerly attended as a unit manager [Johnson Affidavit ¶19].

70.     After he began supervising Johnson, Nance would send her emails on a near daily basis

asking numerous questions about work she had done.  The emails were so frequent that

she had difficulty responding to each before she received another.  Responding to his

emails took time away from performing the tasks required of her job.  Prior to that time,

neither Rademacher nor Warren would raise questions of the type Nance raised in his

emails.  After she became the hardware unit manager, Nance's practices in sending

Johnson these types of emails increased in frequency [Johnson Affidavit ¶ 20].

71.   After Johnson became hardware unit manager, Nance would frequently send her emails complaining that she did not meet the objectives he assigned to her.  Given the work duties assigned to her by Nance, it was impossible to meet his objectives.  Johnson attempted to explain that to him, but her concerns were ignored by him.  All of the criticisms she received from Nance came in the form of emails and generally were limited to a statement that a certain objective was not met without any detail being provided.  When Johnson questioned him about how she had failed to fulfill that objective he ignored her question and responded by repeating his statement that she had not met the objective [Johnson Affidavit ¶ 43, Ex.B].

72.   At no time did Rod Nance ever meet with Johnson to discuss performance issues.  There never was any oral agreement reached between Nance or any other person in Johnson's chain of command and Johnson relating to her meeting certain goals.  The goals established for her were created by Nance and placed in her performance appraisals.  These goals were his. Johnson was not given the opportunity to offer any input into them [Johnson Affidavit ¶ 44].

**Johnson's Termination and Grievance**

73.   In August of 2012 Johnson was terminated from her employment with CMS.  At that time, she had worked for over 3 ½ years as the hardware manager.  During that time period, Nance was the only individual who supervised her work and had day to day supervisory involvement with her.  Neither Rademacher nor Warren had any direct involvement with her when Johnson was the hardware unit manager [Johnson Affidavit ¶

54].

74.    At the time of her termination from employment with CMS, Johnson was a member of a
collective bargaining unit represented by the American Federation of State, County and
Municipal Employees ["AFSCME"].  Following her termination, she filed a timely
grievance through AFSCME claiming that her discharge was without good cause
[Johnson Affidavit ¶ 55].

75.    Because Johnson was offered a position at the Illinois Department of Public Health
["IDPH"] she was willing to resolve her grievance and give up any claims she had
against CMS relating to her termination if CMS would convert Johnson's termination to
a voluntary resignation and facilitate her securing the position at IDPH [Johnson
Affidavit ¶ 60].

76.    Johnson was scheduled to begin her new position with IDPH on November 1, 2012.
Approximately, a week before that date she was informed by IDPH that she could not
begin work for IDPH unless her employment situation at CMS was resolved.  Johnson
understood from IDPH that before she could begin employment with IDPH she needed to
resolve her employment status with CMS [Johnson Affidavit ¶ 61].

77.    After her conversations with IDPH, Johnson understood that in order for her to take the
position at IDPH she needed to clear her work record with CMS by having her
termination changed to a voluntary resignation [Johnson Affidavit ¶ 62].

78.    On October 31, 2012 Johnson and CMS entered into a "Resolution Prior To Arbitration."
By its terms, Johnson agreed to withdraw her grievance and to refrain from pursuing
against CMS any other grievance, administrative or judicial proceeding arising out of her

discharge.  She also agreed to not seek re-employment with CMS in the future.  In

exchange CMS agreed to:  a) allow Johnson to voluntarily resign her position of

employment with CMS on or before the close of business on October 31, 2012; b)

process Johnson's separation as a resignation; c) purge from Johnson's personnel file any

mention of her discharge; and d) consider the time period between August 7, 2012 and

October 31, 2012 as an unpaid leave of absence [[Johnson Affidavit ¶64, Ex.P].

79.    On October 31, 2012 Johnson signed the resolution because it cleared the way for her to

secure her position at IDPH.  If that document would not have enabled her to move on to

IDPH, she would never have signed it [Johnson Affidavit ¶ 64].

**Johnson's Efforts to secure Employment with the Illinois Department of Public Health**

80.    In late 2011 or early 2012 Johnson applied for a Senior Public Service Administrator

["SPSA"] position at IDPH [Johnson Affidavit ¶ 57].

81.    In 2012 Ginger Engle was employed by IDPH as its human resources manager [Engle

Dep.5, 8-9].

82.    According to Engle, the Chief of Staff of IDPH was authorized within IDPH to approve

Johnson's hiring [Engle Dep.10-11].

83.    Siobhan Johnson is the Deputy Director for the office of Human Resources at IDPH

[Siobhan Johnson Dep.5-6].

84.    Toni Colon, an IDPH deputy director, selected Johnson for the SPSA position.  She

secured approval for that decision from Stephen Konya, the IDPH Chief of Staff

[Siobhan Johnson Dep.14-15].  The Governor's Office of Management and Budget

["GOMB"] had to give final approval of the hiring [Siobhan Johnson Dep.16].

85.   Sometime in the early spring of 2012 Johnson was informed by IDPH that she had scored the highest in the Rutan interview process and IDPH was moving forward to securing hiring approval from the Governor's Office.  In October of 2012 Johnson was informed by IDPH that the Governor's Office had approved her hiring [Johnson Affidavit ¶ 58].

86.   Johnson, in receiving the SPSA position, would be given a promotion over her CMS position [Pl.Group Ex.1 at July 23, 2012 email chain].

87.   After Konya approved the hiring of Johnson IDPH checked with CMS about her [Engle Dep.18].

88.   In an October 19, 2012 email Engle informed IDPH officials that if it wanted to hire Johnson they must send to CMS an application for her reinstatement [Engle Dep.27, Pl.Group 1].

89.   Because the SPSA position at IDPH would represent a promotion over the PSA position Johnson held at CMS, she would not be eligible to accept that position if her work record reflected that she had been terminated from employment with CMS.  It was important, therefore, that Johnson's separation from CMS be considered a voluntary resignation rather than a termination [Johnson Affidavit ¶ 59].

90.   The only way Cheryl Johnson could receive a position at IDPH was as an existing state employee [Engle Dep.49].  Johnson had a promotional grade for an SPSA position. However, when she was discharged that grade was extinguished.  She had to be reinstated for the grade to return.  Only CMS could reinstate her [Engle Dep.49-50].

91.   On October 19, 2012 Engle informed Colon that Johnson, although being approved for the SPSA position, it was discovered that she had been discharged for cause on August 7,

2012.  She indicated that if IDPH decided to go ahead and attempt to hire Johnson her

application had to be sent to CMS to qualify her for reinstatement [Pl.Group Ex.1].

92.    On October 29, 2012 Colon informed Engle that she met with Johnson after discovering

that she had been terminated by CMS for cause and she remained approved by IDPH to

be hired.  Her scheduled starting date would be November 1, 2012.  Engle informed her

that because Johnson was being promoted she would have to work with CMS to qualify

her for reinstatement [Pl.Group Ex.1 at October 29, 2012 email chain].

93.    On October 29, 2012 at 3:40 p.m. Engle emailed Colon that she had to get Johnson

qualified for reinstatement by CMS [Engle Dep.35-36, Pl.Group 1].

94.    On October 30, 2012 Engle informed Colon that she had just received information from

CMS that Johnson would not be able to be reinstated because she had been discharged

[Pl.Group Ex.1 at October 30, 2012 email chain].

95.    On October 30, 2012 Engle sent an email to Colon indicating that CMS informed her

Johnson was not eligible to be reinstated because she had been discharged [Engle

Dep.39, Pl.Group 1].  Colon replied to Engle and Siobhan Johnson that Cheryl Johnson

would be working with her union president and would provide an update once she

received more information [Engle Dep.39-40, Pl.Group 1].

96.    On October 31, 2012 Konya indicated that he wished to proceed with hiring Johnson if

that could be accomplished [Pl.Group Ex.1 at October 31, 2012 email chain].

97.    On October 31, 2012 IDPH had decided to hire Johnson [Siobhan Johnson Dep.23]

98.    According to Colon, the starting point for reinstatement was to erase the discharge [Engle

Dep.40].

99.    On November 2, 2012 Engle informed Jason Boltz, the General Counsel of IDPH, that she had just received information from CMS that Johnson had been terminated effective August 7, 2012 for cause due to poor work performance [Pl.Group Ex.1 at November 2, 2012 email chain].

100.   On November 16, 2012 Engle sent to Boltz the disciplinary documents IDPH received concerning Johnson from CMS [Pl.Group Ex.1 at November 16, 2012 email chain].

101.   Johnson did not go to work for IDPH.  According to Engle, Colon and Konya wanted to hire her but CMS would not approve Johnson's reinstatement [Engle Dep.48].

102.   Johnson did not get the position because when her application was sent for qualification review, CMS disapproved it because she had been discharged for cause [Siobhan Johnson Dep.17-18].  That occurred after October 31, 2012 [Siobhan Johnson Dep.21, Group Ex.1].

103.   Siobhan Johnson believes Cheryl Johnson was not hired not because of her disciplinary history, but because CMS would not qualify her for reinstatement because she had been terminated for cause [Siobhan Johnson Dep.23-24, 29-30].

**Johnson's Efforts to Gain Employment with the Capital Development Board**

104.   Heather Humphrey served as the personnel administrator at the Capital Development Board ["CDB"] from July of 2011 until August 12, 2016.  She was involved in all personnel related issues including hiring [Humphrey Tr.5-7].

105.   The Information System Administrator at CDB heads its informational technology unit and supervises seven to ten employees [Humphrey Tr.7].

106.   In the summer of 2013 Johnson was a candidate for the position of Information System

Administrator at CDB [Humphrey Dep.8, Ex.2].  Johnson was on the short list of

candidates for the position [Humphrey Dep.Ex.2].

107.   Humphrey sent an email to Matthew Bilinsky of the Illinois Department of Revenue on

July 18, 2013 seeking information regarding Johnson's employment at CMS.  She saw

him often at labor meetings and consulted him for guidance when questions arose.  She

made the inquiry about ten days after her supervisor informed her that Johnson had been

terminated at CMS for poor performance.  She wanted additional verification of that fact

[Humphrey Tr.17-20, Ex.2].

108.   Bilinsky responded to Humphrey that Johnson had "resigned from CMS but that

indicated that for confidentiality reasons he would not share" if hypothetically she was

discharged and, they cut a deal with her allowing her to resign removing her discharge.

To Humphrey that was confirmation that what her supervisor learned was accurate

[Humphrey Tr.21, Ex.2].  She felt that Bilinsky's response was confirmation they should

not consider Johnson for the position [Humphrey Tr.21-22, Ex.2].

109.   Humphrey probably shared Bilinsky's information with her supervisor because she was

directed by him to send the email to Johnson informing her that she was no longer a

candidate for the position [Humphrey Tr.23, Ex.2].


### III.  STANDARDS WHICH ARE APPLICABLE
### IN A SUMMARY JUDGMENT PROCEEDING

Rule 56 of the *Federal Rules of Civil Procedure* provides that a motion for summary

judgment shall be granted only if the pleadings, depositions, answers to interrogatories and

admissions on file together with affidavits, if any, show that there is no genuine issue as to any

material fact and the moving party is entitled to judgment as a matter of law [*Celotex v. Catrett*, 477 U.S. 317, 91 L.Ed.2d 265 (1986)].

Summary judgment is only appropriate when the record reveals that no reasonable jury could find for the non-moving party [See *Karazanos v. Navistar International Transportation Corp.*, 948 F.2d 332 (7th Cir.1991); *Konowitz v. Schnadig Corporation*, 965 F.2d 230 (7th Cir. 1992); *Anderson v. Stauffer Chemical Company*, 965 F.2d 397 (7th Cir.1992); and *McCoy v. WGN Continental Broadcasting Company*, 957 F.2d 368 (7th Cir.1992)]. It is proper only if there is no reasonably contestable issue of fact which is potentially outcome determinative. Rule 56 was not intended to permit a summary judgment proceeding as a substitute for a trial [*Wallace v. SMC Pneumatics, Inc.*, 103 F.3d 1394, 1396-97 (7th Cir.1997)].

In a summary judgment proceeding the facts and inferences drawn from underlying facts must be viewed in a light most favorable to the party opposing the motion [See *United States v. Diebold, Inc.*, 369 U.S. 654, 8 L.Ed.2d 176, 82 S.Ct. 993 (1962); and *Matsushita Electric Industrial Company, Ltd., et.al. v. Zenith Radio Corporation*, *et.al.,* 475 U.S. 574, 89 L.Ed.2d 538, 106 S.Ct. 1348 (1986)].

In a summary judgment proceeding, it is not the court's function to weigh the evidence and determine the truth of the matter, but instead to determine whether there is a genuine issue for trial. A Court should not determine whether the evidence unmistakably favors one side or the other, but to instead determine whether a fair minded jury could return a verdict for the party opposing the motion on the basis of the evidence presented [See *Anderson v. Liberty Lobby, Inc.* (op.cit.1985); and *Shager v. Upjohn Company*, 913 F.2d. 398 (7th Cir. 1990)]. If evidence is subject to conflicting interpretations or if reasonable people might differ as to its significance

3:14-cv-03001-RM-TSH   # 59   Page 29 of 40

summary judgment must be denied [See *Egger v. Phillips*, 669 F.2d 497 (7th Cir. 1982); and *O'Connor v. Chicago Transit Authority*, 985 F.2d 1362 (7th Cir.1993)].

Summary judgment is only to be granted if the record before the court had it been the record of a complete trial would have entitled the defendant to a directed verdict [See *Sarsha v. Sears, Roebuck and Company*, 3 F.3d 1035 (7th Cir.1993); *Robinson v. PPG Industries, Inc.*, 23 F.3d 1159 (7th Cir. 1994); *CSX Transport, Inc. v. Chicago & North Western Transportation Company, Inc.*, 62 F.3d 185, 188 (7th Cir.1995); and *Illinois Conference of Teamsters v. Steve Gilbert Trucking*, 71 F.3d 1361 (7th Cir.1993)].

When the story line of the parties diverge, a court must give credence to the one advanced by the party opposing summary judgment because the evidence must be viewed in the light most favorable to her [*Ortiz v. Werner Enterprises, Inc.*, 834 F.3d 760 (7th Cir.2016)].

## IV.  ARGUMENT

### A)  The Resolution Should Not Bar Johnson's Claim.

On October 31, 2012 CMS, AFSCME and Johnson signed the Resolution. By its terms, Johnson agreed to not:  a) reapply for work at CMS; and b) pursue any "other grievance, administrative or other judicial proceedings" arising out of her discharge.  CMS agreed to:  a) allow Johnson to  "voluntarily resign" her position with it; b) process her separation as a resignation; c) purge from Johnson's personnel file any mention of her discharge; and d) consider the time between August 7, 2012 and October 31, 2012 as an unpaid leave of absence from Johnson [¶78, Ex.P of Johnson Statement].

It is undisputed that Johnson lived up to what was required of her under the Resolution. However, CMS failed to live up to its end of the bargain.  It failed to set aside Johnson's

Page 29 of  40

discharge and purge it from her personnel file.  As a result, she lost a job offer with IDPH.

Accordingly, CMS should not be allowed to take advantage of the release covenant in the

Resolution.[2]

The enforceability of a release within a settlement agreement is governed by Illinois law

[*Cannon v. Burge*, 752 F.3d 1079 (7th Cir.2014)].  Release agreements are construed and

enforced under principles of contract law [*Solar v. Weinberg*, 274 Ill. App.3d 726, 731, 653

N.E.2d 1363 (1st Dis.1995)].

When one party breaches an agreement, the other may be entitled to rescind it when the

breach or non performance is substantial.[3]  This occurs when the beach of a matter not

performed is of such a nature and importance that the agreement would not have been made

without it [*Solar* at 733, and *Trapkas v. Edstrom's Inc.*, 140 Ill.App.3d 720, 725 (3rd Dis.1986)].

A party may terminate a contract where the non performance by the other party defeats

the objects of the parties in making the agreement [*Wright v. Douglas Furniture Corp.*, 98 Ill.

App.2d 137, 143, 250 N.E.3d 259 (1st Dis.1968); and *Trapkas* at 726].

In October of 2012 Johnson was informed by IDPH that she had been approved to be

hired by it for a Senior Public Service Administrator ["SPSA"] position [¶¶80,84,85 of Johnson's

_____

[2] In its brief CMS mischaracterizes Johnson's position.  It asserts that Johnson claims she was coerced into signing the Resolution through a promise that she would receive the IDPH job.  According to it, because the Resolution makes no "promise" of employment at IDPH, her argument fails [p.19].  This is not Johnson's contention.  Instead, she asserts that if CMS had done what it had promised, she would have had the job.  It failed, however, to live up to its end of the bargain.

[3] Rescission of a contract refers to its cancellation so as to restore the parties to the status before the contract [*Newton v. Sitken*, 260 Ill.App.3d 717, 719, 633 N.E.2d 213 (2nd Dis.1994)].

Statement].  Even after becoming aware that Johnson had been fired, the officials at IDPH still wanted to move forward with her hiring [¶92 of Johnson Statement].

Bcause the SPSA position represented a promotion, Johnson, under state personnel rules, was not eligible for the position unless she was reinstated.  Only CMS could qualify her for reinstatement [¶90 of Johnson Statement].

Johnson entered into the Resolution because under its terms her termination would go away and the time between her leave of absence and October 31, 2012 would be converted to a leave of absence.  That would clear the way for her to go IDPH [¶78,79 of Johnson Statement].

After Johnson signed the Resolution, CMS did not do what it promised.  It neither:  1) converted her discharge to a voluntary resignation; 2) purged the discharge from her personnel file; nor 3) converted her time away from CMS as a leave of absence.

Instead, CMS:  a) on November 2, 2012 informed IDPH that Johnson had been discharged for cause; b) on November 16, 2012 sent IDPH disciplinary documents relating to Johnson's discharge; and c) failed to approve Johnson's reinstatement [¶99,100 of Johnson Statement].

According to IDPH officials, it wished to hire Johnson, but could not because CMS refused to approve her reinstatement.  This refusal on its part occurred after October 31, 2012 [¶101 of Johnson Statement].

Even well after October 31, 2012 CMS remained unfaithful to the spirit of the Resolution.

In the summer of 2012 Johnson was a candidate for a position at CDB.  Heather Humphrey, the CDB Personnel Administrator, contacted Matt Bilinski of the Illinois Department

of Revenue seeking information concerning Johnson.[4]  Effectively, Bilinski informed Humphrey that Johnson had been terminated from CMS for cause.  The information Bilinski provided her confirmed in her mind that Johnson should be excluded from consideration as a candidate for the CDB position [¶107,108 of Johnson Statement].

CMS blatantly ignored the obligations owing by it to Johnson under the terms of the Resolution.  It did not honor its obligation to remove evidence of Johnson's discharge, consider her resignation voluntary and place her in a leave of absence status.  If it had, she would have qualified for reinstatement and satisfied the eligibility requirements for the IDPH position.  Qualifying for that position was the only reason Johnson signed the Resolution.  It represented a material part of the Resolution and was essentially the only consideration Johnson received under the Resolution.

Because of the CMS non performance, the release provisions in the Resolution should not be enforced against Johnson.

### B)  Johnson Has Presented Sufficient Evidence of Improper Discriminatory Treatment To Entitle Her To A Trial.

#### 1)  Johnson's Burden of Proof.[5]

Summary judgment should not be granted where a genuine dispute exists with respect to

---

[4]  At that time, Bilinski worked in the Shared Services, a Division of the Department of Revenue.  That Division, pursuant to Executive Order 2006-06, provided personnel services for CMS as well as other agencies and was its personnel agent [See Attachment G].

[5]  Johnson's claim of racial discrimination is maintained under both the Act and the Equal Protection Clause of the Fourteenth Amendment to the Constitution [42 U.S.C. § 1983].  The requirement for proving discrimination under each theory are identical [*Swearingen-El v. Cook County Sheriff's Department*, 602 F.3d 852, 86 N.6 (7th Cir.2013); and *Cole v. Board of Trustees of Northern Illinois University*, 838 F.3d 888, 899 (7th Cir.2016)].

any issue of material fact.  Materiality is determined by the substantive law governing a particular claim.  In a summary judgment proceeding, a court must view the evidence presented through the prism of the proof burden imposed upon the litigants [See *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 91 L.Ed.2d 202, 106 S.Ct. 2505 (1985); and *Carson v. Allied News Company*, 529 F.2d 206 (7th Cir.1976)].

At trial, Johnson must prove that if everything else had been the same other than her race, she would not have been terminated by CMS [*Gehring v. Case Corp.*, 43 F. 3d 340, 344 (7th Cir. 1994)].  She does not have to prove that her race was the sole factor motivating CMS' action, but that it was a "determinative factor" [See *LaMontagne v. American Convenience Products, Inc.*, 750 F.2d 1405 (7th Cir.1984); *McNeil v. Economics Laboratory, Inc.*, 800 F.2d 111 (7th Cir. 1986); and *Brown v. M&M/Mars*, 883 F.2d 505 (7th Cir.1989)].

The critical question in this summary judgment proceeding is whether Johnson has sufficient evidence to permit a jury to infer that she was the victim of prohibited discrimination [*Perez v. Thortons, Inc.*, 731 F.3d 699, 703 (7th Cir.2013); and *Cole* at p.899].

Our Circuit has recently discarded the direct and indirect methods of proof in a disparate treatment case.  Instead, it now holds that a plaintiff can withstand summary judgment if a reasonable factfinder could conclude that her race caused the discharge.  In a summary judgment proceeding a court must consider the evidence (whether direct or circumstantial) as a whole rather than asking either:  a) whether any particular piece of evidence standing by itself proves the case; or b) whether just the direct evidence does so or the indirect evidence does.  Evidence is evidence whether direct or circumstantial [*Ortiz* at pp.765-766; *Cole* at p.899; and *Williams v. Office of the Chief Judge of Cook County, Illinois*, 839 F.3d 617, 626 (7th Cir. 2016)].

Johnson may prove her case using either direct or circumstantial evidence [see *Desert Palace, Inc. v. Costa*, 539 U.S. 90, 156 L.Ed.2d 84 (2003)]. She can avert summary judgment by either: a) putting forth enough evidence whether direct or circumstantial of discrimination to create a triable issue; or b) by presenting evidence sufficient under the *McDonnell Douglas* formulation to demonstrate a triable issue of disparate treatment [see *Sheehan v. Daily Racing Form, Inc.,* 104 F.3d 940 (7th Cir.1997); and *Rudin v. Lincolnland Community College,* 420 F.3d 712, 719 (7th Cir.2005)].

Johnson may rely upon either direct or circumstantial evidence [*Rudin* at p.720; and *Troupe v. May Department Stores*, 20 F.3d 734, 736 (7th Cir.1994)]. Direct evidence is evidence which, if believed by the trier of fact, would prove the particular fact in question without reliance upon inference or presumption [*Eiland v. Trinity Hospital*, 150 F.3d 747, 751 (7th Cir.1998); and *Rudin* at p. 720]. Circumstantial evidence on the other hand allows the trier of fact "to infer intentional discrimination by the decisionmaker" [*Rogers v. City of Chicago*, 320 F.3d 748, 753 (7th Cir. 2003)]. Circumstantial evidence of intentional discrimination includes evidence of behavior toward or comments directed at other employees in the protected group, evidence showing a difference in the treatment between the plaintiff and similarly situated employee not in the protected group and other bits and pieces of evidence from which an inference of discriminatory intent might be drawn [see *Troupe* at p.736].

Circumstantial evidence of discrimination sufficient to withstand summary judgment need not have a mosaic like character if there is enough evidence to infer a connection between protected status and the adverse employment decision. Johnson need only produce pieces of circumstantial evidence from which a reasonable jury could conclude that the protected status

was a cause for the employer's action [see *Sylvester v. SOS Children's Villages of Illinois, Inc.*, 453 F.3d 900, 904 (7th Cir. 2006); and *Teruggi v. The CIT Group/Capital Finance, Inc.,* 709 F.3d 654, 659 (7th Cir.2013)].

**2)  Johnson Has Fulfilled her Burden of Presenting Sufficient Circumstantial Evidence of Discrimination.**

For multiple reasons taken together, Johnson has presented enough evidence to enable a reasonable jury to infer that her status as an African-American female was a determinative factor leading to her termination.

First, while Johnson worked in the Bureau, it employed over fifty individuals that had a PSA classification.  The Bureau had only three African-Americans (including Johnson) who were PSAs or higher in the Bureau.  She was the only African-American female that was a manager [¶7 of Johnson Statement].

Second, initially while employed in the Bureau Johnson's chain of command was Warren and Rademacher.  Nance was essentially outside of that chain of command.  During that time, Johnson received a fully satisfactory performance review and received positive feedback from Warren and Rademacher concerning the work she did on projects assigned to her by each of them [¶6,8,10 of Johnson Statement].  Her performance issues did not begin until she went under Nance's supervision.

Third, the grounds giving rise to Johnson's discipline and eventual termination came from  Nance.  During that timeframe, it was Nance and Nance only who supervised her.  Neither Rademacher nor Warren had during that period any direct involvement in Johnson's supervision [¶73 of Johnson Statement].

Fourth, Nance almost immediately set Johnson up for failure.  This initially came by

pestering her with constant emails requesting information.  The time it took her to respond to

them took her away from her other duties [¶70 of Johnson Statement].  He then began directing

that work in the hardware unit to be done in a way which was:  a) different than what he had

required of Gordon, her predecessor; and b) imposed needless burdens on her time.  The nature

of what he was requiring was impossible for her to achieve [¶20-26,30-37,45-48,50-52, 56-62 of

Johnson Statement].

Fifth, Nance treated Johnson and Gordon in significant respects differently.[6]  The

difference in between how Nance treated Johnson compared to how he treated Gordon, her

predecessor, is highly significant.  A reasonable jury could conclude that each while serving as

the hardware manager were similarly situated.[7]

---

[6]CMS attempts to argue that Johnson's workload as compared to Gordon and other
Caucasian unit managers was significantly less than theirs through the attestation of Gary
Wasilewski [CMS Ex.15].  Through that document, CMS claims that Johnson had significantly
less work assigned to her than did they.  The flaw in this argument is that Wasilewski was asked
to pull data concerning requests for assistance assigned not to them, but instead the units they
managed.  The Remedy System Reports prepared by CMS [see ¶38-40,53-55,63-67 of Johnson's
Statement] identifies tickets not assigned to the groups they manage, but directly to Johnson and
Gordon themselves.

[7]Whether a comparator is similarly situated is "usually a question for the fact-finder"
[*Coleman v. Donahoe, 667 F.3d 835, 846-847 (7ᵗʰ Cir.2012); and Srail v. Village of Lisle*, 588
F.3d 940, 945 (7ᵗʰ Cir.2009)]. The "similarly situated inquiry" is flexible, common-sense, and
factual.  It asks "essentially, are there enough common features between the individuals to allow
a meaningful comparison?" [*Humphries v. CBocs West, Inc.*, 474 F.3d 387, 405 (7ᵗʰ Cir.2007),
aff'd 553 U.S. 442, 170 L.Ed.2d 864 (2008); and *Coleman* at 841].
        While employees are similarly situated if they had the same supervisor, were subject to
the same standard and engaged in similar conduct, the analysis is flexible and the results depend
on any relevant factor and common sense [*Majors v. General Electric Company*, 714 F.3d 527
(7ᵗʰ Cir.2013)].
        While the comparatives must be comparable to the plaintiff in all material respects, they
need not be identical.  The similarly situated requirement is satisfied "so long as the distinction
between the plaintiff and the proposed comparators are not 'so significant that they render the

Gordon and Johnson had the same job, reported to the same supervisor (Nance), and should have been subject to the same standards (in Johnson's case the standards imposed upon her by Nance were more burdensome than what he imposed upon Gordon).

The apparent reason CMS articulates for Johnson's termination was continuing poor job performance on her part. These deficiencies occurred during Nance's active watch as her supervisor. The performance deficiencies claimed by Nance was Johnson's failure to satisfy the job demands he imposed upon her.

If the demands he imposed upon her were more onerous or burdensome than what he imposed upon Gordon, the difference in treatment could allow a reasonable jury to conclude that a black female was treated under a more rigorous and demanding standard than was a white male and that the difference in treatment led to Johnson's termination.

A reasonable jury could also conclude that Nance treated Gordon in significant respects more favorably than he treated Johnson. In Johnson's Statement she at some length compares work assigned to her with duties Nance asisgned to Gordon. A reasonable jury could conclude that Johnson's duties as created by Nance were significantly more burdensome than those given to Gordon. It could also conclude that Nance was setting Johnson up for failure by giving her objectives that she could not reasonably meet.

Sixth, the reports generated by CMS through the Remedy System reflect that in numerous respects Nance assigned more work in the name of Johnson than he did for Gordon.

---

comparison effectively useless'" [*Coleman* at 840]. The inquiry "should not devolve into a mechanical, 'one-to-one mapping between employees'" [*Humphries* at 405; and *Coleman* at 847].

This difference in ticket assignments is dramatic.

For example:

| | Johnson | Gordon |
|---|---|---|
| November 1, 2008 - August 7, 2012<br>Help Desk Tickets | 2744 | 180 |
| November 1, 2008 to August 7, 2012<br>Task Tickets | 3727 | |
| November 1, 2006 to August 7, 2012<br>Task Tickets | | 125 |
| November 1, 2008 to August 7, 2012<br>Charge and<br>Related Task Tickets | 1245<br>2100 | |
| November 1, 2006 to December 31, 2008<br>Charge and Related Task Tickets | | 41 |

Seventh, Nance refused to provide Johnson with any training. Unlike her predecessor who was allowed to attend hardware training, Johnson's requests were refused. Because Johnson had no previous experience in working on hardware issues and Nance had approved her predecessor to attend training, a reasonable jury could wonder why Nance disallowed her requests [¶49,68 of Johnson Statement].

Finally, a reasonable jury could conclude that Nance had no interest in improving Johnson's performance, but was instead setting her up for failure. He made no reasonable effort to discuss with Johnson her shortcomings and how she could improve. Instead, he summarily told her that she failed to meet expectations that he imposed upon her [¶71,72 of Johnson Statement].

Presented with this evidence, a reasonable jury could conclude that Johnson would not

have been terminated by CMS if she had been a white male and everything else was the same.

## V.  CONCLUSION

Cheryl Johnson has presented sufficient reasons to enable a reasonable jury to find in her

favor.  For these reasons, she respectfully requests that the motion for summary judgment of

CMS be denied.

Cheryl L. Johnson


By: s/James P. Baker
One of Her Attorneys

James P. Baker
Baker, Baker & Krajewski, LLC
415 South Seventh Street
Springfield,  Illinois  62701
Telephone:  (217) 522-3445
Facsimile:  (217) 522-8234
E-mail:  jpb@bbklegal.com
(Memorandums/ johnsoncheryl msj opposition cm 062817)

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on June 30, 2017, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following:

Deborah Barnes
Senior Assistant Attorney General
Office of the Illinois Attorney General
500 South Second Street
Springfield,  Illinois   62701
Phone:  (217) 782-9026
Email:  dbarnes@atg.state.il.us

By:  s/ James P. Baker                        
        Baker, Baker & Krajewski, LLC