IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS
SPRINGFIELD DIVISION

CHERYL L. JOHNSON,            )
                             )
    Plaintiff,              )
                             )
 v.                          )            Case No. 14-3001
                             )
CENTRAL MANAGEMENT SERVICES, )
                             )
    Defendant.              )

## OPINION

RICHARD MILLS, United States District Judge:

This is an action pursuant to 42 U.S.C. § 1983 and Title VII of the Civil Rights Act, 42 U.S.C. § 2000e et al.

Pending is the Defendant's Motion for Summary Judgment.

Ruling: Motion denied.

## I.  INTRODUCTION

In November of 2006, Plaintiff Cheryl Johnson ("Johnson") began working for Defendant Illinois Department of Central Management Services ("CMS"). Johnson is an African-American female.

In 2008, Rod Nance ("Nance") began supervising Johnson. Johnson claims that is when her duties changed and her work performance was criticized. She was frequently disciplined and eventually terminated.

1

Johnson filed a charge of discrimination with the Equal Employment Opportunity Commission on October 12, 2012. She filed a pro se complaint in this cause on January 3, 2014.

Subsequently, counsel entered an appearance on Johnson's behalf. Johnson alleges CMS discriminated against her on the basis of race when it terminated her employment in August of 2012. She claims its conduct violated her rights under Title VII and the Fourteenth Amendment to the Constitution.

CMS alleges it is entitled to summary judgment on two grounds. First, Johnson voluntarily resigned as part of a settlement agreement in a labor dispute. Second, she has failed to produce evidence establishing a prima facie case of employment discrimination.

## II.    FACTUAL BACKGROUND

A. Johnson's position and background at CMS

CMS hired Johnson on November 1, 2006, as a manager of the Midrange WinTel Administration Group. Midrange WinTel is a hardware and software infrastructure that permits state employees to use various computers to perform the daily tasks their work requires. It permits them access to the Internet and to communicate via email, process data and use various other applications.

On or about July 20, 2012, CMS sought Johnson's discharge with a statement of charges based on "poor work performance." On October 31, 2012, Johnson

signed two documents—a "Resolution Prior to Arbitration," and a "Voluntary Withdrawal Request Form." The Voluntary Withdrawal Request Form stated that Johnson agreed to resign her position with CMS, to refrain from initiating or pursuing "any other grievance, administrative or other judicial proceedings, including state and federal lawsuits, arising out of the discharge or the circumstances that led to the filing of the instant charges," and to withdraw any other charges or lawsuits against CMS or CMS employees. At the time CMS sought Johnson's discharge, she was the Midrange WinTel hardware manager; as such, she was responsible for teams of subordinates who installed computer hardware for all the different state agencies.

Johnson reported to Rod Nance. She worked with Randy Anderson and Ed Gordon; all were classified as Public Service Administrator 3. Johnson, Anderson and Gordon all answered to Nance. Johnson claims that, during the last three years she worked for CMS, she was treated differently by Nance due to her race and gender. In support of its motion for summary judgment, CMS has attached copies of evaluations she received.

Johnson asserts that the disciplinary action that was taken against her occurred solely because she is a black woman. She claims the record shows she was treated differently than the white males with whom she worked. Johnson points to the following as evidence of different treatment: (1) She was required to do extra reports

that Anderson and Gordon were not required to do; (2) She was required to "sit in an office made out of bookshelves and they all had their own offices; (3) If team members that Anderson and Gordon supervised made mistakes; she was held accountable for those mistakes; and (4) She claims, "It just the way [sic] I was treated totally different, unfairly, and that's disparate terms."

Since July of 2014, Johnson has worked at the Department of Human Services as an information system specialist. Nance is employed by the Department of Innovation and Technology (DOIT). This unit was formerly part of CMS. Nance is a Manager, MidRange WinTel System Software Services. Nance has worked in various capacities with CMS since February 2, 2005. All of those positions involved information technology. In the position he currently holds Nance manages servers, operating systems, and system software that maintain the integrity of the information technology environment.

CMS is responsible for the operation of more than 3,000 servers throughout the State of Illinois. A server is a computer that provides data to other computers. Many types of servers exist, such as web servers, mail servers and file servers, and the State of Illinois uses all three types. Each server type runs software specific to the purpose of the server. Each state agency has a server specific to the needs of the agency.

Rod Nance worked with Cheryl Johnson—at least in part--from November 1, 2006 to the date that she left the office. Johnson was initially manager of the Midrange WinTel Administration Group, one of five groups responsible for administering information technology for State of Illinois' various agencies. The groups were Administration, Systems Software, Applications, the Planning Group and Hardware.

B. Johnson's performance and comparison to other managers

Ed Gordon and Randy Anderson were each managers of a Wintel Group, holding the same managerial positions as Johnson. As manager of the Midrange Wintel Administration Group, Johnson had seven employees under her supervision. These employees were responsible for assisting thousands of state employees on a daily basis with their requests for assistance with computer or software problems they might be having. They were also responsible for administering requirements of the technology environment, such as creating user accounts, creating groups and assigning access rights.

State employees who are having a particular difficulty, issue or malfunction with their computers, or the software they are using, request assistance by contacting the "Help Desk." The employees at the Help Desk decide which group is responsible for handling a particular issue, and they assign the issue to a group in the form of a "ticket" which is created by a program called "Remedy." "Remedy" was used to

keep track of which group and employee took which ticket and how the ticket was resolved.

Johnson's primary responsibility as manager of the Midrange Wintel Administration Group was to make sure the Administration Group ran smoothly. All managers of the Systems Software, Applications, Planning and Hardware groups, which included Johnson, were also required to resolve tickets.

The parties dispute whether Cheryl Johnson was counseled on several occasions about her performance and whether there were any oral agreements between upper management and Johnson to meet certain goals. According to Nance's affidavit, the counseling sessions resulted in oral agreements between upper management and Johnson to meet certain goals. Johnson alleges that she had no prior hardware experience when she was assigned to manage the Hardware Unit. During her employment with CMS, Johnson was required to take training. According to Johnson's affidavit, however, she made several requests to Nance that she be allowed to attend technical training related to hardware issues. Each request was denied.

The Hardware Unit was responsible for installing new hardware, new servers, and the various other physical components of CMS's information technology requirements. As manager, Johnson consistently had trouble meeting Nance's

requirements of this position and was counseled regarding expectations for her performance. It was determined that Johnson would do the following:

> (1) By 10 a.m. each Monday, provide WinTel management a written, weekly status report for all Remedy Help Desk tasks and tickets that remain open for the Hardware Unit. The report would contain a status report on any outstanding tickets more than 30 days old, and the reason(s) the ticket remained open;

> (2) Monitor the Monday morning low-hard-drive-space report. This refers to servers, which are the components that store information at a remote site; that is, a site other than directly on the user's computer. The State of Illinois maintained about 3,000 servers at that time;

> (3) Provide WinTel management with a weekly decommission list for servers. "Decommission" refers to taking servers out of service, and for security purposes, keeping a record of the activity and the inventory. Inventory was used to supply spare parts for addressing the needs of servers in service. The decommission list was to include the server name, model, serial number, the date the server was added to the decommission list, the date it was expected to be removed from service, the date it was actually removed from service, the date it was expected to be removed from the server rack (the area where decommissioned servers were deposited), and the date the server was picked up to be placed in the state's surplus inventory. This report was due every Wednesday at 9 a.m.

Rod Nance took notes beginning November 9, 2009 and ending on July 23, 2012. He kept the notes on his office computer and the entries were made at or near the time of the events reflected in the entries. The notes reflect Nance's observations of Johnson's consistent inability to perform the duties of her position. In 2011, Johnson consistently had a backlog of 200 to 300 tickets that had unaddressed issues. Johnson alleges this is because of Nance's requirement that tickets in the Hardware Group were assigned to her name regardless of who would work on them.

Four other individuals within the Department held the same position as Johnson, in that they were required to supervise a staff responsible for the activities of their unit. Leslie Domagalski (white female) was responsible for the Administration Group; Randy Anderson (white male) was responsible for the System Software Group; and Ed Gordon (white male) was responsible for the Applications Group; Nance was the fourth individual and was responsible for the Planning Group. Nance had worked with Anderson since November 1, 2006, with Gordon since February 5, 2007 and with Domagalski since December 1, 2009. CMS claims that none of those supervisors ever had the unacceptable level of performance of Johnson—though Johnson claims that is only to the extent each of them satisfied the work requirements established by Nance.

CMS alleges Johnson and her white male counterparts all had similar overall work objectives, as stated in Part IV of the standard evaluation form. However, Johnson asserts the objectives for Gordon while he supervised the Hardware Group were significantly different than those given Johnson by Nance.

CMS alleges Johnson had numerous additional objectives set out for her next reporting period in the evaluation for 2012 in order to address specific deficiencies in her performance. Neither Anderson nor Gordon had additional specific deficiencies that needed to be addressed because their performances were satisfactory. Johnson contends this is undisputed only to the extent Nance imposed

demands on her. Moreover, Johnson claims she had significantly more job responsibilities than Gordon.

CMS further asserts Johnson was required to prepare reports that Anderson and Gordon were not required to complete because Anderson and Gordon were performing their jobs satisfactorily. The goal of requiring Johnson to do reports was to show her more precisely what backlogged work needed to be completed. In an effort to assist Johnson to address the issues with respect to her ability to perform the requirements of the job, she was sent to numerous outside training sessions to provide additional education. After she had completed these training sessions, her performance did not improve. Johnson disputes these allegations and claims she had more job responsibilities. Johnson also claims she made several requests that she be allowed to attend technical training relating to hardware issues. However, these requests were denied.

CMS alleges that for more than three years, Johnson was unable to perform the requirements of her position and CMS ultimately sought her discharge. No white manager, nor any female manager whom Nance supervised during Johnson's tenure at CMS, had performance deficiencies as significant and numerous as Johnson's deficiencies. However, Johnson asserts Gordon was given less demanding work requirements than Johnson.

Neither Anderson nor Gordon had ever been suspended for poor work performance during the time Nance worked with them. Johnson has been suspended for work performance six times. Johnson claims the suspensions were because she could not satisfy Nance's demands.

CMS alleges Nance was in charge of supervising the work of the individual who was hired to take Johnson's place, Vicki Spencer, a white female. Spencer addressed the backlog of tickets within a few months.

C. Work evaluations and performance

In Part III of Johnson's November 2010 to November 2011 evaluation, "Remarks by Supervisor," the following is noted with respect to Johnson's performance deficiencies:

(1)     Requesting to withhold service increase for this period.

(2)     Has difficulty with the duties required of this position.

(3)     Next level manager has to monitor Remedy to ensure tickets are being assigned or worked on.

(4)     Requires continuous supervision by management to ensure assignments are being worked on.

(5)     Fails to follow up to ensure work assigned to staff in Remedy is successfully completed.

(6)     Does not maintain awareness of staff assignments, nor of possible

conflicts with other teams [sic] assignments.

(7)     Numerous attempts to help in day to day activities have been implemented.  Has been asked to track Help Desk Tickets, Servers that are low on hard drive space and Inventory, in an attempt to get the day to day activities of this position under control.  Has repeatedly provided incomplete, or failed to provide any data at all, concerning these requests.

(8)     Has difficulties setting priorities.

(9)     Has difficulty managing staff.  Next level manager must frequently intervene to insure morale is maintained, and tasks are properly prioritized.

(10)    Objective milestones have repeatedly been pushed back, requesting the same information, and still they have not been met.

(11)    Has difficulty managing staff schedules, and frequently is unaware of where staff is at, or where staff has been.

(12)    Does not respond to request from management for information, management has to ask again.

(13)    Closes tickets in remedy without proper verification or notification.

(14)    Misses stated deadlines for task closure.

(15)    Fails to provide accurate and correct paperwork for duties of this

position.

Johnson alleges Nance's "Remarks by Supervisor" were noted because she did not satisfy his demands directed to her. Randy Anderson did not have such deficiencies in his performance for the same period of time.

In Part III of Johnson's February 1, 2012 to May 1, 2012 evaluation, "Remarks by Supervisor," the following is noted with respect to Johnson's performance deficiencies:

(1) Progressive Discipline has been started. Administered 3 suspensions this reporting period.

(2) Requesting to withhold Service Increase for this period.

(3) Has difficulty with the duties required of this position.

(4) Next level manager has to monitor Remedy to ensure tickets are being assigned or worked on.

(5) Required continuous supervision by management to ensure assignments are being worked on.

(6) Fails to follow up to ensure work assigned to staff in Remedy is successfully completed.

(7) Does not maintain awareness of staff assignments, nor of possible conflicts with other teams [sic] assignments.

(8) Numerous attempts to help in day to day activities have been implemented.  Has been asked to track Help Desk Tickets, Servers that are low on hard drive space and Inventory, in an attempt to get the day to day activities of this position under control.  Has repeatedly provided incomplete, or failed to provide any data at all, concerning these requests.

(9)  Has difficulties setting priorities.

(10)   Has difficulty managing staff.   Next level manager must frequently intervene to insure morale is maintained, and tasks are properly prioritized.

(11)   Objective milestones have repeatedly been pushed back, requesting the same information, and still they have not been met.

(12)   Has difficulty managing staff schedules, and frequently is unaware of where staff is at, or where staff has been.

(13)   Does not respond to requests from management for information, management has to ask again.

(14)   Closes tickets in Remedy without proper verification or notification.

(15)   Misses stated deadlines for task closure.

(16)     Fails to provide accurate and correct paperwork for duties of this

position.

Ed Gordon met all of but one of his objectives in his evaluation for May 1, 2011 to May 1, 2012. The only deficiency noted in Gordon's evaluation was that he had not met his training objective due to scheduling issues. Cheryl Johnson met none of her objectives in the evaluation for February 1, 2012 to May 1, 2012. Johnson met none of her objectives in the evaluations for November 1, 2010 to November 1, 2011. Johnson contends that, given the work duties assigned to her by Rod Nance, it was impossible to meet his objectives. Moreover, Nance never met with Johnson to discuss performance issues.

Randy Anderson met all of his objectives in the evaluations for November 2010 to November 2011, and for November 2011 to November 2012. By September 29, 2011, Nance had recommended that Johnson not be given a wage increase due to her poor work performance. Johnson had the following disciplinary history with respect to this recommendation: (1) a 3-day suspension on 11/18/10; (2) a 7-day suspension on 4/18/11; (3) a 12-day suspension on 6/29/11; and (4) a 20-day suspension on 10/7/11. Johnson notes that Nance was the only individual who supervised her work and had daily interaction with her. Neither Anderson nor Gordon was suspended for poor work performance during the time Nance worked with them.

Nance evaluated Vicki Spencer and signed Spencer's evaluation of September 1, 2013 to September 1, 2014. She was given a satisfactory evaluation.

In response to a discovery request from Johnson, Gary Wasilewski of the Department of Innovation and Technology (DoIT) used Remedy software to prepare reports which reflect the number of requests for assistance to unit managers Cheryl Johnson, Randy Anderson and Ed Gordon from November 1, 2008 to August 7, 2012. CMS alleges the results of the report prepared based on the search request parameters show the following:

a. Between November 1, 2008 and August 7, 2012, requests for assistance involving "change" records were distributed among Johnson, Gordon and Anderson as follows:

    Johnson     1,612
    Gordon      9,156
    Anderson    18,938

b. Between November 1, 2008 and August 7, 2012, requests for assistance involving "task" records were distributed among Johnson, Gordon and Anderson as follows:

    Johnson     9,319
    Gordon      20,987
    Anderson    28,900

c. Between November 1, 2008 and August 7, 2012, requests for assistance involving "help desk" records were distributed among Johnson, Gordon and Anderson as follows:

| | |
|---|---|
| Johnson | 4,381 |
| Gordon | 14,404 |
| Anderson | 3,399 |

Johnson disputes the accuracy of these numbers and alleges any disparity is due to the amount of work assigned to each employee.

When Cheryl Johnson was hired, she was in her own office on the second floor of the building where she worked with Randy Anderson. Anderson and John Meneghetti shared an office next to Johnson's office.

CMS alleges that when Ed Gordon was hired, he shared an office with Johnson. Gordon eventually moved into the office with Anderson after Meneghetti left and Johnson had an office to herself again. Johnson disputes these allegations and claims that shortly after she became the Hardware Group manager, Nance removed her from her office and relocated her to the work location where her technicians worked. All other unit managers had private offices. Nance no longer allowed her to attend meetings that she formerly attended as a unit manager.

On several occasions, after Johnson had been asked about the whereabouts or activity of one of the staff members she supervised, she advised that she did not know because she sat on the other side of the building from them. CMS further

alleges that in response to Johnson's complaint that she had to walk over to the other side of the building to address her staff, an area was created as her office so she could sit near her staff. Any difference between Johnson's office and the offices in which other managers were located was due to making an accommodation so that Johnson would be closer to the staff she supervised.

CMS contends that no evidence was adduced during discovery that Johnson was not hired at any particular state agency because a decision-maker who sought her discharge at CMS prevented her hiring specifically to retaliate against Johnson for asserting her rights under employment law. Johnson disputes the assertions and claims she has presented ample evidence which points to retaliation.

CMS further alleges no evidence was adduced during discovery that a decision-maker who sought her discharge at CMS promised Johnson employment at the Illinois Department of Public Health if she resigned from CMS.

CMS alleges there are no material issues of fact and it is entitled to the entry of summary judgment. Johnson asserts that because of a number of factual disputes, the Court should deny CMS's motion.

### III. DISCUSSION

A. <u>Standard of review</u>

Summary judgment is appropriate if the motion is properly supported

and "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *See* Fed. R. Civ. P. 56(a). The Court construes all inferences in favor of the non-movant. *See Siliven v. Indiana Dept. of Child Services*, 635 F.3d 921, 925 (7th Cir. 2011). To create a genuine factual dispute, however, any such inference must be based on something more than "speculation or conjecture." *See Harper v. C.R. England, Inc.*, 687 F.3d 297, 306 (7th Cir. 2012) (citation omitted). Because summary judgment "is the put up or shut up moment in a lawsuit," a "hunch" about the opposing party's motives is not enough to withstand a properly supported motion. *See Springer v. Durflinger*, 518 F.3d 479, 484 (7th Cir. 2008). Ultimately, there must be enough evidence in favor of the non-movant to permit a jury to return a verdict in its favor. *See id.*

B. <u>Settlement agreement and release</u>

CMS first asserts Cheryl Johnson's claims are barred because she voluntarily resigned her position as part of a settlement agreement. A plaintiff may waive a claim under Title VII as part of a voluntary settlement, as long as her consent is knowing and voluntary. *See Wagner v. NutraSweet Co.*, 95 F.3d 527, 532 (7th Cir. 1996). "A release is simply a particular type of contract, and Illinois law governs questions regarding the parties' intent and the proper construction of the agreement." *Hampton v. Ford Motor Co.*, 561 F.3d 709, 714 (7th Cir. 2009). A court's task in interpreting a contract is to give effect to the intent of the parties.

*See id.* The Court does not disturb an unambiguous agreement. *See id.* A release which is clear and explicit must be enforced as written. *See id.* "[T]he party challenging the release must come forward with specific evidence sufficient to raise a question as to the validity of the release." *Id.* at 716 (internal quotation marks and citation omitted).

Johnson asserts the settlement agreement should not bar her claim. On October 31, 2012 Johnson, AFSCME and CMS signed the Resolution Prior to Arbitration. According to its terms, Johnson agreed to not: a) reapply for work at CMS; and b) pursue any "other grievance, administrative or other judicial proceedings" arising out of her discharge. CMS agreed to: a) allow Johnson to "voluntarily resign" her position with it; b) process her separation as a resignation; c) purge from Johnson's personnel file any mention of her discharge; and d) consider the time between August 7, 2012 and October 31, 2012 as an unpaid leave of absence from Johnson.

Johnson claims that although she lived up to her obligations under the Resolution, CMS failed to live up to its end of the bargain. CMS did not set aside Johnson's discharge and purge it from her personnel file. Johnson states that as a result, she lost a job offer with the Illinois Department of Public Health (IDPH). Therefore, Johnson contends that CMS should not be allowed to take advantage of the release covenant in the Resolution.

If one party to a settlement breaches the agreement, "the other party may be entitled to rescission and to be restored to his or her status before the agreement was reached." *Swiatek v. Azran*, 359 Ill. App.3d 500, 503 (1st Dist. 2005). However, not every breach entitles the other party to rescission. *See id*. Rescission may be available only if there has been "substantial nonperformance or breach by the other party." *Id*. This occurs if the matter "is of such a nature and importance that the agreement would not have been entered in to without it." *Id*.

Johnson alleges that in October of 2012, she was informed by IDPH that she had been approved to be hired by it for a Senior Public Service Administrator ("SPSA") position. Even after becoming aware that Johnson had been fired, the officials at IDPH still wanted to move forward with her hiring. Because the SPSA position represented a promotion, Johnson notes that under state personnel rules, she was not eligible for the position unless she was reinstated. Only CMS could qualify her for reinstatement.

Johnson claims that she entered into the Resolution because under its terms her termination would go away and the time between her leave of absence and October 31, 2012 would be converted to a leave of absence. This would enable Johnson to go to IDPH.

After Johnson signed the resolution, CMS did not do what it had promised. CMS neither: 1) converted her discharge to a voluntary resignation; 2) purged the

discharge from her personnel file; nor 3) converted her time away from CMS as a leave of absence.

CMS instead did the following: 1) on November 2, 2012 informed IDPH that Johnson had been discharged for cause; 2) on November 16, 2012 sent IDPH disciplinary documents relating to Johnson's discharge; and 3) failed to approve Johnson's reinstatement.

According to IDPH officials, it wished to hire Johnson but was not authorized because CMS refused to her approve her reinstatement. This refusal on its part occurred after October 31, 2012.

Johnson further asserts that, even well after October 31, 2012, CMS remained unfaithful to the spirit of the agreement. In the summer of 2013, Johnson was a candidate for a position at the Capital Development Board ("CDB"). Heather Humphrey, the CDB Personnel Administrator, was told that Johnson had been terminated from CMS for cause. Humphrey was unable to get any further information and determined that Johnson should not be a candidate for the position.

The Court concludes Johnson has presented evidence which tends to show that CMS did not adhere to its obligations under the terms of the Resolution. Johnson has produced evidence showing that CMS did not honor its obligation to remove evidence of Johnson's discharge, consider her resignation voluntary and

place her in a leave of absence status. Johnson would have qualified for reinstatement and satisfied the eligibility requirements for the IDPH position if CMS had adhered to its obligations. Johnson claims that qualifying for that position was the only reason she signed the Resolution. Undoubtedly, that was a material part of the Resolution.

CMS did not file a Reply brief and thus has presented no evidence in opposition to Johnson's assertions regarding the Resolution.

The Court finds that one party should not be bound by its promises according to the Resolution if the other party did not adhere to its obligations. Upon considering the evidence relating to CMS's non-performance, the Court concludes that the release provisions of the Resolution should not be enforced against Johnson.

C. Discrimination claims

Cheryl Johnson is asserting discrimination claims based on race and gender under Title VII and the Equal Protection Clause of the United States Constitution, pursuant to § 1983. The requirements for proving discrimination under each theory are identical. *See Cole v. Board of Trustees of Northern Illinois University*, 838 F.3d 888, 899 (7th Cir. 2016).

Since *Ortiz v. Werner Enterprises, Inc.*, 834 F.3d 760 (7th Cir. 2016), courts considering discrimination claims no longer separate direct and indirect evidence

and subject them to different legal standards. *See David v. Board of Trustees of Community College District No. 508*, 846 F.3d 216, 224 (7th Cir. 2017). "[T]he test is simply whether the evidence would permit a reasonable factfinder to conclude that the plaintiff's race, ethnicity, sex, religion, or other proscribed factor caused the discharge or other adverse employment action." *Id*. (internal quotation marks omitted). Under that test, the familiar *McDonnell Douglas* burden framework remains one way, but not the only way, to consider circumstantial evidence of discrimination. *See id.* The key question in considering a summary judgment motion is whether "the non-moving party produced sufficient evidence to support a jury verdict of intentional discrimination." *Id*.

CMS contends it is entitled to summary judgment because Cheryl Johnson was not meeting her employer's performance expectations. Additionally, she was not treated less favorably from any similarly situated employees outside the protected class. Johnson alleges she has produced sufficient circumstantial evidence of discrimination to enable a reasonable jury to infer that her status as an African-American female was a determinative factor leading to her termination.

CMS claims that, at the request of his own supervisor, Rod Nance took nearly daily notes on Johnson's work performance from November of 2009 to July 23, 2012. Nance observed that Johnson failed to meet objectives set out for her performance: she failed to keep track of information on servers that were being

decommissioned; she was not properly documenting servers when they were moved or decommissioned; and she consistently had a backlog of 200 to 300 tickets that had unaddressed issues. A counseling session in 2009 where Johnson was provided with written objectives did not improve Johnson's performance. CMS contends that Johnson's performance evaluations show that she was never meeting her employer's expectations. Moreover, Johnson's own opinions of her performance are not enough to withstand summary judgment.

CMS asserts that because Johnson was not meeting her employer's expectations and has no evidence that her job evaluations were phony cover-ups for discrimination, she has not produced evidence of discrimination and CMS is entitled to summary judgment.

Cheryl Johnson notes first that during her tenure, CMS employed over 50 individuals who had a PSA classification. There were only three African-Americans, including Johnson, who were PSAs or higher. She was the only African-American female that was a manager.

Johnson states that when she first started working at CMS, she reported to Don Warren, the Director of the Data Center, even though Rod Nance was designated on paper as her supervisor. Johnson's 2006-2007 performance evaluation was conducted by Warren. She received a fully satisfactory performance evaluation. Her performance issues did not begin until Nance began

supervising her.  Johnson claims that once Nance began supervising her, neither Kevin Rademacher nor Warren had any direct involvement in her supervision.

Johnson further contends that Nance set her up for failure.  Initially, he sent constant emails requesting information.  This resulted in Johnson having to spend time on other duties.  Additionally, Nance began directing that work in the hardware unit be done in a way which was: 1) different than what he had required of Gordon, her predecessor; and 2) imposed needless burdens on her time.

Additionally, Johnson alleges Nance treated her differently than Gordon in important respects.  Johnson asserts CMS's claim that her workload was significantly less than Gordon and other Caucasian unit managers is flawed. Gordon and Johnson had the same job and reported to the same supervisor. Consequently, they should have been subject to the same standards.  Johnson claims Nance subjected her to more burdensome standards than those imposed upon Gordon.

CMS's proffered reason for her termination was continuing poor job performance on Johnson's part.  As Johnson's supervisor, Nance cited performance deficiencies based on the job demands he imposed.  Johnson contends that if, as she alleges, the job demands were more onerous or burdensome than what he imposed upon Gordon, then a reasonable jury could conclude that an

African-American female had to meet a more rigorous and demanding standard than a white male and that difference led to her termination.

Johnson further alleges that a reasonable jury could conclude that Nance treated Gordon in significant respects more favorably than he treated Johnson. Because of Johnson's more onerous work duties, a jury could find that Nance was setting her up for failure by giving her objectives that she could not reasonably meet.

Additionally, Johnson alleges the reports generated by CMS through the Remedy System reflect that in numerous respects, Nance assigned more work to her than he did to Gordon. Johnson points to the difference in ticket assignments as an example: 1) between November 1, 2008 and August 7, 2012, the total number of Help Desk tickets assigned in the name of Johnson was 2744 and the total number of related tasks assigned in her name was 1846; between November 1, 2006 and August 7, 2012, 250 Help Desk tickets were assigned Gordon's name and no related tasks were assigned in his name; 2) between November 1, 2008 and August 7, 2012, the total number of Task tickets assigned in the name of Johnson was 3,727; between November 1, 2006 and August 7, 2012, the total number of Task tickets assigned in Gordon's name was 125; 3) between November 1, 2008 and August 7, 2012, the total number of Change and Related Task tickets assigned in Johnson's name was 1245 Change Tickets and 2100 Related Task tickets;

between November 1, 2006 and December 31, 2008, the number of Change Tickets assigned in Gordon's name was 41 while the number of Related Tasks was 10—only 28 Change Tickets and 6 Tasks related to the hardware group.

Johnson next contends that Nance refused to provide her with any training. While her predecessor was allowed to attend hardware training, Johnson's requests were denied. Because Johnson had no previous experience in working on hardware issues and her predecessor was permitted to attend training, Johnson claims that a reasonable jury could find that Nance treated the two differently.

Additionally, Johnson alleges a reasonable jury could find that Nance had no interest in improving Johnson's performance but was instead setting her up for failure. He did not discuss Johnson's shortcomings with her or tell her how she could improve. Instead, he simply told her that she failed to meet expectations.

For all of these reasons, Johnson claims that a reasonable jury could find that Johnson would not have been terminated by CMS if she were a white male and everything else was the same.

Upon reviewing the record, the Court concludes that genuine factual disputes preclude the entry of summary judgment. CMS notes that an employee's perception of her own performance is insufficient to defeat summary judgment. "[S]elf-serving statements contained in an affidavit will not defeat a motion for summary judgment for summary judgment *when those statements are without*

*factual support in the record*."  *Buie v. Quad/Graphics, Inc.*, 366 F.3d 496, 504 (7th Cir. 2004).

Although many of Johnson's allegations are supported only by her own affidavit, there is some additional evidence which supports her position.  CMS contends that Johnson consistently had a significant backlog.  Moreover, the number of requests for assistance involving the different types of records show that Gordon and Anderson handled more work.  However, Johnson has presented evidence of reports generated by CMS through the Remedy System which, she contends, show that Nance assigned more work in her name than he did for Gordon.  A jury could find that to be circumstantial evidence of discrimination, if it determined she was held to a different standard than a Caucasian male.

Additionally, although CMS alleges Johnson was sent to numerous outside training sessions to provide additional education and her performance never improved, Johnson claims she was never afforded the training she most needed. Johnson had no prior hardware experience when she was assigned to manage the Hardware Unit.  She alleges she made several requests to Nance that she be allowed to attend training related to hardware issues and each request was denied. If a jury found such testimony to be credible, it might agree with Johnson's allegation that she was set up to fail.

## IV.    CONCLUSION

The Court earlier found that, because there are questions regarding whether CMS adhered to the terms of the Resolution, Cheryl Johnson should not be barred from pursuing claims arising out of her discharge.

CMS has proffered a number of reasons which, if believed, would constitute legitimate, non-discriminatory reasons for the employment decision.  However, Johnson has created a factual dispute regarding whether she was held to different standards and whether she was denied appropriate training.  The Court concludes that Johnson has produced just enough evidence that, if believed, could support a jury verdict of intentional discrimination.

<u>Ergo</u>, the Defendant's Motion for Summary Judgment [d/e 56] is DENIED.

The final pretrial conference remains scheduled for April 12, 2018 at 2:00 p.m.

ENTER: March 19, 2018

FOR THE COURT:

 /s/ *Richard Mills*
Richard Mills
United States District Judge