1           IN THE UNITED STATES DISTRICT COURT
       FOR THE CENTRAL DISTRICT OF ILLINOIS
2              SPRINGFIELD DIVISION

3

CHERYL L. JOHNSON,              )
4                               )
             PLAINTIFF,         )  14-CV-3001
5                               )
        VS.                     )  JURY SELECTION
6                               )
THE ILLINOIS DEPARTMENT OF      )  SPRINGFIELD, ILLINOIS
7  CENTRAL MANAGEMENT           )
   SERVICES,                    )  VOL. 1-B
8                               )
             DEFENDANT.         )
9

10          TRANSCRIPT OF PROCEEDINGS
       BEFORE THE HONORABLE RICHARD MILLS
11        UNITED STATES DISTRICT JUDGE

12  AUGUST 27, 2018

13  A P P E A R A N C E S:

14  FOR THE PLAINTIFF:          JAMES P. BAKER
                                BAKER, BAKER & KRAJEWSKI
15                              415 SOUTH SEVENTH STREET
                                SPRINGFIELD, ILLINOIS
16

17  FOR THE DEFENDANT:          DEBORAH BARNES
                                JOSEPH OKON
18                              ILLINOIS ATTORNEY GENERAL
                                500 SOUTH SECOND STREET
19                              SPRINGFIELD, ILLINOIS

20

21

22

COURT REPORTER:         KATHY J. SULLIVAN, CSR, RPR, CRR
23                      OFFICIAL COURT REPORTER
                        U.S. DISTRICT COURT
24                      600 E. MONROE
                        SPRINGFIELD, ILLINOIS
25                      (217)492-4810

```
 1                        I N D E X

 2   WITNESS              DIRECT   CROSS   REDIRECT   RECROSS

 3   DONALD WARREN        112      138     150
     EDWARD L. GORDON     153      185     199        206
 4

 5

 6

 7

 8

 9                      E X H I B I T S

10
     PLAINTIFF'S EXHIBIT
11   NUMBER                    IDENTIFIED   ADMITTED

12   EXHIBIT 2                 130          137
     EXHIBIT 26               125          152
13

14

15

16

17   DEFENDANT'S EXHIBIT
     NUMBER                    IDENTIFIED   ADMITTED
18

19

20

21

22

23

24

25
```

1               P R O C E E D I N G S

2        *    *    *    *    *    *    *    *    *    *    *

3           THE COURT:  Thank you, Madam Clerk.  Thank

4    you everyone.  Right on the money at 1:30.

5        How are we all, ready to proceed?  Good.

6        All right.  Before we ask the jury to come into

7    the courtroom, I think that we have a question about

8    an exhibit that needs to be resolved.

9           MS. BARNES:  Yes, Your Honor.

10          THE COURT:  So should we proceed to that

11   right away?

12          MS. BARNES:  Yes, Your Honor.

13          THE COURT:  Okay.  Good.

14          MS. BARNES:  Your Honor, Plaintiff's

15   Exhibit 16 --

16          THE COURT:  Okay.

17          MS. BARNES:  -- is part of a set of notes

18   that the plaintiff's supervisor took over the course

19   of several years.

20          THE COURT:  Uh-huh.

21          MS. BARNES:  And I believe that a notation,

22   and it's the single piece of paper that is offered

23   in Exhibit 16, made on April 29, 2010, is being

24   offered for reasons that have nothing to do with the

25   probative issues in this case, but only to inflame

1    the jury.

2        And I would like for the Court to take a look

3    at it and hear my argument on why it is not relevant

4    and should not be admitted.

5            THE COURT:  I will certainly like to see

6    the exhibit if you have it.

7            MS. BARNES:  I do.

8            THE COURT:  Do you have one already?

9            THE CLERK:  Yes.

10           THE COURT:  All right.  This is one of the

11   volumes.  Exhibit 16.

12       Okay, 16.  I have it in front of me.  Proceed.

13           MS. BARNES:  If you look at the notation at

14   April 29, 2010, it is some description by her

15   supervisor, Mr. Nance, on that date, related to

16   office hygiene and office attire.

17       The issues in this case are whether the grounds

18   for discharge were discriminatory based on an

19   unlawful motive.  The plaintiff claims that this is

20   evidence of a discriminatory motive.  I think it has

21   nothing to do with the issues in this case.  She was

22   never disciplined for office hygiene or office

23   attire.  It appeared nowhere in any of her

24   evaluations.  And I believe it is being offered to

25   inflame the jury about the -- what Rod Nance is

1    like.  And I think it's objectionable and not

2    relevant.

3           THE COURT:  Now, are you referring to only

4    the paragraph noted as 4/29/10?

5           MS. BARNES:  Yes, Your Honor.

6           THE COURT:  So your argument is limited

7    only to that one paragraph; is that right?

8           MS. BARNES:  Yes.

9           THE COURT:  Okay.  Thank you.  Let me

10   finish reading it.

11       All right.  Thank you, Ms. Barnes.

12       All right.  Mr. Baker, you may respond.

13          MR. BAKER:  Thank you, Your Honor.

14       The exhibit that Ms. Barnes refers to is a page

15   or two out of notes taken by Ms. Johnson's

16   supervisor over an extended period of time.

17       And the page that Ms. Barnes objects to is a

18   page in the Defendant's Exhibit 39.  I'll be glad

19   not to offer that exhibit or even refer to it as

20   part of our direct case.  However, if Exhibit 39

21   comes in, I believe I have a right to question Mr.

22   Nance, the author, concerning various entries in

23   that document including the one on April 29, 2010.

24       And I think it has relevance in two respects.

25   The first goes to Mr. Nance's credibility about the

1    contentions he made about Ms. Johnson.  And this is

2    one example of a contention that we believe is

3    false, and Ms. Johnson wants to testify to it's

4    falsity.

5        Secondly, I think a reasoned person could view

6    this as a stereotypical assessment made by a

7    Caucasian of an African-American female.  And I'm

8    not suggesting that that document, standing by

9    itself, is evidence of discrimination, but I think

10   it's one of many pieces that will be offered in this

11   trial.  Therefore, we believe it's relevant.

12       THE COURT:  Well, now, let me ask this

13   then:  Why don't I have an objection by Ms. Barnes

14   to many other paragraphs of the various exhibits?

15       MR. BAKER:  I cannot answer that question.

16       THE COURT:  Ms. Barnes, are there any

17   others that --

18       MS. BARNES:  Well, I -- it is my

19   observation that if there were any others like this,

20   they -- it would be included in Plaintiff's

21   Exhibit 16.  And so my thought is that this is the

22   only entry out of a series of entries over three

23   years that they're hauling out to suggest that Rod

24   Nance harbored a discriminatory animus toward

25   Ms. Johnson.

1    And I think the substance of it has nothing to

2  do with any issue in this case, certainly.  But if

3  Mr. Baker is suggesting that he gets to -- if we

4  enter into evidence all of Rod Nance's notes, he

5  gets to cross-examine on this particular entry, I

6  still think it's objectionable because it has

7  nothing to do with why she was discharged.

8    It's not anywhere in any of her evaluations.

9  She was not discharged for poor office attire or

10  poor office hygiene, she was discharged for

11  performance.  And it seems to me that any supervisor

12  anywhere in any office environment has a legitimate

13  reason to make observations about a subordinate's

14  office -- proper office attire and office hygiene.

15    So to suggest that this isolated note somehow

16  reflects racial or gender animus I think is

17  misplaced and serves only to inflame the jury.

18        THE COURT:  Well, your last comment may

19  indeed be right, but if this is a legitimate

20  reflection of the record, and the record is

21  relevant, and you are arguing that it is not

22  relevant, I understand.

23    Now, we have -- we have two alternatives here.

24  Well, we have three, actually.  We can either admit

25  it or refuse, or we can redact that one paragraph

1    within the exhibit.

2        Now, Mr. Baker, tell me how this particular

3    issue or this exhibit is relevant to the main

4    purpose of our inquiry?

5            MR. BAKER:  The ultimate issue in this case

6    is whether Mr. Nance would have evaluated Cheryl

7    Johnson the same way as if she were a Caucasian.

8        Now, I can go through a lot of entries in the

9    defendant's exhibits, very lengthy, a lot of them.

10   The significance of this one entry is that it shows

11   a state of mind on the part of Mr. Nance.  He's the

12   one that made the entry.  He can explain away that

13   it had nothing to do with the decision to terminate

14   her, if he's capable of doing that, but I don't

15   think you can cherry-pick what the defendant wants

16   to offer into evidence.  If it's going to offer an

17   exhibit into evidence, the entire exhibit should

18   come in.

19       And this exhibit, apparently, the defendant

20   believes is relevant because it's Mr. Nance's

21   assessment of Ms. Johnson over an extended period of

22   time and one of those areas of assessment are his

23   comments about her hygiene.  And I think a

24   reasonable person could associate that concern with

25   her race.

1          THE COURT:  Okay.  Ms. Barnes, you may have
2     the last bite at the apple.
3          MS. BARNES:  I think to suggest that a
4     supervisor who has concerns about a subordinate's
5     office dress and hygiene is somehow biased against
6     her because of her race is nonsense.
7          There are -- I mean Don Warren would testify
8     that he had a white male he had to discipline based
9     on his office hygiene.  It has nothing to do with
10     her race, and I think it's offensive to suggest
11     that.  But that's what he wants the jury to
12     conclude; that it had something to do with her race.
13     Or her gender, I suppose.
14          And if the Court wants to reserve ruling based
15     on whether we even offer this entire set of notes
16     into evidence, we could wait.  Maybe the defendants
17     won't offer it into evidence.
18          THE COURT:  No, no, I don't like that.
19     Once we get this trial going, I want it to go
20     smoothly and I want it to go consistently and
21     constantly.  I don't want to be sitting around
22     having to wait and then all of the sudden know that
23     we're going to have to take a long break and let the
24     jury sit in there on their hindquarters and wonder
25     what's going on.  I don't like that.  I want to get

1    these things resolved in the beginning and then move

2    on, right or wrong.

3        Well, Ms. Barnes, I can quite understand your

4    concern, both qualitatively and quantitatively.  And

5    as far as the procedure of the Court and the case is

6    concerned, and you want it to go smoothly and I do

7    too.

8        On the other hand, I understand Mr. Baker's

9    position, and I think it probably weighs a little

10   more heavily than yours.

11       Now, this -- this may be cherry-picking, I

12   don't know, but a prime witness for the state here,

13   for the defendant, has indeed made a statement and

14   it is made in an exhibit to which there are no other

15   objections.  And he may very well be able to explain

16   it.  If it comes up.

17       So I think that we're going to leave it in.

18   And I'm going to deny your motion.  But if you come

19   up with any more authority or any other argument

20   that may be pertinent to this one single issue, I'll

21   give you that opportunity to make the motion again

22   and we will re-visit this issue.

23       But as it stands now, it seems to me that

24   whatever your administrator wrote down in these

25   minutes are all relevant to the general aspect of

1   her employment.  Now, some of it is irrelevant to

2   that issue and some is questionable perhaps.  But

3   most of it, since it has been admitted, I think, is

4   going to be permitted to be shown to the jury.

5       Okay.

6           MS. BARNES:  Thank you.

7           THE COURT:  Thank you.

8           MR. BAKER:  Thank you, Your Honor.

9           THE COURT:  Thank you, counsel.

10      All right.  Counsel, we're all ready to

11  proceed?  And let me see, before we have the jury --

12  the jury has already met you all.  But a couple of

13  you might be new to me, since Judge Schanzle-Haskins

14  picked the jury.

15      Now, Ms. Barnes, you are, of course, here for

16  CMS.  And you also have with you co-counsel Joseph

17  E. Okon is it?

18          MR. OKON:  Okon, Your Honor.

19          THE COURT:  Okon.  Nice to have you here

20  for the first time.  And you're with the AG also?

21          MR. OKON:  That's correct.

22          THE COURT:  Excellent.  Excellent.  All

23  right.

24      And who else, Ms. Barnes, do you have at

25  counsel table?

1          MS. BARNES:  Don Warren is to my right.  He

2     is the supervisor of the supervisors.  He represents

3     CMS.

4          THE COURT:  We like to have the head chef.

5     Very good.

6          MS. BARNES:  And Kelsey Wang is our

7     paralegal.

8          THE COURT:  Kelsey, nice to have you.

9     Indeed so.

10       Now, over to the plaintiff's table.  Mr. Baker,

11    you have someone with you?

12         MR. BAKER:  To my right is Cheryl Johnson.

13         THE COURT:  How do you do?

14         THE PLAINTIFF:  Thank you.  Very well.  How

15    about yourself?

16         MR. BAKER:  And to my left is Karen

17    Mansfield, who I think you've met before.

18         THE COURT:  Yes.  Nice to have you.

19       All right.  HAS everyone else been introduced

20    to the jury?

21         THE CLERK:  Yes, Your Honor.

22         THE COURT:  Excellent.  Thank you very

23    much.

24       All right.  Are we ready for the jury to come

25    in?

```
 1              MR. BAKER:  Yes.

 2              THE COURT:  Marshall.  If you would be good

 3      enough to open the door.

 4          (The jury entered the courtroom.)

 5              THE COURT:  Okay.  The next four will be on

 6      the front row.  Excellent.

 7          Fine.  Thank you very much.  Please be seated,

 8      everyone.

 9          Well, ladies and gentlemen, welcome.  We're

10      delighted to have you.  And I, first of all, wish to

11      extend my personal gratitude to Judge

12      Schanzle-Haskins for handling the selection of this

13      jury.  And we welcome all you to Courtroom Number 2

14      as we proceed this afternoon in actual trial of

15      Johnson versus Illinois Department of Central

16      Management Services.

17          You have already, ladies and gentlemen, met and

18      been introduced to the players in this case who have

19      taken their seats at respective tables in the

20      courtroom.  And so everyone is acquainted with

21      everyone else.  And now you're acquainted with me.

22      So it's a pleasure to have you here, and thank you

23      so much for your service.

24          Each one of you are in a particular seat

25      according to a chart that I have in front of me.  So
```

1  it is essential that you each take that same seat

2  throughout the course of the trial.  I would

3  appreciate it very much.  And it also assists Madam

4  Clerk in making the connections and making sure we

5  have all the players in the right spot.

6       Very well.  You all were told what this case is

7  about.  And you were inquired as to your back

8  grounds.  And with that all in mind, we're ready to

9  proceed now with the actual trial in this case.

10       Everyone is in place and we are ready to

11  proceed.  So consequently, we will begin with the

12  first matter on any trial agenda and that is the

13  open statements of counsel.  They will tell you what

14  they believe the evidence is going to show on both

15  sides.  That is for the plaintiff and for the

16  defendant.

17       So I ask you to listen carefully to their

18  opening statements which will give you a preview,

19  really, of what this case is all about.  Now, you

20  have some little idea because it was necessary

21  during the voir dire, that is to speak the right,

22  and your examination at the time of your selection.

23  You knew something about the case just to make sure

24  that everybody was familiar enough to answer the

25  questions on the voir dire.  But now we will go into

1    detail and give you a better and bigger view of what

2    is to come.

3         All right.  Are we ready to proceed?

4              MR. BAKER:  We are, Your Honor.

5              THE COURT:  If so, Mr. Baker, on behalf of

6    Ms. Johnson, you may proceed with your opening

7    statement.

8              MR. BAKER:  Thank you, Your Honor.

9         May it please the Court?

10             THE COURT:  It does.

11             MR. BAKER:  Ladies and gentlemen, good

12   afternoon.  We're now in phase two of this trial.

13   And at this space, Ms. Barnes and I will have the

14   opportunity to talk with you, as Judge Mills

15   explained, to tell you a little bit about the case.

16        I like to metaphorically call it a preview of

17   the case.  And I want to talk to you a little bit

18   about the trial process and the evidence you will

19   hear.

20        To begin with, what we say right now is not

21   evidence.  It's basically our understanding of the

22   facts based upon the work we have done in the case.

23   Later this afternoon, you're gonna hear testimony

24   from the ladies and gentlemen that sit in this

25   trial -- in this chair, you're going to have

1   exhibits presented to you, and that is the evidence.

2        Now, your role is kind of like putting a jigsaw

3   puzzle together.  And what I mean by that is that

4   this is not gonna be like a stage play where

5   everything comes in in a nice, orderly fashion,

6   beginning, middle, and end.  Instead, you're gonna

7   hear little bits and pieces of evidence.  It's not

8   going to come in necessarily in chronological order.

9        But after you have heard all of the evidence,

10  hopefully, with these bits and pieces, you're going

11  to be able to assemble a picture in your mind as to

12  what happened.

13       Now, I'm going to forewarn you about two

14  things.  First thing is this isn't going to be an

15  O.J. trial.  Unfortunately, you're not gonna be on

16  the edge of your seat waiting for the next piece of

17  evidence.  Because we're talking about the adequacy

18  of Cheryl Johnson's performance.  And she worked in

19  an information technology position.  So you're gonna

20  hear a lot of terminology about computers, upon

21  servicing computers.  And I gotta tell you, it's

22  kind of dry.  And I tell you that at the outset just

23  to be prepared.  I apologize for that, but that's

24  the nature of the case.

25       The first thing I think you need to know is

1   what this dispute is about with a little more

2   detail.

3        In August of 2012, Cheryl Johnson, after

4   working for the better part of five years, maybe six

5   years, for the Department of Central Management

6   Services, was terminated.  And the issue for you to

7   decide is whether that termination had anything to

8   do with her status as an African-American female.

9   In other words, if the same thing had happened, but

10  Cheryl was a male Caucasian, would she have been

11  terminated.  And that's bottom line what you're

12  gonna have to decide in this case.

13       We will present evidence to show that Cheryl

14  was treated differently and less favorably than a

15  man who did her type of work.

16       The defendants are going to say, and Ms. Barnes

17  will come to this chair, to this podium, and tell

18  you that Cheryl Johnson was a horrible performer.

19  That she was given a series of disciplines because

20  of her performance, and it just didn't cut the

21  mustard.  That's what she's gonna tell you.  And

22  it's for you to decide which version to believe.

23       Now, I think as a starting point, you need to

24  know a little bit both about the Department of

25  Central Management Services and Cheryl Johnson.  And

1    let's talk about CMS first.

2        CMS is a state agency that essentially provides

3    a variety of services for other state agencies.  It

4    provides health insurance for state employees.  It

5    handles personnel issues.  And back in the time

6    period we're talking about, it essentially managed

7    the information system for the agencies that worked

8    under the jurisdiction of the Governor's Office.

9    And I believe there were roughly twelve of those

10   agencies.

11       And that was done through a part of the CMS

12   called the Bureau of Communications and Computer

13   Services.  It basically was devoted to dealing with

14   state computers; hardware, software, those types of

15   things.  And within that particular bureau was an

16   area called the Data Center.  And you'll hear about

17   the Data Center.  And the man that was the head of

18   the Data Center is Don Warren, the man who is

19   sitting next to Ms. Barnes.  And you're gonna hear

20   from him later today.

21       Within the Data Center, there were a variety of

22   areas dealing with various aspects of computer

23   technology.  And one of those was the Midrange

24   Wintel Group; I think I have that right.  And that

25   was a group or an area that handled a specific type

1    of equipment.  You'll hear more about that later on.

2    Within that -- and that group was headed by a man by

3    the name of Rod Nance.  And you'll meet Mr. Nance

4    later in this case.

5        Under that group, there were a series of units

6    that were responsible for doing various aspects of

7    technology for that particular type of equipment.

8    One of those groups was the Hardware Unit.

9        And you've heard of hardware and software.

10   Well, the Hardware Unit basically was the

11   screwdriver and pliers outfit.  It did work on the

12   equipment.  And the hardware group was headed by

13   Cheryl Johnson during the period of time that this

14   dispute involves.

15       Before Cheryl had that position, it was managed

16   by a man by the name Don Gordon.  And he managed the

17   position for a year or two before Cheryl took it

18   over.  And you're gonna hear from both of them in

19   this case.

20       I believe you're going to hear that -- that

21   within the Data Center, there were a variety of

22   units.  Each unit was devoted to doing these

23   particular aspect of computer technology.  Each unit

24   had a manager or supervisor.  They were typically

25   classified in state classification purposes as a

1    Public Service Administrator.

2        And I believe you will hear that within the

3    Data Center, Cheryl Johnson was the only

4    African-American female that headed a group.

5        Now, it's important in this case to understand

6    some terminology.

7        The first piece of terminology is the help

8    desk.  Now, the help desk was a -- a unit that

9    essentially would receive requests for services from

10   various state agencies that had computer problems.

11   And the purpose of the help desk was to make a

12   preliminary diagnosis of the problem.  And if they

13   couldn't figure out a solution, refer it to the unit

14   that had the expertise to deal with that problem.

15       The methodology for making that referral was

16   through a ticket.  Best way to describe a ticket is

17   it was a work order.  A work order basically

18   identified the agency that had the problem, a little

19   bit about the nature of the problem, who the contact

20   person was.  And the ticket was sent to the manager

21   of the group that was to deal with the problem.  And

22   the manager would then assign it to a subordinate

23   employee who was responsible for making the repair

24   or correction.

25       You are going to also hear about the Remedy

1    System.  And the Remedy System was a program that

2    CMS used to track tickets.  What the ticket was,

3    when it came in, and the various aspects of dealing

4    with the ticket from the time that it first came in

5    until the project was completed.  It would kind of

6    be a summary of the various steps that were involved

7    in fixing the ticket.

8        You're going to hear about Cheryl Johnson in

9    this case.  And what you'll hear is that Cheryl grew

10   up here in Springfield, is a mother and a proud

11   grandmother.  Was educated at local schools and

12   universities; got a degree in computer science.  And

13   then for 30 years, she worked in various positions

14   both in the public sector and in the private sector

15   dealing with information technology.

16       You will hear that in May of 2006, she was

17   given a position at CMS in the Midrange Wintel

18   Group.  Her initial position was as a manager of a

19   software unit.  She'll talk a little bit about what

20   that entailed.  And I believe the evidence is that

21   while Rod Nance was technically her supervisor

22   because he headed the Midrange Wintel Group, most of

23   her interaction between the projects she worked on

24   were with Mr. Warren.  And he did a lot of the

25   effective oversight of her.

1       And I'm not going to suggest that Cheryl

2   Johnson walked on water in that particular position.

3   I'm not going to overstate it.  But what I am going

4   to suggest is that she received evaluations

5   reflecting fully satisfactory service.  While she

6   was in that unit, she was not reprimanded or

7   disciplined for performance issues; her evaluation

8   reflects that she satisfied her objectives.

9       In May of 2008, she was assigned another

10  position in the Wintel Group, and here is where our

11  story really begins.  She was assigned to work as

12  the manager of the Hardware Unit.  She took the

13  place of Ed Gordon.  And she worked in that unit

14  from May of 2008 -- or -- yes, May of 2008 until

15  August of 2012, when she was terminated.

16      She worked under the supervision of Rod Nance.

17  He was the man that oversaw her work.  He was the

18  person who prepared her evaluations.  He is the

19  person who gave her job objectives.  He was the

20  person who evaluated her performance.

21      And I'm not going to get into all the detail

22  with you, but what I am going to say is that during

23  the period of time he supervised Cheryl, he piled it

24  on.  He gave her job assignments and

25  responsibilities and time periods for completing

1    those responsibilities which was impossible for her

2    to meet.  And you're gonna hear a lot about what

3    they were, the time period she had to do them.  And

4    you're gonna hear that she didn't satisfy his

5    objectives.  You're gonna hear from her the reason

6    why she didn't.

7         You're then going to hear that she was

8    terminated.  She was terminated because she didn't

9    meet her job responsibilities as claimed by CMS, and

10   that she had gone through a period of progressive

11   discipline.  It's true she went through progressive

12   discipline.  It's true she didn't meet her

13   objectives.  It's also true that probably no one

14   could have met those objectives that Mr. Nance gave

15   her.

16        You're then going to hear that Cheryl

17   eventually was able to secure a job at another state

18   agency.  That state agency is Illinois Department of

19   Human Services.  And she was in an information

20   technology a position.  On paper, it was a lower

21   position than she had at CMS, but effectively, a lot

22   of the work that she did at the Department of Human

23   Services was project management work of the type she

24   did at CMS.  And you're gonna see that she was

25   evaluated there on two separate occasions as a fully

1    satisfactory employee.

2        Now, I don't mean to argue my case, that's not

3    why I'm here.  I just wanted to give you a little

4    preview of the evidence and I believe I have done

5    that.  I thank you for your attention and I look

6    forward to seeing you daily during this trial.

7        Thank you.

8            THE COURT:  Thank you, Mr. Baker.

9    Ms. Barnes, you have the podium.

10           MS. BARNES:  Mr. Okon will be handling the

11   opening.

12           THE COURT:  Very well.  Mr. Okon.

13           MR. OKON:  May it please the Court?

14           THE COURT:  It does.

15           MR. OKON:  Good afternoon.  As you heard,

16   my name is Joe Okon.  I'm with the Illinois Attorney

17   General's Office.  And I'm here with Deb Barnes.

18   And we represent the defendant, the Illinois

19   Department of Central Management Services which is

20   commonly referred to its abbreviation which is CMS.

21       Now, Mr. Baker, he kind of explained the

22   several agencies and bureaus and groups within

23   bureaus, and it really can get kind of confusing.

24   So I really want to highlight some of the testimony

25   you're going to hear from context purposes so you

1    have an understanding of it from the get-go.

2         Prior to 2016, CMS had a bureau within it

3    called the Bureau of Communication and Computer

4    Services.  And that bureau is referred to, like all

5    other state agencies, by its acronym, BCCS, and it's

6    pronounced bicks.  BCCS performs information

7    technology related services to the various agencies

8    of the State of Illinois and their employees.

9         In 2016, the Department of Innovation and

10   Technology was created.  And the Department of

11   Innovation and Technology is referred to as DOIT.

12   And when DOIT was created, BCCS was taken from CMS

13   and merged into DOIT.  Thus, CMS previously was, and

14   DOIT is now, responsible for more than 3,000 servers

15   that are located throughout the state.  And you will

16   hear testimony that essentially a server is a piece

17   of equipment that stores electronic data.

18        Midrange Wintel Group is a group within BCCS.

19   And it functions to permit state employees to use

20   their computers to perform job-related tasks such as

21   check their email, use the internet, run

22   applications; whatever it might be.

23        And you'll hear about five different groups

24   within Midrange Wintel:  Administrations, Systems

25   Software, Applications, Planning, and Hardware.

1          While each group performed different functions,

2      they all are connected and contribute to the overall

3      goal and purposes of allowing state employees to

4      using their computers successfully without issue.

5          You will also hear a lot of testimony about

6      tickets.  And as Mr. Baker -- Mr. Baker referenced,

7      a ticket is essentially a work order or assignment.

8      And within a ticket, there are several tasks,

9      typically several taxes that need to be completed in

10      order for the overall ticket to be completed.

11          And individuals will explain how each of those

12      five groups received tickets through an application

13      called Remedy.  And the managers were responsible

14      for ensuring completion of those tickets and

15      divvying out tasks associate the under those

16      tickets.

17          As plaintiff's counsel Mr. Baker just

18      mentioned, Ms. Johnson will testify that her

19      immediate supervisor, Rod Nance, treated Ed Gordon

20      more favorable than her due to her race and gender.

21      However, you will hear evidence that directly

22      combats such assertion.

23          Over the duration of this trial, you will hear

24      from four different managers that were managers of

25      the five different groups within Midrange Wintel.

You will hear how Ms. Johnson was hired initially as manager of the Administration Group and was later moved to the Hardware Group which she managed until her employment was terminated.

Ed Gordon will explain how he was the first manager of the Hardware Group.  And he held such position for over a year, at which point he was moved to manage the Application Group.  And that is the point that Ms. Johnson was then moved to manage Hardware.

While Ms. Johnson will testify that she received more work than Ed Gordon when she was manager of Hardware, you will hear evidence opposing such assertion.

Mr. Gordon will testify and explain how he carried some of the duties of Hardware manager with him and continued to do such duties while he was the manager and supervisor of Applications.  These are duties that Ms. Johnson never had to complete, despite them falling under the umbrella of Hardware manager.

And Ms. Johnson will testify that she and not Ed was forced to specifically put tickets in her name which made her personally responsible for the completion of such tickets and created a significant

1    amount of more work for her.  However, evidence will

2    show that tickets were simply placed in her name to

3    assist Ms. Johnson in better managing the status and

4    completion of those tickets which her group was

5    responsible for.  And regardless of whether or not a

6    ticket was with -- was in a supervisor's name, the

7    supervisor is always responsible for all tickets

8    that are assigned to their group.  And it didn't

9    change their duties.

10       Rod Nance will explain how he supervised all

11   group managers, including the Plaintiff and

12   including Mr. Gordon.  Mr. Nance will also explain

13   how he was part of the hiring committee that decided

14   to hire Ms. Johnson to work for CMS back in 2006.

15       Vicki Spencer will testify as to how she took

16   over as manager of Hardware Group following

17   Ms. Johnson's departure.  She will explain the

18   significant backlog of tickets she was faced with

19   due to Ms. Johnson's poor performance.  And

20   Ms. Spencer will testify that after approximately

21   six months, she was able to correct many of the

22   issues created by Ms. Johnson and was able to get

23   the hardware running efficiently again, much like it

24   was when it was handed to Ms. Johnson from

25   Mr. Gordon.

1      And Don Warren, seated at table here, will

2   explain how he oversaw all the managers, including

3   Ms. Johnson's immediate supervisor Rod Nance and was

4   Mr. Nance's direct supervisor.

5      Don Warren will speak at length concerning Ms.

6   Johnson's quarterly and yearly evaluations which

7   were performed to identify the deficiencies,

8   articulate those deficiencies to her with the hopes

9   of improving her performance as a manager.

10     You will also hear testimony from Jo Higgerson.

11  And Ms. Higgerson is a current DOIT employee, and

12  she currently has work experience with CMS as well.

13     Now, in preparation for this trial,

14  Ms. Higgerson will explain how she was tasked with

15  collecting specific data using a specific access

16  occasion at the request of Ms. Johnson.  And

17  Ms. Johnson asserts that such data is evidence that

18  supports her claim she received more work than Ed

19  Gordon and she was responsible to complete the

20  tickets herself.

21     This data that was collected by Jo Higgerson is

22  on this CD right here which we will be viewing in

23  court, and you, as members of the jury, will also

24  have the option to view during deliberations.  And

25  Ms. Higgerson will explain that the data requested

1    by Ms. Johnson lacks significant pertinent

2    information and does not establish which technicians

3    worked on the tickets that were assigned to her.

4        Conversely, Ms. Higgerson will testify

5    regarding this exhibit.  And she will explain how

6    she performed an additional search on the same data

7    requested by Ms. Johnson, but she used a different

8    application.  And in doing so, she establishes --

9    she can establish which technician worked on the

10   tasks associated with the ticket that was assigned

11   to Ms. Johnson.

12       Ed Gordon, Rod Nance, Vicki Spencer, Don

13   Warren, Vicki Higgerson, they will all testify that

14   they provided assistance to Ms. Johnson with the

15   intent to improve her performance and understanding

16   of her position.  And you will hear testimony that

17   Ms. Johnson received approximately twice the amount

18   of training classes than Ed Gordon did.

19       In all, what I want to convey to you and what

20   will be elicited through testimony is that

21   Ms. Johnson was given opportunity after opportunity

22   and continued assistance to improve her performance

23   as manager.  But she could not improve her

24   performance.  And despite Mr. Nance and Mr. Warren

25   clearly articulating Ms. Johnson her deficiencies,

1   hoping her performance would improve, Ms. Johnson

2   was unable to correct such deficiencies which is why

3   her employment was terminated.

4       I'm looking forward to you hearing the evidence

5   over the course of this trial.  And I'm confident in

6   the end, you will find a verdict in favor of the

7   defendant and against the plaintiff.

8       Thank you.

9           THE COURT:  Thank you, Mr. Okon.

10      All right, ladies and gentlemen, you have heard

11  the opening statements of counsel.  I believe we are

12  now ready to proceed with the case in chief.

13      And I will call upon the Government -- the --

14  on Mr. Baker to present his first witness, and we

15  will proceed.

16          MR. BAKER:  Thank you, Your Honor.  I'd

17  like to call Mr. Warren.

18          THE COURT:  Please, come right up here and

19  be sworn by Madam Clerk first.

20      (The witness was sworn.)

21          THE COURT:  Please.

22              DONALD WARREN

23  called as a witness herein, having been duly sworn,

24  was examined and testified as follows:

25

WARREN - DIRECT                    112

1                    DIRECT EXAMINATION
2    BY MR. BAKER:
3         Q.  Good afternoon, Mr. Warren.  Can you state
4    your name and address for US?
5         A.  Donald Eugene Warren, 507 Mobile, Brighton,
6    Illinois.
7         Q.  Are you presently employed?
8         A.  No.  I'm retired.
9         Q.  And prior to your retirement, where did you
10   work?
11        A.  Before I retired, I worked at CMS, Central
12   Management Services.
13        Q.  And when was your last day at CMS?
14        A.  December 31st, 2015, I believe.
15        Q.  I want to take you back for the time period
16   between 2006 and 2012; roughly six years.  Did you
17   work at CMS at that time?
18        A.  Yes.
19        Q.  And did you work in a specific bureau?
20        A.  Yes.  I worked in BCCS.
21        Q.  Okay.  That's the Bureau of Computer --
22   Communication and Computer Services?
23        A.  Yes.
24        Q.  And how long did you work at BCCS?
25        A.  From 2004 until I retired.

WARREN - DIRECT                    113

1      Q.  During the time period I've talked about,

2  2006 to 2012, what was your position at BCCS?

3      A.  I had various positions.  When I first came

4  there, I was the Midrange Wintel manager.  I then

5  became the Midrange manager.  And then I moved into

6  the Data Center Operations executive position.

7  That's where I retired from.

8      Q.  All right.  Do you recall when you went into

9  that position?

10      A.  Pardon?

11      Q.  Do you recall when you went into your last

12  position?

13      A.  No.

14      Q.  Okay.  You're acquainted with Cheryl

15  Johnson?

16      A.  Yes, I am.  Yes.

17      Q.  And can we agree that Cheryl Johnson came to

18  your bureau sometime in 2006?

19      A.  Yes.

20      Q.  At that time, what was your position?

21      A.  I believe I was still the Midrange Wintel

22  manager.  I'm not positive about that.  I might have

23  been the Midrange manager.  But one of those two

24  positions.

25      Q.  Okay.  Can you tell us what Wintel -- what

WARREN - DIRECT                                    114

1   Midrange Wintel was?  Or is?

2       A.  Yeah.  Midrange Wintel was basically in

3   charge of the Windows servers.  So servers that are

4   devices that contain data and run applications so

5   users can log into them, they can do email, they can

6   get out to the internet.  They run applications like

7   personnel applications and store data on them so

8   that users can recall it back and things like that.

9   Word processing.

10      Q.  Okay.  For those of us that are

11  technologically deprived, would a server be a type

12  of a computer?

13      A.  Yes.  Yes.

14      Q.  Okay.

15      A.  You have a server and you have a desktop

16  unit.  So the desktop is the one that you sit in

17  front of.  It's connected to a severe on the back

18  end.  That's where data is stored and applications

19  run and things like that.

20      Q.  Okay.

21      A.  Desktop is your interface.

22      Q.  Okay.  So did the -- did the Midrange Wintel

23  deal with particular types of servers?

24      A.  They were Windows servers; yes.

25      Q.  What do you mean by Windows server?

WARREN - DIRECT                    115

1        A.  Windows is the operating system it runs on

2   it.  There were different kinds of computers.

3   Basically, what I was responsible for at the end --

4   at that time it was just Windows servers.  But

5   within the Data Center, we had mainframes which were

6   large computers that ran an IBM operating system.

7   We had Unix computers that ran Unix operating

8   systems.  A then we had Windows servers that ran the

9   Windows operating systems.

10       Q.  All right.  While we're on this topic,

11  within the Midrange Wintel area, how many servers

12  did it have some responsibility for?

13       A.  Within the Windows group, probably, in the

14  end, 27, 2800 maybe.

15       Q.  And were those servers -- where were they

16  located?

17       A.  The majority of them were located in the

18  Data Center.  We had a project going on -- basically

19  there was a consolidated project that went into

20  effect in 2000 -- around 2004.  And that's when they

21  decided to move all the servers from the agencies

22  into the Data Center.  So I had a project that

23  moved -- and the majority of them were all Windows.

24       So one of my projects was to go to an agency,

25  move all of their servers into the Data Center, and

1    close down the agency Data Center.  That would save

2    the state money.

3         So as we went along, more and more servers came

4    into the Data Center.  When I first got there, there

5    were probably a few hundred servers.  And by the

6    time we finished, there were close to 3,000.

7         Q.  3,000 that were in the Data Center?

8         A.  Most of them, yes.  Some of them we left in

9    some of the agencies for certain reasons, but that

10   was very few.  The majority of them were in the Data

11   Center; yes.

12        Q.  Okay.  And when -- when was in completed?

13        A.  Still ongoing, I believe.

14        Q.  Okay.  At the time you retired, how many

15   servers were in the Data Center?

16        A.  Windows servers, there were somewhere around

17   3,000.  Twenty-eight to 3,000.

18        Q.  Okay.  That was in 2015?

19        A.  Yes.

20        Q.  Okay.  So between 2004 and 2015, there was a

21   transition of relocating servers from the field --

22        A.  Yes.

23        Q.  -- to the Data Center?

24        A.  Yes.

25        Q.  And when we talk about servers in the field,

1    could you be a little more specific and tell us

2    what -- what that refers to?

3        A.  When we say servers in the field, basically

4    each agency had their own Data Center.  So

5    Department of Human Services had a group of servers

6    in their Data Center, Department of Transportation

7    had a group of servers in their Data Center.  So

8    what our project was was to pull those servers from

9    their Data Center into our Data Center and close

10   down their Data Center.

11       Q.  And was a lot of that work done by the

12   Hardware Unit?

13       A.  It was done by a group, not necessarily the

14   Hardware Group.  We had a special project, that was

15   all special project.  So we had different people

16   responsible for that.  We had a team that was set up

17   and pulled them in.  Some of them were members of

18   the Hardware Group, some of them were members of

19   other groups.

20       Q.  Okay.  I want to talk to you a little bit

21   about the organization in the Data Center.  While

22   you were the manager of the Midrange Wintel Group,

23   how many subordinate units were in that group?

24       A.  I believe -- at that time, I believe there

25   were five.  There was the Administration Group,

WARREN - DIRECT                                    118

1    there was the Hardware Group, the Software Group,

2    the Application Group.  There are four.

3         Q.  Are you familiar with the help desk?

4         A.  Yes.

5         Q.  And was the help desk with -- within the

6    Data Center?

7         A.  No.

8         Q.  Where was that the help desk?

9         A.  The help desk was located across the street

10   from the Data Center in the main CMS building.

11        Q.  Was it a part of BCCS?

12        A.  Yes, it was.

13        Q.  And what was the function or mission of the

14   help desk?

15        A.  The help desk was responsible for taking

16   calls from the various agencies and opening tickets

17   on -- within the Remedy system.  And then the

18   tickets would be assigned to the appropriate group,

19   and then the group would take those and resolve

20   them.

21        Q.  Okay.  Say, for example, I worked in the

22   Department of Corrections and I had a server-related

23   problem.  Would I -- would I contact the Data Center

24   for purposes of dealing with that problem?

25        A.  No.  You would contact the help desk.

WARREN - DIRECT                        119

1          Q.  The help desk?

2          A.  Yes.

3          Q.  And what would the help desk do?

4          A.  The help desk would create a ticket and

5     assign it to the appropriate group.

6          Q.  All right.  So would a ticket be the same

7     thing as a work order?

8          A.  Basically; yes.

9          Q.  What type of information would be in the

10    ticket?

11         A.  Basically there would be a number assigned,

12    a contact person from the agency, an overview of

13    what the problem was.

14         Q.  And would the help desk make the

15    determination as to which unit would best be able to

16    deal with the problem?

17         A.  Yes.  Based upon the information provided by

18    the agency person, they would assign it to what they

19    thought the appropriate group.

20         Q.  Okay.  So with respect to a Midrange Wintel

21    type of problem, would it be assigned to one of the

22    five groups in Midrange Wintel?

23         A.  Yes.

24         Q.  Okay.

25         A.  Assuming it was a Windows problem; yes.

 1        Q.  Windows problem, okay.

 2        And would that particular unit be responsible

 3   for correcting the problem?

 4        A.  They would be responsible for investigating

 5   the issue, and if it was appropriate to their group,

 6   they would resolve the problem.  If not, they would

 7   hand it off to what they thought the -- I may be

 8   wrong.  It might get assigned back to the help desk

 9   or it might get assigned to the appropriate group,

10   I'm not sure which way it went.

11        Q.  Okay.  Now, you talked about -- well, before

12   you do that.  Within BCCS, does the term "task" have

13   any particular meaning?

14        A.  The term what?

15        Q.  Task?

16        A.  Oh, task.  Yes, yes.

17        Q.  Can you tell me what?

18           THE COURT:  How do you spell that word?

19        A.  T-a-s-k.

20           THE COURT:  Oh, task.

21        A.  It's a task.

22           THE COURT:  Very good.  Thank you.

23   Okay.  Can you tell me what a task is at least

24   within the purview of BCCS?

25        A.  Yes.  So help desk is -- well, we'll just

WARREN - DIRECT                          121

1    stick with help desk tickets.  A help desk ticket is

2    opened up and assigned to a group.  And then within

3    that, depending upon what needs to be done, tasks

4    are assigned.  If it's just one person needs to do

5    one thing, a task is assigned for that.  If it

6    requires maybe multiple people to do something or

7    multiple groups to do something, the task for each

8    one of those things would be created.  And usually,

9    they're sequential.  So the first person does their

10   thing, closes their task, it goes on to the next

11   person, they do their thing, close their task until

12   it's completed.

13        Q.  So a task would be a segment of work needed

14   to complete a ticket?

15        A.  Yes.

16        Q.  Okay.  And I'm assuming that in certain

17   instances, one person could do all the tasks; and in

18   other situations, there might have to be multiple

19   people to do a task?

20        A.  Correct; yeah.

21        Q.  Okay.  From time to time, in order to

22   complete a task within a ticket, would more than one

23   unit have to be involved in the ticket?

24        A.  Yes.

25        Q.  And how did that work in -- in shipping out

WARREN - DIRECT                          122

1    work to another unit?

2         A.  Basically, they were assigned a task.

3         Q.  And who would have made that assignment?

4         A.  The owner of the ticket or -- and Remedy

5    evolved over time, so there were pre-defined tasks

6    set up.  So what that means is like a server

7    installed -- that's a bad example.

8         There are two types of tasks in Remedy.  Or two

9    types of tickets.  There's an ESR which is a service

10   request, and then there's the help desk ticket.

11        Help desk tickets are more ambiguous.  So

12   it's -- you get a call, you think, "Well, I believe

13   this is what needs to be done."  You create a task

14   and you give it to somebody.  Whereas an ESR is a

15   service request, and it's maybe they need a new

16   server.  So that's fairly consistent from one time

17   to the next.

18        So what we did was we created a series of

19   tasks, and when you open a ticket for that,

20   everything was filled in automatically, all the

21   tasks were filled in.

22        Where was I going with that.

23        Q.  When was that put in place?

24        A.  I'm not sure -- like I said, it evolved.  So

25   probably -- it could have been in place around 2008

WARREN - DIRECT                                    123

1    maybe.  It could have been before or a little bit

2    after, I'm not certain.

3         Q.  Okay.  Now, you used the term owner of the

4    ticket.

5         A.  Mm-hmm.

6         Q.  Who is the owner of the ticket?

7         A.  The owner is the person that was assigned

8    to.  So it could be -- it could be a manager, it

9    could be one of the subordinates within the group.

10        Q.  And what is the responsibility of the owner

11   of the ticket?

12        A.  To ensure that the work is completed.

13        Q.  And an owner could be a technician or it

14   could be a manager?

15        A.  Yes.

16        Q.  Okay.  I want to talk with you -- let me ask

17   you this:  The managers of the five units in the

18   Midrange Wintel Group, what was their job

19   classification?

20        A.  The managers were PSAs, Public Service

21   Administrators Option 3.

22        Q.  And can you tell me a little bit about what

23   the duties were of a PSA Option 3?

24        A.  Basically, in our case, it was to manage a

25   group of people to ensure work was completed in a

WARREN - DIRECT                    124

1    timely manner.
2         Q.  Okay.  Did -- did the managers get involved
3    in actually working on projects?
4         A.  Yes.
5         Q.  So a ticket could be assigned to a manager?
6         A.  Yes.
7         Q.  Okay.  Would that be kind of the exception
8    to the rule?  And by that, would it normally be
9    assigned to a technician?
10        A.  I believe so; yes.
11        Q.  Now, does the term help desk ticket have any
12   significance to you?
13        A.  Other than it's a ticket that was opened by
14   the help desk.
15        Q.  Okay.  Was there any time period that a help
16   desk ticket had to be completed?
17        A.  In most cases, we asked that they be
18   completed within four days, I believe.  Within four
19   days, I believe.
20        Q.  All right.  And is a help desk ticket
21   typically dealing with a repair?
22        A.  It could be; yes.  Not typically, but yes,
23   it could be.
24        Q.  And by that I mean, someone calls in and
25   says "I have a problem with my server, I need it

WARREN - DIRECT                125

1   fixed?"

2        A.  Yes.

3        Q.  And in that situation, it would have to

4   be -- the objective is to have it completed within

5   four days?

6        A.  Well, at most.  If a server was down, it was

7   very important, so it should be completed within

8   minutes to hours.

9        Q.  Okay.  And what was the normal time period

10  for assigning a ticket to a technician?

11       A.  One day.

12       Q.  Are you sure about that?

13           THE COURT:  Say that again?

14       A.  One day.

15       Q.  Are you sure about that?

16       A.  I'm fairly certain; yes.

17       Q.  Okay.

18       A.  It varies.  I mean -- like I said, there are

19  different kinds of tickets in Remedy.  One is help

20  desk, one is ESR.  So in help desk I think they were

21  one day things had to be assigned.

22       Q.  Mr. Warren, there's a big white -- big gray

23  book, I guess, in front of you.

24       A.  Yes.

25       Q.  Could you go Exhibit 26 for me, please.

WARREN - DIRECT                          126

 1        A.  Okay.

 2        Q.  Can you identify that document for me?

 3        A.  That's a performance eval for Ed Gordon.

 4        Q.  And is that a performance evaluation for the

 5   period May 1, 2007, to May 1, 2008?

 6        A.  Yes, it is.

 7        Q.  And if you go to the back page, I'm gonna

 8   ask if your signature appears on it?

 9        A.  Yes, it does.

10        Q.  Could you go to Part 4?

11        A.  Yes.

12        Q.  And I'm looking -- Part 4 is the objectives

13   given for Mr. Warren during the next reporting

14   period; am I correct?

15        A.  For Mr. Gordon.

16        Q.  Mr. Gordon, excuse me.

17        A.  Yes.

18        Q.  Can you go to Item Number 1.

19        A.  Yes.

20        Q.  What time period was he expected to assign

21   tickets to subordinate staff?

22        A.  In this particular eval it's two days.

23        Q.  Okay.

24        A.  That evolved over time and changed.

25        Q.  Okay.  Well, my question is back in -- back

WARREN - DIRECT                    127

1    in 2007-2008, it was two -- it was -- had two days

2    to make the assignment?

3         A.  Yes.

4         Q.  Okay.  Do you recall when that changed?

5         A.  I believe the following year.

6         Q.  Were your personally acquainted with the

7    managers that were in the five units in the Intel

8    group?

9         A.  Yes.  I knew them all; yes.

10        Q.  Okay.  And that would have been true when

11   Cheryl Gordon -- Cheryl Johnson was in that group?

12        A.  Yes.

13        Q.  Other than Cheryl Johnson, was any manager

14   African-American?

15        A.  No.

16        Q.  So she would have been the only

17   African-American female?

18        A.  Yes.

19        Q.  Within your area of responsibility when you

20   were the -- I think the head of the Data Center; am

21   I correct?

22        A.  Yes.

23        Q.  How many managers worked in the Data Center

24   at that time?

25        A.  That reported to me?

WARREN - DIRECT                    128

1        Q.  Well, not necessarily.  Managers that worked

2    in the Data Center?

3        A.  12 to 15 maybe.

4        Q.  Were any of them African-American females?

5        A.  No.

6        Q.  Other than Cheryl Johnson?

7        A.  Correct.

8        Q.  At any time between 2005 and when you

9    retired in your area of responsibility, were there

10   ever any African-American female managers?

11       A.  No.

12       Q.  Cheryl was the only one?

13       A.  Other than Cheryl.  Yes.

14       Q.  I'd like to ask that you turn to -- let me

15   ask you this:  When Cheryl first began working for

16   CMS, she came in off the street; am I correct?

17       A.  Yes.  She did not currently work for CMS.

18       Q.  All right.  And in fact, she came in from

19   someplace other than State of Illinois?

20       A.  And that I don't recall.

21       Q.  Okay.  Did she have to go through a

22   probationary period?

23       A.  Six months; yes.

24       Q.  And did she complete the probation?

25       A.  Yes.

1      Q.  So at least within the first six months, her

2  work was satisfactory?

3      A.  Yes.

4      Q.  When Cheryl first came into CMS, do you

5  recall what her job was?

6      A.  When she first came to CMS she was manager

7  of the Administration Group.

8      Q.  And that was in Wintel --

9      A.  That was within Wintel, it was just a group

10  under Wintel.

11      Q.  Okay.  So in Cheryl doing her job in the

12  Administration Group, and in you doing your job

13  during that time period, were you in a position to

14  assess and evaluate Cheryl's performance?

15      A.  Yes.

16      Q.  And would it be accurate to say you would

17  have been in a better position to do it than Rod

18  Nance would have?

19      A.  When she was in Administration?

20      Q.  Yes.

21      A.  I'm thinking, because when -- when Cheryl

22  was hired, I had -- I don't remember if she reported

23  directly to me, if I was the Wintel manager there,

24  or if I was already Midrange manager and she

25  reported directly to Rod.  I don't recall that.

1          Q.  Okay.  Well, can we agree that there was

2     some point in time where she began reporting

3     directly to Rod?

4          A.  Yes.

5          Q.  And prior to that, she essentially reported

6     directly to you?

7          A.  And that I cannot say definitively.  I don't

8     recall.

9          Q.  You don't recall when that was?

10         A.  Yes.

11         Q.  I want you to go to Plaintiff's Exhibit 2.

12             THE COURT:  2 was it?

13         Q.  Yes.

14         A.  Okay.

15         Q.  Can you identify that document for me?

16         A.  Yes.  That's a performance evaluation for

17    Cheryl Johnson.

18         Q.  And it covers what period of time?

19         A.  November 2006 to November of 2007.

20         Q.  Now, if you recall, did Cheryl begin working

21    for CMS in May of 2006?

22         A.  I'm assuming that's when she started; yes.

23         Q.  Okay.  So this evaluation would have been

24    for work through the first year and a half she

25    worked at CMS?

WARREN - DIRECT                        131

1        A.  Yes.

2        Q.  Okay.  Did you have any involvement in the

3   preparation of this evaluation?

4        A.  The only thing I did was sign it after the

5   immediate supervisor signed it.

6        Q.  But you were the person that really oversaw

7   much of her work during that time period, were you?

8        A.  No.

9        Q.  You weren't?

10       A.  No.  Otherwise, I would have been the direct

11   supervisor.

12       Q.  All right.  You say there was a period of

13   time that you supervised her?

14       A.  I said there was a period of time where I

15   may have.  I just don't recall when I moved up a

16   position.  If I would have been the Midrange Wintel

17   manager which Rod signed off -- that was the

18   position he was in when this document was signed.

19   If I was still in that position and I just don't

20   remember when I changed job positions.

21       Q.  Okay.  During a time period you supervised

22   her, did you ever reprimand her for her performance?

23       A.  I don't recall if I ever directly supervised

24   her, but no, I never reprimanded her for her

25   performance.

WARREN - DIRECT                          132

1      Q.  Okay.  There came a point in time where

2  Cheryl was assigned to the Hardware Unit?

3      A.  Yes.

4      Q.  In you doing your job at CMS and in Cheryl

5  doing her job in the Hardware Unit, how much contact

6  did you have with her?

7      A.  I had a fair amount.  The job position that

8  she was in was very important.

9      Q.  And would the same thing have been true

10 while you were -- while Cheryl was in the

11 Administration Unit?

12     A.  Yes.  I'm sorry, that's what I thought you

13 were referring to, is the Administration Unit.  Yes.

14     Q.  Okay.  All right.  So when she was in the

15 Administration Unit, you had a fair amount of

16 contact with her?

17     A.  Yes.

18     Q.  When she went to the Hardware Unit, how much

19 contact did you have with her?

20     A.  Still had some contact.

21     Q.  You say some.  How much?

22     A.  I'd had moved up another level, so I had

23 less time to spend with certain -- you know, various

24 groups.  So I spent more time probably with the

25 managers that reported directly to me rather than

WARREN - DIRECT                             133

1    the subordinate managers.

2        Q.  Okay.  When you moved up, how many managers

3    reported directly to you?

4        A.  Five.

5        Q.  And how many subordinate managers were there

6    under those five managers?

7        A.  Probably just five.

8        Q.  Okay.  So you would -- there would have been

9    five managers and five subordinate managers that

10   would have in some respect been under your chain of

11   command?

12       A.  Yes.

13       Q.  Okay, ten total.

14           When you were in that position, how much time

15   did you have to spend with the Wintel Hardware Unit?

16       A.  More than likely the only time I spent was

17   when I had questions.  I usually -- I didn't sit in

18   my office all day long and, you know, emails and

19   things like that, I would get up and talk to

20   somebody if I had a question or wanted information.

21   So if I needed information, I would go ask and talk

22   to them.

23       Q.  Okay.

24       A.  I could go to the Midrange manager which

25   would be Rod, or I could go to Cheryl possibly.  Or

WARREN - DIRECT                    134

1    if I knew, you know, that a particular person was

2    working on a project, I may go directly to them.

3         Q.  Okay.  Would it be an accurate statement to

4    say that you were not in a real good position to

5    assess Cheryl's performance while she was the

6    Hardware manager?

7         A.  Day-to-day performance; no.  Overall

8    performance, yes.

9         Q.  All right.  Would it be fair to say that

10   most of what you found out about Cheryl came from

11   Rod Nance.

12        A.  Yes.

13        Q.  May I have just a moment, Your Honor?

14            THE COURT:  Yes, surely.

15   Kind of backtracking for a moment.  Would it be

16   accurate to say that the Hardware Unit, as I

17   characterized in my opening statement, was kind of

18   the pliers and screwdriver unit?

19        A.  That is correct.

20        Q.  And from time to time, it had to take

21   servers out of service?

22        A.  Yes.

23        Q.  And install new servers?

24        A.  Yes.

25        Q.  And when a server is taken out of service,

WARREN - DIRECT                    135

1    is there some down time where the customer agency

2    doesn't have access to the server?

3         A.  Yes.

4         Q.  And just to coordinate that particular

5    process of either installing or taking out of a

6    server, was it important to coordinate the work with

7    the customer?

8         A.  Yes.

9         Q.  Who normally did that?

10        A.  I don't remember.

11        I -- I think it was probably the manager.  It

12   would probably be Cheryl coordinating at that time.

13   Or sometimes, depending upon how large the project

14   was, there could be a project manager that was

15   assigned to it, in which case, they would do the

16   coordinate.

17        Q.  Okay.  Was it ever done by the technician?

18        A.  Yes.  Yes.

19        Q.  So it could be the manager, it could be a

20   project manager, or it could be a technician?

21        A.  Yes.  Depending upon the importance of the

22   server.

23        Q.  Sure.

24        I don't think I've asked you about something

25   that I think may be important in this case.  What is

WARREN - DIRECT                              136

1    the Remedy system?

2        A.  It's -- it's basically the ticketing system

3    that was used.  And it did various things.  Remedy

4    was the way duties were assigned.  So if a server

5    needed to be built, basically, a Remedy ticket was

6    created and all the tasks would be there and then

7    the managers would assign technicians to them.  And

8    then they'd track status of the ticket.  Help desk

9    tickets were within Remedy also.

10       I believe assets were in Remedy also.  I mean

11   there were a lot of things stored in there.

12       Q.  Okay.  So would it be an accurate statement

13   that the Remedy system could be used to track the

14   progress of work done to complete a ticket?

15       A.  Correct.

16       Q.  And would it identify the agency that -- or

17   the person that was requesting the work?

18       A.  Yes.

19       Q.  And --

20       A.  I believe so.  At least the agency would be.

21   But I think probably the person -- it would at least

22   have a contact person.

23       Q.  Okay.  And would it identify the owner of

24   the ticket?

25       A.  Yes.

WARREN - DIRECT                    137

1        Q.  Okay.  And would it identify the various

2    tasks that were performed in connection with the

3    ticket?

4        A.  Yes.

5        Q.  Okay.  Within the Hardware Unit, can you

6    tell me what a change ticket was?

7        If you remember.

8        A.  You know, I've been retired for a while.

9        I don't remember exactly what it is, no.  I

10   mean a change ticket -- no, I -- I can't say

11   definitively what it is.

12       If you can tell me what you think it is, I can

13   tell you, yeah, that's right.

14       Q.  I'm gonna make it easier, I'm going to ask

15   somebody else.

16       A.  Okay, that's fine.

17       Q.  Your Honor, I'd like to offer into evidence

18   Plaintiff's Exhibit 2 which is the performance

19   evaluation for Ms. Johnson for November 2006 to

20   November 2007.

21            THE COURT:  Any objection to 2?

22            MS. BARNES:  No, Your Honor.

23            THE COURT:  Thank you.  It's admitted.

24       (Plaintiff's Exhibit 2 admitted.)

25   What does it mean to close a ticket?

1          A.  Basically, ensure that the work has been

2     completed and close the ticket within the Remedy

3     system.

4          Q.  Okay.  That means the work is done and the

5     customer is satisfied?

6          A.  Works done.

7          Q.  And the customer should be satisfied?

8          A.  Should be satisfied; yes.

9          Q.  Okay.  I don't think I have any further

10    questions.  Thank you very much.  Mr. Warren.

11              THE COURT:  All right.  Counselor?

12              MS. BARNES:  Oh, I'm sorry.

13              THE COURT:  That's all right.

14         All right, Ms. Barnes.

15                    CROSS EXAMINATION

16    BY MS. BARNES:

17    Mr. Warren, Mr. Baker asked you about the time

18    required to address a ticket.

19         A.  Yes.

20         Q.  And he was talking to you about Plaintiff's

21    26.  And that would have been Mr. Gordon's

22    evaluation?

23         A.  Yes.

24         Q.  And the time frame required for addressing a

25    ticket in that evaluation was what?

WARREN - CROSS                    139

1         A.  That particular one was two days, I believe.

2    Yes.

3         Q.  26.  What page are you looking at?

4         A.  I'm looking at page 3 of 4, Part 4.

5         Q.  Are you looking at paragraph -- or

6    Exhibit 26?

7         A.  Yes.

8         Q.  Okay.  Look -- okay.  Assigned to staff

9    within two days, okay.  That is an employee

10   objective for the next reporting period; correct?

11        A.  Correct.

12        Q.  Now, that was required of Mr. Gordon.  Would

13   you go back to Exhibit 2.  What was required of

14   Ms. Johnson?  In terms of assigning tickets?

15        A.  Two days.

16        Q.  The same requirement; correct?

17        A.  Yes.

18        Q.  All right.  Now, let's look at the rest of

19   this evaluation.

20            THE COURT:  We're still on 26 now?

21   Well, I want you to take a look at 2, page 3 of 4,

22   in the section employee objectives?

23        A.  Okay.

24        Q.  And what requirement was imposed on

25   Ms. Johnson for closing help desk calls?

WARREN - CROSS                          140

1        A.  90 percent must be closed within four days.

2        Q.  Now flip back to 26; Mr. Gordon's

3   evaluation.

4        A.  Okay.

5        Q.  Same section, page 3 of 4.

6        A.  Yes.

7        Q.  What requirement was imposed on him for

8   closing help desk tickets?

9        A.  90 percent within four days.

10       Q.  The same requirement that was required of

11   Ms. Johnson; correct?

12       A.  Yes.

13       Q.  Go back to 2 again, same page.  What was the

14   third requirement set out there for Ms. Johnson?

15       A.  You mean the maintain compliance with --

16       Q.  Yes, that.  Could you read that?

17       A.  Yes.  (As read:)  Maintain compliance with

18   all CMS policy and procedures 100 percent of the

19   time.

20       Q.  Go back it 26; Mr. Gordon's evaluation.  And

21   would you tell the jury please what was required of

22   Mr. Gordon in number 3?

23       A.  Number 3?

24       Q.  Yes.

25       A.  (As read:)  Maintain compliance with change

WARREN - CROSS                                    141

1    incident problem and project management policies and

2    processes 100 percent of the time.

3        Q.  The same requirement that was imposed on

4    Ms. Johnson; correct?

5        A.  It's not worded the same; no.

6        Q.  Is it different?  Substantively is it

7    different.  I know it's different --

8        A.  No, it's policies.  It's basically the same.

9        Q.  They both had to --

10       A.  Hundred percent of the time; yes.

11       Q.  Okay.  All right.

12       The -- does Ms. Johnson's, Exhibit 2, address

13   any requirement for subordinate annual evaluations?

14       A.  Yes.  Ensure all subordinate annual

15   evaluations are completed and submitted in a timely

16   manner.

17       Q.  What was required of Mr. Gordon in

18   Exhibit 26 in that same section?

19       A.  Ensure all subordinate annual evaluations

20   are completed and submitted in a timely manner.

21       Q.  The same requirement that was required of

22   Ms. Johnson; isn't that right?

23       A.  Correct.

24       Q.  Let's look at -- what about tasks,

25   completing tasks?  What is required of Ms. Johnson

1    in Exhibit 2?  It's Number 11.

2         A.  Excuse me.  It's paper clipped.

3         You said it was number 11?

4         Q.  Yes.

5         A.  Are you talking about objectives for the

6    next reporting period?

7         Q.  Yes.  Page 3 of 4 in Exhibit 2?

8         A.  This one only has 10.

9         Q.  Really?

10        A.  Yes.

11        Q.  We may need to straighten something out --

12        A.  We're talking Cheryl Johnson's evaluation

13   for 11/7 through 11/8?

14        Q.  Yes.

15        A.  Part 4, employee objectives for next

16   reporting period?

17        Q.  Yes.

18        A.  Yes, this only has 10 objectives.

19        Q.  Let me show you what -- the page provided by

20   the plaintiff in my set of exhibits.  Would you take

21   a look at that page.

22        A.  Number 11 is complete all assigned tasks by

23   the scheduled due date.

24        Q.  Okay.  Now, could you flip to Exhibit 26,

25   Mr. Gordon's evaluation?

WARREN - CROSS                                    143

1        A.  That is line 10 on the one that I'm looking

2    at also.  Same thing.

3        Q.  I'm sorry.  Complete all assigned tasks by

4    the scheduled due date?

5        A.  Yes.  On mine it's number 10.  There is not

6    an 11 on this particular one.

7        Q.  Okay.

8        A.  But that objective is included in it though.

9        Q.  So ensure subordinate annual evaluations is

10   the same as Mr. Gordon's, and there is also complete

11   all assignments by the scheduled due date?

12       A.  Correct.

13       Q.  Okay.  I'm sorry.

14       Now go to Exhibit 26.  In Mr. Gordon's

15   evaluation at number 8, what is required of him?

16       A.  Complete all assigned tasks by due date.

17       Q.  The same requirement that was made of

18   Ms. Johnson; correct?

19       A.  Yes.

20       Q.  Now, some of these numberings are different.

21   Could you explain to the jury maybe why there's a

22   few different sections on Ms. Johnson's as opposed

23   to Mr. Gordon's?

24       A.  I mean it varies from job to job.  So

25   depending upon the responsibilities of that

WARREN - CROSS                                    144

1    particular group or that particular individual, they

2    could vary.

3        Q.  Okay.  They had two different groups?

4        A.  Yes.

5        Q.  Okay.  But these two evaluations, it's

6    correct to say, for both Ms. Johnson and Mr. Gordon,

7    required both of them to effectively manage staff

8    resources, tickets must be assigned to staff in two

9    days, 1.  90 percent of help desk calls must be

10   closed in a four day time frame, 2.  Maintain

11   compliance with change incident and project

12   management policies and processes 100 percent of

13   time, 3.  Ensure annual evaluations completed and

14   submitted timely, 4.  Complete assigned tasks by the

15   scheduled due date, 5.

16       All five of those categories were required of

17   both Ms. Johnson and Mr. Gordon; isn't that right?

18       A.  Yes.

19       Q.  Now, I want you to take a look at who signed

20   both of these evaluations as the direct supervisor?

21       A.  Rod Nance signed Cheryl Johnson's as the

22   immediate supervisor.

23       And Rod Nance signed Ed Gordon's as the

24   immediate supervisor.

25       Q.  And in this first evaluation for

WARREN - CROSS                                      145

1     Ms. Johnson, go there to the list of -- Part 2 in

2     Ms. Johnson's general appraisal of employee

3     performance.  Do you see that?

4          A.  Yes.

5          Q.  There are ten categories there; right?

6          A.  Yes.

7          Q.  Would you just quickly read to the jury what

8     categories those are that are being applied to

9     Ms. Johnson's performance?

10         A.  (As read:)  Job knowledge, productivity,

11    quality, initiative, use of time, planning,

12    follow-up, human relations, leadership, subordinate

13    development.

14         Q.  Could you go to Mr. Gordon's, please,

15    Exhibit 26, at page 2 of 4.

16         A.  And they will be the same.  That was

17    consistent.

18         Q.  The exact same categories; correct?

19         What did Mr. Nance give Ms. Johnson on this

20    particular evaluation in terms of the appraisal?

21         A.  Okay.  For job knowledge, needs improvement.

22    Productivity, needs improvement.  Quality, needs

23    improvement.  Initiative, meets expectations.  Use

24    of time, needs improvement.  Planning, needs

25    improvement.  Follow-up, needs improvement.  Human

1    relations, meets expectations.  Leadership, needs

2    improvement.  And subordinate development, meets

3    expectations.

4         Q.  Okay.  Would you take a look at the second

5    page of the exhibit that I was given by plaintiff's

6    counsel and tell me what sections are checked in

7    those ten categories with respect to Ms. Johnson?

8         A.  Oh, wait, was I looking at the wrong one

9    possibly?

10        Q.  Exhibit 2?

11        A.  They just fell out.

12        Q.  Oh.

13        A.  From 11/6 to 11/7?

14        Q.  Yeah.

15        A.  Okay, I'm sorry.  For that -- I read the

16   wrong one.

17        Q.  He's reading the wrong page.  Sorry.

18        A.  Okay.  For that particular one, for each one

19   of those categories, job knowledge, productivity,

20   quality, initiative, use of time, planning,

21   follow-up, human relations, leadership, and

22   subordinate development, all of those categories

23   were meets expectations.

24        Q.  Meets expectations?

25        A.  Yes.

WARREN - CROSS                                   147

1      Q.  Okay.  Go over to Mr. Nance's --

2      A.  Mr. Gordon's?

3      Q.  What was checked on those general appraisals

4  of those ten categories?

5      A.  For Mr. Gordon?

6      Q.  Yeah.  All but -- all but two were meets

7  expectations; correct?

8      A.  Yes.  Initiative --

9      Q.  Or all but three?

10     A.  -- and follow-up and leadership were all

11  exceeds expectations.

12     Q.  Okay.  So would it be fair to say then that

13  these two evaluations by Rod Nance of Ms. Johnson

14  and Mr. Gordon were pretty equivalent?

15     A.  Yes.

16     Q.  Okay.  Take a look at the -- the box above

17  number -- Number 2 on appraisal of objectives.

18     A.  For?

19     Q.  For Ms. Johnson.  It would be Exhibit 2.

20     A.  Okay.  The box above what?

21     Q.  The Part 2.  Would be Part 1, appraisal of

22  objectives.

23     A.  Yes.

24     Q.  What is that first --

25     A.  For reporting period, 100 percent of help

WARREN - CROSS                            148

1    desk --

2            THE COURT:  Wait a minute, wait a minute.

3    Start that again.  Read it clearly.

4    The first objective, appraisal of objectives in Part

5    2 for Exhibit 2 required of Ms. Johnson is what?

6        A.  For current reporting period, 90 percent of

7    help desk calls must be closed within a four day

8    time frame.

9        Q.  And that was the met; correct?

10       A.  Correct.

11       Q.  Flip over to Mr. Gordon's.  The first

12   appraisal of objectives for him was what?

13       A.  For current reporting period, help desk

14   calls must be closed within a four day time frame.

15       Q.  The same requirement that was imposed on

16   Ms. Johnson; correct?

17       A.  Yes.

18       Q.  And that was also met?

19       A.  Yes.

20       Q.  So they had -- they essentially had the same

21   evaluation for that?

22       A.  Yes.

23       Q.  What about the next category?  Maintain

24   compliance with change incident problem and project

25   management 100 percent of the time?  What was Mr.

WARREN - CROSS                                    149

1    Nance's report there of Ms. Johnson?

2         A.  She received a met.

3         Q.  What did Mr. Gordon receive in that same

4    category?

5         A.  He received a met.

6         Q.  What about the next category, manage staff

7    efficiently creating tasks through the use of Remedy

8    applications to assign work to staff?  What did

9    Ms. Johnson receive from Mr. Nance?

10        A.  She received a met.

11        Q.  What did Mr. Gordon receive in that same

12   category from Mr. Nance?

13        A.  He received a met.

14        Q.  So at least for these two evaluations in

15   this time frame, Ms. Johnson's November '06 to '07,

16   Mr. Gordon's May '07 to '08, these evaluations

17   were -- would it be fair to say they were

18   equivalent?

19        A.  They were similar; yes.

20        Q.  Okay.  Now, an employee's performance may or

21   may not change; would you agree with that?

22        A.  Correct.

23        Q.  Okay.  Over time?

24        A.  Yes.

25        Q.  Thank you, that's all I have.

WARREN - REDIRECT                    150

1          THE COURT:  Thank you, Ms. Barnes.

2     Mr. Baker.

3          MR. BAKER:  Thank you, Your Honor.

4          THE COURT:  You may redirect.

5                    REDIRECT EXAMINATION

6   BY MR. BAKER:

7     Q.  You have a lot of paper in front of you.

8     A.  Yeah, it fell out.  It's out of order, so --

9     Q.  If we take a look at Exhibit 26.  That's an

10  evaluation of Mr. Gordon while he headed the

11  Hardware Unit?

12    A.  That is correct.

13    Q.  And if we take a look at Exhibit 2, that is

14  the evaluation of Ms. Johnson while she was in the

15  Administration Unit?

16    A.  Yes.

17    Q.  Okay.  And you had more contact with her

18  when she was in the Administration Unit; am I

19  correct?

20    A.  Possibly so; yes.

21    Q.  I notice in all of these evaluations there

22  is a Part 4 which says (as read:)  Employee

23  objectives for next reporting period.  You see that?

24    A.  Yes.

25    Q.  Who sets those objectives?

WARREN - REDIRECT                    151

1       A.  The manager -- I mean it can be done between

2   the manager and the individual, but a lot of times

3   it's the manager setting the objectives.

4       Q.  Okay.

5       A.  But -- well, actually, it's the individual,

6   you know, they'll have some goals they want to

7   achieve, and then the manager will add to them.

8       Q.  Okay.  Is it normally an interactive

9   process?

10      A.  Somewhat, yes.

11      Q.  Yeah.  I mean the manager says, "Here, I

12  think, are some goals I would like.  What do you

13  think about it."  And the employee says, "Well, here

14  are some goals that I think might be more

15  realistic."  And they -- a kind of give-and-take

16  process?

17      A.  Yes.

18      Q.  And ultimately, the manager is the final

19  word on the objectives?

20      A.  Yes.  There are some basics, like the help

21  desk tickets closed four days, those are consistent

22  across the board.

23      Q.  Okay.  All right.

24  So there's some that are just standard?

25      A.  Yes.

1          Q.  Everyone has them?

2          A.  Yes.

3          Q.  And there are others that are manager

4    created?

5          A.  Yes.

6          MR. BAKER:  Okay.  I have no further

7    questions.  Thank you.

8          THE COURT:  Thank you.  Mr. Baker.  Back to

9    you, Ms. Barnes?

10         MS. BARNES:  Well, Your Honor, the only

11   addition -- we would like the Court to admit

12   Exhibit 26.  I think Exhibit 2 was admitted, and we

13   think Mr. Gordon's should be admitted too.

14         MR. BAKER:  I have no objection.

15         THE COURT:  It's admitted.

16      (Plaintiff's Exhibit 26 admitted.)

17         THE COURT:  Well, that's good timing.  It's

18   about time for our break, isn't it?  Of course it

19   is.  Let's take our afternoon break.  We will stand

20   in recess for twenty minutes.  Please recall,

21   however, ladies and gentlemen, the admonition of the

22   Court not to discuss this case at all, even among

23   yourselves, until it's time to deliberate your

24   ultimate verdict.  Okay?  So zip 'er.

25         Very good.  Let's enjoy our break.  We will

1    stand in recess for twenty minutes.

2        (A recess was taken.)

3            THE COURT:  Thank you, everyone.  Please be

4    seated.  I apologize for keeping you stranded for a

5    few minutes, but I have a long route back here

6    that's slanted because of OSHA and all of the

7    typical requirements, so I've got a hike from the

8    chambers up this back tab.

9        In any event, thank you very much.  And we're

10   all in place after our break.  And Mr. Baker.

11            MR. BAKER:  Thank, Your Honor.  I'd like to

12   call Ed Gordon.

13       (The witness was sworn.)

14            THE COURT:  Please have a seat right up

15   here.  Make yourself comfort and lean in the

16   microphone, if you would, please, sir.

17            THE WITNESS:  Okay.

18                    EDWARD L. GORDON

19   called as a witness herein, having been duly sworn,

20   was examined and testified as follows:

21                  DIRECT EXAMINATION

22   BY MR. BAKER:

23       Q.  Good afternoon, Mr. Gordon.

24       A.  Hello.

25       Q.  Would you state your name and address for

GORDON - DIRECT                                154

1    us, please?

2        A.  Yeah, Edward L. Gordon.  5101 Smith Road in

3    Pleasant Plains.

4        Q.  By whom are you employed?

5        A.  DOIT right now.  Department of Innovation

6    Technology for State of Illinois.

7        Q.  Okay.  That may require some explanation.

8    Were you, at one time, employed by the Department of

9    Central Management Services?

10       A.  Yes.  Up until pretty recently, when DOIT

11   was put into law.

12       Q.  Okay.  And you worked in The Bureau of

13   Communication and Computer Services?

14       A.  That's correct.

15       Q.  Did the Bureau of Communication and Computer

16   Services kind of go into DOIT?

17       A.  As of July, I believe it was July the

18   Governor signed it into law.

19       Q.  So basically, your unit transferred from CMS

20   to DOIT?

21       A.  Yeah.  Yes.

22       Q.  Okay.  So I'm gonna talk with you about your

23   employment when it was at CMS.  When did you go to

24   work for CMS?

25       A.  I started February 5th in 2007.

GORDON - DIRECT                    155

1        Q.  And are you familiar with the Midrange

2   Wintel area?

3        A.  Absolutely; yes.

4        Q.  Okay.  Throughout your employment with CMS,

5   were you working in that unit?

6        A.  Yes.

7        Q.  And can you tell me what your job

8   classification was when you worked in that unit?

9        A.  Initially, I was hired as Midrange Wintel

10  hardware supervisor manager.  And I worked in that

11  capacity for about 14 months.  And then after that,

12  it was Midrange Wintel Applications Unit until

13  present.

14       Q.  Okay.  So are you a public service

15  administrator?

16       A.  I am.

17       Q.  Option 3?

18       A.  Option 3.

19       Q.  Can you tell me generally what that means in

20  terms of your work responsibilities?

21       A.  Public service administrator is a

22  supervisory management position.  The Option 3 is a

23  designation for technical.  So a technical

24  background, technical familiarization.

25       Q.  Okay.  My understanding is there are five

GORDON - DIRECT                    156

1    separate work units within Midrange Wintel.  Am I

2    correct in that respect?

3         A.  Currently?

4         Q.  Well, back in 2006 to 2012?

5         A.  Let's see.  Midrange Wintel Administration,

6    Midrange Wintel Hardware, Midrange Wintel Software,

7    Midrange Wintel Applications.  There was a Midrange

8    Wintel Projects or Special Projects, I don't

9    remember exactly, but a projects unit.

10        Q.  Okay.  So five?

11        A.  I think so.

12        Q.  Okay.  And you have worked in two of those

13   units?

14        A.  Correct.

15        Q.  Initially, you worked in the Hardware Unit

16   and you were a supervisor; am I correct?

17        A.  That's correct.

18        Q.  How many people did you supervise in the

19   Hardware Unit?

20        A.  Initially there were five staff.

21        Q.  Did that ever change?

22        A.  We had one person that didn't perform, and I

23   was involved in getting -- working to have him

24   terminated, so that became four people.

25        Q.  All right.  When you went to the second

1    unit, whose name I have forgotten already, how many

2    people did you supervise?

3         A.  Oh, I'm trying to think.  I'm trying to

4    remember.  Let's see.  Seven or eight.  I don't --

5    seven or eight people.  I don't -- I have to think

6    back in time or look at an org chart.  There were

7    seven or eight in the Applications Unit.

8         Q.  Okay.  So the Application Unit had more

9    individuals in it than the Hardware Unit?

10        A.  It did.  Totally different duties, totally

11   different staff.

12        Q.  During the time period between when you

13   first joined CMS in 2007, I believe, through 2012,

14   did you always have the same supervisor?

15        A.  I did.

16        Q.  And who was that?

17        A.  Rod Nance.

18        Q.  Okay.  So Mr. Nance would have been the

19   individual that did your evaluations?

20        A.  He did; yes.

21        Q.  And was he the individual who assigned you

22   your job objectives?

23        A.  Yes.

24        Q.  Okay.  I want to talk with you a little bit

25   about the work of the Hardware Unit.  But let me

GORDON - DIRECT                        158

1    begin by asking you:  The five people initially and

2    then the four people that worked under you.  What

3    was their background?  What type of skills did they

4    bring to the unit?

5        A.  The staff were -- so we had a staff, two

6    staff unit members that were from Central

7    Management, CMS.  So they were present already.

8    These staff existed before -- I didn't hire them or

9    anything, they were existing.

10       We had a gentleman from Department of

11   Transportation that was in the unit.  Gentleman from

12   agriculture, Department of Agriculture, that was in

13   the unit.  And a gentleman who was from Department

14   of Human Services, DHS.

15       Q.  Okay.  So these people were from other

16   units, they came to CMS?

17       A.  Prior to me, but yes.

18       Q.  Okay.  And formerly, they had worked in

19   the -- in the departments you've described?

20       A.  Different agencies.

21       Q.  These people, what type of technical

22   background did they have in hardware?

23       A.  I honestly couldn't speak to that

24   specifically.  I could talk about their capabilities

25   that I saw, but --

GORDON - DIRECT                              159

1        Q.  Okay.  Well, without getting into

2   individuals, would it be fair so say that they

3   didn't all have the same level of capabilities?

4        A.  Oh, certainly.  They had different levels.

5        Q.  Some had better skill sets than others?

6        A.  Of course.

7        Q.  And some had more years of experience doing

8   hardware work than others --

9        A.  Absolutely.

10       Q.  -- would that be correct?

11       A.  Absolutely; yes.

12       Q.  Were the people in the Hardware Unit all

13  expected to be able to do any type of task that came

14  into that unit?

15       A.  I think ultimately they were expected to.

16       Q.  So let's talk for a moment about the type of

17  work that the Hardware Unit did.  We have heard a

18  little bit already in this case about servers?

19       A.  Sure.

20       Q.  And a server would be a piece of hardware;

21  am I correct?

22       A.  That's correct.

23       Q.  And I'm assuming that servers might have

24  various components that are used with them?

25       A.  I don't want to mis-answer your question,

GORDON - DIRECT                          160

1    but a server is basically like a PC or workstation

2    you have at home, but it's a commercial version.  So

3    more robust.  But -- so yes, it has components that

4    make up a server.  Similar to a computer.

5         Q.  Okay.  When you were in the Hardware Unit,

6    how many servers was Wintel Midrange responsible

7    for?

8         A.  I think about -- probably about 3500.

9         Q.  All right.  And were some of those servers

10   located at the Data Center?

11        A.  The majority were at the Data Center here in

12   Springfield.

13        Q.  And others were in the field?

14        A.  Correct.

15        Q.  Do you know how many were in the field?

16        A.  Estimation, probably about 450, or a little

17   more, at remote locations, you know, outside of

18   Springfield.

19        Q.  And when you say remote locations, what are

20   we talking about?

21        A.  Field offices for the various agencies.

22        Q.  Okay.  So there might be a field office for

23   the Department of Children and Family Services down

24   in Alton that could have a server, for example?

25        A.  Hypothetically; sure.

GORDON - DIRECT                      161

1        Q.  Okay.  So would it be accurate to say these

2    servers were spreads throughout the State of

3    Illinois?

4        A.  Yeah.  The remote servers were spread

5    wherever central or remote offices for the various

6    agencies we supported were located.

7        Q.  And my understanding is that the Hardware

8    Unit would kind of be the--for lack of a better

9    term--the screwdriver and pliers unit when it comes

10   to working on the servers?  Would that be perhaps an

11   oversimplification, but a description of what it

12   did?

13       A.  That's a super oversimplification.  They

14   supported the physical hardware that --

15       Q.  Okay.  Excuse me, I interrupted you.  Go

16   ahead.

17       A.  I mean they supported -- I mean part of it

18   was with screwdrivers and wrenches, but more than

19   that.

20       Q.  It was a little more involved than that, I

21   take it?

22       A.  Yeah.

23       Q.  So would the Hardware Unit repair servers?

24       A.  Absolutely.

25       Q.  My understanding is there's this entity

GORDON - DIRECT                        162

1    called the help desk?

2         A.  There is.

3         Q.  Is that correct?  And the help desk would

4    issue tickets?  Am I right so far?

5         A.  They were -- yeah, they were one source of

6    work flow and tickets.

7         Q.  And these tickets might have come from the

8    help desk would be to correct problems -- hardware

9    problems with a server?

10        A.  Yeah.  They would -- they would be

11   notification that potentially there was a problem

12   with -- there was a problem for the -- users in the

13   field, the users anywhere.  And it certainly could

14   have been and lot of cases was a server issue.

15        Q.  Okay.  And did a -- is there such a thing as

16   a decommissioning of a server?  Are you familiar

17   with that term?

18        A.  Yeah.  It's just simply if a server is going

19   to be removed from service, no longer needed or

20   replaced or upgraded.  So the decommission would be

21   remove the physical asset, physical server, and take

22   it out of service and dispose of it properly.

23        Q.  Okay.  And then would your unit have built

24   servers?

25        A.  Hardware Unit built servers.

1        Q.  What is involved in building a server?

2        A.  Powering it up, making sure that it powers

3   up.  And if there's any kind of faults or alarms or

4   anything mechanical, electrical broke, fans, just

5   basic things.  Installing an operating system.  To

6   equate it back to a computer at home, you know,

7   Windows, we use Windows Server.  So it's an

8   operating system.  Make sure the server is on the

9   network, so meaning it has network access.  Same as

10  home computer nowadays with the internet.  You would

11  make sure it's up to current patch level.

12       Q.  What does that mean?

13       A.  So it had the most current version of the

14  Windows Operating System that was -- the most recent

15  version.  Making sure they had any bugs or anything

16  would have been taken care of with the most previous

17  version.  And a lot of exploits for security,

18  vulnerability.

19       You'd make sure the server was accessible

20  remotely.  Making sure that it was set up so it

21  would receive, when I say patching, future automated

22  patches for Windows updates.  It would -- we would

23  ensure that there was antivirus protection, just

24  similar to home like McAfee or, you know, an

25  antivirus protection on it.

GORDON - DIRECT                    164

1        That's basically -- and then you would be -- at

2    that point, it would be able to be kind of ready to

3    receive or do its real job, get application

4    installed or whatever it was being built for.

5        Q.  Okay.  Now, that's -- we're involved in

6    building servers now, right?  That's what you're

7    talking about?

8        A.  Yeah.  Up to that point, that would be -- so

9    when you build a server, you present something that

10   was up and ready to be used.

11       Q.  Okay.  Did you upgrade servers?

12       A.  Sure.

13       Q.  Now, what does it mean to upgrade a serve?

14       A.  I don't know if it's okay to keep equating

15   it to PCs, but it just makes it simple.  So if you

16   have an older version of, in our case it was still

17   Windows, the older versions would be out of support

18   through Microsoft, who supports and created Windows,

19   Window Server.

20       And so to stay current, to stay where you could

21   apply security patching and have a product that was

22   supported, a server that was supportable, you would

23   say go from a Windows Server 2003, when that was

24   going out-of-date, you would upgrade a server would

25   be to go to server functioning the same, providing

GORDON - DIRECT                        165

1    the same role, with Windows 2008 Operating System.

2        Q.  Okay.  For those of us that are

3    technologically impaired, myself included, when it

4    came to upgrading a server, would that -- would that

5    involve increasing storage space or capacity?

6        A.  Well, that could be a form of an upgrade.

7    It could be considered an upgrade.

8        Q.  Okay.  Would that be a part of the work that

9    was done by your unit?

10       A.  Yes.

11       Q.  Hardware unit.

12       Did the Hardware Unit have any responsibility

13   for installing servers?

14       A.  Yes.

15       Q.  And what -- and what would be the

16   responsibility there?

17       A.  So when -- I described the server build

18   process a little earlier.  The -- it would be the

19   installation, say a remote site where the server

20   wouldn't be operating at the Data Center where it

21   was built, it would be powered down, packed up,

22   delivered to whatever location, a remote office say.

23   And it would be installed and brought back up and

24   available on the network.

25       Q.  So you would -- you would take a server from

GORDON - DIRECT                    166

1    the Data Center out to a remote location and install

2    it at the remote location?

3        A.  Yeah.  That would be its permanent -- that

4    would be its new home to operate; yeah.

5        Q.  Okay.  Have we basically covered the general

6    duties and the functions of the Hardware Unit, or

7    have we left something out?

8        A.  Well, you know, there were -- there were

9    additional areas that were part of the Hardware Unit

10   during my -- it was about 14 months.

11       Q.  What were they?

12       A.  We did inventory on servers and established

13   the number.  And when I first started, we didn't

14   have a clear number of servers or locations.  We had

15   some general ideas, but they were brought in from a

16   number of agencies.  So to compile all that

17   information and to validate it and to know the

18   physical number and location of the servers, makes

19   and models, that was part -- a big part of -- part

20   of the unit's job at least when I was in that unit.

21       Also server monitoring.  That was a real big

22   accomplishment to get servers monitored.  Health

23   monitoring, so we would know the server health.  If

24   a server was alarming, if a server was operating or

25   not operating, you know, up or down basically.  So

GORDON - DIRECT                                    167

1    that was a big piece, also, of what we did and what

2    was accomplished.

3        Q.  Okay.  Would -- would it be accurate to say

4    that the Hardware Unit was responsible for all

5    Midrange Wintel servers, at least the hardware

6    aspects of it, for all agencies under the

7    jurisdiction of the Governor's Office?

8        A.  All the -- well, all the servers that we

9    knew about.  Agencies -- agencies weren't always

10   willing participants in all cases.  So there may

11   have been straggler servers that we weren't aware

12   of.  But yeah, I would say that was the intent.  We

13   were responsible for about 3500 servers that we were

14   aware of.

15       Q.  Okay.  Are you familiar with the Remedy

16   system?

17       A.  Absolutely.

18       Q.  And can you tell us what that was?

19       A.  Essentially, it's a trouble -- it's a

20   trouble ticketing system for -- you'd mentioned if

21   the help desk made a ticket, they would make it in

22   the Remedy system.  And that would be a way to

23   permanently track the reported outage, track any

24   progress or any issues along the way, any problems

25   trying to get it resolved.  That was one of the --

GORDON - DIRECT                                        168

1   one of the features of Remedy.  Projects were run

2   out of Remedy at that time.

3        And any kind of non-help desk, like routine,

4   non-emergency type -- like, oh, I don't know, reset

5   a password or something like that might be help

6   desk, or it might just be like a general service

7   request.

8        But those types of tickets were -- our work

9   flow was input really primarily through the Remedy

10  system.

11       Q.  Okay.  So the Remedy system kind of

12  identified work orders or tickets and what progress

13  was made on them; would that be a fair statement?

14       A.  Yeah.  And most importantly, it brought --

15  it brought outages.  If we hadn't caught them

16  through server monitoring, it brought any kind of

17  service impact that was being reported from the

18  field to our attention.  And it kind of got the

19  clock ticking for us to begin work.

20       Q.  Okay.  How did the Hardware Unit get its

21  work?  Who would -- who would send it to you?

22       A.  There were probably several ways it came in.

23  Remedy tickets would be one of them.

24       Q.  Okay.  Now, who would issue the Remedy

25  ticket?

GORDON - DIRECT                    169

1        A.  It could be our Service help desk would

2   create them.  You had authorized, I believe local

3   office administrators or similar title at each

4   agency, each agency had kind of their own name for

5   it, but a person authorized from certain agencies to

6   report problems and create tickets.  Some of the

7   agencies even maintained a help desk.

8        Q.  So some of the agencies could send tickets

9   or work orders directly to the Hardware Unit?

10       A.  Yeah.  They could create them and send them

11  to hopefully the appropriate group.

12       Q.  Okay.  When a ticket would come in, would

13  it -- in the Hardware Unit, would it have gone to

14  you?

15       A.  Well, it was available to anyone in

16  Midrange, but I had a view set up so that I would

17  see them.  And in my unit, at least during the time

18  I ran Hardware, and even to this day, I assign work,

19  I'm the one -- I'm the first line when tickets come

20  in that would evaluate who the best person, who's

21  available, and assign the tickets.

22       Q.  All right.  So when a ticket came to the

23  Hardware Unit, you would take a look at the ticket

24  and find out what the nature of the work was; am I

25  correct?

GORDON - DIRECT                          170

1        A.  Nature of the work, severity, impact.

2        Q.  And then you would kind of figure out who in

3   your unit had the time to work on it and who was

4   most capable of working on it; would that be a fair

5   statement?

6        A.  Yes.

7        Q.  Okay.  And then you would assign it to that

8   individual?

9        A.  I would.

10       Q.  And that individual would become the owner

11  of the ticket?

12       A.  Well, they would become the implementer or

13  the person working on it.  The manager.  So I owned

14  all the tickets for my group ultimately.

15       Q.  Okay.  Did that indicate on Remedy that you

16  were the owner of the ticket?

17       A.  Yeah.  I mean -- well, through the group, it

18  would show -- it would also show that I assigned it.

19  And -- I'd have to look, but through the group name,

20  you would know who the manager of that unit was.

21  The managers were always -- were always the owners

22  of the tickets for their group.

23       Q.  Well, that's how it was supposed to be done?

24  Did that --

25       A.  I mean that was the expectation.  That's the

GORDON - DIRECT                          171

1   way we -- yeah, the managers would ultimately have

2   to answer for -- in other words, if there was an

3   issue with a ticket or it had escalated or

4   something, the manager would be the contact.

5        Q.  Okay.  Like the buck stops here?

6        A.  Yes.

7        Q.  If there's a problem, it comes to you?

8        A.  That's correct.

9        Q.  Okay.  So what was the process of assigning

10   a ticket to a subordinate employee?

11       A.  Help desk or -- just depends what type of

12   ticket.

13       Q.  Well, let's talk about a help desk ticket.

14       A.  A help desk ticket, yeah.  If we're talking

15   about me, in my group, or whatever group I was in at

16   the time, yeah, I would look at the ticket, evaluate

17   who the best candidate was to work on it, who was

18   available, prioritize it.  And to the best of my

19   ability, make initial contact with -- if the ticket

20   wasn't clear, make contact with the requester to

21   make sure that when it was assigned, that the

22   technician, whoever that was, that he or she had

23   enough information to begin working on it.

24       Q.  Okay.  So when you had gone through that,

25   what was the actual process of assigning it to a

GORDON - DIRECT                           172

1    technician?  What did you have to do to get the

2    ticket to the technician?

3         A.  Select their name from the drop down of our

4    group and hit assigned.

5         Q.  How long did that take?

6         A.  Well, the actual clicking?  You know,

7    30 seconds.  The evaluating and looking at the

8    ticket --

9         Q.  That took more time?

10        A.  That took -- yeah, it took what it took.

11   But you know, two to three minutes up to an hour

12   even to make the right determination.  But the

13   actual assigning was very quick.  It was -- you

14   select the technician and save the ticket.

15        Q.  Okay.  Now, once the -- once the ticket was

16   assigned to the technician, what was the role of the

17   technician?

18        A.  Utilize their skills and abilities to

19   effect, you know, a repair as quickly as possible.

20   Engage other people for help if needed.  And also

21   report back to the supervisor, whomever it was.  In

22   my case me, I mean for my group.  Keep me abreast of

23   any kind of issues or problems if there was any

24   speed bumps, so to speak.

25        Q.  Okay.  So the technician would basically run

GORDON - DIRECT                           173

1   with the ticket?

2        A.  Yes.

3        Q.  If he or she had problems, they would seek

4   you out?

5        A.  Yes.

6        Q.  Okay.  So when a ticket was completed, all

7   the work from the ticket was done, what was your

8   role?

9        A.  So typically -- and it would depend on the

10  severity.  Major severity, I had a much more active

11  role.  A routine ticket, maybe smaller severity,

12  typically, the technician, there would be an email

13  chain validating did this -- is it working for you

14  now?  There would be an email ideally back from

15  whoever the person who complained was or had the

16  issue.

17       Q.  Typically, did you term that by taking a

18  look at the Remedy system?

19       A.  No.  There might be -- there would be an

20  email chain probably.  It's difficult.  A lot of the

21  state users that report problems are on the phone

22  all day for Human Services -- they deal with the

23  public.  So a lot of times it was very difficult to

24  get through on the phone.  So email would be

25  probably the most normal source to validate, you

GORDON - DIRECT                                    174

1    know, I think I've got it fixed, it is working for

2    you now?  And that --

3         Q.  Okay.  Is that something the technician

4    would typically do?

5         A.  Very often.

6         Q.  Yeah.

7         A.  In some cases, it was a bigger, more severe

8    outage, I think a variance on that is I probably

9    would follow up.  If it was more than one office, it

10   might be the technician and myself.

11        Q.  So if it were a bigger problem, more serious

12   problem, you'd become involved in the verification

13   process?

14        A.  Yeah.

15        Q.  And if it was kind of a routine item, the

16   technician would verify it with the customer?

17        A.  Typically.  They would either paste the

18   response from the email on the ticket or I think I

19   would get copied on the email to see it.

20        Q.  Okay.  And just by reviewing the emails and

21   looking in the Remedy system is what you would do?

22        A.  Yeah.  Yes.

23        Q.  Okay.  Are you familiar with change tickets?

24        A.  Change ticket.  A form of a Remedy ticket.

25        Q.  Okay.  What is exactly a change ticket?

GORDON - DIRECT                    175

1        A.  A change simply is -- it's a type of ticket.

2   It's a technical or industry kind of term, change.

3   But if you make a change to a server, a change would

4   be changing the operating system, changing the

5   amount of memory, a physical change to the server.

6        So I guess a change ticket is just what it

7   sounds like, it would represent a change.  To

8   configuration.

9        Q.  Okay.  Now, from time to time, would a

10  ticket involve work that would require the services

11  or assistance of another unit?

12       A.  Yes.

13       Q.  Give me an example of when that would occur?

14       A.  So, a server built request.  So you build a

15  server.  The server would need to be connected to

16  the network so they could talk and communicate to

17  anything.  I mean it -- a server that isn't

18  connected to the network really can't offer much use

19  to anyone and can't do any kind of real work.  So

20  that would be a really common example where you'd

21  have the Network Group provide network connectivity.

22       Q.  And when you got the ticket, say from the

23  help desk or from the customer, would it identify

24  the need for another unit to become involved?

25       A.  No.

GORDON - DIRECT                                    176

1        Q.  Who would make the determination that

2   another unit needed to be involved?

3        A.  Well, there would be an exception.  So on a

4   project=type ticket where you have a project

5   manager --

6        Q.  That would be a bigger ticket?

7        A.  The project manager would make you aware

8   that -- that they knew going in it was a bigger

9   project.  But for routine-type tickets; no.  The

10  user or whoever was suffering the outage wouldn't

11  know what's involved to do the repair.  They would

12  count on us to determine that and take care of it,

13  implement it, assign it.

14       Q.  Okay.  So how would -- how would the

15  Hardware Unit coordinate work with another unit?

16       A.  We would create a task under a change

17  ticket, or actually under any kind of ticket you

18  could create a task.  And that would be sent to the

19  other unit outlining what you needed, what you

20  required, what you were asking for, hopefully with

21  enough specifics, enough information for them to

22  accomplish whatever you needed, provide what you

23  needed.

24       Q.  Who would do that?  Would it be you or the

25  technician?

GORDON - DIRECT                      177

1        A.  It could be a combination.  Or early on --

2    it was me early on.

3        Q.  Did it change?

4        A.  As some of the technicians became more

5    skilled at understanding what the process was.

6    There wasn't much of a process when I started.  I

7    helped create the build process and decommission

8    processes.  So there was no real formal -- formal

9    way to do that.  This is -- CMS and all those units,

10   the five units that you asked about at the

11   beginning, those were kind of start-up just prior to

12   me showing up.

13       So anyway, as it became established, I would do

14   the early tasks.  And then as it was proven that

15   they made sense, they worked, they were viable, then

16   technicians were able to do that and would assist

17   me; I could delegate for them to create some tasks.

18   Some tasks were more evident than others; it just

19   would depend.  So yes, I did some of them and

20   eventually technicians did create tasks.

21       Q.  The work of the technician, was some of that

22   done in the field?

23       A.  The technicians worked sometime in the

24   field; absolutely.

25       Q.  What type of work would they do in the

GORDON - DIRECT                              178

1    field?

2         A.  Oh, just about anything -- anything they

3    would do locally.  Troubleshoot a server.  Of

4    course, you have the handicap of being remote, so

5    bring a spare server; You know, research what the

6    server was, have spare parts.  Troubleshoot the

7    problem.  Ideally, change out any components that

8    were needed.  They could have been upgrading memory

9    for -- if it was -- if it was determined that it

10   needed more -- more memory or things like that, they

11   could have done upgrades in the field as well.

12        They could have done hard drive -- if they

13   increased hard drive space, they could have done the

14   migration with increased hard drive space.  Those

15   were generally a lot of times overnight affairs.

16        So pretty much any work you would do in the

17   luxury of the Data Center, you would -- you could be

18   performing out in the field in a remote office that

19   you're not familiar with.

20        Q.  So if the server was in the Data Center, you

21   do the work there?

22        A.  Yeah.

23        Q.  If the server was in the field, you'd have

24   to go to where it was located?

25        A.  Sure.  And be prepared as best you can to

GORDON - DIRECT                    179

1    have spare parts, et cetera.

2         Q.  Sure.  Are you familiar with the WUG, W-u-g,

3    WUG report?

4         A.  Yeah.  I was the implementer.

5         Q.  Okay.  What was the WUG report?

6         A.  WUG is -- it's a brand name that is

7    Ipswitch.  Means nothing if you -- if you don't

8    know.  There's a vendor, it's called What's Up Gold.

9    And it is a kind of a low-cost, pretty efficient

10   server monitoring system that will monitor networks,

11   server health, server applications.  I can elaborate

12   on and on.

13        Q.  Would the WUG system monitor the available

14   space on a server?

15        A.  So we -- it would -- so it wasn't highly

16   sophisticated.  It could be set for thresholds.  And

17   so typically -- I don't want to get too involved,

18   but servers have different partitions on their hard

19   drive.  There's a partition which -- people are

20   generally know as C drive, where your Windows server

21   operates.  If that space were to fill up and there's

22   no more space available, the server ceases to

23   operate.  It needs some room -- it needs a little

24   bit of overhead space, a little free space to run.

25        So we had set a threshold at 97 percent and --

GORDON - DIRECT                    180

1    so it would alert us if, hey, this server is at the

2    point where it could be critical.  We quit having

3    outage related to space on that C drive, which is

4    the hard drive.

5        Q.  So if a server is above 97 percent, does

6    that mean something has to be done to increase its

7    space?

8        A.  It tells you you're at risk that if anything

9    more is put on there -- if that 97 percent becomes a

10   hundred percent, then the server will fail.

11       Q.  Right.

12       A.  That's what it does tell you.

13       Q.  Okay.  So when a server was low on disk

14   space, what if any responsibility did you have or

15   your group have for that server?

16       A.  So what we -- I monitored What's Up Gold.

17   So I was in it, and to this day, every day all day

18   long it's running on my screen.  In addition to hard

19   drive space, I'm watching any kind of outages.

20       But if I saw a server that was at 97 percent,

21   immediately engage a technician, create a help desk,

22   see if they could delete unneeded files to free up a

23   little more space and buy more time.  And then make

24   plans to address the space issue.  Once again, if it

25   was in the building at the Data Center here in

1    Springfield, a little less complicated.  If it's out

2    in the field, then we'd make preparation, coordinate

3    with the site, and have to do an on-site drive

4    expansion.

5        And those frequently ran through a weekend.

6    You know, we try to plan them for a minimum -- you

7    could be down for a day and a half or two days, so

8    we'd those on a weekend.  And that would be the

9    Hardware staff that travelled.  That was some of the

10   remote duties.

11       Q.  Okay.  So I'm assuming you would have to

12   coordinate with the customer --

13       A.  Yes.

14       Q.  -- because you're taking the server out of

15   service?

16       A.  Yes.

17       Q.  Okay.  And you would also have to figure out

18   who was available to go out in the field on your

19   staff?

20       A.  Absolutely.

21       Q.  Okay.  How long did you have to do that?

22       A.  Well, I -- from February 5th, 2007, and then

23   I transitioned during the month of April, Cheryl and

24   I transitioned units.  I transitioned into the

25   Applications Unit, so it would be my direct

GORDON - DIRECT                    182

1   responsibility through into April 2008.

2       Q.  But once -- once you identify a server being

3   at 97 percent capacity, how long did you have to

4   increase the capacity?

5       A.  Okay.  I'm trying not to make it

6   complicated.  So if you have a very small hard

7   drive, 3 percent could be a very small amount of

8   space.  You know, if it's say the hard drive is a

9   hundred and you know it's at 97, you only have 3

10  left.  If it's at a thousand, you have 30 left, I

11  mean percentage-wise.  So you had to use a little

12  bit of judgment.  You had to kind of look -- now,

13  there was a history in What's Up Gold to show

14  utilization.  So --

15      Q.  So --

16      A.  -- you could make some judgment calls.

17      Q.  Excuse me, I interrupted you.  So it varied

18  depending upon the capacity of the server?

19      A.  The amount of time you had, yeah, it varied

20  on the rate of utilization and the capacity of the

21  server.

22      Q.  Excuse me just a minute.

23      Could I have a moment, Your Honor?

24          THE COURT:  Of course.

25      Q.  When it came to decommissioning servers --

GORDON - DIRECT                           183

1     A.  Yes.

2     Q.  -- would you get that assignment through the

3  help desk or through some other means?

4     A.  You would probably not get it through the

5  help desk.  That would probably be the least -- the

6  least place you'd get it.  It would come from a

7  variety of places.  Want me to elaborate?

8     It could come from an agency who doesn't want

9  to pay for it.  They were being billed for servers,

10  so they could identify, hey, we're not using this

11  anymore.  They would know the business need and they

12  would know what they were doing with the server to a

13  much higher degree than we would.  So the agency may

14  say, "Please -- please decommission this.  We don't

15  want to pay for it anymore."

16     It could come from an upgrade.  So if a server

17  was upgraded to say a more modern server, more

18  modern operating system so that it was supportable,

19  obviously, it would -- you would want to

20  decommission the one that was no longer being used

21  for the one you replaced it with.

22     So those would come in, some of those might

23  even be created by the Hardware Unit ourself.  As

24  you did an upgrade, you would know when you

25  coordinate and determine if the old server was still

GORDON - DIRECT                        184

1    required or not.  Certainly the agency would be the

2    final authority when they get their bill and don't

3    want to pay for it.

4         Q.  When you're upgrading, is there a required

5    period of time to decommission a server once the

6    request was made?

7         A.  Yes.  So we would do -- we would email and

8    talk to the customer and try to determine, A., if it

9    was feasible, if it made sense to decommission a

10   server if it wasn't being used.  Verify to the best

11   of our ability.

12        We do what we kind of call a screen test,

13   but -- where you would actually take the server,

14   leave it intact, take it off the network, or stop

15   anyone from being able to use it by taking their

16   log-ins away.  And so you would have a 30-day window

17   to where if no one came back and reported, hey,

18   where's my server, hey, I can't do something, that

19   gave you kind of the green light to decommission a

20   server that probably wasn't going to be used, it was

21   probably a safe bet.

22        And then after that, usually we'd -- we'd

23   decommission a server, would be about a 30-day

24   window.

25        Q.  Okay.  So there would be 30 days to kind of

GORDON - CROSS                    185

1    evaluate whether it should be decommissioned?

2         A.  Safety net.

3         Q.  Safety net.  And then another 30 days to

4    take it out?

5         A.  Yeah.

6         Q.  Total of 60 days.

7         Thank you, I have no further questions.

8              THE COURT:  All right.  You may cross.

9                   CROSS EXAMINATION

10   BY MR. OKON:

11        Q.  Good afternoon, Mr. Gordon?

12        A.  Hello.

13        Q.  You previously testified that you had, at

14   least at one point, five technicians within your

15   Hardware Group; correct?

16        A.  So -- yes, when I started February 5th,

17   2007, there were five team members.  There were five

18   people in that unit.

19        Q.  Now, prior to you starting as the manager of

20   the Hardware Group on February 5th, 2007, were there

21   any previous managers of the Hardware Group before

22   you?

23        A.  Not that I'm aware of.  I wasn't a state

24   employee prior to that, so I don't know a lot of the

25   history or -- but no, I don't think there was an

1    actual manager assigned to that unit yet.

2        Q.  Okay.  So would it be fair to say that you

3    were the first manager of the Hardware Group;

4    correct?

5        A.  Yes.

6        Q.  Okay.  And could you please explain to the

7    jury, since being the first manager of the Hardware

8    Group, some of the additional difficulties or things

9    you had to set up since this was a new group that

10   was getting going?

11       A.  Well, the initial -- the first initial thing

12   that -- that hit me is I had asked the number of

13   servers that we maintained, you know, and their

14   location.  The answer was, we don't know for sure.

15   So initially figuring out the number of servers that

16   I was responsible for, my group was responsible for,

17   their locations, kind of the age, the vintage of

18   them, the age of them, the variety of operating

19   systems that we might encounter.

20       Then almost immediately, as part of identifying

21   the servers, putting a server monitoring tool out

22   there.  There was a basic tool in place for

23   Department of Transportation.  We elected to go with

24   a different brand, it was that What's Up Gold.  But

25   implement server monitoring as well.  Implement

GORDON - CROSS                         187

1    server build process so that there was a

2    standardized way for whoever needed a server to ask

3    for it and cover kind of all the bases of things we

4    would ask so that they knew.  And that was my

5    initial challenges.

6        Q.  Sure.  So you mentioned a couple times help

7    create the build processes.  What exactly do you

8    mean by that?  Does that have to do with specific

9    list of tasks associated with a ticket type?

10       A.  So it was to identify -- yeah, it was to

11   identify the steps required.  And these would have

12   started out as the fundamental basic steps.  Nothing

13   too elaborate.  But wanting to know what network it

14   needed to be on, who -- who was going to utilize it.

15   Kind of the capacity, the size of the applications

16   and/or software based on the role.

17       So basically to give the specifications and the

18   requirements for a server.  It helped us pick which

19   model number.  We had a couple different model

20   numbers.  And those would have different costs as

21   well.  So you would want to put the right hardware

22   with the right -- the right use so that you weren't

23   putting out, you know, more expensive and more

24   robust machine than you needed.

25       Q.  Okay.  When you started as the manager of

GORDON - CROSS                    188

1    the Hardware Group if in '07, was there already a

2    list of these build processes in place that you

3    could take and advance from there on, or did you

4    have to yourself create them?

5         A.  I didn't find any.  There was no -- there

6    was no documented process that I am aware of.

7         Q.  Okay.  So being the first manager, to your

8    knowledge, of the Hardware Group, you then had to

9    create these build processes or these specific types

10   of ticket types; is that correct?

11        A.  So I created the build -- the build request.

12   How to build a server, the technicians had their

13   own -- I don't know if it was a formal document

14   approved by anyone.  The technicians had cheat

15   sheets and processes they developed on how to

16   install Windows operating systems.  So I don't want

17   to negate or not mention that.  They -- the

18   technicians had their own documentation.  If you get

19   a server, where it would -- with the operating

20   system on it.

21        But as far as taking it to the next level where

22   it was ready for a customer or to be put in

23   production and used, that was a portion -- and we

24   engaged kind of the other teams, that was the part

25   that I worked on.

GORDON - CROSS

1    Q.  Okay.  And you also mentioned that you had a

2 technician within your group that was performing

3 unsatisfactorily; is that correct?

4    A.  There was.

5    Q.  Was it one technician or more than one

6 technician?

7    A.  There was one.

8    Q.  Okay.  And was this a technician that while

9 you were the manager of the Hardware Group that had

10 to be let go?

11    A.  Yes.  He -- it was an abuse of time issue.

12    Q.  Okay.  Then you also testified that you

13 moved on to be the manager of Applications; correct?

14    A.  Yes.

15    Q.  And you had seven to eight technicians as

16 the Applications manager?  About?

17    A.  Yeah.  I'd have to look at an org chart.

18 That sounds right.  Seven or eight is probably

19 correct.

20    Q.  Okay.  Can you kind of explain the

21 differences between applications and hard ware, and

22 do you have an opinion as far as which ones you kind

23 of deem more difficult than the other?

24    A.  Well, the Applications Unit, personally I

25 think it's the worst of the five groups to get stuck

GORDON - CROSS                          190

1    in.  But -- so Applications is loading the -- I'm

2    trying to think of an example that would crossover

3    in the civilian word, but a mapping software, say.

4         So Applications, you're working with vendors.

5    So a variety of vendors who write different

6    applications for accounting, for mapping, for

7    storing -- storing scans and images of documents so

8    you don't have paper, so you have an electronic

9    copy.  Those types.  There's a lot more.

10        So you're interfacing with vendors.  That takes

11   a little bit of the control out of your hands.

12   You're dependent on vendors.  You're kind of forced

13   to upgrade or to do upgrades on servers based on

14   newer versions of applications.

15        I don't know, better or worse is hard.  For me,

16   it was worse.  It's less tangible, it's less

17   something you can see and touch.  Hardware, for me,

18   was something that was more tactile, and you could

19   look at it, touch it.  If it caught on fire, you

20   smelled it.

21        Applications can break and you're relying on

22   the vendor and/or your own team may have caused --

23   you know, within Midrange or within network, there

24   could be other things that caused problems.  So it

25   would give you a lot more of a headache, and it's

GORDON - CROSS                           191

1   not something that you can a screwdriver and wrench,

2   so to speak, fix.

3        Q.  So did you think Hardware was easier as

4   opposed to Applications?

5        A.  For me.

6        Q.  Okay.  We also talked about some of the

7   duties as a Hardware manager.  Are managers of

8   Hardware required to complete all the tasks

9   associated with tickets assigned to their group?

10       A.  No.

11       Q.  And you previously mentioned you have

12   technicians within your group that you can assign

13   tasks to; correct?

14       A.  Within our group and outside of our group.

15       Q.  Okay.  And when you say outside of your

16   group, can you inform the jury what you're referring

17   to?

18       A.  So, inside the group would be one of the

19   technicians on the Hardware team.  We're talking

20   about when I was Hardware manager, right?

21       Q.  Correct.

22       A.  And so outside the team would be if we need

23   network connectivity, within the network there's

24   firewall rules, ports that have to be opened up.

25   Just network things that have to be done.  So

1    obviously, we would assign that task to the Network

2    to perform that.  We wouldn't even have permission

3    to do that.

4        If you needed storage space that's outside the

5    server--not all storage is inside servers.  So a lot

6    of times you use mass storage that's onsite.  Even

7    remote sites have it.  So that would be a different

8    request.

9        Q.  Okay.  So are you referring to just the

10   ability to assign tasks to technicians that are not

11   within your group, but within one of the five groups

12   of Midrange Wintel?

13       A.  No.  Even groups outside of those five.

14       Q.  Okay.  And are these non-state employee

15   contractual organizations that you can assign tasks

16   to?

17       A.  Well, in the case you're talking about now,

18   it would be -- it would be state employees in say

19   the Network Group, Storage Group which is disk

20   space, whether it --

21       For non-state employees, that would be

22   separate.  That would be more for a break fix or

23   help desk situation.

24       Q.  Okay.  What I'm trying to ask you is, are

25   you familiar with Novaris?

GORDON - CROSS                        193

1      A.  Novanis?

2      Q.  Novanis, excuse me.

3      A.  Yes.

4      Q.  Can you inform the jury of what Novanis is?

5      A.  So Novanis is or was, I don't know if these

6  places are still in business today.  Times are

7  tight.  But Novanis and Sentinel were -- they were

8  private shops in the area that we were able to --

9  the State of Illinois had contracts.  They provided

10  technicians, they provided warranty support for the

11  brands that we -- of servers which was

12  Hewlett-Packard.

13      So you could -- you could call and contact and

14  leverage Novanis or Sentinel to conduct -- would

15  probably be a repair situation.

16      Q.  Okay.  So -- so there were tasks that you

17  could assign to technicians that didn't work for the

18  state, but worked for Novanis and Sentinel; is that

19  correct?

20      A.  Yeah.  You would -- it was through IBM.  It

21  would be an IBM support case.  There was an online

22  form that you could fill out.  And you could

23  coordinate and assign work to the Novanis or

24  Sentinel via IBM.

25      Q.  And was there any limit to how often you

1    could utilize those services?

2        A.  I never reached it if there was.  And some

3    of the work was warranty work, so there was no

4    charge.  The servers had, I believe, a three-year

5    warranty.  So if there was an outage, hardware

6    outage in the first three years, then it was a free

7    repair.  Just took the time it took to make the

8    request.

9        Other repairs, in a pinch, if you were tight on

10   manpower or it was a remote site that would take us

11   hours to get to and either Sentinel or Novanis --

12   Sentinel was my preference, but Sentinel, you could

13   call them and if it was a serious outage you could

14   have somewhere there ideally a lot quicker than what

15   we were able to dispatch out of Springfield here.

16       Q.  And how would you go about -- as the

17   Hardware manager, how would you go about assigning a

18   task or having Sentinel and/or Novanis involved in

19   completing a task for a ticket?

20       A.  So being not a technician, at least not in

21   that capacity, and so I would open an IBM service

22   ticket.  They were pretty specific and actually well

23   thought out as far as what IBM required.  You give

24   them all the pertinent information, including onsite

25   contacts, and I would delegate and really have one

1    of my technicians keeping an eye on it.  Because

2    they're technical, they would kind of understand

3    better what that Sentinel or Novanis technician were

4    doing, kind of parts needed.  Sentinel or Novanis

5    didn't necessarily have every spare part that we

6    had.  We were pretty standardized on our equipment.

7    So it wouldn't be unheard of if they were doing a

8    repair to get them a part if they were able to fix

9    it that day.  So there was some coordinate with one

10   of the techs on the Hardware team when I was there.

11       Q.  Are the services of Sentinel and Novanis

12   reserved for only use by those in the Hardware

13   Group?

14       A.  It's the only group I'm aware would benefit

15   from it and that used it for server-type repair.

16   That was their specialty.  Or at least that's what

17   we used them for.

18       I can't think of another unit that would have

19   needed them.  I certainly wouldn't have in my

20   Applications Unit.

21       Q.  Okay.  And are you aware whether these

22   services were available when Ms. Johnson took over

23   as the Hardware manager?  Excuse me, the manager of

24   the Hardware Group?

25       A.  Yeah, they were still available.

GORDON - CROSS                           196

1        Q.  Okay.  Now, Mr. Baker was previously using

2    the term "owner" of the ticket.

3        As the manager of any group, including

4    Hardware, do you need to have that ticket placed in

5    your name specifically to be quote, the owner, of

6    the ticket?

7        A.  No.  It wouldn't make any difference.  If

8    it's in my unit, if it's in -- so now it would be

9    Midrange Wintel Applications, but if there's a

10   ticket in my group, I would be -- ultimately, I own

11   it.  And I think Mr. Baker said the buck stops here.

12       So I -- yeah, I would be responsible for the

13   resolution, any delays, and have to give status

14   updates.  Or the glory of getting it fixed quickly

15   and everyone is happy.  You own all that.

16       Q.  Okay.  I also want to ask you about the WUG

17   report you were referring to.  You said you were the

18   initially implementer.  What did you mean by that?

19       A.  Well, we didn't have a universal server

20   monitoring tool when I started.  The monitoring tool

21   helped in discovery, so you can do -- you can do

22   kind of manual work, contact sites, take the reports

23   of what was brought over, initial building reports,

24   things from the agencies.  But the what's Up Gold

25   tool, server monitoring tool, it would go out and do

GORDON - CROSS

1    discovery.  So servers kind of live in the same IP

2    range, the same network space.  So you were able to

3    go out and scan and determine if there were

4    additional servers and kind of validate if even the

5    servers you thought were out there are still awake

6    and alive.

7         So what was the original question, because I

8    was trying to get there?

9         Q.  Sure.  Did being the -- as you were the

10   initial implementer as you described, did that

11   require any things that you would have to do on the

12   front end that once What's Up Gold was established,

13   you didn't have to continue doing because it was

14   already implemented and running?

15        A.  I'm sorry, I don't -- I'm not.

16        Q.  I'll rephrase.

17        You said you were the initial implementer of

18   What's Up Gold; correct?

19        A.  Yes.  That was -- that was the project --

20   product of choice for several reasons.

21        Q.  And were there any things that you had to do

22   in order to get that program running to implement

23   it, so to speak, so it could be utilized?

24        A.  Yeah.  Myself and there was another

25   technician, I don't want to take all the credit for

1   configuring.  I pretty much selected the product

2   based on a bunch of criteria; one of which, it

3   didn't require anymore overhaul on the servers,

4   didn't require a client installed out in the field.

5   And then myself and a technician, which -- yeah, you

6   had to configure every single alarm.  And kind of

7   the way you'd want it to report by agency.  You'd

8   want it to report by function.  So if it was a

9   database-type server, you were able to look at the

10  database servers.  If it was a Department of Human

11  Services server, you could call them up by that.

12       So there was some configuration setup.  Same

13  with the hard drive space.  There was a determining

14  the threshold, what was -- what was a threshold that

15  worked that didn't give an over amount of

16  notification and alarms, and certainly didn't give

17  too little.

18       Q.  Sure.

19       A.  So there was a lot of configuration that

20  went into it.  You know, times three plus thousand

21  servers.  And then later even more with a lot of the

22  network things, network routers and some of the

23  network incorporated.

24       Q.  And was What's Up Gold, was it implemented

25  by the time Ms. Johnson became manager of Hardware?

1       A.  Yes.

2       Q.  Okay.  No further questions, Your Honor.

3            THE COURT:  Thank you, Mr. Okon.  Back to

4   you for redirect.

5                   REDIRECT EXAMINATION

6   BY MR. BAKER:

7       Q.  Unfortunately, questions beget questions.

8       A.  Sure.

9       Q.  So the first position you had at CMS was the

10  Hardware Unit manager?

11      A.  Midrange Wintel Hardware.

12      Q.  Okay.  And you -- you came from outside the

13  State of Illinois --

14      A.  I did.

15      Q.  -- to that position.  You were in the

16  private sector; am I correct?

17      A.  Yes.

18      Q.  Did you interview specifically for the

19  Hardware position?

20      A.  I believe so.

21      Q.  Okay.  I mean typically in state government

22  there's a notice describing a position and people

23  apply to that notice.  Was it -- was the notice for

24  a Hardware person?

25      A.  I'd have to look at the original -- I would

1  have taken any job, I needed money.  So I didn't

2  care what it was.  I don't remember what the

3  original job was.  I think it was Hardware.  I'm

4  pretty sure it would have been.

5      Q.  All right.

6      A.  I wouldn't have applied if I didn't feel

7  confident that it was something that I could do.

8      Q.  Okay.  So did you have prior hardware

9  experience?

10     A.  Well, I did.

11     Q.  Can you give us a little background of your

12  hardware experience when you came in to the --

13     A.  Yeah, my background was with electric --

14  electronic equipment.  Was -- I was in the Air

15  Force, United States Air Force for six years.  I

16  worked on radio equipment.  So that's hardware.

17  It's different, right, it's not computers, but it's

18  radio equipment out in missile fields.  And then

19  later in Japan for a couple years.

20         So I was familiar with hardware supporting all

21  the equipment.  It was a heck of a lot better stuff

22  than we have here.  I had the luxury of working on

23  some really nice stuff in the military.

24         Then after that, in the private sector,

25  continued to work on radio equipment or RFI

1    engineering type equipment as a technician.  And

2    later as a supervisor manager where we did inventory

3    and some of the basic things you would do with

4    hardware.  Once again, it wasn't computer hardware,

5    but it was definitely hardware.

6        Q.  Was your hardware experience in the private

7    sector or military sector, did it translate well to

8    the work you did at CMS in the Hardware Unit?

9        A.  I think so.

10       Q.  Okay.  Best estimate, how many years of

11   hardware experience did you have before you went to

12   CMS?

13       A.  Well, six years in the military, five of

14   which -- four of which I wasn't in school.  So four

15   years of hands-on.  And then in -- 19, 20 years.  So

16   24 years at least.

17       Q.  Okay.  You indicated that the Applications

18   Unit, you had more headaches?

19       A.  I don't know if I used that word at all.

20   But I didn't like it as much.

21       Q.  Beg your pardon?

22       A.  I don't enjoy it as much.  I don't know

23   about headaches, but if I said that, then yeah, I

24   probably had more headaches.

25       Q.  Well, I wrote it down, maybe I was just

GORDON - REDIRECT

1    dreaming.

2        Was the problem in the Applications Unit you

3    were kind of depending upon vendors to do some of

4    the work?

5        A.  That's certainly one of the frustrations.

6        Q.  Okay.  So you didn't have the control you

7    had on the Hardware Unit?

8        A.  Well -- yeah, you don't have -- working with

9    a vendor, there's delays that you wouldn't have

10   within the state.  You don't get the immediate

11   response, you're put in queue.  And it's outside of

12   your control.

13       Also, depending on the size of the vendor

14   company and whatever contact is in place, you have

15   to live within those terms.  So if a vendor

16   has--which probably we don't have any this fast--a

17   two-hour turnaround, that would be great, you know

18   you're gonna get help in two hours.  Some days you

19   wait two days.  And --

20       So yeah, you're working with -- and not only

21   that, you're not with a standard one or two

22   applications like in servers, you have two primary

23   servers you have to learn.  At the time -- at least

24   at that time.  So if you knew those, you've learned

25   two, you've got it made.  There were some older ones

GORDON - REDIRECT                    203

1    that you'd have to learn, but your bread and better

2    was two.  With applications, there's probably

3    hundreds.

4        Q.  Would it be an accurate characterization

5    that while you managed the Hardware Unit, it was a

6    busy unit?

7        A.  Yes.

8        Q.  Not a whole lot of down time for

9    technicians, was there?

10       A.  No.

11       Q.  They were kept hopping?

12       A.  Yeah.  We -- we all were.

13       Q.  And it was -- it was tough to keep up with

14   the work with five technicians; am I correct?

15       A.  I mean you always wish you had more.  I

16   think you had to budget time and resources and it

17   was doable.  I mean I was in there 14 months, so it

18   wasn't years, but sure, it was hectic and it was a

19   challenge, I'd say that.

20       Q.  All right.  Now, you were asked some

21   questions about, is it Novanis and Sentinel?

22       A.  Correct.

23       Q.  And as I understand it, they were outside

24   vendors that had a relationship with CMS; am I

25   correct there?

GORDON - REDIRECT                          204

1        A.  Correct.  Via IBM.

2        Q.  I beg your pardon?

3        A.  They were -- they were engaged via IBM.  And

4    IBM bigger contract, but yes, there was a

5    relationship through IBM.

6        Q.  Okay.  So -- so they would be called in to

7    assist you when you couldn't get the work done; is

8    that fair?

9        A.  We leveraged them.  We used -- yes, we used

10   their assistance for both warranty and work, other

11   outages, other work.

12       Q.  Okay.  So the warranty work was -- I think I

13   have an understanding of that.  But what other types

14   of work would they do for you?

15       A.  Well, a server -- let's say a server failed,

16   any number of reasons.  Keep it simple, the power

17   supply died, so the thing shut off.  We can't really

18   fix that remotely.  You know, it's not just a tweak

19   of having -- try to turn it back on for you.  So

20   that requires a visit.

21       We're in Springfield.  If there was -- if it

22   was a site say in DeKalb or somewhere up north,

23   we're many hours away, a lot of traffic away.  Kind

24   of difficult on certain days with the state to even

25   get a vehicle in a timely manner to travel.

GORDON - REDIRECT                              205

1          So in the interest of the customers, of the --

2     of the people dependent on that server in DeKalb in

3     this case hypothetically, you could call Sentinel or

4     Novanis.  In my case, it would have been Sentinel

5     probably; I worked with them more.  And they would

6     have someone out perhaps in an hour and a half, two

7     hours because they're physically -- have staff at

8     their offices up there.

9          Q.  Okay.  Was there any restriction on the

10    amount of use you could make of Novanis and

11    Sentinel?

12         A.  If there was, I never hit it.  So I -- if

13    there was a restriction on it, I never reached that

14    point where I was made aware of it.

15         Q.  How frequently did you use Novanis -- well,

16    you said Sentinel was the one you primarily used; am

17    I correct?

18         A.  In my case, yes, it was.  I happened --

19         Q.  Prefer Sentinel?

20         A.  I just happened to use them.

21         Q.  How frequently did you use them?

22         A.  Well, take warranty work aside which a lot

23    of that was at Data Center because the majority of

24    the servers were there.  So they would come in and

25    replace things.

1        Oh, probably three or four times early on in a

2    given month.  Probably reasonably accurate.

3    Probably a little less than that.  Three or four

4    times in a month would be probably a lot.

5        Q.  Okay.  So maybe between two and four times a

6    month, would that be --

7        A.  We'd have to pull reports, but sure --

8        Q.  Rough estimate?

9        A.  No more than once a week probably.  And --

10   but yeah -- yeah, something like that.

11       Q.  Okay.  Fine.  Thank you.  I have no further

12   questions.

13           THE COURT:  Thank you, Mr. Baker.

14       Back to you, Mr. Okon.

15           MR. OKON:  One brief follow-up, Your Honor.

16           THE COURT:  Wonderful.  You've got the

17   timing right down to an nit.  Super.  Go.

18           MR. OKON:  We try.

19                    RECROSS EXAMINATION

20   BY MR. OKON:

21   Mr. Gordon, when you left Hardware and when

22   Ms. Johnson took over, did you just let Ms. Johnson

23   figure it out on her own?  How to manage Hardware

24   Group?

25       A.  So the history was Cheryl and I, or

1    Ms. Johnson, we were roommates for about a year, a

2    little more.  Real friendly, got along.  And so

3    during the transition, which would have been pretty

4    roughly, but April of 2008 would have been kind of

5    the month that we transition -- that we were

6    transitioning.

7         I took all the information, any of the forms

8    for server build decommission, inventory, whatever

9    else I had, probably more, and created -- I don't

10   know if people are familiar with Share Point, but

11   a -- a location on -- a location that we all had

12   access to and that she was granted permission to on

13   the network where you could go look at a web page

14   basically.  And it had folders just like in your

15   computer at home.  It would have decommission

16   folder, the other process and procedures.  I think

17   inventory certainly would have been shared.

18        And I know Cheryl, over a couple of days--not

19   full two days, but over the course of a couple

20   days-- went over kind of what the content was out

21   there.  And --

22        Q.  So if I understand correctly, this is

23   something you created; correct?

24        A.  Yeah.  I put stuff out in Share Point so

25   that it would be a resource for Cheryl.

1        Q.  And after creating it, you also showed it to

2   Ms. Johnson and kind of explained what each folder

3   was, what's within it; is that accurate?

4        A.  I did.  And actually, the group used it and

5   expanded that later.  They had included some

6   other -- some other things out there.  So I think it

7   was a good starting point, it was a good core amount

8   of information.  And I think they actually took that

9   and expanded it an used it.  So great.

10       Q.  Had you had that when you started as

11  manager, would that have been helpful for you?

12       A.  I didn't even know how many number of

13  servers I was in charge of.  I -- no, I had nothing.

14       Q.  And would that have been helpful if you had

15  that Share Point site with all those?

16       A.  Yes, it would be helpful to anybody, yeah,

17  who's in that job.

18            MR. OKON:  No further questions, Your

19  Honor.

20            THE COURT:  Thank you.

21       Well, now back to an opportunity to the

22  plaintiff?

23            MR. BAKER:  I have no questions, Your

24  Honor.

25            THE COURT:  Oh, good.  Look at that, five

GORDON - RECROSS                                209

```
 1    four minutes 'til five.  That's excellent timing.  I
 2    compliment counsel for having this all figured out.
 3    Wonderful.
 4         All right.  Are we all finished then with
 5    Mr. Gordon?
 6              MR. BAKER:  Yes.
 7              THE COURT:  Everybody gets the chance.
 8    Mr. Gordon, we're all finished with you.  How's
 9    that.
10              THE WITNESS:  Thank you.  Should I leave?
11              THE COURT:  And thank you for being with
12    us.  You may step down.
13         (The witness was excused.)
14              THE COURT:  And I think this is the perfect
15    time for us to recess for the evening.
16         Now, ladies and gentlemen, we are three minutes
17    'til five.  So we will see you in the morning at
18    9:00.  If you would be here just a few minutes
19    early, and back in the -- after you have checked in
20    with the Clerk's Office and be back in the jury
21    deliberation room.  Coffee will be ready for you.
22    Everything.
23         So please be here on time with a fresh new
24    patch that says Juror on it.  And we'll be ready to
25    go hopefully on time.  And I am very confident that
```

1    we will.

2        So until 9:00 tomorrow morning, please recall

3    this admission.  I do not want you to talk about

4    this case or anything involving it or anything about

5    it with anyone, including your spouses, your

6    children, anybody else in the home.  We just don't

7    want to do that because everything has to be done by

8    you.  You will make the final decision.  And we want

9    you to be with nothing in your mind except the

10   evidence that comes out in this courtroom.  Okay?

11       Very good.  Then please recall that admonition

12   at all times.  And we will see you all tomorrow

13   morning at 9:00.  Thank you very much.

14       Counsel, is there anything that we need to

15   discuss outside of their presence?

16            MR. BAKER:  I don't believe so.

17            MS. BARNES:  No, Your Honor.

18            THE COURT:  Very good.  Thank you all.

19   We'll stand in recess until 9:00 tomorrow morning.

20       Thank you very much.

21       (Court was recessed for the day.)

22

23

24

25

1

2   I, KATHY J. SULLIVAN, CSR, RPR, CRR, Official Court

3   Reporter, certify that the foregoing is a correct

4   transcript from the record of proceedings in the

5   above-entitled matter.

6

7

8

9

10              This transcript contains the

11              digital signature of:

12

13              Kathy J. Sullivan, CSR, RPR, CRR

14              License #084-002768

15

16

17

18

19

20

21

22

23

24

25