212

1          IN THE UNITED STATES DISTRICT COURT
         FOR THE CENTRAL DISTRICT OF ILLINOIS
2                 SPRINGFIELD DIVISION

3

CHERYL L. JOHNSON,              )
4                               )
              PLAINTIFF,        )  14-CV-3001
5                               )
         VS.                    )  JURY SELECTION
6                               )
THE ILLINOIS DEPARTMENT OF      )  SPRINGFIELD, ILLINOIS
7  CENTRAL MANAGEMENT           )
   SERVICES,                    )  VOL. 2
8                               )
              DEFENDANT.        )
9

10           TRANSCRIPT OF PROCEEDINGS
         BEFORE THE HONORABLE RICHARD MILLS
11            UNITED STATES DISTRICT JUDGE

12  AUGUST 28, 2018

13  A P P E A R A N C E S:

14  FOR THE PLAINTIFF:         JAMES P. BAKER
                               BAKER, BAKER & KRAJEWSKI
15                             415 SOUTH SEVENTH STREET
                               SPRINGFIELD, ILLINOIS
16

17  FOR THE DEFENDANT:         DEBORAH BARNES
                               JOSEPH OKON
18                             ILLINOIS ATTORNEY GENERAL
                               500 SOUTH SECOND STREET
19                             SPRINGFIELD, ILLINOIS

20

21

22

COURT REPORTER:      KATHY J. SULLIVAN, CSR, RPR, CRR
23                   OFFICIAL COURT REPORTER
                     U.S. DISTRICT COURT
24                   600 E. MONROE
                     SPRINGFIELD, ILLINOIS
25                   (217)492-4810

1                           I N D E X

2      WITNESS              DIRECT    CROSS    REDIRECT    RECROSS

3      JO HIGGERSON         220       242      274/297     291
       CHERYL JOHNSON       299
4

5

6
                          E X H I B I T S
7
       PLAINTIFF'S EXHIBIT
8      NUMBER                    IDENTIFIED      ADMITTED

9      EXHIBIT 3                    354            356
       EXHIBIT 15                   390            391
10     EXHIBIT 19                   431            432
       EXHIBIT 28                   232            232
11     EXHIBIT 29                   237            238
       EXHIBIT 30                   229            232
12     EXHIBIT 31                   225            226
       EXHIBIT 32                   235            237
13     EXHIBIT 33                   230            232
       EXHIBIT 34                   238            239
14     EXHIBIT 35                   239            242
       EXHIBIT 36                   241            242
15

16
       DEFENDANT'S EXHIBIT
17     NUMBER                    IDENTIFIED      ADMITTED

18     EXHIBIT 41                   291            292
       EXHIBIT 48                   247            249
19     EXHIBIT 49                   255            256

20

21

22

23

24

25

<pre>
  1                    P R O C E E D I N G S

  2      *    *    *    *    *    *    *    *    *    *    *

  3          (The following proceedings were held outside

  4          the presence of the jury.)

  5              THE COURT:  Thank you, Madam Clerk.  Good

  6      morning, everyone.  You may show that the jury is

  7      not, not in the courtroom.  And I've been advised

  8      that we have an evidentiary matter that needs to be

  9      resolved outside of their presence.

 10          So all counsel are present and are ready to

 11      proceed.  And I'll turn to the Government -- to the

 12      State, since Ms. Barnes looks likes she's poised to

 13      bring up a matter to the Court.

 14              MS. BARNES:  Your Honor, a witness named

 15      Lisa Rush was disclosed by the plaintiff literally

 16      on the eve of trial.  We objected.  The plaintiff --

 17      the Court's order said that she could be produced

 18      by -- put on the stand by the plaintiff.

 19          I asked plaintiff's counsel yesterday about

 20      her, and he declined to advise us what the

 21      foundation and substance of her testimony would be.

 22      She is not a state employee, she is an outsourced

 23      employee who works at the security guard stand at

 24      the front of the building where BCCS was housed.

 25      She's not part of BCCS, and she has no understanding
</pre>

1     or duties with respect to the work BCCS does.

2          Watching plaintiff trundle equipment in and out

3     and signing security paperwork is not relevant to

4     any issue in this case.  And we don't know what

5     she's going to say and we had no opportunity --

6     excuse me.  We've had no opportunity to investigate

7     what she's going to say, or take any steps, if

8     needed, to prepare a witness to rebut, if needed,

9     what she says, if that's necessary to this case.

10         We are completely in the dark about why a

11    non-state employee security guard has any evidence

12    that is relevant to this case.  And at a minimum,

13    Your Honor, we'd like to be informed of the

14    foundation of her testimony and the substance of her

15    testimony so that we can take steps to defend it if

16    we need to.

17              THE COURT:  Okay.  Thank you, Ms. Barnes.

18    Mr. Baker, you may respond.

19              MR. BAKER:  Thank you, Your Honor.

20    Good morning.

21              THE COURT:  Good morning.

22              MR. BAKER:  Lisa Rush works for, I believe,

23    Universal Protective Services which is now Allied

24    Protective Services.  She works at the Data Center

25    for what use to be the Department of Central

1    Management Services as a security guard.

2        Ms. Barnes informed me of who she was after I

3    had made a visit to that office a couple of weeks

4    ago.  For the benefit of counsel, her telephone

5    number is 720-0264.

6        One of the tasks of Ms. Johnson involved

7    checking in inventory, maintaining inventory

8    associated with servers and miscellaneous equipment.

9    And one of Ms. Rush's jobs involved overseeing or

10   providing security for the room where this inventory

11   was located.  And she would work with Ms. Johnson in

12   checking in inventory.

13       She will say that she saw Ms. Johnson on

14   average of three times a week.  She will say that

15   she seemed to be doing her job fine in terms of

16   maintaining the inventory.  She will say from time

17   to time, Rod Nance would come over and attempt to

18   check up on Ms. Johnson.  And most times, perhaps

19   not all, but most times, what Ms. Johnson had done

20   was accurate.

21       She will also say that after Ms. Johnson left

22   CMS, other individuals would -- would do the duties

23   she was assigned, but it was not only the manager of

24   the Hardware Unit.  Mr. Nance would do it,

25   technicians would do it.  That's the substance of

1   her testimony.  And it goes to the issue of the

2   quality of her work in maintaining the inventory.

3           THE COURT:  Thank you, Mr. Baker.

4       Back to you, Ms. Barnes.

5           MS. BARNES:  Your Honor, the opinion of a

6   non-state employee about whether Cheryl Johnson is

7   doing her job is not relevant.  He has established

8   no foundation that this witness had any, any input

9   into Cheryl Johnson's work performance officially.

10  And it is -- I cannot discern what an employee in

11  this position could offer in terms of the official

12  evaluation of Ms. Johnson's work performance.

13      Asking the person at the guard stand to tell

14  this jury whether she's doing her job?  That has no

15  merit whatsoever.  And no place in an employment

16  case.

17          THE COURT:  Thank you.  Let's --

18          MR. BAKER:  Quick response --

19          THE COURT:  -- see what Mr. Baker says to

20  that one.

21          MR. BAKER:  Carrying Ms. Barnes' argument

22  to its logical conclusion, the only official who

23  could evaluate whether Ms. Johnson was doing or not

24  doing her job would have been Mr. Nance, her

25  supervisor who officially evaluated her.

1          One of the issues in this case is was she doing

2     her job properly.  One of the components of her job

3     was maintaining inventory.  This witness has

4     knowledge about how Ms. Johnson did the inventory

5     and will -- will assert that it appeared that from

6     what she observed, seeing her multiple times a week,

7     she was doing it properly.

8          And I will agree she's not an official of the

9     State of Illinois.  But I don't think there's any

10    requirement that she need be an official of the

11    State of Illinois.  If she has some knowledge

12    relevant to how Ms. Johnson did her job, I think

13    she's fair game as a witness.

14              THE COURT:  One last bite.

15              MS. BARNES:  Your Honor, Lisa Rush would

16    have no idea whether Mrs. Johnson was doing her job

17    properly.  No idea.  She was not charged with never

18    taking inventory.  She was charged with not

19    following the appropriate procedures that were

20    established by CMS.  There is no foundation for the

21    admission of this testimony.

22              THE COURT:  Close call, but you'll

23    remember, yesterday we argued as to a particular

24    paragraph in an exhibit.  And I think that there may

25    be a slight nexus between that and what we are

1  talking about now.

2      Now, this is a civil case.  And I would rather

3  err for letting something in than to keep it out

4  when it should have been allowed.  So on that narrow

5  basis, I'm going to allow her testimony.  After all,

6  she is an employee of the state, she's being paid by

7  the state.

8          MS. BARNES:  No, she is not.  She is not a

9  state employee.  She's being paid by a separate,

10  outsourced security company.

11          THE COURT:  But she's working for the

12  state.  She is working at the same site as where the

13  plaintiff has been employed.  And there is a narrow

14  nexus that I think is permissible.  And so I'm going

15  to allow it.  The motion is denied.

16      Are we ready now for the jury?  Anything else?

17  Any other crumbs to be disposed of?

18      All right.  Then I'll ask the Court Security

19  Officer to bring the jury in.

20      (The jury entered the courtroom.)

21          THE COURT:  Thank you, please be seated,

22  ladies and gentlemen.

23      And good morning to all of you.  Hope you're

24  all rested and ready to go.  Ready to tear up the

25  road.  Excellent.

HIGGERSON - DIRECT                    220

1         We did have one minor matter that I had to take

2    out of your presence.  It has been resolved and we

3    are ready to hit the road.

4         So, everyone is in place now.  And, Mr. Baker,

5    to the plaintiff.

6              MR. BAKER:  Thank you, Your Honor.

7         We would like to call Jo Higgerson.

8              THE COURT:  Very well.

9         Come right up here, please, and be sworn by

10   Madam Clerk.

11        (The witness was sworn.)

12             THE COURT:  Would you come right up here

13   and have the second best seat in the house.

14                     JO HIGGERSON

15   called as a witness herein, having been duly sworn,

16   was examined and testified as follows:

17                   DIRECT EXAMINATION

18   BY MR. BAKER:

19        Q.  Good morning, Ms. Higgerson.

20        A.  Good morning.

21        Q.  Would you state your name and address for

22   us?

23        A.  Jo Higgerson, 249 Maggie, Springfield,

24   Illinois.

25        Q.  And for the record, what is your race?

HIGGERSON - DIRECT                221

1        A.  Caucasian.

2        Q.  Where are you employed presently?

3        A.  The -- Department of IT Services.  We just

4    changed, it was Central Management Services.

5        Q.  Gotcha.  So how long did you work for

6    Central Management Services?

7        A.  Probably eight years.

8        Q.  And did you work in the Bureau of

9    Communication and Computer Services?

10       A.  Yes.

11       Q.  Last year, 2017, what was your job there?

12       A.  I worked on the Remedy system.  So it is a

13   ticketing system that technicians get their work

14   from.  I do the data management for that.

15       Q.  Okay.  And what -- what does your job do

16   with respect to the Remedy system?

17       A.  I do integrations.  So the data that's from

18   the ticketing system, propagating it out to other

19   systems to use.

20       Q.  My understanding, and correct me if I'm

21   mistaken, but my understanding is that the Remedy

22   system would track the life of a ticket from the

23   time it's opened to the time it's closed?

24       A.  That's correct.

25       Q.  And in that respect, it would identify the

HIGGERSON - DIRECT                    222

1  various components or parts associated with

2  performing the work required of the ticket?

3        A.  Yes; that's correct.

4        Q.  And it would identify who was assigned the

5  task, what the task was, when it was opened, when it

6  was completed; is that correct?

7        A.  That is correct; yes.

8        Q.  We've -- we've talked earlier in this case,

9  I'll represent to you, about some various

10  terminology in a CMS situation.

11        With respect to the Remedy system, what is a

12  task?

13        A.  A task is a job that's assigned to a person.

14  There can be a whole change, which is several tasks

15  that work together to get one job done.

16        Q.  So it would be a component of work that's

17  required to be performed to complete a ticket?

18        A.  Yes.

19        Q.  And with respect to a ticket, could there be

20  multiple tasks in the ticket?

21        A.  Yes.

22        Q.  And the Remedy system tracks who was

23  assigned the ticket?

24        A.  Correct; yes.

25        Q.  Okay.  In -- I guess it was last year, in

HIGGERSON - DIRECT                    223

1    2017, were you requested by Ms. Johnson to prepare

2    certain reports through the Remedy system?

3         A.  Yes.

4         Q.  And do you recall what reports you were

5    requested to prepare?

6         A.  She wanted reports on each one of the

7    supervisors in the servers area.  Only the tickets

8    that were assigned to them, not to their

9    subordinates.

10        Q.  Okay.  And were you able to generate such

11   reports?

12        A.  Yes.

13        Q.  Can you tell us how you went about doing

14   that?

15        A.  I have access to the database which stores

16   all of the tasks, changes -- there's actually three

17   kind of tickets:  Tasks, changes, and help desk

18   tickets.  And so I pulled all of them -- Cheryl --

19   there was several iterations of her name at one

20   point in the system.  So we pulled -- I pulled all

21   of the data for each one of the iterations of her

22   name.  And most of them were help desk tickets that

23   she had asked for help for, not something that she

24   was tasked out.  So it came down to like one name

25   basically.  And then I pulled the tickets for the

HIGGERSON - DIRECT                           224

 1    other two supervisors as well.  That were assigned

 2    directly to them.

 3         Q.  Was one of those supervisors Ed Gordon?

 4         A.  It was.

 5         Q.  All right.  You identified three different

 6    types of tickets?

 7         A.  Uh-huh.

 8         Q.  Let's talk about each for a moment, if we

 9    could.  What is a help desk ticket?

10         A.  A help desk ticket is when you are -- as a

11    user, you're having trouble doing something, so you

12    call in.  Need your password changed is a simple

13    one.  You call and you can't access something is

14    another example of that.  And it's impeding your

15    work right away, so --

16         Q.  So there has to be some repair made?

17         A.  Yes.

18         Q.  Okay.  And what is a change ticket?

19         A.  And that's more involved because it's like

20    installing a server.  Which would be kind of like if

21    you were putting a PC together at home, you've got

22    your cables and all of your -- where your mouse

23    needs to be plugged in and all of that.  So there's

24    different tasks that go with a change, like

25    installing a server.

HIGGERSON - DIRECT                    225

1        Q.  All right.  And then did you refer to a task

2   ticket?

3        A.  Yeah.  That's the different things like

4   plugging in the cable.  And I'm kind of simplifying

5   this, but I mean plugging in the cable.  There's

6   kind of a shelf store thing that servers sit on, so

7   you have to construct the shelf and plug it into the

8   network so it can hit -- so that people can get to

9   it.  Or their servers can get to it.

10       Q.  And when a task ticket is assigned to a

11  person, is that the person that performs the task?

12       A.  Yes.

13       Q.  What I would ask you to do is to go to

14  Exhibit 27.

15       A.  In this?

16       Q.  Here, let me help you.

17       You got it right.

18       I got it wrong.  Would you go to Exhibit 31.

19       A.  Yes.

20       Q.  Would you identify that document for me?

21       A.  And this is one of the reports that I

22  generated.

23           THE COURT:  What's that?

24       A.  Yeah, this is one of the reports that I

25  generated for her.

HIGGERSON - DIRECT                          226

1       Q.  And what is this -- what is this report
2    supposed to reflect?
3       A.  This one in particular is the tasks that
4    were actually assigned to Ed Gordon.
5       Q.  During what time period?
6       A.  Oh.  It's November 1st of 2006, to
7    December 31st of 2008.
8       Q.  All right.  Your Honor, I'd like to offer
9    Exhibit 31 into evidence.
10      (Court reporter requested clarification?)
11          MR. OKON:  No objection, Your Honor.
12          THE COURT:  It's allowed.
13      (Plaintiff's Exhibit 31 admitted.)
14      Q.  I want to talk to you about the format on
15   the first page.
16          THE COURT:  Move that over a little bit to
17   the left, would you please, Mr. Baker.
18          THE CLERK:  You want the annotations to go
19   away --
20      Q.  Okay.  Thank you.
21      In the left-hand side of Exhibit 31 there is
22   what I believe is a column that's headed Task ID; am
23   I correct?
24      A.  Yes.
25      Q.  And what -- what is the information that's

HIGGERSON - DIRECT                    227

1    in that column?

2         A.  That's just the number, the ticket number so

3    the system keeps track of the tasks.

4         Q.  All right.  And the next column is Group.

5    Would that be the group the ticket was assigned to?

6         A.  Yes.

7         Q.  All right.  And then the next heading is

8    Implementer.  Mr. Gordon's name appears beneath

9    that.  What is that?

10        A.  That is the person who is working on the

11   task.

12        Q.  Okay.  That would be the person assigned the

13   ticket?  The owner of the ticket?

14        A.  Yes.

15        Q.  And then the next column is Name.  What

16   is -- what is in that column?

17        A.  That's the person who requested the work to

18   be done.

19        Q.  Okay.  And that could be someone from a

20   different state agency?

21        A.  Yes; that's correct.

22        Q.  And then the next column is Create date.  Is

23   that the date the task ticket was created?

24        A.  That is correct; yes.

25        Q.  All right.  And then the next -- the next

HIGGERSON - DIRECT

1    section to the far right is identified as Workload.

2    What does the workload refer to?

3        A.  It's work log.  What it is is when people

4    have comments about the ticket who are working on

5    it, sometimes it's somebody who's not even working

6    on it, but they put it in there so that the person

7    who is working on it can see maybe some progress or

8    something that they may not have known that would

9    help them in later tasks.  Or just to document

10   exactly the chain of events.

11       So there may be some things that aren't

12   represented in there.  It just depended on the

13   technician, if they felt like they needed to put

14   something in for other people to know.

15       Q.  Okay.  Now, we're gonna be talking about

16   some other reports in a few minutes.

17       A.  Okay.

18       Q.  Is the format for each of the reports you

19   did about the same as what we've just talked about

20   with this particular report?

21       A.  Yes, it is.

22       Q.  Okay.  Now, does this report identify the

23   number of tickets that was assigned -- that were

24   assigned to Ed Gordon, task tickets, between

25   November 1, 2006, and December 31, 2008?

HIGGERSON - DIRECT                    229

1      A.  Yes.

2      Q.  And go to the last page of this document.

3  What were the total number of task tickets assigned

4  to Ed Gordon during that time period?

5      A.  75.

6      Q.  By the way, how many pages is this report?

7      A.  I don't see page numbers.  Oh, is it --

8  well, yeah, I don't see a page number.

9      Q.  Okay.

10         THE COURT:  Do you have a particular point

11  that you're pointing to here?  That you can point

12  out to her?

13      Q.  No, I don't.  I just asked if she knew the

14  number of pages.

15      Is this a complete copy of the report you

16  generated for Ed Gordon dealing with task tickets

17  assigned to him?

18      A.  Yes.

19      Q.  Okay.  I would ask that you go to Exhibit --

20  I believe it's Exhibit 30.

21      Exhibit 30 appears to be a three-page document;

22  am I correct?

23      A.  Yes.

24      Q.  Is this a portion of a report you generated

25  at Ms. Johnson's request?

HIGGERSON - DIRECT                    230

1        A.  Yes.

2        Q.  And what does that report refer to?

3        A.  The task tickets for Cheryl.

4        Q.  Okay.  During what time period?

5        A.  This November of 2008, it looks like from --

6   it was pulled for the same time period as the ones

7   for Ed, so --

8        Q.  It looks like the last entry was in August

9   of 2012; does that look about right to you?

10       A.  Yeah.

11       Q.  So that would be a report of task tickets

12  issued to Cheryl Johnson during a span of just about

13  four years; am I correct?

14       A.  That's correct.

15       Q.  How many task tickets were issued to her

16  during that time span?

17       A.  3727.

18       Q.  How much?

19       A.  3727.

20       Q.  3,727?

21       A.  Yes.

22       Q.  Okay.  If we had the complete report here,

23  do you know how many pages it would be?

24       A.  I actually don't know because the work logs

25  are different lengths, so it kind of depends.

HIGGERSON - DIRECT                    231

1        Q.  Okay.  Would you go to Exhibit 33 for me,

2    please.  Can you identify that document?

3        A.  And that's help desk tickets for Ed Gordon

4    November of 2006 to December of 2008.

5        Q.  And it talks about related tasks.  What are

6    related tasks?

7        A.  The tasks that need to be done to finish a

8    help desk ticket.

9        Q.  So this document identified both help desk

10   tickets assigned to Ed Gordon and tasks related to

11   those tickets that were assigned to Ed Gordon?

12       A.  Correct.

13       Q.  And that covers a little over a two year

14   time span; am I correct?

15       A.  That is correct.

16       Q.  And if you know, does that basically cover

17   the time period he was the manager of the Hardware

18   Unit?

19       A.  I think so.

20       Q.  Okay.  This is a 23 page document; am I

21   correct?

22       A.  Yes, because page 1 of 23.  Sorry.

23       Q.  What were the total number of help desk

24   tickets assigned to Ed Gordon during that time

25   period?

HIGGERSON - DIRECT                                    232

1    A.  70.

2    Q.  And what were the total number of related

3  tasks assigned to Ed Gordon during that time period?

4    A.  One.

5    Q.  Could you turn to Exhibit 28 for me, please.

6    Your Honor, I don't believe I've offered

7  Exhibits 30 and 33, and I'd like to do that at this

8  time?

9        MR. OKON:  No objections, Your Honor.

10        THE COURT:  Admitted.

11    (Plaintiff Exhibits 30 and 33 admitted.)

12    Q.  Can you identify Exhibit 28 for me?

13    A.  That's help desk tickets for Cheryl Johnson.

14    Q.  All right.  And that was one of the reports

15  which you prepared?  What time period does it cover?

16    A.  The same -- well, it's November of 2008 and

17  then it goes to like August of --

18    Q.  2012?

19    A.  2012; yeah.

20    Q.  Your Honor, I'd like to offer into evidence

21  Plaintiff Exhibit 28.

22        MR. OKON:  No objections, Your Honor.

23        THE COURT:  Admitted.

24    (Plaintiff Exhibit 28 admitted.)

25    Q.  Exhibit 28 is a four-page document; am I

HIGGERSON - DIRECT                    233

1    correct?

2         A.  Mm-hmm.

3         Q.  Is that the complete report?

4         A.  No.

5         Q.  I'm going to bring to you some paper.  And

6    my question is, after you look at it, if the

7    documents I'm providing you are a complete copy of

8    Exhibit 28?

9         A.  Okay.  That appears to be the case.

10        Q.  Okay.

11        A.  Without going through every one.

12        Q.  I won't ask you to do that.

13        A.  Thank you.

14        Q.  Your Honor, I'd like to offer the documents

15   which are also identified as Exhibit 28.

16             THE COURT:  Say that again, would you,

17   Mr. Baker?

18             MR. BAKER:  I'd like to offer, as a

19   supplement to Exhibit 28, the documents which

20   Ms. Higgerson has just reviewed.

21             THE COURT:  All right.

22             MR. OKON:  No objection, Your Honor.

23             THE COURT:  They are admitted then.

24        (Supplement to Plaintiff Exhibit 28 admitted.)

25             THE COURT:  What number is that again,

HIGGERSON - DIRECT                      234

1      Mr. Baker?

2              MR BAKER:  I believe it's Exhibit 28.

3              THE COURT:  So 28 that we have in the main

4      book is merely a recap?

5              MR. BAKER:  It is the first page and I

6      believe the last two pages of Exhibit 28.

7              THE COURT:  All right.  Fine, okay.

8          And what you have just had her identify and

9      which has been admitted are the details?

10             MR. BAKER:  That's the complete report.

11             THE COURT:  All right, fine.  As long as

12     we're clear on that.

13         Q.  (BY MR. BAKER:)  Ms. Higgerson, how many

14     help desk tickets was assigned to Cheryl Johnson

15     during the time period covered by this report?

16         A.  So 2744.

17         Q.  2,744?

18         A.  Hm-mmm.

19         Q.  And how many related tasks were assigned to

20     Cheryl Johnson during that same time period?

21         A.  1845.

22         Q.  Okay.  1,845?

23         A.  1846 maybe.  I can't read that.

24             THE COURT:  One thousand what?

25         Q.  I think we're having trouble reading the

HIGGERSON - DIRECT                    235

1   last digit, it's either --

2        A.  1846, I think.  I apologize.

3        Q.  That's okay.

4        I'm going to ask that you turn to Plaintiff

5   Exhibit 32 in the book.

6        Can you identify that document for me?

7        A.  So that's help desk tickets for Ed Gordon.

8   And it looks like it starts on July 2007 and goes to

9   the --

10       Q.  Are you looking --

11       A.  I'm sorry.

12       Q.  Are you looking at Exhibit 32?

13       A.  I thought I was.  Maybe I'm off one.  I

14   apologize.

15       Oh, change tickets for Ed Gordon.

16       Q.  All right.  Can you identify what this

17   report is?

18       A.  It's change tickets for Ed Gordon between

19   November of -- no, September of 2007 to --

20       Q.  Let me --

21       A.  I was starting with this.  This says

22   November of 2006 to December of 2008.

23       Q.  All right.  Sorry; you threw me off here.

24       A.  Sorry.

25       Q.  Let's go back and start again.  This is a

HIGGERSON - DIRECT                    236

1    report you prepared?

2         A.  Yes.

3         Q.  And as I understand it, it's a report of

4    change tickets with related tasks assigned to Ed

5    Gordon between November 1, 2006, and December 31,

6    2008 --

7         A.  That's correct.

8         Q.  -- am I correct?  And it looks like it's a

9    51-page report?

10        A.  Okay.  Yeah.  Oh, it says, I'm sorry, 1 to

11   51.  I apologize.

12        Q.  Okay.  I'm not gonna make you count them.

13        If you go to, I believe it is the second to

14   last page of that report.  During that two plus

15   years time span, how many change tickets were

16   assigned to Ed Gordon?

17        A.  41.

18        Q.  And how many related task tickets were

19   assigned to Ed Gordon?

20        A.  Ten.

21        Q.  Okay.

22            THE COURT:  How many?

23        A.  I'm sorry.  Ten.

24        Q.  Ten.

25            THE COURT:  Thank you.

HIGGERSON - DIRECT                           237

1          Q.  Your Honor, I'd like to offer Exhibit 32?

2              MR. OKON:  No objection, Your Honor.

3              THE COURT:  Admitted.

4      (Plaintiff Exhibit 32 admitted.)

5          Q.  I may have already asked you this, but at

6      the risk of redundancy, I'm going to ask it again.

7      What is a related task?

8          A.  It is -- it is a -- a job or whatever that

9      someone has to do to get the change done.  It's a --

10         Q.  Okay.

11         A.  -- I want to say task, but that's redundant,

12     but --

13         Q.  All right.  Can you go to Exhibit 29 for me,

14     please.

15         Is Exhibit 29 a portion of a report you

16     prepared?

17         A.  Yes.

18         Q.  And that is -- is that report one for

19     related -- for change tickets and related tasks for

20     Cheryl Johnson?

21         A.  Yes; that is correct.

22         Q.  And what time period does that cover?

23         A.  So that is 2008 to 2012.

24         Q.  Okay.  November 2008 to August 2012, okay.

25     This is a three-page document?

HIGGERSON - DIRECT                    238

1          A.  Uh-huh.

2          Q.  Can we agree that this is not the entire

3     report?

4          A.  Correct.

5          Q.  Okay.  How many change tickets were assigned

6     to Cheryl Johnson during that time period?

7          A.  Like 1245.

8          Q.  1,245?

9          A.  Hm-mmm.

10         Q.  Is that yes?

11         A.  Yes.

12         Q.  Okay.

13         A.  I'm sorry.

14         Q.  And how many total task tickets were

15    assigned to her during that time period?

16         A.  2100.

17         Q.  Okay.  Your Honor, I'd like to offer

18    Exhibit 29 into evidence.

19             MR. OKON:  No objections, Your Honor.

20             THE COURT:  Admitted.

21         (Plaintiff's Exhibit 29 admitted.)

22         Q.  Can you go to Exhibit 34 for me, please.  Is

23    that another report you prepared?

24         A.  Yes.

25         Q.  And what does that report reflect?

HIGGERSON - DIRECT                    239

1        A.  I'm sorry, what?

2        Q.  What is the subject matter of that report?

3        A.  It's Ed Gordon's task tickets for

4   November 2008 to August of 2012.

5        Q.  Okay.  So a little less than a four year

6   time span.  This is a three-page document.  Can we

7   agree that there are more pages to the real report

8   than three?

9        A.  Yes.

10       Q.  Okay.  So during that time period, how many

11  task tickets were assigned to Ed Gordon?

12       A.  125.

13       Q.  Okay.

14            THE COURT:  How many?

15       A.  125.

16       Q.  125.  I'd like to offer Exhibit 34 in

17  evidence.

18            MR. OKON:  No objections, Your Honor.

19            THE COURT:  Admitted.

20       (Plaintiff's Exhibit 34 admitted.)

21       Q.  Would you turn to Exhibit 35, please.  Can

22  you identify that document?

23       A.  So that's the change -- the change report

24  for Ed Gordon, November of 2008 to August of 2012.

25       Q.  Okay.  And that is, again, a roughly

1    four-year time span.  If you know, is this a portion

2    of that report or the entire report?

3        A.  It might be the entire one.  I'm not -- it

4    appears it might be the entire one.  I'm not

5    positive.

6        Q.  All right.  During the period of time

7    covered by that report, how many change tickets were

8    issued to Ed Gordon?

9        A.  17.

10        Q.  And during that time period, how many task

11    tickets were issued to Ed Gordon?

12        A.  14.  It might be 12.  It's so tiny.

13        Q.  Okay.

14          THE COURT:  What is the difference between

15    a task ticket and a change ticket?

16        A.  There are -- a change ticket is an entire --

17    entire job, an entire installation.  It's like

18    having a server installed, or you -- if you bought a

19    PC at Best Buy and then you got home, you have

20    different steps that you have to do to put that PC

21    together and to get it to work.  Those would be the

22    tasks.  And the change would actually be installing

23    the PC.  And that's kind of simplified, but -- does

24    that make sense?

25        Q.  So the change ticket would encompass the

HIGGERSON - DIRECT                  241

1    entire project?

2        A.  Hm-mmm.  Yes.

3        Q.  And the task ticket would be one of the

4    steps or components that needed to be undertaken to

5    complete the entire project?

6        A.  Yes; correct.

7            THE COURT:  Thank you.

8        Q.  Could you go to Exhibit 36 for me, please.

9    Can you identify that document?

10       A.  Help desk report for Ed Gordon

11   November 2008, August 2012.

12       Q.  And does that identify -- excuse me.

13       Does that identify help desk tickets issued to

14   Ed Gordon during that four-year time period?

15       A.  I think so -- this doesn't even -- well --

16   okay.  Yes, I guess so.

17       Q.  And does it identify task tickets issued to

18   Ed Gordon in connection with the help desk tickets?

19       A.  It should; yes.

20       Q.  How many help desk tickets were issued to Ed

21   Gordon during that four-year time span?

22       A.  It's so small, I can't really read it.  I

23   think it's 150.

24       Q.  Okay.

25       A.  I can't tell.

HIGGERSON - CROSS                    242

1      Q.  And how many task tickets were issued to

2  him?

3      A.  Zero.

4      Q.  Okay.  Your Honor, could I have just a

5  moment?

6          THE COURT:  Surely.  Of course.

7          MR. BAKER:  I have no further questions.

8      Thank you, Ms. Higgerson.

9          THE COURT:  You may cross.

10          MR. BAKER:  Oh, Your Honor.

11          THE COURT:  Yeah.

12          MR BAKER:  I would like to offer

13  Exhibit 36.  I don't think I've done that.

14          THE COURT:  Number 36?

15          MR. BAKER:  Yes.

16          MR. OKON:  No objections, Your Honor.

17          THE COURT:  It's admitted.  Thank you.

18          MR. BAKER:  And 35 as well.

19          THE COURT:  Okay.  How about that one?  35?

20          MR. OKON:  No objections, Your Honor.

21          THE COURT:  It's admitted also.

22      (Plaintiff Exhibits 35 and 36 admitted.)

23              CROSS EXAMINATION

24  BY MR. OKON:

25      Q.  Good morning, Ms. Higgerson.

HIGGERSON - CROSS

1      A.  Good morning.

2      Q.  I'd like to show you Plaintiff Exhibit 75.

3          MR. BAKER:  I'm sorry, what exhibit?

4          MR. OKON:  Excuse me.  35.

5          THE COURT:  This is 75?

6          MR. OKON:  35, Your Honor.  Sorry.  35,

7   Exhibit 35.

8          THE COURT:  Thank you.

9          MR. OKON:  Excuse me, let me backtrack.

10  Exhibit 31, I'm starting with.

11         THE COURT:  Okay.

12     Q.  (BY MR. OKON:)  Do you have that available

13  in front of you, Ms. Higgerson?

14     A.  I do.

15     Q.  And if you recall, you testified that this

16  exhibit, Plaintiff's Exhibit 31, indicates the

17  number of tickets that were assigned in Ed Gordon's

18  name during the approximately '06 to 2008 time

19  period; correct?

20     A.  That's correct.

21     Q.  Does this exhibit identify the number of

22  tickets that Ed Gordon was responsible for during

23  that time period?

24     A.  Absolutely not.

25     Q.  And why do you say that?

HIGGERSON - CROSS

1         A.  Because he's a supervisor and he is

2    responsible for all of his employees and their

3    tickets as well.

4         Q.  So the number indicated at the end of the

5    Exhibit 75, which you said was the tickets -- or the

6    tasks he was responsible for during that time

7    period, that's not what he was responsible for, is

8    it?

9         A.  Correct.  Yeah, he's responsible for his

10   employees as well.

11        Q.  Next I'd like to show you Plaintiff's

12   Exhibit 30.

13        So if you recall, you testified that this

14   exhibit shows that there were approximately 3,727

15   tasks assigned in Ms. Johnson's name during the --

16   I'm not sure, '08 to 2012 time period; correct?

17        A.  Yes; that's correct.

18        Q.  Those 3,727 tasks assigned in her name, does

19   that indicate all tasks that she worked on during

20   that time period?

21        A.  All tasks that she worked on?

22        Q.  Did she -- if all those tasks are in her

23   name specifically, does that mean that she completed

24   all the work associated with those tasks?

25        A.  No.

HIGGERSON - CROSS                      245

1        Q.  And why is that?

2        A.  Because she -- you can look in the work

3    logs, but there's -- there's other things that may

4    need to be done, and she would go ask that person to

5    do it.  So it may or may not; I'm sorry.

6        Q.  Okay.  I'd next like to show you Plaintiff's

7    Exhibit 33.  And if you recall, these were help desk

8    tickets assigned in Ed Gordon's name; correct?

9        A.  That is correct.

10       Q.  And you stated that during the '06 to '08

11   time period, there were approximately 70 help desk

12   tickets assigned in Ed Gordon's name?

13       A.  Correct.

14       Q.  Does that number 70 during that time period,

15   does that represent all of the tickets that Ed

16   Gordon was responsible for as manager during that

17   time period?

18       A.  Absolutely not.

19       Q.  And again, you say absolutely not; why do

20   you say that?

21       A.  Because there were tickets assigned to his

22   employees.  And actually, probably most of the

23   tickets were assigned to his employees, not to him

24   himself.

25       Q.  And just because they're not assigned in his

HIGGERSON - CROSS                    246

1   name within the Remedy system, does that mean he is

2   not responsible for those tickets as manager of the

3   group?

4       A.  Oh, no.  He is responsible to make sure that

5   those tickets are completed.

6       Q.  Okay.  And we can go on and on, but do any

7   of the exhibits that plaintiff's counsel just showed

8   you, do any of them indicate the work that Ed Gordon

9   was responsible for concerning tickets and tasks and

10  related tasks?  Do any of those exhibits accurately

11  indicate the responsibilities of Ed Gordon during

12  that time period?

13      A.  It's not a complete picture at all.

14      Q.  Is it even close to a complete picture?

15      A.  No.

16      Q.  Do you know why there are so many tickets in

17  Ms. Johnson's name as opposed to Ed Gordon's name?

18      A.  Not specifically, I suppose, but I know that

19  in my jobs, I've been -- there's been times that

20  I've had projects and my supervisor had to take over

21  my tickets and manage them for me, and he would put

22  in the -- just to keep things going, like put in the

23  entries and that sort of thing.

24      So there are situations.  The system is

25  flexible enough that there's situations where

1   different people are assigned the tickets based

2   on -- on what the needs are of the area.

3        Q.  Okay.  And at the start of your testimony,

4   you described that you collected data upon request

5   by Ms. Johnson; correct?

6        A.  Yes.

7        Q.  And a lot of the data you collected was

8   actually the plaintiff's exhibits that I just showed

9   you; is that correct?

10        A.  That is correct.

11        Q.  Was that all the data you collected?

12        A.  No.

13        Q.  Okay.  I'd like to show you what's been

14   marked as Defendant's Exhibit 48.

15            THE COURT:  Would you like it on the

16   machine?

17        Q.  We had it on her screen --

18            THE COURT:  All right.  Now we've got 'er

19   up.

20        Q.  Okay.  Ms. Johnson (SIC), what is this?

21   This green, what are we looking at here?

22        A.  Okay.  This is all the reports that I pulled

23   at the request of Ms. Johnson based on what Deb had

24   instructed me to do.

25        Q.  And when you say Deb, are you referring to

HIGGERSON - CROSS                          248

1    Ms. Barnes --

2         A.  Yes.  I'm sorry.

3         Q.  And Ms. Barnes had instructed you to request

4    any and all data that was sought after by

5    Ms. Johnson; is that correct?

6         A.  That's correct; yes.

7         Q.  And what -- what type of data did

8    Ms. Johnson specifically request?

9         A.  She wanted tickets that were assigned to

10   three supervisors that were in the server area.

11        Q.  And did she request that the data be

12   presented in a specific format?

13        A.  She did.

14        Q.  And what format was that?

15        A.  She wanted the columns that we saw in those

16   reports that came up.  Which didn't include what the

17   actual assignment was, but it did include the work

18   log and who it was assigned to and who requested the

19   work.

20        Q.  And were you able to obtain all the data

21   that Ms. Johnson requested?

22        A.  Yes.

23        Q.  And all the data she requested concerning

24   Ms. Johnson as well as Ed Gordon, is reflected

25   within this exhibit; correct?

1          A.  That's correct.

2          Q.  And, Your Honor, we move to admit

3     Defendant's Exhibit 48 at this time.

4               MR. BAKER:  No objection.

5               THE COURT:  It's admitted.

6          (Defendant's Exhibit 48 was admitted.)

7          Q.  And could we also publish it for the jury at

8     this time?

9               THE COURT:  Yes, you may.

10         Q.  Okay.  So we are looking at several PDFs

11    here; correct?

12         A.  Hm-mmm.

13         Q.  And the first -- it looks like the first six

14    PDFs include the name Gordon within it; correct?

15         A.  Yes.

16         Q.  Is that reflective of the data you collected

17    concerning Mr. Gordon's tasks and tickets that were

18    assigned to his name?

19         A.  Yes.

20         Q.  And the remainder of the CD are many

21    different PDFs with Johnson within the title;

22    correct?

23         A.  Mm-hmm.

24         Q.  And are those reflective of the data you

25    collected concerning Ms. Johnson's tickets that were

HIGGERSON - CROSS                          250

1    assigned in her name?

2         A.  Yes.

3         Q.  Why are there are so many PDFs in --

4    concerning Ms. Johnson as opposed to Mr. Gordon?

5         A.  There was a time where there was different

6    iterations of Ms. Johnson's name.  So it didn't have

7    the middle initial, had the middle initial.  So she

8    wanted us to pull that to make sure there wasn't any

9    extra tickets that weren't included in the pull of

10   her full name.

11        And the reason that -- that they are all on one

12   and it was her full name is because when you call in

13   to make a help desk ticket, so she requested

14   something, sometimes a person I guess didn't find

15   her and so they typed her in again.  But the -- she

16   was part of the Hardware Support Group, and that --

17   that one was Cheryl L. Johnson.

18        So -- but we pulled all of them just to make

19   sure that there wasn't anything, because I felt like

20   that was -- I mean that is a reasonable request,

21   so --

22        Q.  Sure.  So this request was -- was made by

23   Ms. Johnson; correct?

24        A.  Mm-hmm.

25        Q.  And she requested that she wanted you to

HIGGERSON - CROSS                        251

1    search the data under several variations of her

2    name; correct?

3          A.  Yes.

4          Q.  And did any of those other variations come

5    up with any results for her?

6          A.  They did not.

7          Q.  Okay.  For instance, what does this document

8    show?

9          A.  This was under one of the names that she

10   requested and that had tickets that she had

11   requested stuff on was C.L. Johnson 2.  But it

12   didn't have anything that was assigned to her under

13   that name.

14            THE COURT:  Now, Mr. Okon, I'm not sure

15   that the record shows what document we're talking

16   about.

17         Q.  Oh, sure.  This is the PDF titled Excel

18   Johnson's change TSK3 which is within Defendant's

19   Exhibit 48.

20            THE COURT:  Good.

21         Q.  So you completed the search.  This is one of

22   the variations of the name that Ms. Johnson wanted

23   you to search; correct?

24         A.  Correct.

25         Q.  And it didn't come up with anything;

HIGGERSON - CROSS                    252

1    correct?

2         A.  Correct.

3         Q.  And that would be true for Excel Johnson

4    Change TSK 1 through 8; correct?

5         A.  That is correct; yes.

6         Q.  Okay.

7         So you previously went through this with

8    Mr. Baker.  In the upper left-hand corner, could you

9    instruct the jury what that number is there?

10        A.  That's the number that I got by those change

11   tickets.

12        Q.  Okay.  So each change ticket has a specific

13   number identified for it; correct?

14        A.  Yes.

15        Q.  And could you go all the way to the right,

16   please.

17        And we discussed the -- the work log history.

18   And what exactly is the work log?

19        A.  It is comments that -- that people who are

20   working on the ticket--some people actually may be

21   not even--but that are germane to the ticket being

22   worked.

23        Q.  And again, for clarity purposes, this is the

24   PDF titled Excel Johnson Change TSK.

25        And so you said there could be technicians or

HIGGERSON - CROSS

```
 1    individuals that show up in the work log history,

 2    but that is not indicative of whether or not they

 3    actually worked on the ticket?

 4        A.  That is correct.

 5        Q.  Okay.  Could you please go to page 1,252 of

 6    the PDF.  Can you zoom in on the left side.

 7        And what is this change ticket number?

 8        A.  So it's 280860.

 9        Q.  Okay.  And who was this ticket assigned to?

10        A.  It was assigned to Cheryl Johnson.

11        Q.  And in regards to the work log entry column,

12    does this ticket -- or per the work log entry

13    column, does it indicate all technicians that worked

14    on this ticket that was assigned to Ms. Cheryl --

15    excuse me, Ms. Johnson?

16        A.  No, it does not.

17        Q.  And can you scroll to the next page.

18        So at the top of this ticket -- or this page,

19    excuse me, it's a continuation of the ticket we were

20    just viewing on the previous page; correct?

21        A.  Yes.

22        Q.  And -- and you can see within the work log

23    entry -- oh, at the very bottom of the work log

24    entry of this ticket it says Tina M. Rollins.  Do

25    you know who Ms. Rollins is?
```

HIGGERSON - CROSS

1          A.  I do.

2          Q.  And who is she?

3          A.  She was the change manager at the time.  So

4     she had to either approve the change, or if it was

5     something that didn't cost any money or didn't --

6     then she would not necessarily have had to approve

7     the change.

8          Q.  So is she a technician that worked on this

9     ticket?

10         A.  She's not a technician; no.

11         Q.  Okay.

12             THE COURT:  Now, where -- just a moment,

13    where is her name again?

14         Very good.  Thank you.  Everybody see that?

15    Okay.

16         I'm sure you follow this better than I do.

17    I've got nods both ways.

18         Very good.  Excuse me, Mr. Okon.

19         Q.  I appreciate that.

20         Does this work log entry indicate any work that

21    Ms. Johnson did on this ticket?

22         A.  Yeah, it does look like she did the cabling

23    request.  It's not actual physical work, but it's

24    paperwork.

25         Q.  Okay.  Managerial type work; is that fair?

HIGGERSON - CROSS                              255

1        A.  Correct.  Yes.

2        Q.  Okay.  And again, could you scroll to the

3   left side so we can look at the ticket number once

4   more.

5        So again, this is ticket number 280860;

6   correct?

7        A.  Yes.

8        Q.  Okay.  Next I'd like to show you what's been

9   marked as Defendant's Exhibit 49.  And this has not

10  been admitted yet nor, obviously, published to the

11  jury.

12        (Court reporter requested clarification.)

13            THE COURT:  This is 49?

14        Q.  Defendant's Exhibit 49.

15        All right.  Now, Ms. Higgerson, what is this

16  document?

17        A.  This shows the actual screens of the ticket,

18  that specific ticket.  That specific change ticket.

19        Q.  Okay.  And at the request of the Attorney

20  General's Office, were you able to obtain additional

21  information which is not indicated on the data that

22  was requested by Ms. Johnson?

23        A.  Yes; that's correct.

24        Q.  And does this exhibit reflect that

25  additional information that you collected on behalf

1    of the Attorney General's Office?

2         A.  It does.

3         Q.  Okay.  Your Honor, at this time, we'd move

4    to admit Defendant's Exhibit 49.

5              MR. BAKER:  No objection.

6              THE COURT:  It's admitted.

7         (Defendant's Exhibit 49 admitted.)

8         Q.  And can we publish it at this time?

9              THE COURT:  You may.

10        Q.  So at the very top, could you please explain

11   to the jury -- it says page 1522.  Could you please

12   explain to the jury what all that is?

13        A.  So that's what we were -- the ticket that we

14   were just looking at.  And then below that, it's the

15   technicians that were in the work log.  So you saw

16   Cheryl Johnson, John Frye, Mark Jarvis.

17        Q.  So correct me if I'm wrong; you put the text

18   at the top of this PDF in this exhibit; correct?

19        A.  That's correct.

20        Q.  And specifically, this refers to the last

21   ticket we were just looking at within Defendant's

22   Exhibit 48 of Ms. Johnson's data; correct?

23        A.  Yes.

24        Q.  And according to the work log within her

25   exhibit, it only shows that Ms. Johnson, a John

1    Frye, and a Mark Jarvis were associated with

2    completing a task with that ticket; correct?

3        A.  Yes.

4        Q.  But that doesn't paint the full picture of

5    who actually worked on that ticket, does it?

6        A.  Correct.

7        Q.  And -- scroll down.  Keep going.

8        Now, can you please explain to the jury what

9    we're looking at within this screenshot here?

10       A.  And this is a screenshot of the actual

11   ticket in our system.  That's as it's presented to a

12   user.

13       Q.  Okay.  So -- within the system, are you

14   referring to the Remedy system?

15       A.  Correct.

16           THE COURT:  To the what?

17       Q.  The Remedy system?

18       A.  The Remedy ticketing system; yes.

19           THE COURT:  Oh, Remedy.

20       A.  Yes.

21           THE COURT:  Thank you.

22       Q.  And the Remedy ticketing system is the

23   ticket -- or the system that managers as well as

24   technicians work and utilize; correct?

25       A.  Yes.

HIGGERSON - CROSS                    258

1        Q.  Okay.  Why does this look different than the

2    ticket data Cheryl requested?  Ms. Johnson

3    requested?

4        A.  Because sometimes there aren't work log

5    entries for everyone single -- every single thing

6    that's done.  So it doesn't reflect all the

7    technicians or all the people that were involved in

8    getting that ticket completed.

9        Q.  So there could be technicians that worked on

10   the ticket but don't make work log entries; correct?

11       A.  Correct.

12       Q.  There could be individuals that don't work

13   on the ticket that make work log entries; correct?

14       A.  That is correct.

15           THE COURT:  Wait a minute.  Wait a minute.

16   I'm not sure I understand that.

17       You say there are names that will appear, but

18   they didn't actually work on the ticket?

19           THE WITNESS:  Yes.

20           THE COURT:  Why would that be?

21           THE WITNESS:  Because they put a comment in

22   about the ticket that helped the technician know

23   what to do next.

24       So it may have been -- it probably was an IT

25   person, obviously, but it doesn't necessarily have

1   to be.  It's like the thing with Tina Rollins that

2   we looked at earlier.  Tina is the change manager,

3   or she was at the time, and she didn't actually

4   physically do any work, she was only responsible for

5   approving or not approving the change.  So --

6       And there would be that in other areas as well.

7   There's a hierarchy of -- because we don't want just

8   anybody to be able to put out a ticket and spend

9   money, so there's an approval process.  And

10  sometimes it falls into that and sometimes it does

11  not.  So those names would appear in the work log,

12  and they're not actually somebody who did technical

13  work on the project.

14          THE COURT:  So that's why there appears to

15  be a layered -- where different people work on

16  something, but they don't really?

17          THE WITNESS:  Yeah.  Maybe.  And some of

18  them do.  Some of them are things that they were

19  actually working on it.

20      And if I was working on a ticket and it was

21  something that I thought the next guy who's working

22  on it doesn't need to know, I probably wouldn't put

23  it in there.  Because you don't want to waste any

24  time.  But there are things that they do need to

25  know, so those things, you might copy an entire

HIGGERSON - CROSS                              260

1    email in there so that they can see.  And that would

2    make that four pages long instead of one, but --

3          Yeah, that's basically -- so it isn't all of

4    the technicians that worked on it.

5                THE COURT:  Okay.  Thank you.

6          Q.  (BY MR. OKON:)  Does this screenshot

7    indicate that the same ticket that we were just

8    looking at in regards to the data that you collected

9    for Ms. Johnson?

10         A.  Yes.

11         Q.  And that would be ticket number 280860;

12   correct?

13         A.  Yes.

14         Q.  In this column here it says Sequence.  What

15   does sequence refer to?

16         A.  Sometimes there's an order in which you have

17   to do things.  So you can't -- you can't turn it

18   on -- you can't turn the server on until you plug it

19   in, so -- and then sometimes there's things that

20   doesn't matter.  So the server is already up, you

21   can put -- you can be installing two kinds of

22   software at once.  You've got to have your operating

23   system first, Windows 2000.  What is Windows now?

24   But anyway, so -- so there are things that have to

25   be done in a sequence, in order, but there are other

HIGGERSON - CROSS

1    things that they could all be done at the same time

2    possibly.

3         Q.  And we can see several columns here going

4    left to right.  Are those the various tasks that

5    were completed for this -- for this ticket?

6         A.  That's correct.

7         Q.  And within this column it says, Implementer

8    Name.  What does that refer to?

9         A.  This's the person that was assigned the

10   ticket.

11        Q.  So that would be the technician that

12   completed that task associated with this ticket;

13   correct?

14        A.  Yes.

15        Q.  Could you scroll down the page, please.

16            THE COURT:  Is that right?

17        A.  Yes.  I'm sorry.  Yes.

18            THE COURT:  Thank you.

19        Q.  And again, is this a continuation of the

20   screenshot of the same ticket that we were just

21   looking at?

22        A.  It is.

23        Q.  So these are additional tasks that various

24   technicians completed associated with this same

25   ticket; correct?

1        A.  That is correct.

2        Q.  Okay.  And -- now, there's some additional

3    text at the bottom of this page.  Could you please

4    explain to the jury what this text indicates?

5        A.  So like, for instance, there's all of the

6    techniques.  So Mark Jarvis did four tasks, John

7    Frye did three, Cheryl Johnson did two, Neil

8    Holgerson did one, Keith Klockenga did three.  And

9    each one of those, there's the supervisor that was

10   responsible.

11       So for Mark's four tasks, Cheryl Johnson was

12   responsible.  For John Frye's three task, Gary Salk

13   was responsible.  For Cheryl L. Johnson's two tasks,

14   Rod Nance was responsible.  Neil Holgerson's one

15   task, Randy Anderson.  Keith Klockenga's three

16   tasks, Randy Anderson.  Vicki Spencer one task, Ed

17   Gordon.  And so on.

18       Q.  So according to Ms. Johnson's data, if you

19   were to look at this ticket and her data, it would

20   indicate that three technicians worked on this

21   ticket; correct?

22       A.  Yeah.  That's kind of how it appears in

23   that.

24       Q.  But that's not a complete picture, is it?

25       A.  No, it is not.

HIGGERSON - CROSS

1      Q.  Does the data you collected here show a

2  complete picture of the technicians that worked on

3  that specific ticket?

4      A.  It does.

5      Q.  Okay.  And for instance, as you said, Mark

6  Jarvis, he did four tasks associated with this

7  ticket; correct?

8      A.  Correct.

9      Q.  John Frye two tasks?

10     A.  Yes.

11     Q.  Ms. Johnson two tasks and so on.  So there

12 were one, two, three, four, five, six, seven, eight

13 different technicians including Ms. Johnson that

14 worked on this ticket; correct?

15     A.  Correct.

16     Q.  And Ms. Johnson was only the responsible

17 supervisor for one of those technicians?

18     A.  Correct.

19     Q.  Okay.  Would you scroll --

20     And again, this is a ticket that is

21 specifically assigned in Ms. Johnson's name;

22 correct?

23     A.  Yes.  I'm sorry, yes.

24     Q.  And this is pulled from the same data that

25 you got Ms. Johnson's data from; correct?

HIGGERSON - CROSS                          264

1      A.  Yes.

2      Q.  Okay.  So at the top here it reads page

3   1,265; correct?

4      A.  Yes.

5      Q.  And would that refer to page 1,265 of the

6   PDF titled Excel Johnson Change TSK?

7      A.  Yes.

8      Q.  Which is located within Defendant's

9   Exhibit 48?

10     A.  Yes.

11     Q.  Okay.  And specifically, that ticket number

12  is what?

13     A.  It's 281702.

14     Q.  Okay.  And according to Ms. Johnson's data

15  you collected, how many technicians worked on that

16  ticket?

17     A.  In the work log you can see comments from

18  Cheryl Johnson, Mark Jarvis, and Roger Londrigan.

19     Q.  Okay.  Scroll down.

20     Are these screenshots of that same ticket

21  referred to on the PDF page we were just speaking

22  about?

23     A.  Yes.

24     Q.  Okay.  And again, this would indicate the

25  various tasks that were completed and the -- and the

1    technician responsible for those tasks; correct?

2         A.  Correct.

3         Q.  Okay.  So at the top, everything above that

4    line, that refers to the data you collected and the

5    technicians that worked on this same ticket;

6    correct?

7         A.  Yes.

8         Q.  So again, according to Ms. Johnson's data,

9    there were three technicians that worked on this

10   ticket; correct?

11        A.  Yes.

12        Q.  And this is a ticket, again, that is

13   specifically assigned in Ms. Johnson's name as

14   manager; correct?

15        A.  Yes, that is correct.

16        Q.  And how many different technicians worked on

17   this ticket?

18        A.  One, two, three, four, five, six.

19        Q.  Six different technicians.  And of those six

20   technicians, how many was Ms. Johnson the

21   responsible supervisor of?

22        A.  Just Mark Jarvis.  So just one.

23        Q.  You can scroll down.  Keep going.  Go up,

24   sorry.  Yeah.  Right there.

25        Now, I will refer to everything below this

HIGGERSON - CROSS                    266

1   line.  So again, this refers to page 2,041 on

2   Ms. Johnson's data you collected which is titled

3   Excel Johnson Change TSK within Defendant's

4   Exhibit 48; correct?

5       A.  Yes.

6       Q.  And what is the ticket number within this

7   ticket?

8       A.  So 336274.

9       Q.  And according to Ms. Johnson's data within

10  the work log column, how many different technicians

11  worked on this ticket?

12      A.  The ones that commented were John Frye,

13  Keith Klockenga, Sherry Flynn, and Tad Nall.

14      Q.  Scroll down.

15      And again, these are the tasks that various

16  technicians worked on for this same ticket; correct?

17      A.  Yes.

18      Q.  Okay.

19      According to the data you collected, how many

20  different technicians worked on this ticket?

21      A.  So there was nine it looks like.

22      Q.  And actually, I'm gonna have you scroll up

23  on the next page as well.  I believe there are

24  three?

25      A.  I'm sorry.

HIGGERSON - CROSS

1      Q.  There's three more there?

2      A.  Yes.  Sorry.

3      Q.  So 12 technicians that worked on this

4  ticket, but according to Ms. Johnson's there were

5  three; correct?

6      A.  Yes, that's all that showed in the work log.

7      Q.  And again, this is a ticket that is assigned

8  in Ms. Johnson's name?

9      A.  Correct.

10      Q.  And of those 12 different technicians, how

11  many technicians was Ms. Johnson the immediate

12  supervisor of?

13      A.  You know, I wrote two, but actually, I put

14  Cheryl down as Cheryl's boss and that's not true,

15  it's Rod Nance.  So --

16      Q.  So that would be --

17      A.  So really one.

18      Q.  So one of the 12 technicians that

19  Ms. Johnson was the responsible supervisor for that

20  ticket?

21      A.  Yes.

22      Q.  If you could scroll down --

23        THE COURT:  Did you say responsible to or

24  responsible for?

25      Q.  Responsible for.  Yes.  Thank you.  She was

HIGGERSON - CROSS

1    the responsible supervisor for that technician?

2           THE COURT:  Thank you.

3      Q.  Okay.  So here, this would be page 2 on the

4    PDF we've been referring to within Ms. Johnson's

5    data you've been collected; correct?

6      A.  Yes.

7      Q.  What is this ticket number?

8      A.  This is help desk 347487.

9      Q.  And you will did a search within the Remedy

10   system right there; correct?  The same ticket?

11     A.  Yes, exactly.

12     Q.  And according to the work log entry within

13   Ms. Johnson's exhibit, how many technicians worked

14   on that ticket?

15     A.  Five.

16     Q.  Okay.  If you could scroll down.

17     So here, how many technicians per the data you

18   searched, the complete data, how many technicians

19   worked on this ticket?

20     A.  Six.

21     Q.  And of those six technicians, how many was

22   Ms. Johnson the responsible supervisor for?

23     A.  Just Greg Reed.

24     Q.  And again, this is a ticket that is

25   specifically assigned per the Remedy system within

HIGGERSON - CROSS                    269

1    Ms. Johnson's name; correct?

2        A.  That is correct.

3        Q.  Okay.  And while we're here, why don't I ask

4    you:  How did you go about collecting these tickets?

5    Because we seem to be jumping around pages here a

6    little bit within Ms. Johnson's data?

7        A.  I tried to get a pretty even representation

8    of, and I think we were trying to get like 12

9    because that seemed like so that you could kind of

10   see how they look and what the differences are.

11   Like this one is not that much different.  You know,

12   there's only one difference.  Except that when you

13   realize who the supervisors are, that's something

14   that you didn't see in the work log data and you

15   wouldn't have been aware of had we not pointed that

16   out, but --

17       Q.  And did our office specifically direct you

18   which tickets to select out of the 2,000 or so pages

19   within Ms. Johnson's PDF?

20       A.  No.

21       Q.  Okay.  So at the very bottom of this page it

22   says page 42 within Ms. Johnson's PDF; correct?

23       A.  Yes.

24       Q.  And that refers to the next page if you

25   scroll down.  And within page 42 of the PDF, what

 1    ticket number?

 2         A.  241229.

 3         Q.  And again, it's kind of hard to read there.

 4    Is that the same ticket reflected within the Remedy

 5    screenshot?

 6         A.  Yes.

 7         Q.  And per Ms. Johnson's work log, how many

 8    different technicians worked on that ticket?

 9         A.  Cheryl Johnson and Rebecca were the only

10    ones that commented on that.  Rebecca Stevens.

11         Q.  Okay.  Could you scroll down to the text.

12         Now, per the complete data you collected, how

13    many ticket -- excuse me, how many technicians

14    worked on that same ticket?

15         A.  There were eight.

16         Q.  Eight.  And of those eight, how many was

17    Ms. Johnson's the immediate supervisor for?

18         A.  Just the one, Greg.

19         Q.  And again, this is yet another ticket that

20    was specifically assigned in Ms. Johnson's name;

21    correct?

22         A.  Correct.

23         Q.  Okay.  If you could scroll down.  There.

24         So again, this is page 238 referring to the PDF

25    within Defendant's Exhibit 48; correct?

HIGGERSON - CROSS

1      A.  Yes.

2      Q.  And this ticket number 427656; correct?

3      A.  Correct.

4      Q.  And per Ms. Johnson's data, how many

5  different technicians are indicated within the work

6  log column?

7      A.  Cheryl L. Johnson, Tad Nall and the Novanis

8  technician; so three.

9      Q.  Okay.  And I want to stop you for a second.

10  Could you explain to the jury what the Novanis

11  technician, who they are and --

12      A.  It's a consulting or -- yeah, a consulting

13  firm that's -- agency or firm that's contracted by

14  the state to do hardware installs, troubleshooting,

15  whatever we -- whatever the state needs.  So they're

16  available to the state for -- for help with hardware

17  issues.

18      Q.  So this would indicate that a manager,

19  likely Ms. Johnson, reached out to Novanis for

20  assistance in completing a task with this ticket;

21  correct?

22      A.  Yes.

23      Q.  Okay.  Could you scroll down to our text.

24      So again, within the -- within the data you

25  searched, it shows Ms. Johnson, Tad Nall, and the

HIGGERSON - CROSS

1    Novanis technician that worked on this ticket;

2    right?

3         A.  Correct.

4         Q.  Okay.  Ms. Higgerson, we could keep going on

5    through all these tickets, but in summary, how did

6    the data that you requested compare to the data that

7    Ms. Johnson requested?

8         A.  The data that Ms. Johnson requested was kind

9    of a partial, a portion of what the actual full

10   picture of data that --

11        Q.  So it didn't show what technicians were

12   working on each ticket; correct?

13        A.  Correct.  It did not show all of the

14   technicians that were working on tickets or who the

15   supervisor was that was responsible for the tickets.

16        Q.  In fact, it could even list the name of a

17   person within the work log entry that didn't work on

18   the ticket at all?

19        A.  That is correct.

20        Q.  And all the individuals you have listed

21   within these tickets are the technicians that worked

22   on that specific ticket; correct?

23        A.  Yes.

24        Q.  One moment, Ms. Higgerson.

25        A.  Okay.

HIGGERSON - CROSS

1       Q.  And again, these are thousands of tickets

2   that were specifically in the name of Ms. Johnson;

3   correct?

4       A.  Correct.

5       Q.  Did Ms. Johnson have to do the work

6   associated with all of those tickets that were

7   placed in her name for the Remedy system?

8       A.  No.

9       Q.  And concerning all the exhibits concerning

10  Ed Gordon that plaintiff's counsel Mr. Baker showed

11  you, do those exhibits indicate all of the tickets

12  that -- all the tickets and tasks that Ed Gordon was

13  responsible for?

14      A.  No, they do not.

15          MR. OKON:  Okay.  No further questions,

16  Your Honor.

17          THE COURT:  Thank you, counsel.

18      I think before I come back to you, Mr. Baker,

19  that we could take our morning break at this time.

20  All right?

21      Very well.  Ladies and gentlemen, we're going

22  to stand in recess for about twenty minutes, morning

23  break.  And please enjoy yourselves, but do not

24  discuss the case even among yourselves until it's

25  time to deliberate.

1          All right.  We'll stand in recess for

2     twenty minutes, everyone.

3          (A recess was taken.)

4              THE COURT:  Thank you, everyone.  Please be

5     seated.

6          All right.  Mr. Baker, I believe it is now your

7     turn to what, re-cross.

8          No, re-direct.

9              MR. BAKER:  Re-direct.

10                   REDIRECT EXAMINATION

11    BY MR BAKER:

12         Q.  You indicated in response to one of

13    Mr. Okon's question that Ed Gordon was personally

14    responsible for all the tickets in his group whether

15    they were assigned in his name or not?

16         A.  Correct.

17         Q.  Would the same thing have been true for

18    Cheryl Johnson?

19         A.  That is correct.

20         Q.  So even if a ticket was not assigned in her

21    name, she would have some personal responsibility

22    for it?

23         A.  The people of her employees; yes.

24         Q.  Okay.  But in this case, there were tickets

25    that were specifically assigned in her name?

1    A.  Yes.

2    Q.  She was the manager?

3    A.  She was the manager of the change.

4    Q.  Well, she was manager of the group?

5    A.  Yeah.  No, I'm sorry.  Like a change ticket,

6  that's what I was trying to -- I think that's where

7  you were going was the change ticket that she's

8  responsible for.

9    Q.  Well, she was responsible for tasks, she was

10  responsible for help desk tickets, she was

11  responsible for change tickets.  And the reports we

12  talked about earlier this morning show that all

13  those tickets were assigned in her name even though

14  she was the manager; am I correct?

15    A.  Well, and I think responsibility here is

16  where we're having a little bit of -- like you're

17  responsible for your employees, the tickets that

18  are -- that your employees -- your supervisor on all

19  the tickets that your employees, you're responsible

20  for them getting that done.

21    And then if there's a change, and as your

22  saying, there's other people on that, you -- there's

23  paperwork and there's checking up that you have to

24  do, but the ultimate responsibility is on the

25  supervisor.  Does that make sense?

1        Q.  Well, maybe.

2        A.  Okay.

3        Q.  Are you saying the fact that the tickets

4   were assigned in Cheryl's name meant she had

5   something to do with the tickets other than just

6   being the supervisor?

7        A.  Say that again, please?  I'm sorry.

8        Q.  Well, here's my dilemma?

9        A.  All right.

10        Q.  You said that Mr. Gordon was personally

11   responsible for all the tickets in his group?

12        A.  Mm-hmm.

13        Q.  But the exhibits reflect only a handful of

14   tickets were assigned in his name?

15        A.  Correct.

16        Q.  Ms. Johnson, as the supervisor of the

17   Hardware Unit, would have been responsible for all

18   tickets in her group whether they were assigned in

19   her name or not?

20        A.  Correct.

21        Q.  But in this case, there were thousands of

22   tickets assigned in her name?

23        A.  Correct.

24        Q.  That was done by someone other than her;

25   right?

1      A.  Yes.

2      Q.  So the fact --

3      A.  I'm assuming.  I mine she could assign her

4  own -- them to herself as well.  I'm sorry.

5      Q.  Sure.  So the fact that the tickets were

6  assigned in her name meant something more than she

7  was just the manager of the group?

8      A.  Well, and I -- you're responsible

9  regardless.  So there's different reporting tools,

10  there's different management tools.  So they could

11  be managed a different way.

12      Q.  Okay.  So there's some reason for assigning

13  the ticket in her name other than the fact that she

14  was the manager of the group?

15      A.  That is -- yes.

16      Q.  Okay.

17      A.  Maybe.  I mean I don't know.  I wasn't -- I

18  wasn't in charge of that group.  But I'm just saying

19  that --

20      Q.  Sure.  I understand you don't know.  But

21  that would seem logical, would it not?

22      A.  Yeah.

23      Q.  Normally, when a ticket is assigned in the

24  name of a person, is that person normally the

25  technician that's working on the ticket?

HIGGERSON - REDIRECT                    278

1        A.  It is typically; yes.

2        Q.  Have you ever known of a manager being

3   assigned this many tickets in his or her name other

4   than Cheryl Johnson?

5        A.  No.

6        Q.  Now, I want to --

7           THE COURT:  Mr. Baker, I'm not -- I'm not

8   clear on -- on this business.  Let's examine it so I

9   do understand it.

10        Now, first of all, I can tell you and I confess

11   that I am not up to snuff on this modern technology.

12   I don't know how to turn this machine on.

13           MR. BAKER:  That makes two of us.

14           THE COURT:  Well, good.  We're starting out

15   from scratch.

16        But I -- I simply don't quite understand from

17   the testimony that we've had so far what it means to

18   have your name on there as being responsible, or

19   being my ticket, and the work that's done.  It --

20   this isn't clear to me.  And so I must assume, and

21   maybe wrongly, that there's one or two members of

22   the jury that don't quite understand it either.  And

23   they're the ones that have to ultimately make the

24   final decision here.

25           MR. BAKER:  Sure.

1          THE COURT:  So I like to be able to at

2    least be conversant with this as I go through.

3          So obviously, our witness now, Ms. Higgerson,

4    is very familiar and understands this business.  Why

5    don't we go into this question again as to how the

6    tasks are put out there and -- to me, it's a jumble

7    at the moment.  I don't quite understand.  If I had

8    to come in and ask for an explanation of a given

9    problem, who I would go to.  We have got a list of a

10   whole bunch of people, and I'm not clear on that.

11   I -- I'd like to know.

12         I mean I'd like to know because of the case.  I

13   really wouldn't otherwise.  If that makes any sense.

14           MR. BAKER:  It makes abundant sense, Your

15   Honor.  I'm in the same boat.  Let me take stab at

16   this.

17           THE COURT:  Great.

18        Q.  (BY MR. BAKER:)  Let's take a step or two

19   back if we can, Ms. Higgerson.

20        A.  Okay.

21        Q.  In the Wintel Group --

22        A.  Mm-hmm.

23        Q.  -- I believe there were five work units.  Am

24   I correct?

25        A.  I thought Wintel Midrange was -- well, I

HIGGERSON - REDIRECT                    280

1    guess I just looked at the server stuff, so just the

2    three, but --

3         Q.  And each group had -- had technicians?  Am I

4    correct?

5         A.  Correct.

6         Q.  Then each group had a manager?

7         A.  Mm-hmm.

8         Q.  Is that -- and the manager, I believe, was

9    always a Public Service Administrator --

10        A.  Yes.

11        Q.  -- is that correct?  And the manager's job

12   was to supervise the group?

13        A.  Yes.

14        Q.  Okay.  And then we have tickets which, for

15   lack of a better term, are just work orders?

16        A.  Mm-hmm.

17        Q.  And the tickets can be generated from

18   several different sources?

19        A.  Correct.

20        Q.  And tickets are assigned to a unit within

21   Wintel that has the expertise for doing what's

22   required in the ticket?

23        A.  Correct.

24        Q.  All right.  And typically, the manager of

25   the group would assign the ticket to a technician to

1    work on?

2         A.  Well, and I think typically is where you're

3    going there.  That there are different ways that you

4    can handle it based on what the workload is and

5    what -- I mean when I'm -- there's been a couple

6    times I've been on project work that my manager

7    ended up taking all of my tickets and updating them

8    and rerouting things that needed to be done.  So it

9    is possible -- I mean it is.

10        Q.  Let me ask you this:  In the normal set of

11   circumstances, if there is such a thing --

12        A.  That's the problem.

13        Q.  Is it the technician that normally does the

14   work?

15        A.  The technician that normally does the work;

16   yes.

17        Q.  Okay.  And then --

18        A.  The physical work.

19        Q.  The physical work; sure.

20        A.  Okay.

21        Q.  And then typically, typically, would the

22   ticket be assigned in the name of the technician

23   that does the work?

24        A.  And in most cases I see that.  Not always

25   though.  It depends on what the needs of the area

HIGGERSON - REDIRECT                    282

1   are.

2       Q.  Okay.  And then sometimes the work would

3   require -- well, let me back up here.

4       A.  Okay.

5       Q.  Because this gets confusing.  Within a

6   ticket, and in other words, to complete the work

7   required by the ticket, tasks have to be performed?

8       A.  Hm-mmm.

9       Q.  And the number of tasks would vary depending

10  upon what was required in the ticket?

11      A.  Yes.  What was requested.

12      Q.  And an individual would be assigned to do

13  that task?

14      A.  Yes.

15      Q.  Okay.  Sometimes, not always, but sometimes

16  a task is required to be done by another group?

17      A.  Right.

18      Q.  And I believe some of the tickets that

19  Mr. Okon showed you appear to be tickets that were

20  done by technicians in other groups?

21      A.  Yes.

22      Q.  Okay.  And in the documents that he showed

23  you, on several of them there's a column that says

24  Responsible Supervisor?

25      A.  Correct.

1          Q.  Is that merely the person that -- that

2     supervises the technician in that group?

3          A.  That is the person that's responsible for

4     making sure that that person gets their job done,

5     because they are the supervisor.

6          Q.  Okay.  So, for example, there's a man named

7     John Frye listed here?

8          A.  Okay.  Yes.

9          Q.  And apparently, John Frye was not in Cheryl

10    Johnson's group?

11         A.  Yes.

12         Q.  He was in a group headed by a man named Gary

13    Funk?

14         A.  That's correct.

15         Q.  All right.  So Gary Funk, because he was

16    John's supervisor, was considered the responsible

17    supervisor?

18         A.  Yes.

19         Q.  But that doesn't transfer the owner of the

20    ticket, does it?

21         A.  Okay.  And what the deal is is like, okay,

22    to make the example simple, there's a PC.  And in

23    order for it to be able to talk to other PCs, you

24    have to plug it in, just like you would plug in your

25    cable box at the back of your TV.  So John Frye was

HIGGERSON - REDIRECT                               284

1    responsible for that connectivity.

2         So as -- you know, the ticket is made and it's

3    got the list of people including John Frye.  And so

4    John is responsible for looking at his -- his -- he

5    has a queue that comes up that says, I have this to

6    do today, this to do today, this to do today.  So

7    that one comes up and I goes, "Oh yeah, I gotta get

8    that done, too."  Or not, because there's a bunch of

9    other stuff.

10        So his supervisor Gary should be looking at all

11   of John's tickets, all of his other employees as

12   well, and seeing, oh, John is kind of lacking on

13   this, so I need to he remind him.  Okay.

14        So let's just say that doesn't happen for some

15   reason either.  Then Cheryl would be looking at the

16   tickets that she's responsible for, whether her name

17   is on it or not, and saying, "Oh, you know, I'm not

18   sure John -- I don't know what happened here, but

19   we're stuck."  And so then she would call John's

20   supervisor or email John or email -- whatever, you

21   know, whatever it took.  You kind of try to stay

22   with the hierarchy, but sometimes you don't or

23   whatever.

24        So she would contact them and go, "Hey, I don't

25   know if this fell through, I'm not sure what

1    happened, but it looks like to me --"  And then Gary

2    would be like, "Okay, well, we've got this many

3    things to do and I told John he could wait until

4    tomorrow."  Or whatever the case may be.

5         But in normal circumstances, it wouldn't be --

6    she wouldn't need to contact them.  It would be

7    John's responsibility to get it done.  If John's by

8    some reason didn't notice it or didn't get it done,

9    it would be Gary's responsibility to tell him -- or

10   to remind him or work something out with him.

11        Q.  So if --

12        A.  So that's kind of how it worked.

13        Q.  So if John dropped the ball --

14        A.  Yeah.

15        Q.  -- and Gary didn't catch it?

16        A.  Correct.

17        Q.  Then the third area of responsibility is

18   Cheryl to remind them to had to be done?

19        A.  Sure.  Just kind of a level of extra.

20        Q.  Okay.  So getting back to the person who has

21   ownership of the ticket.

22        A.  Yes.

23        Q.  In a typical situation, that's not the

24   manager of the group, is it?

25        A.  Well, there again, it depends on the needs

 1    of the area.  Like I said, I've had that situation

 2    before where I was in project work and my manager

 3    did.  But the norm is that technicians are -- handle

 4    their tickets.

 5         Q.  Okay.

 6         A.  Or are assigned their tickets.

 7         Q.  All right.  Now, as I understand it through

 8    your discussion with Mr. Okon, that you looked at a

 9    handful of tickets that were assigned in Cheryl

10    Johnson's name?

11         A.  Yes.

12         Q.  And I think the number of tickets he talked

13    with you about was 12 or fewer --

14         A.  Yes.

15         Q.  -- am I correct?  So if we go back to these

16    reports that I talked to you about earlier today --

17         A.  Mm-hmm.

18         Q.  -- each report had a total for the number of

19    help desk tickets that were assigned in her name or

20    a number of change tickets that were assigned in her

21    name or a number of tasks that were assigned in her

22    name.  Would that report have been a compilation of

23    all the tickets in the Remedy system that had Cheryl

24    Johnson's name attached to it?

25         A.  They were the ones that were assigned to

 1    her.  It wasn't all of the tickets that she was

 2    responsible for.

 3        Q.  Okay.  So she was responsible for many other

 4    tickets other than those?

 5        A.  Yes.

 6        Q.  Okay.

 7        A.  And so was Ed.

 8        Q.  Right.

 9            THE COURT:  Would her name be shown on each

10    one of those tickets?

11        A.  No.

12            THE COURT:  Okay.  This is --

13        A.  I'm sorry.  Each one of the ones that she

14    was assigned, but not each one of the ones that she

15    was responsible for.  Does that make sense?

16            THE COURT:  Okay.

17        Q.  Okay.  So you -- you talked about tasks that

18    were done under these tickets?

19        A.  Mm-hmm.

20        Q.  And it looks like some of the tasks were, in

21    fact, done by Cheryl Johnson?

22        A.  Correct.

23        Q.  And I don't know how many tasks were in

24    her -- she was assigned that you talked about this

25    morning, but maybe seven or eight, something like

 1   that?

 2       A.  Okay.

 3       Q.  Would the tasks that were identified in the

 4   report be a compilation of all the tickets that had

 5   tasks assigned to her?

 6       A.  Say that again?  I'm sorry.

 7       Q.  Okay.  I don't have an extra copy of this

 8   document, but some of the documents that Mr. Okon

 9   showed you had an editorial comment that identified

10   the number of tickets that were assigned to

11   Cheryl -- or number of tasks assigned to Cheryl

12   Johnson on a particular ticket?

13       A.  Yes.

14       Q.  Say, for example, the one I'm holding in my

15   hand, she had two tasks.  And others she had tasks

16   as well.  You follow me so far?

17       A.  Yeah, I'm with you.

18       Q.  Now, the reports you prepared that showed

19   her tasks, would that be a summation of all the

20   tasks that were assigned on these tickets to her?

21       A.  I'm still not following you.  I'm sorry.

22       Q.  All right.  That's because it wasn't a good

23   question.

24       Each ticket that was assigned to her in her

25   name.

1        A.  Okay.

2        Q.  You have noted with respect to the 12 or so

3   you pulled how many tasks were assigned to her?

4        A.  Correct.

5        Q.  Okay.  If we were to start with the first

6   ticket assigned to her name and ended with the last

7   ticket assigned in her name, and -- and took out of

8   each ticket the tasks that were assigned to her?

9        A.  Okay, got you.

10       Q.  And added them all up?

11       A.  Okay.

12       Q.  Would that total be what's in the reports?

13       A.  And that is what's in the task report.  The

14   change and task report actually reflects tasks that

15   are in the total task reports.  So it's in there

16   twice.

17       Q.  Okay.  But when you say tasks, whether it's

18   once or twice, it's a total of specific tasks that

19   were assigned to Cheryl on tickets?

20       A.  Yes.

21       Q.  So if, for example, I can't recall the

22   number, but let's assume there were 1500 tasks that

23   were assigned in her name?

24       A.  Hm-mmm.

25       Q.  That would be reflected on the individual

HIGGERSON - REDIRECT                    290

1    tickets that were a part of the Remedy system that

2    showed tasks that were assigned to her?

3        A.  Yes.

4        Q.  Okay.  And would the same be true for Ed

5    Gordon?

6        A.  Yes.

7        Q.  So let's assume he had 15 tasks assigned to

8    him in the report.  If we pulled out all the tickets

9    assigned in his name and added up all the tasks, it

10   should equal that 15?

11       A.  Correct.

12       Q.  Okay.  How many tickets did you look at in

13   performing the assignment that was requested of you

14   by the Attorney General's Office?

15       A.  You mean the -- the like 12 or whatever to

16   find --

17       Q.  Yeah.

18       A.  I don't -- I don't know really.  I mean I

19   just kind of paged through and hit different areas

20   or whatever and -- so tried to get a good

21   cross-section of different --

22       Q.  So it would have been more or less than a

23   hundred?

24       A.  Yeah, could be.  I'm not -- I don't have an

25   exact number.  I'm sorry.

1      Q.  All right.  How long did it take you to go

2   through the tickets?

3      A.  A couple of days.

4      Q.  I have no further questions.  Thank you,

5   Ms. Higgerson?

6          THE COURT:  Thank you, Mr. Baker.

7      Mr. Okon.

8                   RECROSS EXAMINATION

9   BY MR. OKON:

10     Q.  Just a couple of questions, Your Honor, I

11  think could help clarify a number of things.

12         THE COURT:  Sure.

13     Q.  Ms. Higgerson, did assigning tickets in

14  Ms. Johnson's case create more responsibility for

15  her as a manager?

16     A.  No.

17     Q.  And you testified that supervisors are

18  responsible for the tickets that are assigned to

19  their group; correct?

20     A.  That is correct.

21     Q.  I'd like to show you what's been marked as

22  Defendant's Exhibit 41.  This has not been admitted

23  yet.  Don't publish.

24     To you recognize this document?

25     A.  I do.

HIGGERSON - RECROSS                         292

1      Q.  And what is it?

2      A.  It's summary or -- yeah, I guess summary.

3  It's counts of tickets based on how many each

4  manager had for those three server areas.

5      Q.  And was this document created based on the

6  data that you collected?

7      A.  It was.

8      Q.  And what time period does this reflect?

9      A.  It's the same, November 2008 to when she

10  left in August of 2012.

11     Q.  And here it indicates tickets assigned to

12  individually Ms. Johnson and Mr. Gordon as well as

13  the group of Ms. Johnson's group and Mr. Gordon's

14  group; correct?

15     A.  Yes.

16     Q.  And, Your Honor, defendant's at this time

17  move to admit Defense Exhibit 41.

18          MR. BAKER:  No objection.

19          THE COURT:  It's admitted.

20     (Defendant's Exhibit 41 admitted.)

21     Q.  Could we publish it as well?

22          THE COURT:  You may.  Put it up there.

23     Q.  So to start, I want to focus on this

24  category.

25          So again, this is the same data you collected

1    for Ms. Johnson as well as the Attorney General's

2    Office; correct?

3         A.  Mm-hmm.

4         Q.  And here, how many tickets, approximately,

5    how many change tickets were individually assigned

6    in Ms. Johnson's name?

7         You don't have to be exact, but would it be

8    1,174 plus the 74?

9         A.  That's what I was looking at.  I guess, yes.

10        Q.  And I would assume because the iteration of

11   her name, there's additional data that came up?

12        A.  Correct.  Yeah, I'm sorry.  I was like --

13   okay.

14        Q.  And then in Ed Gordon's name, how many

15   tickets, change records were individually assigned

16   in Mr. Gordon's name?

17        A.  47.

18        Q.  Okay.  Now, these are change records that

19   were assigned to their groups; correct?

20        A.  Yes.

21        Q.  How many change records were assigned to the

22   technicians within Ms. Johnson's group?

23        A.  So that's 1612.

24        Q.  And how many change records were assigned to

25   the technicians within Mr. Gordon's group?

1       A.  9156.

2       Q.  And that's 9,156; correct?  And those are

3   all the tickets he was responsible for as manager;

4   correct?

5       A.  Correct.

6       Q.  Whereas during the same time period,

7   Ms. Johnson was responsible for 1,612 tickets;

8   correct?

9       A.  Yes.

10      Q.  Let's move to individually assigned task

11  records.  And again, there's two variations of

12  Ms. Johnson's name.  And approximately -- you don't

13  have to be exact, but approximately, how many

14  tickets were individually assigned in Ms. Johnson's

15  name?

16      A.  So 3400.

17      Q.  And how many tickets concerning task records

18  were individually assigned in Ed Gordon's name?

19      A.  125.

20      Q.  Now, this reflects the task records that

21  were assigned within each of their groups and the

22  technicians within their groups; correct?

23      A.  Correct.

24      Q.  So during this time period, how many task

25  tickets were assigned to Ms. Johnson's group?

HIGGERSON - RECROSS                              295

1          A.  So 9391.

2          Q.  And how many task records were assigned to

3     Mr. Gordon's group?

4          A.  20,987.

5          Q.  So again, that is 20,987 task tickets that

6     Mr. Gordon was responsible for as manager of his

7     group; correct?

8          A.  That is correct.

9          Q.  Whereas Ms. Johnson, as manager of her

10    group, she was responsible for 9,391; correct?

11         A.  That is correct.

12         Q.  And we've also discussed help desk tickets.

13    And again, approximately how many help desk tickets

14    were individually assigned in Ms. Johnson's name?

15         A.  So about 1700.

16         Q.  And how many help desk tickets were

17    individually assigned in Mr. Gordon's name?

18         A.  182.

19         Q.  Same time period, how many help desk tickets

20    were assigned to Ms. Johnson's group?

21         A.  4381.

22         Q.  And how many help desk tickets were assigned

23    to Mr. Gordon's group?

24         A.  14,404.

25         Q.  So again, that would be 14,404 help desk

1    tickets that Mr. Gordon was responsible for as

2    manager of his group; correct?

3        A.  Correct.

4        Q.  Whereas Ms. Johnson, she was responsible for

5    4,381 help desk tickets during the same time period?

6        A.  That is correct.

7        Q.  And per the data, Mr. Johnson, he was

8    responsible for a significant amount more tickets

9    assigned to his group; correct?

10       (Court reporter requested clarification.)

11       Q.  Excuse me.  Mr. Gordon was responsible for a

12   significant amount of more tickets assigned to his

13   group; correct?

14       A.  That is correct.

15       Q.  That regards change tickets; correct?

16       A.  Mm-hmm.

17       Q.  As well as task tickets as well as help desk

18   tickets; correct?

19       A.  Correct.

20           MR. OKON:  I have no further questions,

21   Your Honor.

22           THE COURT:  All right.

23           MR. OKON:  Do you want this up here?

24           MR. BAKER:  Yeah, keep it.

25           THE COURT:  All right.  Gone keep it up.

1    Good.

2                    REDIRECT EXAMINATION

3    BY MR. BAKER:

4         Q.  I apologize for having to ask you more, but

5    I'll try and be brief.

6         A.  Okay.

7         Q.  The document that's marked as Defendant

8    Exhibit 41 that's on the screen, that covers a

9    little less than a four-year time period?

10        A.  Okay.

11        Q.  And during that four-year time period,

12   Cheryl Johnson was manager of the Hardware Group?

13        A.  That was my understanding -- yeah, I think

14   so.

15        Q.  And during that four-year time period, what

16   was Ed Gordon's job?

17        A.  He was responsible for Software.

18        Q.  Excuse me?

19        A.  Sorry.

20        Q.  Did you make any analysis of the tickets

21   assigned to the Hardware Unit when Mr. Gordon was

22   the manager of that unit?

23        A.  I don't have any statistics on that I don't

24   think.  I'd have to go back and look, but I don't

25   think so.

HIGGERSON - REDIRECT                298

1     Q.  Okay.  Do you know how many technicians were

2   assigned to the Hardware Unit during the time period

3   covered by this document?

4     A.  There was approximately four.  And the

5   reason I know that, there was kind of an in and out,

6   but I looked at it when I was looking at the -- what

7   was.  And then there's also Novanis and Sentinel

8   which were agents or companies -- I keep saying

9   agency.  It's actually a company that's contracted

10   by the state.

11     So kind of unlimited to a certain extent, but

12   then kind of four.  Four actual employees, and then

13   unlimited access to Novanis and Sentinel.

14     Q.  If Ms. Johnson says during most of the time

15   there were three technicians, could you disagree

16   with her?

17     A.  I -- I don't know that I could -- yeah, I

18   don't know.  I did not look specifically at how long

19   each employee was there.  We had org charts, but I

20   didn't.

21     Q.  While Mr. Gordon was the manager of his unit

22   during this four-year time period, do you know how

23   many technicians reported to him?

24     A.  Now, you're saying when he was manager of

25   Software or when he was --

1      Q.  Correct; Software?

2      A.  And that I found approximately eight.

3      Q.  Okay.  I have no further questions.  Thank

4   you.

5          MR. OKON:  No further questions, Your

6   Honor.

7          THE COURT:  Very good.  Thank you.

8      All right.  You may step down, Ms. Higgerson.

9   Thank you very much.

10     (The witness was excused.)

11         THE COURT:  And you may call your next.

12         MR. BAKER:  Thank you, Your Honor.  I would

13   like to call Cheryl Johnson.

14     (The witness was sworn.)

15                  CHERYL JOHNSON

16   called as a witness herein, having been duly sworn,

17   was examined and testified as follows:

18                DIRECT EXAMINATION

19   BY MR. BAKER:

20     Q.  Good morning, Ms. Johnson.

21     A.  Good morning.

22     Q.  Is it okay if I call you Cheryl?

23     A.  Please do.

24     Q.  Cheryl, would you state your name and

25   address for us?

JOHNSON - DIRECT                    300

1          A.  Cheryl H. Johnson, 433 West Jackson Parkway,

2     Springfield, Illinois.

3          Q.  By whom are you presently employed?

4          A.  Illinois Department of Human Services, but

5     now DOIT Agency/DHS.

6          Q.  All right.  And when did you go to work for

7     the Department of Human Services?

8          A.  In July 1st of 2014.

9          Q.  Did you ever work for the Department of

10     Central Management Services?

11          A.  Yes, I did.

12          Q.  Can you tell me when you began work at CMS

13     and when your last day of work was?

14          A.  I believe it was November 2006 and then

15     August of 2012.

16          Q.  Okay.  I'd like to talk with you a little

17     bit about your background.

18          A.  Yes.

19          Q.  Where were you born and raised?

20          A.  Springfield, Illinois.

21          Q.  And did you graduate from my school?

22          A.  I did.

23          Q.  Where?

24          A.  Springfield High School.

25          Q.  When?

JOHNSON - DIRECT

1     A.  1979.

2     Q.  After you graduated from Springfield High

3  School, did you further your education?

4     A.  I did.

5     Q.  And can you tell us what you did in that

6  respect?

7     A.  I have an Associate of Applied Science in

8  electronic EDP from electronic data processing from

9  Lincoln Land Community College.  And then I also

10  have a Bachelors of Science in computer science from

11  University of Illinois at Springfield.

12     Q.  Okay.  I want to talk with you about your

13  work background before you came to CMS.

14     A.  Yes.

15     Q.  After you completed your education -- let me

16  do it this way:  Where did you work immediately

17  before you went to work at CMS?

18     A.  I worked at the Illinois Department of

19  Comptroller.  Illinois Office of the Comptroller.

20     Q.  And how long did you work there?

21     A.  For about three years.

22     Q.  And what was your job at the Comptroller's

23  Office?

24     A.  I was the third shift computer operations

25  manager.

1      Q.  And what did you do in that role?

2      A.  I was responsible for balancing billions of

3  dollars of budgets for all the state agencies.

4  Working directly with the Department of Treasury in

5  anything financial for all the state agencies.

6      Q.  How many people did you supervise?

7      A.  Approximately seven or so.

8      Q.  Why did you leave that position?

9      A.  I left there because I had been working

10  nights and I wanted a day-time position as a

11  manager.

12      Q.  Before you worked at the Comptroller's

13  Office, where did you work?

14      A.  I worked at the Illinois Department of

15  Veteran's Affairs.

16      Q.  And how long did you work there?

17      A.  For about three years.

18      Q.  And what was your position in that

19  department?

20      A.  I was the Information Systems Software

21  Manager.

22      Q.  And what did you do in that position?  What

23  was your job?

24      A.  I was responsible for all the software and

25  applications for the entire Veteran's Affairs

1   including the -- the local office and plus 50 field

2   offices and veteran's homes and hospitals.

3        Q.  Why did you leave that position?

4        A.  My position was abolished.  They no longer

5   had that role anymore.

6        Q.  When you were in that position, how many

7   people did you supervise?

8        A.  I think I had about, at various times, five

9   or six people that reported directly to me.

10  However, I also had staff that was in the field that

11  was responsible for the applications that they

12  developed out in the field.  That was in the

13  field -- in the central office.

14       THE COURT:  How many people did she say?

15       Q.  I think five or six.

16       A.  In the central office, but also other people

17  that were out in the field reported to me when it

18  was applications related.  So it varied, the number

19  of people.

20       THE COURT:  All right.  Did you supervise

21  them?

22       A.  I had to supervise the work that they did

23  out in the field when it was applications related.

24       Q.  Before you were at the Illinois Department

25  of Veteran's Affairs, what type of work did you do?

JOHNSON - DIRECT                            304

1       A.  I did various computer consulting

2   assignments.

3       Q.  Can you be a little more specific concerning

4   the type of work?

5       A.  Well, I was mostly a project manager or

6   project leader on some major corporations; some were

7   state agencies.  And when I first came back to

8   Springfield and prior to that, I worked for

9   companies like Federal Express Corporate, AT&T

10  Corporate, Merrill Lynch Corporate.  Yeah, Federal

11  Express.

12      Q.  And can you tell us a little more about the

13  type of work you did?

14      A.  It was mostly -- it was all applications.

15  Mostly doing the analysis, design, development, and

16  managing projects for new systems that were going to

17  be implemented.

18      Q.  And did you work for various firms?

19      A.  I did.

20      Q.  And were these forms that may have had a

21  contract with a government agency or --

22      A.  I did work at firms that did have contracts

23  with government agencies.

24      Q.  And how long did you do that type of work?

25      A.  I think it was about -- let me see.  About

JOHNSON - DIRECT                          305

1    ten years almost.

2         Q.  Did you say ten years?

3         A.  I think so; yeah.

4         Q.  Prior to doing that type of work, where did

5    you work?

6         A.  I worked at the State of Illinois at the

7    Illinois Department of Public Aid at the time.

8         Q.  How long did you work for Public Aid?

9         A.  About four years.

10        Q.  And what was your job there?

11        A.  I was a lead programmer analyst and

12   applications development of junior level

13   programmers.

14        Q.  And can you tell us a little more about what

15   you did in that position?

16        A.  Well, we did the analysis, design, and what

17   they call the full-life cycle development of

18   application systems where we design information that

19   may be -- been done manually and made it automated

20   in the computer system.

21        Q.  Prior to joining CMS, how many years of

22   experience did you have in information technology?

23        A.  I would say -- well, I had actually started

24   in IT when I was in high school.  So I had over

25   25 years of, you know, working in IT some fashion or

1   another.  My position at -- when I first started at

2   Public Aid, I was a student intern.  But before

3   that, I did things like data entry.  So I've always

4   been in IT.

5       Q.  Okay.  What was your -- what was your

6   background in information technology?  Was it

7   hardware related, software related, programming?

8   What was it?

9       A.  Most of my experience has been in software

10  and applications related areas.

11      Q.  Prior to joining CMS, can you describe for

12  us your experience with the hardware aspects of

13  information technology?

14      A.  I had no experience in hardware.

15      Q.  At the time you joined CMS, did you apply

16  for a specific position?

17      A.  Yes.

18      Q.  And what was that position?

19      A.  We were going to do -- they were going to do

20  the consolidation of these different agencies.  And

21  initially, I thought I was gonna be working on HFS

22  agency being consolidated into the Data Center and

23  applications.

24      Q.  Okay.  Was that a software area or a

25  hardware area?

JOHNSON - DIRECT                                  307

1          A.   My initial position was a software area.

2          Q.   Okay.  So let's talk about your first

3     position at CMS.

4          A.   Yes.

5          Q.   Can you describe what it was?

6          A.   Well, I worked in an area where I had

7     experience of doing security for the computer

8     systems.  What that meant is that when someone

9     needed access to computer services, then we have to

10    give them what they call security rights in order to

11    be able to read or write to that information on the

12    computer.

13         And that's -- my main focus was giving all of

14    the consolidated agencies that were coming into CMS,

15    the people that work at those agencies, giving them

16    right to, like, database information or to be able

17    to update a file or to read information from a

18    system, something like that.

19         Q.   All right.  Was that a position that was in

20    the Midrange Wintel Group?

21         A.   Yes.

22         Q.   And what was your position title or

23    classification?

24         A.   Public Service Administrator Option 3.

25         Q.   And that was your -- that was your job

JOHNSON - DIRECT                          308

1   classification, I guess?

2        A.  Yes.

3        Q.  Did you have a working title in that

4   position?

5        A.  I was called the Systems Administration and

6   Support Unit Manager.

7        Q.  Okay.  So you managed a unit.  How many

8   individuals worked in that unit?

9        A.  I think there were approximately eight

10  people that worked in that unit.

11       Q.  How many?

12       A.  Eight.

13       Q.  And have we -- have we generally talked

14  about what that unit was responsible to do?

15       A.  Yes.  In general; yes.

16       Q.  All right.  At the time you first went to

17  work for CMS in that position, who headed the

18  Midrange Wintel area?

19       A.  I believe Rod Nance was still a part of

20  the -- was the manager of the Midrange Wintel.

21       Q.  Okay.

22            THE COURT:  Who?

23       A.  Rod Nance.

24       Q.  In your position, how much interaction did

25  you have with Rod Nance?

JOHNSON - DIRECT                         309

1          A.  Initially, not very much.

2          Q.  Was there -- was there some manager,

3     supervisor that you generally did interaction with?

4          A.  Yes.

5          Q.  And who was that?

6          A.  Don Warren.

7          Q.  And would you do projects for Mr. Warren?

8          A.  Yes.

9          Q.  And did Mr. Warren supervise your work?

10         A.  Yes.  At that point.

11         Q.  And in terms of frequency of communication

12    with the supervisor; did you communicate more

13    frequently with Mr. Warren than any other

14    supervisor?

15         A.  Yes.

16         Q.  During this time period, how frequently

17    would you communicate with Mr. Nance?

18         A.  Not very.  Very seldom.

19         Q.  Okay.  In you doing your job in that

20    position, and in Mr. Nance being the supervisor of

21    the Wintel Group, how frequently would you deal with

22    one another?

23         A.  Not very often at all.

24              THE COURT:  All right.  Now, just a moment.

25    Mr. Nance is the manager of the group?

JOHNSON - DIRECT                    310

1          THE WITNESS:  Yes.

2          THE COURT:  And Mr. Warren was the

3   supervisor?

4          THE WITNESS:  He was Rod Nance's

5   supervisor.  But I was working directly doing work

6   on a project where I worked mostly with Don most of

7   the time.

8      Q.  (BY MR. BAKER:)  Okay.  Cheryl, can you go

9   to the white book, Plaintiff's Exhibit 2.

10     A.  Okay.

11     Q.  I think it's already been admitted into

12  evidence.

13     It appears that that covers your first year at

14  CMS; am I correct?

15     A.  Yes.

16     Q.  And during that first year, you were working

17  in this software position?

18     A.  That's correct.

19     Q.  Okay.  In terms of being in a position to

20  evaluate your performance, would Mr. Nance have been

21  in that position?

22     A.  No, not really, because I never saw him that

23  much.  I mostly worked with Don at that time.

24     Q.  Okay.  During the first year you --

25          THE COURT:  You mean Mr. Warren?

JOHNSON - DIRECT                              311

1              THE WITNESS:  Yes, Mr. Warren.

2              THE COURT:  All right.

3              THE WITNESS:  I'm sorry.

4         Q.  (BY MR. BAKER:)  During that first year, did

5    you have to complete a probationary period?

6         A.  I did.

7         Q.  And did you successfully complete it?

8         A.  Yes.

9         Q.  During that first year, was there any

10   serious criticism about how you were doing your job?

11        A.  No.

12        Q.  Any written reprimands, that sort of thing?

13        A.  No.

14        Q.  Okay.  From time to time, when you were

15   working in that unit, were you given special

16   projects to work on?

17        A.  I did.

18        Q.  Can you give me an example of one of those

19   projects.

20        A.  One of the special projects I had to do was

21   do the research of definitive time solution, where

22   we were bringing in servers from other agencies and

23   they all had their own time clocks.  And one of the

24   researches I had to do was to find a procurement of

25   a definitive time solution that would synchronize

JOHNSON - DIRECT                           312

1    all of the time clocks on the all of the servers.

2         Q.  And who gave you that project?

3         A.  Mr. Rademacher gave you that project.

4         Q.  Okay.  We're talking about a new person.

5    Who was Mr. Rademacher?

6         A.  That was Don Warren's supervisor.

7         Q.  Was he the head of the bureau?

8         A.  Yes.

9         Q.  And were you able to complete that project?

10        A.  Yes.

11        Q.  Did you receive any criticisms concerning

12   either the timeliness of completing the project or

13   the quality of your work?

14        A.  No.

15        Q.  During the time period you worked in the

16   bureau, did you become familiar, at least in terms

17   of being able to put a name with a face, of all of

18   the managers that worked in the bureau?

19        A.  I think so.

20        Q.  And I'm talking about managers including but

21   not limited to the Wintel Group?

22        A.  Yes.

23        Q.  Roughly how many managers were there?

24        A.  I would say overall over -- not just Wintel

25   Group, and that I would see initially at meetings,

1    were maybe 30 or 40 managers.  Maybe more.

2        Q.  Okay.  Other than you, were any

3    African-American females?

4        A.  No.

5        Q.  Were any African-Americans?

6        A.  I think there were two others.

7        Q.  They were African-American males?

8        A.  That's correct.

9        Q.  During your first year at CMS, what building

10   was your office located in?

11       A.  At the Data Center at 201 West Adams.

12       Q.  And what floor was your office located on?

13       A.  On the first floor.

14       Q.  And where were the other managers' offices

15   located?

16       A.  On the second floor.

17       Q.  Okay.  So you -- you worked away from other

18   managers?

19       A.  Well, the other managers, like Don Warren

20   and Kevin Rademacher, they were all on the first

21   floor too.  The bigger managers, I would say of --

22       Q.  Okay.  Where was Rod Nance's office?

23       A.  On the second floor.

24       Q.  Okay.  Would it be a fair statement that you

25   wouldn't even see Rod on a daily basis?

JOHNSON - DIRECT                    314

1        A.  The only time I would see Rod on a daily

2   basis because we had a 15-minute, what they call

3   stand-up meeting, to get a status of where all the

4   projects are.  I would see him there.

5        Q.  Okay.  Let's talk about meetings.  Are you

6   familiar with the term charter meeting?

7        A.  Yes.

8        Q.  And can you tell us what a charter meeting

9   was?

10       A.  A charter meeting is a meeting that gives

11  you all of the details of a new project that's being

12  implemented.  It talks about what type of project

13  it's going to be, how long it's going to be, what

14  type of equipment is going to be involved, and what

15  groups would need to be involved in the project.

16  And a lot of decisions are made, like what kind of

17  technology we're going to use for that project.

18       Q.  Did you attend charter meetings?

19       A.  I did at first.

20       Q.  And how frequently would you attend those

21  meetings?

22       A.  Whenever they had them.  That -- you know,

23  all the managers would come.

24       Q.  So at those charter meetings, who else would

25  be in attendance?

1       A.  I would see other managers there.  All

2  the -- from all the different groups, because most

3  of the times, a project went across multiple groups,

4  so I would see all the managers from all the

5  different groups there.

6       Q.  It that point in time, in your first

7  position, did you know Ed Gordon?

8       A.  I did.

9       Q.  Was Ed Gordon regularly at those meetings?

10      A.  Yes.

11      Q.  Throughout the period of time you held your

12 first position, did you regularly attend charter

13 meetings?

14      A.  I did.

15      Q.  At the time you held your first position,

16 did you regularly attend other meetings?

17      A.  Yes.

18      Q.  Can you give us an example of the types of

19 meetings you would attend?

20      A.  They had for special projects and status

21 meetings.

22      Q.  Would those be special projects that would

23 involve your unit?

24      A.  Yes.

25      Q.  And at any of those special project

JOHNSON - DIRECT                    316

1    meetings, was Ed Gordon ever in attendance at those

2    meetings?

3         A.  I saw Ed Gordon at those meeting.

4         Q.  Was he regularly in attendance at those

5    meetings?

6         A.  Yes.

7         Q.  In you doing your job as a manager of a

8    group, were those meetings helpful?

9         A.  It was invaluable because it had all the

10   details.  A lot of decisions were made at those

11   meetings.  What kind of technology.  And you had

12   input at those meetings to say if you think that was

13   gonna work, you had input to say if it was gonna

14   meet your schedule or if you had the staff.  And it

15   just -- a lot of information was given at those

16   meetings.

17        Q.  Okay.  I want to take you to May of 2008.

18   At that time, was there any change in your job?

19        A.  Yes.

20        Q.  And what was the nature of the change?

21        A.  I was moved to the Hardware Group as the

22   Hardware Manager.

23        Q.  Did you request going to the Hardware Group?

24        A.  No.

25        Q.  Were you ever given an explanation of why

JOHNSON - DIRECT                        317

1    you were being sent to the Hardware Group?

2         A.  I was told it was restructure.

3         Q.  Okay.  So let's talk a little bit about

4    that -- that position.  Can you tell us what the

5    mission was of the Hardware Group?

6         A.  The Hardware Group was to -- to solve

7    problems that had to do with the servers.  The

8    servers are like a middle-size equipment that's

9    under the Wintel Group.

10        Q.  Okay.  When you say servers, you're talking

11   about the hardware --

12        A.  The physical server hardware that -- the

13   screws and the parts and the pieces that go into a

14   server.

15        Q.  At the time you went into that group, what

16   hardware experience did you bring with you?

17        A.  None.

18        Q.  Now, when you went into the Hardware Group,

19   was there any change in your supervision?

20        A.  Yes.

21        Q.  And what was that change?

22        A.  That I was working directly with Rod Nance

23   on a regular basis, day-to-day basis.

24        Q.  Okay.  And at that point in time, once you

25   were in the Hardware Group, how much interaction did

JOHNSON - DIRECT                    318

1    you have with Don Warren?

2         A.  Not very much.

3         Q.  So it was basically a switch from Don Warren

4    to Rod Nance?

5         A.  That's correct.

6         Q.  When you initially went into the Hardware

7    Unit, what was the size of the staff?

8         A.  There were four staff members.

9         Q.  Did that ever change?

10        A.  It did.

11        Q.  And do you recall when?

12        A.  Not long after I started in the Hardware

13   Group.

14        Q.  What was the nature of the change?

15        A.  One of the staff got another position.

16        Q.  So you were down to three?

17        A.  Yes.

18        Q.  And during the balance of the time period

19   you were in the Hardware Group, did you always

20   supervise a staff of three technicians?

21        A.  Yes.

22        Q.  Okay.  At the time you went into the

23   Hardware Unit, how many servers was the unit

24   responsible for?

25        A.  There was about 3,000 servers overall.

JOHNSON - DIRECT                    319

1          Q.  And how many of those servers were located

2     in -- in Springfield at the Data Center?

3          A.  Well, I'm still thinking it was not -- it

4     was more out in the field at the time.  When I first

5     started in the Hardware Group, most of the servers

6     were still out in the field.  There was maybe 500 to

7     a thousand servers or so in the Data Center at the

8     time when I first started in the Hardware Group.

9          Q.  And the balance were out in the field?

10         A.  Yes.

11         Q.  And would that have been -- in the field,

12    we'd be talking about throughout the State of

13    Illinois?

14         A.  Yes.

15         Q.  For example, there might be a server at the

16    Pontiac Correctional Center?

17         A.  Yes.

18         Q.  Or a server at a field office of the

19    Department of Children and Family Services in Mt.

20    Vernon?

21         A.  That's correct.

22         Q.  Okay.  And various other places throughout

23    the state?

24         A.  Yes.

25         Q.  I'm probably going to be redundant now, but

JOHNSON - DIRECT                                    320

1    I want to go back over this.  How did the Hardware

2    Unit get its work?

3        A.  Through a Remedy ticket.

4        Q.  All right.  And we've heard about The help

5    desk?

6        A.  Yes.

7        Q.  Would the help desk have been one of the

8    sources for issuing a ticket?

9        A.  Yes.

10       Q.  Where would other sources have been for

11   issuing a ticket?

12       A.  Like some of the agencies do have like

13   the -- the Chief Technology Officer can create a

14   Remedy ticket.

15       Q.  So Chief Technology Officer of the

16   Department of Human Services could create a ticket

17   and send it to your unit?

18       A.  Yes.

19       Q.  What -- what type of information would be in

20   that ticket?

21       A.  It would have a description of the problem

22   or change.  It would have details of what the

23   problem was.  It might have some attachments or

24   any -- some supporting documentation that was part

25   of the ticket.

JOHNSON - DIRECT                                    321

1      Q.  Okay.  And when the ticket arrived at the

2   Hardware Unit, would it come to you?

3      A.  It would come to the Hardware Group.

4      Q.  All right.  And once the ticket got to the

5   Hardware Group, would you assign it?

6      A.  I would have to go through some additional

7   steps to assign the ticket once it came in the

8   Hardware Group.

9      Q.  Can you explain how that was done?

10      A.  Well, initial, when I was in software, I had

11   two days where I was able to just assign the ticket

12   like Ed Gordon talked about where you just clicked

13   down a name and you click that -- under that name

14   and the ticket would go to that person.  And then

15   they'd become personally responsible for that

16   ticket.

17      Q.  And so we've heard about tickets assigned in

18   one's name?

19      A.  Right.

20      Q.  When you were in the Software Unit and

21   initially in the Hardware Unit, did you follow the

22   same process that Ed Gordon described yesterday?

23      A.  Yes; initially.

24      Q.  And I think he said it was a matter of one

25   click.  Would you agree with that?

1      A.  I would agree with that.

2      Q.  And then once you made that click, the

3  Remedy system would show that that ticket was

4  assigned in the name of the technician?

5      A.  Yes.  And I would have to follow-up.  I mean

6  I would have to make sure that -- you know, I could

7  look inside the Remedy system and see what the

8  status is because they should be updating the ticket

9  with the information.

10      Q.  So initially, when you were -- went into the

11  Hardware Unit, what was the process you followed to

12  check the status of tickets?

13      A.  When I first went there, because I was

14  still -- it was like a split evaluation.  I was

15  still under the old evaluation.  So when I first

16  came there, I was able to assign tickets to the

17  staff members.

18      Q.  And then once the ticket was assigned to the

19  staff member, what would you do to make sure that

20  the work was done?

21      A.  I would just -- I would follow-up.  I would

22  like inside the Remedy system and they should have

23  some kind of updates.  They should show that they

24  had follow-up with the customer, and they should

25  show notes that, you know, they verified with the

JOHNSON - DIRECT                                      323

1    customer now the work was complete, then I would

2    know it was done.

3         Q.  Okay.  And if the work was not done, what

4    would you do?

5         A.  I would just go to the staff member and ask

6    him why.  You know, ask them to give me an update.

7         Q.  Okay.  You used a term a moment ago.

8    Verification?

9         A.  Yes.

10        Q.  Within the Remedy system or the ticket

11   performance system, what was a verification?

12        A.  A verification is calling up a customer and

13   following up with them to make sure that the work

14   was done is completed correctly.  And make sure

15   they're satisfied with the work that was done.

16        Q.  Is verification something that is to be done

17   before the work on the ticket is considered

18   completed?

19        A.  Yes.

20        Q.  And I think there's a term called closed?

21        A.  Yes.

22        Q.  Is -- does that mean when the ticket is

23   completed?

24        A.  Yes.

25        Q.  All right.  So when you were in your

JOHNSON - DIRECT                              324

1    position in the software system, who did the

2    verification?

3          A.   The technician.

4          Q.   And what would you do with respect to

5    verification?

6          A.   I would look in the Remedy system to make

7    sure that all the verification information was

8    there.

9          Q.   Okay.  And initially, when you were in the

10   Hardware Unit, what did you do with the verification

11   process?

12         A.   Initially, I was able to verify that the

13   information was inside of the ticket.

14         Q.   Same way you did in the Software Group?

15         A.   Yeah.  For the first two or three months.

16         Q.   Okay.  When you went into the Hardware Unit,

17   I think you indicated you had no hardware

18   background?

19         A.   That's correct.

20         Q.   Did you have to go through a process of

21   educating yourself?

22         A.   I spent a lot of time Googling information,

23   talking to technicians, and, you know, I did ask Ed

24   Gordon questions.

25         Q.   Okay.  Yesterday, Ed Gordon mentioned some

JOHNSON - DIRECT                          325

1    files he created?

2         A.  Yes.

3         Q.  Are you familiar with what he was talking

4    about?

5         A.  Yes.

6         Q.  And what were those files?

7         A.  Well, those files are -- a Share Point is

8    just like a file cabinet.  And it's -- it's

9    basically something that stores documents.

10        So on that Share Point site, when I would look

11   in there, it would have things like a form, a server

12   build form.  It wouldn't have all the details that

13   it took in order to build a server, but it had bits

14   and pieces of information there.

15        Q.  When you went into the Hardware Unit, did

16   you know what it took to build a server?

17        A.  No.

18        Q.  When you went into the Hardware Unit, did

19   you know what it took to change or upgrade the

20   capacity of a server?

21        A.  No.

22        Q.  When you went into the Hardware Unit, did

23   you know what the specifics were to make a

24   particular repair in a server?

25        A.  No.

JOHNSON - DIRECT                    326

1        Q.  So how did you learn that stuff?

2        A.  I did a lot of just trying to figure things

3    out.  Had to rely on my staff, you know, technical

4    skills.  And, you know, just trying to do the best I

5    could with what I knew.

6        Q.  You are acquainted with Ed Gordon?

7        A.  Yes.

8        Q.  And you knew that he was the former manager

9    of the Hardware Unit?

10       A.  Yes.

11       Q.  Did you seek him out for assistance?

12       A.  Yes.

13       Q.  Was he helpful?

14       A.  Some of the things that he -- some of the

15   things that he did, I think is because he was so

16   familiar with hardware, that it was so intuitive for

17   him, that a lot of things did get documented.  And a

18   lot of things I think he just did it naturally.

19       So it was kind of like -- it wasn't like

20   translated into a paper really.  So a lot of the

21   things I really couldn't really figure out, you

22   know.  It was bits and pieces of information, but

23   nothing was a whole complete process in place.

24       And a lot of questions I asked him about, he

25   said he didn't have to do that so then he didn't

JOHNSON - DIRECT                                327

1   have an answer for that.

2       Q.  Okay.  When you first went into the Hardware

3   Unit, I want to talk with you about some of the

4   areas of work.  Okay?

5       Is it an accurate statement to say that a help

6   desk ticket basically is one that seeks to have

7   something repaired?

8       A.  Yes.  Something that's wrong that a

9   customer, maybe they can't access information that

10  they used to be able to, so they'll create a help

11  desk ticket.

12      Q.  And when you first went into the hardware

13  unit, was there a time period you had to assign

14  tickets to technicians?

15      A.  Initially, at the beginning of my eval

16  period, it was two days.

17      Q.  Did that ever change?

18      A.  It did change.

19      Q.  To what?

20      A.  The next time I had my evaluation -- may I

21  refer?

22      Q.  We'll get to the evaluations in a moment.

23  Just tell me --

24      A.  Well, by the next reporting period then,

25  there was a new requirement that I had to assign

JOHNSON - DIRECT                          328

1    every single help desk ticket to myself and then

2    create a task to the staff within one day.

3         Q.  Okay.  We'll come back and talk about

4    that --

5         A.  Okay.

6         Q.  -- a little later.

7         Did your unit decommission servers?

8         A.  Yes.

9         Q.  And what was involved in decommissioning a

10   server?

11        A.  Well, decommissioning a server required

12   several different groups being involved.  And that

13   was like similar to one of the tickets that we saw

14   earlier.  What would happen was that I was required

15   to -- it would usually be a change ticket.  I would

16   have to assign the main ticket to myself.  And then

17   I would have to create tasks for all the different

18   groups, even if they reported to some other manager,

19   to the staff that reported to other managers.  So

20   all the tasks that we saw on that list were tasks

21   that I created for someone to work on.

22        Q.  Now, initially, when you first went into the

23   Hardware Group, were tickets assigned in your name?

24        A.  No.

25        Q.  And did you have to prepare a detailed task

JOHNSON - DIRECT                    329

1   list?

2        A.  No.

3        Q.  Okay.  That came later?

4        A.  Yes.

5        Q.  Okay.  So we'll talk about that in a bit.

6   Right now, I just want to know kind of the nuts and

7   bolts of what's involved in decommissioning a

8   server?

9        A.  Okay.  A decommissioning of a server means

10  that you're taking a server out of commission.  That

11  means that it was working and it was able to report.

12  The purpose of the server is to communicate with

13  other devices that tell other devices what to do.

14  So when you take a server out -- if you decommission

15  a server, you take it out of service where it can't

16  report or do any of the other things that it used to

17  do.  It's no longer active.

18       Q.  And typically, when you decommissioned a

19  server, was it a server that was located in

20  Springfield or in the field?

21       A.  A lot of times it would be in the field.

22       Q.  And when you decommissioned a server, did

23  that mean for a certain period of time the customer

24  was not able to use a server?

25       A.  That's correct.

JOHNSON - DIRECT                                    330

1      Q.  So what did that mean in terms of

2   coordinating the work with the customer?

3      A.  Well, what I was responsible for doing was

4   to communicate with the sites.  They would have what

5   they called a remote office liaison.  And I have to

6   work with that person and decide a time that would

7   be the best for them.

8      You know, some of those agencies were 24/7, so

9   it was hard to make a time that would be convenient

10  for them.  So we had to try to find a window that

11  would be the less destructive to their --

12     Q.  Initially, was it your responsibility to do

13  the coordination with the customer, or was that the

14  technicians' responsibility?

15     A.  Initially that -- a senior level technician

16  would be assigned to decommission, and they could

17  work with the customer.  It would kind of spread the

18  work out so that a lot can be done at the same time.

19     Q.  And then early on, when did you become

20  involved in communicating with a customer to

21  coordinate the decommission?

22     A.  Well, after I was required to also start

23  having the change tickets assigned to my name.

24     Q.  Okay.  Did you -- did your work unit have a

25  responsibility -- well, let me back up.  How long

JOHNSON - DIRECT                                331

1    did your group have to decommission a server?  Was

2    there a specified time period?

3        A.  Well, initially, a server should be -- we

4    have 30 days initially for to decommission a server,

5    where you get it off the network.  And then another

6    30 days for to go pick it up.

7        Q.  So that would be a total of 60 days?

8        A.  Yes, initially.

9        Q.  Okay.

10           THE COURT:  Mr. Baker?

11           MR. BAKER:  Yes, sir?

12           THE COURT:  Time for lunch.

13           MR. BAKER:  All right.  I'm hungry.

14           THE COURT:  Okay, everyone, we're going to

15   break for lunch for an hour and fifteen minutes.

16   Please be sure and keep your stickers on so no one

17   possibly would say anything to you.  I want you to

18   keep those on all the time while you're serving, if

19   you would.  And if they peel off, just get a new one

20   in the Clerk's Office.  All right?

21       Now, please do not discuss anything about this

22   case until time to deliberate.  So enjoy your lunch.

23   We'll be free until 1:30.

24           (Court reporter requested clarification.)

25           THE COURT:  That was a misspeak.  I did not

JOHNSON - DIRECT                                332

1    intend to do that.  I didn't want to short anybody

2    any minutes, including myself.  So 1:30.  And please

3    be back in the jury room ready to go.

4         Thank you, everyone.  Please.  We'll stand in

5    recess everyone until 1:30 this afternoon.

6         (A lunch recess was taken.)

7              THE COURT:  Thank you, everyone.  Please be

8    seated.

9         Very well.  Now, let's see, Mr. Baker, you may

10   continue your direct.

11             MR. BAKER:  Thank you, Your Honor.

12        Q.  (BY MR. BAKER:)  Cheryl, before we broke for

13   lunch, I believe we were talking about the type of

14   work that was done in the Hardware Unit?

15        A.  Yes.

16        Q.  Did the Hardware Unit have any

17   responsibilities for rebuilding servers?

18        A.  Yes.

19        Q.  Can you give me an example of what would

20   fall within the category of rebuilding servers?

21        A.  A lot of the servers that belonged to the

22   customers were old servers.  They were outdated.

23   And one of the things that we would do be build and

24   give them an updated version of that same server.

25        Q.  Would increasing the space of a server fall

JOHNSON - DIRECT                    333

1    within the category of rebuilding?

2        A.  It would -- no, it's not exactly a rebuild,

3    it's something different.  Yes.

4        Q.  Okay.  Did the Hardware Unit have any

5    responsibilities for building servers?

6        A.  Yes.

7        Q.  Okay.  And did the Hardware Unit have any

8    responsibilities for maintaining the inventory of

9    hardware?

10       A.  Yes.

11       Q.  And would that be hardware that was in the

12   Data Center or hardware in the field or both?

13       A.  It would be both.

14       Q.  And can you generally tell us what that

15   responsibility was?

16       A.  The responsibility was to be able to

17   identify every single piece of hardware for every

18   single agency that was under the regime of the

19   Governor that reported to the Data Center that was

20   part of the consolidation.  And there was not just

21   the major agencies, but there's also some boards and

22   commissions.  And so --

23       Q.  How many -- excuse me, how many agencies are

24   we talking about?

25       A.  Well, there was 12 major agencies, but then

JOHNSON - DIRECT                          334

1    there was several boards and commissions.  I would

2    say hundreds.

3         Q.  I'm sorry.

4         A.  Hundreds, I would say.

5         Q.  All right.  So when you came into the

6    Hardware Unit, did the Hardware Unit have a pretty

7    good handle on all the servers that were located?

8              THE COURT:  Mr. Baker, may I interrupt,

9    just so that I understand.  When we're talking about

10   all the servers, all -- are we talking about the

11   entire Illinois, State of Illinois, or are we

12   talking only about CMS?  Or what are we talking

13   about.

14             MR. BAKER:  I believe, and I'll have Cheryl

15   correct me if I'm wrong --

16             THE COURT:  Would you please.

17             MR. BAKER:  I think we're talking about all

18   servers that belonged to the agencies under the

19   jurisdiction of the Governor, as well as various

20   boards and commissions.

21             THE COURT:  Okay.  But it wouldn't come

22   under -- it wouldn't include other agencies like the

23   Comptroller's Office or the Attorney General or any

24   of the other separate ones?

25             MR. BAKER:  That's correct.  I think

JOHNSON - DIRECT                                335

1    servers that came -- that were part of another

2    constitutional officer would not be included.

3              THE COURT:  But everything else would be

4    within -- under the Governor's umbrella?

5              MR. BAKER:  Sure.

6              THE COURT:  Okay.  Is that right?

7              THE WITNESS:  That's correct.

8              THE COURT:  Okay.  Thank you.

9         Q.  (BY MR. BAKER:)  When you came into the

10   Hardware Unit, did that unit have a pretty good

11   handle on what all the servers were and where they

12   were located?

13        A.  There was no one accurate place that listed

14   every single server at every location.

15        Q.  So what if any responsibilities did you have

16   to identify or locate servers?

17        A.  It was my responsibility to determine where

18   the equipment was, to call customers, to verify the

19   equipment is there.  Send technicians out looking

20   for equipment to verify it.

21        Q.  Okay.  Now, in addition to locating

22   equipment, what were the groups other

23   responsibilities when it came to inventorying

24   equipment?

25        A.  One of the responsibilities I got later,

JOHNSON - DIRECT                    336

1    once I started in the Hardware Group, was to

2    inventory all the parts and peripherals and every

3    little thing that had anything to do with a server

4    that was located at the Data Center.  And also keep

5    track of other inventory.

6        Q.  So when you say located at the Data Center,

7    was there a room or warehouse that has this

8    equipment?

9        A.  There was, at the third floor at the Data

10   Center, all the servers there, there be would

11   drawers of little pieces of equipment and

12   miscellaneous parts, and also servers and server

13   parts.

14       Q.  Your unit, as I understand it, also had a

15   responsibility for building servers?

16       A.  That's correct.

17       Q.  What, generally, was involved in building a

18   server?

19       A.  With building the server, there really

20   wasn't any real process in place.  So basically,

21   building the best that we could.  I know there was

22   certain standards as far as the guys knew what type

23   of things to load onto the server, so to speak.  You

24   know, there's certain types of programs; they had

25   those things.  But there's also other parts to

JOHNSON - DIRECT                                      337

 1    having to build a server.  Like we were told earlier
 2    before, there's other groups that had to get
 3    involved.  There was like the networking team that
 4    would have to be involved to be able to get them
 5    connectivity once the server is built.
 6         Q.  Did the Hardware Group kind of quarterback
 7    the process of building a server?
 8         A.  Yes.
 9         Q.  Initially, when you came into the Hardware
10    Unit, what was the time period you had to
11    decommission a server?
12         A.  When I first came into the Hardware Group,
13    the standard was -- for everyone, that the start of
14    decommission within the first 30 days and then
15    completing it within the next 30 days.
16         Q.  And what was the time period initially to
17    rebuild a server?
18         A.  Three days.
19         Q.  And what was the time period to build a new
20    server?
21         A.  Well, that would be within one of the time
22    frames of a change ticket that had to be done within
23    four days.
24         Q.  When the work in a ticket was -- was
25    completed, when you first came into the unit, what

JOHNSON - DIRECT                    338

1  was the process of communicating with the customer

2  concerning completion of the project?

3      A.  The technician would take the responsibility

4  because they the ones that did the work and they

5  knew exactly what it is that they did.  And they

6  would contact the customer.

7      Q.  And did you, as the manager, ever contact

8  customers when the project was completed?

9      A.  Not in the standard way, not initially.

10      Q.  Did you ever in a non-standard way?

11      A.  Yeah.  I would -- I would follow-up with

12  customers.  And there was times when I -- when it

13  was a critical project or something like that, I

14  would make sure that I follow-up personally with the

15  customer.

16          THE COURT:  Mr. Baker, could we kind of

17  give us an illustration of how -- what you're

18  talking about here would work?

19      A.  Yes.

20          THE COURT:  From someplace.  And whoever is

21  in charge and making the request.  And follow it

22  through step by step.

23      Q.  That's a good idea.

24      Let's -- let's use a change order as an

25  example.  And my understanding is that a change

JOHNSON - DIRECT

1   order could involve building a new server, it's a

2   more complicated work; is that correct?

3       A.  Yes; that's correct.

4       Q.  Okay.  So from the time -- and again, I'm

5   talking about initially, when you first joined the

6   Hardware Unit?

7       A.  Yes.

8       Q.  The ticket came to you?

9       A.  Yes.

10      Q.  And then what would you do?

11      A.  I would determine what the ticket was in

12  response to and which technician had the most

13  experience in that area.  And I would assign that

14  ticket to them to work on.

15      Q.  Okay.  And that would involve one click?

16      A.  Pretty much.  I mean I would have to take

17  the time, as Ed said before, it could take a minute

18  or it could take an hour just to do the analysis of

19  the original ticket.

20      Q.  Okay.  And then what would -- what would

21  happen next on the technician's part?

22      A.  Then the technician, if -- they're a senior

23  level person, and they would have to do all the

24  tasking that was associated with that ticket.

25      Q.  Okay.  So let's be a little more specific.

JOHNSON - DIRECT                        340

1    When you say tasking?

2        A.  I mean they would create Remedy tasks and

3    assign it to the different groups.  If they needed

4    to.  And then it would be the person that what they

5    call took ownership of the ticket to make sure the

6    work was complete.

7        Q.  All right.  So -- so assigning the tasks

8    that would be done by the technician, not by the

9    manager?

10       A.  Yes.  For the senior level technician.

11       Q.  Okay.  And during the process of work being

12   done on the ticket, what would you as the manager

13   do?

14       A.  I would coordinate and I would verify and I

15   would manage -- I would watch the ticket to see, you

16   know, if there's updates going on, and see what --

17   what the status is of the ticket.  And see if it's

18   on track and stuff like that.

19       Q.  How would you do that?

20       A.  By opening up the Remedy system and opening

21   up the change ticket and see the activity on the

22   ticket.

23       Q.  Okay.  So we've heard a lot about the Remedy

24   system in this case.  Is that a matter of putting up

25   something on your computer?

JOHNSON - DIRECT                                341

1        A.  Yes.  I would open up a screen.  And I can
2    look at the change ticket and I can see the activity
3    of that work log that we talked about earlier.
4        Q.  How frequently did you do that?
5        A.  That's something I did every day.
6        Q.  Okay.  If -- if a ticket was behind
7    schedule--for lack of a better term--what would you
8    do?
9        A.  I would work with the technician to find out
10   what the problem is.  Ask them if they need any
11   assistance.  Maybe they're having some type of
12   problem where they need me to intervene.  And so I'd
13   follow-up with them and -- to see if there's
14   anything we can do to get the ticket moving along.
15   See if there's other priorities and see if there's
16   other things we can do in order to expedite the
17   matter.
18       Q.  Okay.  Now, with respect to a change ticket,
19   does it reach a point where all the work is
20   completed?
21       A.  Yes.
22       Q.  And that would not only be work that was
23   performed by the Hardware Unit, but work performed
24   by the other units as well?
25       A.  Yes.

JOHNSON - DIRECT                           342

 1        Q.  Okay.  By the way, before I forget it:  How
 2   would the Hardware Unit coordinate work or assign
 3   work to the other units?
 4        A.  Through a task in Remedy.  By creating a
 5   task in Remedy.
 6        Q.  And that, again, was done by the technician?
 7        A.  Yes.  In that aspect; yes.
 8        Q.  Okay.  And then when -- when all the work
 9   was completed, what would be the steps associated
10   with closing the project or ticket?
11        A.  Well, every task would have to be closed
12   ahead of the very last task.  And the person that's
13   responsible for the ticket would do the verification
14   with the customer.  And that means a lot of ways you
15   can contact the customer, sometimes through email,
16   sometimes through phone.  The best way.  Sometimes
17   you have to do a lot of back and forth with the
18   customer.
19        Q.  Now, is that the last step in the process?
20        A.  Yes.
21        Q.  Why is that important?
22        A.  To make sure that the work had been done
23   correctly.
24        Q.  So the customer is satisfied?
25        A.  Yes, the customer is satisfied.

JOHNSON - DIRECT                                    343

1        Q.  Sometimes is it difficult to communicate

2    directly with the customer?

3        A.  Yes.

4        Q.  Can you explain that?

5        A.  Well, a lot of the customers were at remote

6    locations.  Some of them, you had never ever met.

7    And a lot of times you couldn't get them on the

8    phone, sometimes they won't respond to email right

9    away.  So there was a lot of times there's a lot of

10   phone calls and a lot of communication back and

11   forth.  And if that technician is the one that's

12   doing the work, then they would get the first

13   contact with the customer when they get done with

14   the work.

15       Q.  Would you ever contact the customer?

16       A.  I have contacted a customer before when,

17   like, there was problems or something didn't getting

18   resolved.  And I would talk to the customer to find

19   out why it's not still working, and then make sure

20   the work got done.

21       Q.  Okay.  Now, sometimes with a ticket like

22   this, would the server have to be taken out of use?

23       A.  Yes.

24       Q.  And when that happened, was there any

25   coordination required with the customer?

JOHNSON - DIRECT                                    344

1        A.  Yes.

2        Q.  Why was that?

3        A.  Well, because the customers were at remote

4   locations.  They had applications that were a high

5   priority applications.  And we had to find a way

6   that would be a convenient time to take their system

7   out of service so we can exchange the equipment or

8   do an upgrade on the equipment.

9        Q.  So would that minimize the disruption to the

10  customer?

11       A.  Yes.

12       Q.  And initially, who would do that coordinate?

13       A.  The person who owned the change ticket would

14  be the one doing the coordinating.  These would be

15  sentence level technician who's working on the

16  ticket.

17       Q.  And would you ever become involved in that

18  coordination process?

19       A.  I would if it ever became an issue or a snag

20  or something I had to expedite, and I was the person

21  that would expedite it.

22       Q.  Okay.  Now, the work that had to be done by

23  the technician, was that work that would be done at

24  the location of the server?

25       A.  Yes.  In cases where -- wherever the server

1    was, that's where the work was done.

2        Q.  Okay.  And depending upon the nature of the

3    work, I assume the time period could vary in terms

4    of how much time a technician would have to be at

5    the location of the server?

6        A.  Yes.  Especially when it's something that

7    had to do with a complete rebuild of a server or

8    doing what we call a server migration from an old

9    server to a new server.  That whole process could

10   take a couple of days because you have to first

11   backup all the data to someplace safe, so that if

12   something went wrong, you can restore the data back

13   to the old server if the new one didn't work.  So

14   that whole process could take a couple of days.

15       Q.  Now, who would -- who would coordinate the

16   time you could have a technician go out to the

17   location?

18       A.  I would have to coordinate the time for a

19   technician to go out on a location.

20       Q.  All right.  What considerations would you

21   give in doing that?

22       A.  I have to make the consideration of how many

23   technicians that I have.  How many are out in the

24   field at any one time.  And the availability of

25   their schedule based on all the other duties that

1    they had available that they had to work on.

2         Q.  Okay.  In terms of work, how many -- what

3    was the maximum number of technicians you could send

4    out in the field at any one time?

5         A.  With having only three technicians, the most

6    I could ever send out in the field at any time would

7    be two because I always needed to have someone at

8    home to take care of the home base, as we call it.

9    Where they had to take care of help desk tickets or

10   anything that came in to the group while the other

11   technicians were gone.

12        Q.  We've heard in this case about two companies

13   apparently had contracts with the state.  One is

14   Novanis, and for the moment, I can't think of the

15   other.  And are you familiar with those companies?

16        A.  Yes.

17        Q.  And I think Mr. Gordon said that he would

18   use them on average of once a week?

19        A.  Is according to what the problem is.

20        Q.  What type of work were those companies

21   capable of doing?

22        A.  The main purpose of those types of companies

23   are if there was something quick that could be done,

24   like they have things like called power supplies

25   that would go out on a customer's server.  And if

JOHNSON - DIRECT                                    347

1    there was a technician from Sentinel in the area,

2    and they had a power supply, it would be easier for

3    them to -- it probably only took them 15 minutes to

4    make the exchange.

5         Q.  Okay.  So if there was -- if there was a

6    server out in Dupage County, there might be a

7    Novanis technician in one of the Chicago suburbs

8    that could go do it?

9         A.  Yes; for something simple like a power

10   supply.

11        Q.  Okay.  Did you use those companies for

12   change tickets?

13        A.  Not for major changes; no.

14        Q.  Why is that?

15        A.  Because it took more than a day or two.  And

16   it was something that we had to -- that we had to

17   schedule with the customer.  And we had to have a

18   technician.  They wouldn't -- those types of people

19   wouldn't just do a day long, they wouldn't meet with

20   the customer.  They usually did something quick,

21   something that was an easy change.

22        Q.  I think Ms. Higgerson said this morning that

23   you had unlimited access to those companies.  Was

24   that an overstatement?

25        A.  Well, unlimited to a point where there's

JOHNSON - DIRECT                    348

1    only certain things they will do.  They wouldn't go

2    in and do a server migration.  They would go and

3    change a power supply.  And we had a lot of old

4    servers, and power supplies would go out, so that

5    was the kind of thing.  Because my staff was off

6    doing other types of things; that was something that

7    they could do that my team wouldn't have to do.

8         Q.  We talked this morning about your experience

9    in information technology?

10        A.  Yes.

11        Q.  And I believe you indicated that one of the

12   areas where you had little experience was hardware?

13        A.  I had no experience in hardware.

14        Q.  When you went into the Hardware Unit, did

15   you feel you needed some more formal training?

16        A.  I did.

17        Q.  Why did you feel that way?

18        A.  Because I didn't know anything about

19   hardware.  Over time -- I've been in IT for over

20   30 years, and over time, technology has evolved.

21   And each time, I learn something new.  So I'm very

22   capable of learning something new.  If I'm taught

23   new technology, I learn it, obviously, because we're

24   not doing punch cards anymore.  People who know IT,

25   knew about that.

JOHNSON - DIRECT                    349

1        Q.  Okay.  At any time when you went -- after

2   you went into the Hardware Unit, did you make any

3   requests for more formal training in hardware?

4        A.  I did.

5        Q.  To whom did you make that request?

6        A.  Rod Nance.

7            THE COURT:  Who?

8        A.  Rod Nance.

9            THE COURT:  Thank you.

10       Q.  And how many times did you request that

11  training of Mr. Nance?

12       A.  Several times.  Maybe would be five

13  different times I asked for technical training.

14       Q.  Did you ever receive that training?

15       A.  No.

16       Q.  Were you ever given a reason why?

17       A.  One time it was -- I was told that there

18  wasn't any funding for paid classes.  At one point,

19  I was told that.

20       Q.  Do you think more formalized training would

21  have helped you?

22       A.  I certainly do.

23       Q.  Why is that?

24       A.  Like I said, I can learn anything.  Given

25  the right tools and technology, I've evolved over

JOHNSON - DIRECT                           350

1    different fields and I worked different types of

2    areas of IT.  But every time there's new technology,

3    I get trained in that area.  Even when I first

4    started there at CMS, we had specialized training

5    for what we were going to do right then and there to

6    help me.

7          Q.  I want to turn to another area.  I think you

8    identified this morning where your office was

9    located in your first position?

10         A.  Yes.

11         Q.  After you went into the Hardware Unit, where

12   was that work location in relation to the location

13   of your staff?

14         A.  When I first started at the Hardware Unit, I

15   was in the same office area as all the other

16   managers -- all the other managers that report to

17   Rod Nance.

18         Q.  And the technicians that worked in the

19   Hardware Unit, where were they located in the --

20         A.  They were in another room at the other end

21   of the same floor, in a big room all together.

22         Q.  Rough estimate, how long would it take you

23   to walk from your office to where they were located?

24         A.  Probably less than 30 seconds.  Probably --

25   you know, probably about 30 seconds maybe.

JOHNSON - DIRECT                    351

1        Q.  What was your practice of communicating with

2   technicians that reported to you when you initially

3   went into the Hardware Unit?

4        A.  I would -- there was email.  Also just

5   talking to them.  I'd just go in there and talk to

6   them and see how things were going.  I've always had

7   an open-door policy, and my staff could come and

8   talk to me any time they needed to.

9        Q.  Okay.  And with what frequency would you

10  talk to your staff on an average day when the staff

11  member was in Springfield?

12       A.  Two or three times a day to, find out what's

13  going on, how things are going.  Or if I have any

14  questions about anything.

15       Q.  At any point in time, was your office

16  relocated?

17       A.  Yes.

18       Q.  And when was that?

19       A.  I would say after the first few months.  I'm

20  not sure the exact time period after I came to the

21  Hardware Group.

22       Q.  And where was your office relocated to?

23       A.  It wasn't an office anymore.  I was inside

24  the room -- same room as the hardware technicians.

25  And my office became a set of bookcases that

JOHNSON - DIRECT

1    surrounded a desk.  That became my new office.

2         Q.  Okay.  What was the size of that office?

3         A.  Probably less than the size of the space I'm

4    setting in.  I can't tell you how big this is.  Just

5    big enough for a desk to be there.

6         Q.  Okay.  Did that facility better

7    communication with the technicians?

8         A.  No.  No better than what I had already been

9    doing.  I still did the same thing, talked to them

10   and I still sent them emails when I needed to send

11   them emails, and I still talked to them about the

12   projects when I needed to talk to them about the

13   projects.

14        Q.  All right.  Within the Wintel Group, did any

15   other manager share a room with the technicians that

16   reported to him?

17        A.  No.

18        Q.  This morning we talked about meetings that

19   you attended?

20        A.  Yes.

21        Q.  After you went into the Hardware Unit, was

22   there any change in meetings you were permitted to

23   attend?

24        A.  Yes.

25        Q.  What was that change?

JOHNSON - DIRECT                          353

1          A.  I was told I was no longer needed at the

2     charter meetings.

3          Q.  Okay.  Were you ever given a reason why you

4     were not needed?

5          A.  No.

6          Q.  Who told you that?

7          A.  Rod Nance.

8          Q.  So the information that might have been

9     exchanged at those charter meetings, how would it

10    get to you?

11         A.  Through Rod Nance.

12         Q.  And what was his practice in communicating

13    that information to you?

14         A.  I would get a lot of emails.  That's pretty

15    much most of the things I would hear.  Oh, now we

16    need servers, we need ten servers.  And I don't

17    think why, I don't what the whole -- what surrounded

18    it, what the project was about.  All I got was the

19    information I was given.

20         Q.  Okay.  Why was -- why was Mr. Nance told you

21    less adequate than attending the meetings?

22         A.  Because then I didn't have any input into

23    anything.  At one point in time, I had a voice.  I

24    could -- you know, because I knew how it would

25    affect my group.  I could give some advice on

JOHNSON - DIRECT                                    354

1    technology.  I learned how the whole project was

2    going to work together.  And I knew the team members

3    that were going to be involved.  I knew about the

4    technology that they had chosen for the process.  I

5    knew all the deadlines and what's the priorities of

6    the project.

7         Q.  During the time period you were in the

8    Hardware Unit, roughly four years, was there ever a

9    change and you were allowed to attend meetings?

10        A.  Pardon me?

11        Q.  At any time while you worked in the Hardware

12   Unit, after you were initially told you could not

13   attend meetings, was there ever any change so that

14   you were allowed to attend meetings?

15        A.  No.

16        Q.  Cheryl, could you turn to Group Exhibit 3.

17        Can you identify for me what Group Exhibit 3

18   consists of?

19        A.  It is my 11-107 -- this is Group 3A, is

20   that --

21        Q.  I'm talking about the entire group now?

22        A.  Oh, the entire group.  Well, it shows my

23   performance evaluation, except for 3B.  I don't know

24   what that is.  I don't recognize that.

25        Q.  Okay.  Are those performance evaluations

JOHNSON - DIRECT                     355

1    that cover this four year time period you were in

2    the Hardware Group?

3         A.  Yes.

4         Q.  Okay.  What I would like you to do -- before

5    you do that, I'd like to offer Group Exhibit 3 into

6    evidence.

7              THE COURT:  Surely.

8              MS. BARNES:  What about 3B?  There's not

9    even a signature on that.

10             THE WITNESS:  That's what I'm saying.  I

11   can't say that's on evaluation of mine because it

12   doesn't have an employee signature page and it

13   doesn't have an employee section for comments.

14             MR. BAKER:  Your Honor?

15             THE COURT:  Yes.

16             MR. BAKER:  I would remove Exhibit 3B from

17   Group Exhibit 3, and ask that the remainder of Group

18   Exhibit 3 be admitted into evidence.

19             THE COURT:  Ms. Barnes?

20             MS. BARNES:  Yeah, that's fine, with the

21   proviso that if there's another one like this, I

22   would have the same objection.  But I don't have any

23   reason to believe that right now.

24             THE COURT:  Very good.  Who knows, it may

25   not -- the possibility may not even surface.  But I

JOHNSON - DIRECT                          356

1    don't know.

2              MR. BAKER:  Okay.

3              THE COURT:  So as I understand it, Group

4    3A --

5              MR. BAKER:  Group 3.

6              THE COURT:  Group 3, with the exception of

7    Group 3B, is going to be offered in evidence and

8    there's no objection?

9              MR. BAKER:  I think that's correct.

10             MS. BARNES:  That's correct.

11             THE COURT:  With that limitation, it is

12   admitted.

13        (Plaintiff's Group Exhibit 3 admitted.)

14        Q.  (BY MR. BAKER:)  Now, Cheryl, for purposes

15   of just organization of this exhibit, there are

16   various subcomponents:  3A, 3C on to 3M, I believe.

17   Do each of those subcomponents represent an

18   evaluation?

19        A.  Yes.

20        Q.  Okay.  So what I would like to do is turn to

21   Exhibit 3A.

22             THE COURT:  All right.  Now you'd like to

23   have that placed on the Elmo?  Or whatever this

24   thing is --

25        Q.  I do in a moment, Your Honor.

JOHNSON - DIRECT                              357

1             THE COURT:  Thank you.

2        Q.  That evaluation covers a one-year time

3   period; am I correct?

4        A.  Yes.

5        Q.  And that time period is November 1, 2007, to

6   December 1, 2008?

7        A.  Yes.

8        Q.  Now, I believe you indicated--and correct me

9   if I'm mistaken--that you were assigned to the

10  Hardware Unit in May of 2008?

11       A.  That's correct.

12       Q.  So does part of this evaluation cover work

13  you did in your first position at CMS and part of it

14  relate to work you did in the Hardware Unit?

15       A.  Yes.

16       Q.  Okay.  Can we turn that on.  Cheryl, I'm

17  referring now to Part 1 of the evaluation.

18       Cheryl, Part 1 is an appraisal of whether you

19  met or did not meet five objectives?

20       A.  Yes.

21       Q.  Were those objectives ones that were

22  assigned to you when you were in the Software Unit?

23       A.  Some of them were.  Most of them.

24       Q.  Most of them were.  Which ones were not?

25       A.  I think they may have all been in this group

JOHNSON - DIRECT                        358

1   here assigned when I was in the Hardware Group.  I

2   mean in the Software Group.

3        Q.  Okay.

4        A.  Mm-hmm.  On this first page, the Part 1.

5        Q.  All right.  And at least at the time of this

6   appraisal, it looks like, if you go to number 1, all

7   tickets had to be assigned within a two-day time

8   period?

9        A.  Yes.

10       Q.  Okay.

11       A.  The only thing is that -- the reason why

12  this is -- there's certain objectives that I know,

13  because they say systems administration, but then

14  there's some other objectives that they could have

15  been assigned when I was in Hardware Group.  And

16  those are the more general objectives.

17       Q.  Okay.  Are any -- are any of these five

18  objectives ones that were assigned to you in the

19  Hardware Group?

20       A.  I believe Number 2.

21       Q.  Okay.  And that's one you did not meet?

22       A.  Yes.

23       Q.  Were you ever told -- it looks like in that

24  objective you had to -- 90 percent of help desk

25  tickets must be closed within a four-day timeframe?

JOHNSON - DIRECT                    359

1       A.  Yes.

2       Q.  Were you ever told how far the Hardware Unit

3  was short of that 90 percent?

4       A.  No.

5       Q.  You don't know whether you were at

6  89 percent or 53 percent?

7       A.  No.

8       Q.  Cheryl, I am handing you a continuation of

9  Part 1; am I correct?

10       A.  Yes.

11       Q.  And are any of those objectives ones that

12  were created for your work in the Hardware Unit?

13       A.  I know that Number 9 was all of these

14  classes which were like customer service type

15  classes.  Type of classes that I already had

16  experience in, like human resource kinds of things.

17  There's like ten of them was added.

18       And then there was -- it says (as read:)

19  Complete all assigned tasks by the due date.

20       Well, since I didn't get 90 percent of all help

21  desk done in four days, according to that --

22  whatever that calculation was, then I automatically

23  got a not met or completed all assigned tasks by a

24  scheduled due date.  That was automatic.

25       Q.  Okay.

JOHNSON - DIRECT                    360

1        A.  And then there was one that had to do, when

2   I was towards the end of my period in systems

3   administration, that had to do with three agency

4   print services being converted.  And prior to it, I

5   had one agency to work on at a time.  And I passed

6   that objective.  And this one, at the same time

7   period, had three to work on at the same time.  So

8   this one I didn't meet.

9        Q.  So which objective is that?

10       A.  That's the one that's Number 8.

11       Q.  Okay.  Let's talk a little bit about that.

12   What -- when were you given that assignment?

13       A.  It had to be somewhere during the time

14   period of in the beginning of this reporting period

15   was.  It had to have been in the last -- I don't

16   know when I got it, to be honest with you, because I

17   don't remember seeing it before, but --

18       Q.  It looked like that was a project that had

19   to be completed by April 1st, 2008?

20       A.  Yeah.

21       Q.  Can you tell us what that entailed?

22       A.  Which -- what this entailed?  Well, there

23   was printing services that use to be done by the

24   legacy agencies.  And some of the larger agency, one

25   was DHS, where we converted all their printing

JOHNSON - DIRECT                      361

1    services over to the Systems Administration and

2    Support Group.

3         And at the same time, during the same time

4    period, both of these were due on the same date.

5    And then on this number 8, then there were three

6    different agencies that had to have their print

7    services converted.  And that was three of the

8    larger agencies.

9         Q.  Okay.  So that looks to me like that was an

10   objective that had to be met while you were still in

11   your first position?

12        A.  Yeah.  Right at the very end of my last

13   position.

14        Q.  Okay.  And you did not meet that objective?

15        A.  Yes.

16        Q.  And why was that?

17        A.  Pardon me?

18        Q.  Why was it you didn't meet that objective?

19        A.  Because the initial printing services, it

20   was a large project.  And I was able to get the one

21   done for DHS, and that's one of the very largest

22   ones, the largest agency.

23        And then at the exact same time period, being

24   there was three agencies that needed to be converted

25   at the same time, it doesn't necessarily mean not

JOHNSON - DIRECT                        362

1    one of these agencies were converted, but if one of

2    them didn't have every single thing converted, then

3    the whole objective was not met.

4        Q.  Okay.  Do you know how far along you were

5    on --

6        A.  I know that we made a lot of progress on

7    those.  That they were pretty close to being done.

8        Q.  All right.  Can you turn to the last page of

9    that evaluation?

10       A.  Yes.

11       Q.  When were you given it?

12           THE COURT:  Put that on the screen.

13       Q.  What's the date you signed the evaluation?

14       A.  It was July 22nd, 2009.

15       Q.  And how long was that after the close of the

16   time period covered by the evaluation?

17       A.  Eight months.

18       Q.  And who gave you that evaluation?

19       A.  Rod Nance.

20       Q.  Now, prior to receiving that evaluation,

21   had -- had Mr. Nance given you any forewarning that

22   he was going to evaluate you downward because you

23   hadn't met objectives?

24       A.  No.

25       Q.  Had Rod Nance, during that time period,

JOHNSON - DIRECT                        363

1    criticized the quality of your work in any respect?

2         A.  No.

3         Q.  Had he criticized the timeliness of your

4    work?

5         A.  No.

6         Q.  Before we go on with any more evaluations;

7    you basically, as I recall, were supervised

8    effectively by Mr. Warren in your old position?

9         A.  Yes.

10        Q.  And then in your new position, you were

11   supervised by Mr. Nance?

12        A.  Yes.

13        Q.  Was there any difference in their

14   supervisory style?

15        A.  I just noticed right away that I would start

16   getting a lot of emails.  Almost like I would call

17   it a barraging of emails.  Constant emails.

18        Q.  What type of information would be in those

19   emails?

20        A.  It was always a bunch of questions.  What

21   about this?  What about this?  What about this?  And

22   it would go on for about -- I mean starting in the

23   morning, and it might go on for 30 minutes to an

24   hour, to the point where I could barely answer one

25   question and another email would come.

JOHNSON - DIRECT                          364

1        Q.  Did that -- did that have any affect on your

2   ability to do your supervisory duties?

3        A.  It did.  I was constantly running from one

4   place to another trying to answer these questions.

5   And then it would start again in the afternoon

6   before I even got finished with the morning

7   questions.

8        Q.  What I would like to do is go to Exhibit 3C.

9        Before we do that, I want to go back to Exhibit

10  3A.  And I'm referring to Part 4 which are employee

11  objectives for the next recording period.  You see

12  that?

13       A.  Yes.

14       Q.  The first sentence in that part --

15           THE COURT:  Wait a minute.  I want to make

16  sure I've got the right page.  What page is it now?

17       Q.  Is it 3A, Part 4.  It's page 3 of four

18  pages.

19           THE COURT:  Are we on the page?

20       Q.  It's Page 3.

21           THE COURT:  Okay.  And did you say Part 4?

22       Q.  Yes, sir.

23           THE COURT:  All right.

24       Q.  Cheryl, can we agree that Part 4 were job

25  objectives established for you during your next

JOHNSON - DIRECT                              365

1    period of evaluation?

2        A.  Yes.

3        Q.  Now, you see the first sentence, and I'll

4    read it.  It says, (as read:)  To be established by

5    the supervisor with input from the employee.

6        See that?

7        A.  Yes.

8        Q.  How are these objectives established?

9        A.  They were given to me by my supervisor.

10       Q.  And when were they given to you?

11       A.  At my evaluation.

12       Q.  Prior to that, did Mr. Nance ask you for any

13   thoughts about what objectives might be reasonable?

14       A.  No.

15       Q.  Were you offered any opportunity to provide

16   input into your objectives?

17       A.  No.

18       Q.  At any time, with respect to any evaluations

19   that were done for you by Mr. Nance, were you given

20   the opportunity to provide any input into your

21   evaluations?

22       A.  No.

23       Q.  Now, I want to refer you to the first

24   objective.  And I'm gonna read it.  It says, (as

25   read:)  Effectively manage staff resources via

JOHNSON - DIRECT                        366

1    Remedy.  Log into Remedy to create, monitor, and

2    assign tasks within the system to staff as required

3    to complete the task of the Hardware Unit.  All help

4    desk tickets must be assigned to the manager and a

5    task created and assigned to the staff within one

6    day.

7         Do you see that?

8         A.  Yes.

9         Q.  Was that objective any different than any

10   earlier objective you had concerning assigning work?

11        A.  Yes.

12        Q.  How was it different?

13        A.  Initially, I was able to assign the ticket

14   directly to my staff member to work on.  And I had a

15   two-day timeframe in order to do that.

16        Q.  Okay.  So it was assigned to the staff

17   member?

18        A.  Yes.

19        Q.  And now it was assigned to you?

20        A.  Yes.

21        Q.  In your name?

22        A.  Yes.

23        Q.  You were the owner of the ticket?

24        A.  Yes.

25        Q.  Did Mr. Nance ever explain to you why he

JOHNSON - DIRECT                           367

1    wanted it done that way?

2         A.  I never really got a good explanation about

3    why this had to be done this way.

4         Q.  Okay.  Now, we've heard your testimony and

5    Mr. Gordon's testimony about the process of

6    assigning a ticket to a staff member.

7         A.  Yes.

8         Q.  And that was when the ticket was assigned in

9    the name of the staff member; am I correct?

10        A.  Yes.

11        Q.  Was it any different when it was assigned to

12   you?

13        A.  Yes.

14        Q.  Can you explain how it was different?

15        A.  The difference is a help desk ticket is

16   designed to be assigned to a staff member to work

17   on.  And there -- they work with the customer, they

18   fix the problem, they communicate with the customer.

19   So that's one thing you could -- you assign the

20   ticket to them and then you monitor it.

21        Then it became a new rule for me that I had to

22   assign every single help desk ticket to myself.

23        Q.  So without talking about what your

24   responsibility was, what -- what was involved on

25   your part in going through that process?

JOHNSON - DIRECT                          368

1          A.  The way that this objective is set up, I

2     would have to -- the main ticket, which is the help

3     desk ticket, would have all the information that

4     talks about what the problem that was being

5     reported.  We talked about that earlier.  It will

6     have a description, it will have the title, it will

7     have a contact person in it.

8          But then in order -- instead of me handing the

9     ticket to the staff and they have that information

10    already there, I would have to assign a task to the

11    staff and then duplicate all the information that

12    was in the main ticket so they would have everything

13    that they needed to do the work.

14         So in other words, I was just duplicating what

15    was already in the main ticket by assigning the task

16    and me holding the main ticket with all the

17    information in it.

18         Q.  Did you also have to reflect and consider

19    who best to assign the ticket to?

20         A.  And I also still had my regular work where I

21    had to do the analysis upfront to find out who was

22    the technician that had to work on the ticket.  And

23    then in addition to that, it took one step to assign

24    the ticket to my name, and then took another step to

25    then duplicate all the information in the main

JOHNSON - DIRECT                              369

1    ticket by opening up two screens and copying and

2    pasting and copying and pasting.

3        Q.  So Mr. Nance -- Mr. Gordon yesterday said it

4    was a click to assign the ticket?

5        A.  Yes.

6        Q.  Was it a click here?

7        A.  No.  It took me -- it could take maybe 15 to

8    20 minutes or 30 minutes to do all this extra

9    cutting and pasting if there was a lot of

10   information in the original ticket.  And I had to

11   make sure that the technician had all they needed to

12   do to get the work done that was already in the main

13   ticket.  If I could have given them the main ticket,

14   they would have had the information they needed.

15       Q.  Okay.  So it says, (as read:)  Must be

16   assigned to the manager and a task created?

17       A.  Yes.

18       Q.  Was that a task for the technician?

19       A.  Yeah.

20       Q.  And if there's more than one task required

21   for the ticket, did you have to identify all the

22   tasks?

23       A.  Yes.

24       Q.  Okay.  And you said it could take up to

25   15 minutes to do?

1          A.  It could take more than that, you know, but

2     that's just an average, I would say.

3          Q.  Okay.  If you go to Number 2, which says,

4     (as read:)  Monitor staff assignments in Remedy to

5     assure -- to insure all assigned tasks are acted

6     upon and closed within four days of assignment?

7          A.  Yes.

8          Q.  (As read:)  Within one day of staff closer

9     of the task, verify with the customer to assure work

10    is completed.

11         A.  Yes.

12         Q.  How is that task or objective different than

13    earlier objectives?

14         A.  Earlier it was that all tasks had to be

15    acted upon within four days, and that's what

16    everyone else had to do.  But in addition to this

17    now, within one day of staff closing their tasks,

18    that was part of the ticket, then I had to

19    personally verify with every single customer instead

20    of the staff member.

21         Q.  Okay.  So if the ticket has to be acted upon

22    and closed within four days, would that mean that

23    you would have to verify with the customer within

24    that four-day timeframe?

25         A.  Yes.

1      Q.  So what was involved on your part in doing

2  that?

3      A.  I would -- I would have to go to the

4  technician, determine what they did.  Then I would

5  have to duplicate that information and pass it on to

6  the customer, instead of them going directly.  It's

7  kind of -- it was like taking an extra long time to

8  follow-up with the customer because I had to be the

9  middle person.

10     And then I would have to -- maybe I'll get in

11 touch with the customer and maybe I wouldn't.  They

12 might have a question, then I'll have to take it

13 back to the technician.  And then I have to try to

14 reinvest what the customer just told me, instead of

15 them talking to the customer directly.  And it just

16 added a lot of layers of different information that

17 had to get passed back and forth that it would have

18 saved half the time if the customer -- it would have

19 been better customer service if we could have went

20 to the customer himself.

21     Q.  Was that time-consuming on your part?

22     A.  Very time-consuming.

23     Q.  Can you go to Number 4.

24     A.  Yes.

25     Q.  And that says, (as read:)  Provide Wintel

JOHNSON - DIRECT                    372

1    management a written weekly status report for all

2    Remedy help desk tickets?

3        A.  Yes.

4        Q.  (As read:)  Task and ESR tickets that remain

5    open for the Hardware Unit.  This will be due by

6    10:00 a.m. on Monday of each week.  The most -- the

7    report must contain a weekly update on any

8    outstanding tickets over 30 days old.

9        Is that a repeat of an objective you had in

10   earlier evaluations?

11       A.  My earlier objectives said that I had to

12   have a written weekly status report of all tickets

13   that remained open, and that was due by 10:00 every

14   Monday.  And I would have got met on that objective.

15       Q.  Was this any different?

16       A.  The difference was then all the tickets that

17   were 30 days older, then I had to personally put an

18   update into Remedy about the ticket itself.

19       Q.  Okay.  Let's go to Number 5.

20       A.  Yes.

21       Q.  It says, (as read:)  Ensure the timely build

22   of all Midrange Wintel servers.  The objective will

23   be considered met if the server builds are completed

24   within three days of receipt of the request or the

25   specified due date.

JOHNSON - DIRECT                    373

1          See that?

2          A.  Yes.

3          Q.  Is that a different objective in any respect

4     from any of your earlier objectives?

5          A.  That was a new objective that was entered

6     here.

7          Q.  What were you expected to do before that

8     with respect to completing server builds?

9          A.  It didn't really -- we just, when we got the

10    server builds, we'd get them done.  And it didn't

11    really have a timeframe when they needed to be done

12    at that point of time.  But when we get a change

13    ticket in, since I had to have certain ones done in

14    four days, then I would have to have that done in

15    four days.  So within that timeframe at the minimum.

16    Because every ticket had to be acted upon and done

17    within four days according to my objectives.  So

18    that would fall into that range.

19         Q.  Okay.  Cheryl, can you go to Exhibit 3C.

20         A.  Yes.

21         Q.  And specifically, Part 4.

22         A.  Yes.

23         Q.  Now, Exhibit 3C is your evaluation for the

24    period November 1, 2008, to November 1, 2009; am I

25    correct?

JOHNSON - DIRECT                    374

1        A.  That's correct.

2        Q.  Okay.  And Part 4 sets forth objectives that

3   you would have for the next reporting period?

4        A.  Yes.

5        Q.  Are there any new objectives that are set

6   forth in Part 4 from what you had earlier had?  See

7   the --

8        A.  At the minimum 12, including the next page.

9   This is just the first page of my objectives for the

10  next reporting period, but then it continues on

11  another continuation page.

12       Q.  Do you see on the screen, toward the bottom

13  of that page --

14       A.  Yes.

15       Q.  -- a page that's bracketed on the right

16  side?

17       A.  Yes.

18       Q.  Can you tell us what that objective

19  entailed?

20       A.  It said it -- I had to document all of the

21  servers for DHS at every remote location.  And I had

22  to include what type of server it was, all the type

23  of hardware that was on the servers.  I needed to

24  have a documented conversion plan to upgrade all of

25  the servers at the remote sites.  And the conversion

JOHNSON - DIRECT                    375

```
1    plan must include all of the dates of the

2    conversions.  It would have to have the equipment

3    ordered and it would have to have staff assignments.

4        Q.  If you go to the back page.  That evaluation

5    given to you on November 3rd, 2009 --

6        A.  Yes.

7        Q.  -- am I correct?

8        A.  That's correct.

9        Q.  And was that when you first became aware of

10   that objective?

11       A.  Yes.

12       Q.  So it looks like you had something due on

13   January 1st, 2010?

14       A.  Yes.

15       Q.  So that's roughly 60 days?

16       A.  Yes.

17       Q.  What did you have to do to provided what was

18   required by January 1st?

19       A.  I was required to find every piece of

20   equipment, which it wasn't available anywhere that

21   had every piece of equipment, every server at every

22   remote site at every DHS location.  And what kind of

23   equipment was there, the serial number of that

24   equipment.

25           In addition to that, I had to have, by that
```

JOHNSON - DIRECT                        376

1    date, every server documented that would have to

2    have a conversion any time I had to have it

3    documented with a scheduled date and the staff

4    members assigned to it.

5        Q.  Okay.  So starting out, what information did

6    you have to work with to do this?

7        A.  Well, there was some -- some inventory.

8    There was some things I had gathered along the way,

9    you know, for certain inventory.

10       Some of the -- we knew where some of the remote

11   locations were, but we didn't actually know where

12   all the equipment was.  So a lot of the things we

13   had to do, I had to either call the customer up to

14   find out where the equipment was, I had to count on

15   them to give me the serial number, the make and

16   model of the equipment, or I would have to send a

17   technician there looking for it to see what it was.

18       Q.  Was that an easy project to complete in

19   60 days?

20       A.  No.  Because DHS is one of the largest

21   agencies, and they have hundreds and thousands

22   actually of servers.  And they have a lot of

23   equipment out in the field that needed to be

24   converted because they had a lot of old equipment.

25   And not having one place where I -- it probably

1    would have been an easy task if I had one place that

2    had all this information already set up and all I

3    had to do was make a report of exactly one thing.

4    But have me go out and try and make sure I had every

5    piece of equipment, everything documented.  And the

6    reason it was another difficult task is because I

7    was required to have a scheduled date for every

8    conversion, and that was humanly impossible.

9         Q.  Okay.  Let's take it one step at a time.

10   First thing, you had to document where the equipment

11   was located?

12        A.  Yes.

13        Q.  And identify it?

14        A.  Yes.

15        Q.  And then you had to prepare a conversion

16   plan?

17        A.  I had to make a conversion plan.  And that

18   conversion plan had a schedule -- the plan was about

19   which schedules -- which locations would be

20   converted first.  And the conversion plan included a

21   schedule.

22        Q.  Would the schedule be the date the

23   conversion would be done?

24        A.  That would be the date the conversion would

25   be done.

JOHNSON - DIRECT                        378

1        Q.  And to put that plan together, what did you

2   have to do?

3        A.  I would have to contact every customer at

4   every remote site and try to find a way to determine

5   when would be a best time to convert their system.

6   I would have to get an approval from that customer

7   to tell me that, oh, you know, this is gonna be two

8   years -- I mean with all the amount of service they

9   were, it could run out for months before I could get

10  to them because of so many.  And they wasn't willing

11  to commit to a schedule date that was in the future.

12       So unless there was something that could be

13  done immediately, we only could do so many in a

14  period of time.  So being able to schedule out for

15  every single server that needed to have a conversion

16  was impossible because I wouldn't get an agreement

17  from the customers, number one.  And number two, the

18  staff members, I only had two at the time that can

19  go out and do upgrades or do anything out in the

20  field at any one point in time.  And I had to know

21  their schedule for months and months in advance.

22  And plus, all the other tasks that they were doing

23  that they were assigned to, it was impossible.

24       Q.  To do one of these conversions out in the

25  field, how long would it take a staff member?

JOHNSON - DIRECT                               379

1        A.  It would take a staff member -- it could

2   take a day, could take two days, based on we talked

3   about earlier, it's according to how much

4   information they had on their computer.  It could

5   take hours and hours to backup their data before we

6   took their system down.

7        Q.  Okay.  Now, assuming you could get that plan

8   done by January 1st?

9        A.  Yes.

10       Q.  As I understand it, then you had to submit

11  something to Wintel management.  I guess that would

12  be Mr. Nance?

13       A.  Yes.

14       Q.  By February 1st.  What was it you had to

15  submit?

16       A.  I need to know of every -- every remote

17  site, what kind of hardware that I would need to

18  have installed at each of those sites and have an

19  order put in for it.

20       Q.  How did you go about doing that?

21       A.  Well, I had to really kind of rely on my

22  technicians because they knew more about the

23  hardware.  What kind of hardware would -- they had

24  different types of servers, they can go at different

25  locations.  And I would have to kind of really rely

JOHNSON - DIRECT                    380

1    on the technicians to know what kind of hardware

2    that we need to order and what type of -- you know,

3    how it was compatible with the equipment they

4    already had at their site.

5         Q.  Okay.  All right.  So assuming you were able

6    to order all the material, it looks like then you

7    had to replace or convert servers; am I correct?

8         A.  That's correct.

9         Q.  And you had to do 25 by May 1st, 2015?

10        A.  Yes.

11        Q.  So that's three months?

12        A.  Yes.

13        Q.  What was the problem with that?  Or was

14   there?

15        A.  There was a problem with that because there

16   was two staff members.  And that means, at the

17   minimum, that would be like eight servers a month.

18   And with two staff members and all the other staff

19   assignments that they had, it was impossible for

20   them to do, you know, eight servers at one time in a

21   month.

22        Q.  Okay.  They weren't supposed to throw

23   everything else down and just devote themselves to

24   the conversion?

25        A.  If that's all we had to do, it would have

JOHNSON - DIRECT                                    381

1    been an easy task to do.  We would have found a way,

2    you know, with everybody.  We would have made a way

3    to get those done.  But that's not the only task

4    they had to do, that was just one of the things they

5    had to do.

6        Q.  Okay.  And you had to, apparently, replace

7    25 additional servers by May 1, 2010?

8        A.  That's correct.

9        Q.  What, if anything, was wrong or difficult

10   about that?

11       A.  It was still -- it would be in the process

12   of replacing the old servers because we didn't have

13   time to get those, and the next thing you know,

14   there were another 25 servers on top of that.  So

15   that meant there was automatically a backlog on the

16   second set of servers.

17       Q.  Was this a reasonable task?

18       A.  No.

19       Q.  Is that for the reasons you've already told

20   us?

21       A.  Yes.

22       Q.  Okay.  At the bottom of that page there is a

23   project that says, (as read:)  Develop and implement

24   remote office ILO upgrade?

25       A.  Yes.

JOHNSON - DIRECT                    382

1      Q.  Okay.  So what's an ILO?

2      A.  It's called Integrated Lights Out.  And what

3  that is, it's a board that's installed inside of a

4  computer so a system similar to WUG could actually

5  read what's going on on the server, and it can

6  monitor the health of the server, it can monitor the

7  amount of disk space that's on a server.

8      Q.  So ILO is a piece of hardware?

9      A.  Yes.

10     Q.  And it looks like this objective dealt with

11 placing that hardware on certain servers?

12     A.  Well, one of the things it required me to

13 identify every server for any agency that could

14 possibly need a Lights Out Board added to it.  That

15 means every agency and all the servers that went to

16 every agency, I had to determine if their equipment

17 was old, if their equipment was new.  I had to know

18 exactly where that equipment was.  And it's the same

19 thing I had to do for DHS sites for every other site

20 at the same time.

21     Q.  This wasn't just DHS --

22     A.  Right.  It was all the other sites.  Because

23 it was -- it was just all servers that needed a

24 Lights-Out board.

25     Q.  Okay.  Did you have any material to work

JOHNSON - DIRECT                    383

 1    with that would have identified servers that were in

 2    need of the ILO?

 3         A.  Well, some of them did have -- well, we had

 4    like the monitoring system.  But the problem with

 5    that was that the old equipment couldn't talk to it.

 6    And that's the purpose of it.  We couldn't monitor

 7    the old equipment because they didn't have the

 8    Lights Out Board.  So it was kind of a Catch 22

 9    because they didn't have the boards in them for us

10    to monitor them.

11         Q.  Would there be any document that would have

12    identified servers and where they were located?  And

13    whether they did or didn't have the --

14         A.  Over the time, documents were starting to

15    gather up, but it was never anything apprehensively

16    that gave me every single piece of information that

17    I needed for every piece of server at every agency

18    ever.

19         Q.  Okay.  So what did you do to document and

20    identify servers that require an ILO installation or

21    configuration?

22         A.  I did the best I could to do -- kind of

23    looked at whatever tools that we had.  Tried to

24    determine ones that we knew had those in there.  Did

25    research to determine all -- what all the different

JOHNSON - DIRECT                    384

1    remote sites were.  And a lot of the times, it

2    included having to call different sites and have

3    them look up the equipment and to find --

4         And as -- every time we gathered more

5    equipment, we added to a list so that we didn't have

6    to keep doing the same information.  But it was

7    something that took a long time.  There never was a

8    comprehensive list that ever existed.

9         Q.  If you know, had -- had CMS always had the

10   responsibility for these servers?

11        A.  No.

12        Q.  When did CMS assume that responsibility?

13        A.  They -- when I started in 2006, that's when

14   the beginning of the consolidation started.

15        Q.  And prior to that, did each agency have an

16   IT department that was responsible?

17        A.  Yes.

18        Q.  And was a lot of the information you needed

19   in the possession of the IT departments at these

20   agencies?

21        A.  Some of them.  Some of them did have

22   information and some of them didn't have -- a lot of

23   the information was obsolete.  Because a lot of the

24   things were never real kept up.  So you -- we can

25   try and get as much information as we could from

JOHNSON - DIRECT                               385

1      different sites, but it was never, I would say, a

2      comprehensive list of everything.

3         Q.  Okay.  So did you ever get a list of servers

4      that needed ILOs that you felt was --

5         A.  I did -- I mean I had hundreds and hundreds

6      of them.  But I guess I still -- it wasn't enough, I

7      guess, on there, you know.  I mean it was impossible

8      to always find every single one.  And even though

9      there might have been hundreds and hundreds on my

10     list that -- you know, we started on them, we never

11     could get to them all anyway.  Even in a year.

12        Q.  And then it looks like once you documented

13     these servers that required the ILOs?  You had to

14     provide Mr. Nance with the documentation and

15     hardware requirements to complete the task?

16        A.  Yes.

17        Q.  How would you do that?

18        A.  I did the best that I could.  I -- like I

19     said, I used whatever pieces of information I could

20     find.  And it was never one place, it was bits and

21     pieces here and there.  And then I did my best to

22     try to fill in the blanks by either contacting the

23     site and having what they call the remote office

24     liaison look at the equipment, give us the

25     information about the equipment, or send staff

1    there.

2        Because I mean we had did DHS, and now there's

3    all these other agents we had to try to figure out.

4    I mean we were still doing DHS at the same time we

5    were trying to do out these other agencies too.

6        Q.  All right.  Now, it looks like this plan was

7    due on March 1st?

8        A.  Yes.

9        Q.  And that's 30 days after -- 28 days after, I

10   guess, the report was due for the DHS remote

11   conversions?

12       A.  Yes.

13       Q.  Was that doable; getting it done by

14   March 1st?

15       A.  Not at all.  So many that we had to try and

16   figure out, I mean, where they were.  I mean it was

17   like there was so many of them.

18       It was impossible to get everything.  We got a

19   really good list, we got a real comprehensive list,

20   but it wasn't -- couldn't identify every single

21   piece of equipment at every single agency.

22       Q.  So assuming you had a plan in place by

23   March 1st, you then had to actually install the

24   ILOs?

25       A.  That -- the other thing about having a plan,

JOHNSON - DIRECT

 1    one of the things I was required to do is to

 2    schedule with every single customer.  Because part

 3    of the plan was to have every single server

 4    scheduled.  I had to have a due date, I had to have

 5    the equipment, and I would have to have a technician

 6    that was assigned to do that.

 7        Q.  When you install an ILO to a server, is the

 8    server taken out of service?

 9        A.  Yes, it is.

10        Q.  How long does it take to install an ILO?

11        A.  It would be the same type of scenario there,

12    where you would have to take the server down, and

13    we'd have to make sure their data is backed up.  It

14    was something you would have to take the server down

15    and then install the new piece, and then make sure

16    that their data is brought back to their server.  To

17    the same server.

18        Q.  Okay.  So you -- was this another situation

19    where you only had two technicians available to do

20    this work?

21        A.  Yeah.  They were -- and so there's already

22    trying to get them out there for the DHS

23    conversions.  And I couldn't really make, logically,

24    a schedule for 25 servers in a year just for that

25    project when I looked at the time constraints, and

JOHNSON - DIRECT                           388

1    then had to add this one on top of it.  And so you

2    could only do so many, you know, in one year.  I

3    mean in -- in a month.

4         Q.  Okay.  So looks like 25 servers had to be

5    upgraded by June 1st; am I correct?

6         A.  That's correct.

7         Q.  And then 25 additional servers upgraded by

8    September 1st?

9         A.  Yes.

10        Q.  And then 20 additional servers upgraded by

11   November 1st?

12        A.  Yes.

13        Q.  So if my math is correct, that meant between

14   June 1st and November 1st, your staff would have to

15   do 70 ILO upgrades?

16        A.  Yes.

17        Q.  Was that a reasonable objective?

18        A.  Not at all.

19        Q.  Why is that?

20        A.  It's because each one of these upgrades

21   requires staff to have to be wherever the server is.

22   Now, every server was -- some of it was locally here

23   in Springfield, but you would still -- that staff

24   would have to be available for the whole weekend.

25   We would have to coordinate with the customer.  We'd

JOHNSON - DIRECT                                389

1    have to make sure they are able to have their server

2    down for that time period.  They would have to have

3    someone escort the staff member around their site.

4    It was a lot of arrangements that had to be made for

5    each and every one.

6         Q.  I'm going to hand you what is marked as Page

7    3.  Have we already talked about these objectives?

8         A.  Those are the ones that were different

9    from -- the other ones were saying, in addition to

10   these two objectives, I still had all the same

11   objectives I had in the last reporting period too.

12   On top of these.

13        Q.  Okay.  You see the bracketed material that

14   is toward the top of Part 4?

15        A.  Yes.

16        Q.  Was that a new objective you were given?

17        A.  Yes.

18        Q.  And can you tell us what that objective

19   entailed?

20        A.  This objective was called monitor the Monday

21   morning low hard drive space report.

22        Q.  Is that the WUG report?

23        A.  That's the WUG report that would talk about

24   the health of the servers.  And it would monitor how

25   much free space is still on the server.

1      Q.  So you were not responsible for preparing

2  that report, were you?

3      A.  Not the WUG report; no.

4      Q.  All right.  What were you supposed to do

5  in -- in view of the WUG report?

6      A.  Well, I had --

7          THE COURT:  In view of the what?  Which

8  report?

9      Q.  The WUG report.

10         THE COURT:  Thank you.

11     A.  It's that what's Up Gold report that Ed

12 talked about.  It's a monitoring system that

13 monitors the servers.  And there was a report that

14 came out an Monday mornings called Low on Disk Space

15 Report where the monitoring of those servers would

16 say if the server had a certain percentage of free

17 space left on it or not.

18         MS. BARNES:  Excuse me.  What exhibit are

19 we on, and what page?  I've lost it.

20     Q.  Exhibit 3C, Page 3 of 4.

21         MS. BARNES:  Okay, thank you.

22     Q.  Cheryl, I'm jumping around here a bit, but

23 could you go to Exhibit 15.

24     A.  15.  Okay, yes.

25     Q.  Can you tell me what Exhibit 15 is?

JOHNSON - DIRECT                                   391

 1        A.  This is one page of the first 50 servers of

 2    a Low on Disk Space Report.  This had to do with DHS

 3    servers.  I can tell by the name of them.

 4        Q.  Would this be a sample of the first page of

 5    a weekly WUG report?

 6        A.  Yes.

 7        Q.  Okay.  I'd like to offer Exhibit 15 into

 8    evidence.

 9            MS. BARNES:  No objecting.

10            THE COURT:  Admitted.

11        (Plaintiff's Exhibit 15 admitted.)

12        Q.  Cheryl, just to help us interpret; this is

13    the first page of a WUG report?

14        A.  Yes.

15        Q.  If I'm reading it correctly, it would

16    identify 50 servers that are low on disk space?

17        A.  Yes; 50 servers.

18        Q.  Okay.  And typically, how many pages would

19    there be to a WUG report?

20        A.  I know that it could be hundreds of servers.

21    I mean it could be maybe, hum, maybe 50 pages or

22    more.  It could be 300 or so servers on the weekly

23    report.

24        Q.  Okay.  Now, is there -- is there a column

25    that identifies the percentage of available space?

JOHNSON - DIRECT                    392

1          A.  What the column shows is the amount of space

2     that was used on the server.

3          Q.  And --

4          A.  So then that would equate to how much free

5     space is left.

6          Q.  Which column is that?

7          A.  Well, if it -- there is J column shows a

8     percentage of free space.  That -- how much space

9     was used on the server.

10         Q.  Okay.  So if you go to Item Number 2, Server

11    Number 2 --

12         A.  Yes.

13         Q.  -- on the WUG record, over to Column J, it

14    looks like 42.1 percent?

15         A.  Yes.

16         Q.  What would that signify?

17         A.  That means about 42 percent of the server

18    space was being -- has been used up.

19         Q.  All right.  And then if you go to Column G,

20    again for server Number 2, there's an 82.4 percent.

21    What does that mean?

22         A.  That look like that's not opposite.  I'm not

23    sure the difference on that one.  It look like it's

24    the opposite.

25         Q.  Now, if we go back to your objective for a

1    moment.

2        A.  Yes.

3        Q.  It says, (as read:)  Monitor the Monday

4    morning Low Hard Drive Space Report?

5        A.  Yes.

6        Q.  (As read:)  Develop a detailed plan for each

7    server that appears on the list?

8        A.  Yes.

9        Q.  Now, what is the list?

10       A.  The list were all the servers that showed up

11   on the Low on Disk Space Report --

12       Q.  Okay.

13       A.  -- every week.

14       Q.  You recall yesterday that Mr. Gordon talked

15   about 97 percent being close to the critical area?

16       A.  Yes.

17       Q.  Were you just supposed to do something for

18   the servers that were approaching that 97 percent?

19       A.  No.

20       Q.  What were you supposed to do?

21       A.  I was supposed to have a detailed plan for

22   every single server that appeared on the list every

23   week.

24       Q.  Okay.  So what was to be included in that

25   detailed plan?

JOHNSON - DIRECT                          394

1          A.  Well, I had to have -- I had to alleviate

2     the hard drive issues.  And it would include things

3     like all steps necessary to ensure that no server

4     ever runs out of space.  Ever.  And all servers on

5     the Low Hard Drive Space Report must have the plan

6     implemented and removed from the space report by the

7     following Monday.

8          Q.  Okay.  So let's talk about that.

9          It looks like the report comes down on a

10    Monday?

11         A.  Yes.

12         Q.  And then you had to do something by

13    9:00 a.m. Tuesday morning?

14         A.  Yes.

15         Q.  What was it you had to do by 9:00 a.m.

16    Tuesday morning?

17         A.  By 9:00 a.m. Tuesday morning, I had to have

18    a plan for every single server on that -- an

19    alleviation plan on what it's gonna take for that

20    server never to run out of space again.  I would

21    have to make a plan on how to -- to get it off the

22    Low on Disk Space list that week.  And then by the

23    end of that week, I need to have it off the list.

24    Have the plan implemented.

25         Q.  And that was to be done in 24 hours?

JOHNSON - DIRECT                          395

1        A.   Yeah.   The plan was due the next day.

2        Q.   So how did you go about doing that?

3        A.   What I would do was find all the servers

4    that only had 5 percent free space left, and I

5    would -- would try to get a plan just for those.

6    Because that would be more of a reasonable number.

7        So I'd create an alleviation plan where I would

8    plan what I needed to do for that server, do the

9    best I could to try and get in touch with the

10   customer and plan the date with them, and try to see

11   what staff I can get to go to one of those upgrades

12   to get them off the list.

13       Q.   All right.   And then it says towards the

14   bottom, (as read:)  All servers in the Low Hard

15   Drive Space Report, all servers, must have a plan

16   implemented and be removed from the space report

17   list by the following Monday unless deferred by

18   Wintel management?

19       A.   Yes.

20       Q.   Let me ask you this:  Did you ever ask Mr.

21   Nance for a break, to be deferred?

22       A.   Of course.

23       Q.   Were you allowed a break?

24       A.   No.

25       Q.   So what was involved in going from the

JOHNSON - DIRECT                          396

1    Tuesday plan to what had to be done by Monday?

2         A.  The best I could do was come up with the

3    alleviation plan where I had a schedule.  I would

4    schedule as many as I could for that week.  How many

5    customers that I can get in touch with.  And I try

6    to go with the most critical servers, the one I see

7    would be they only had 5 percent free space left.

8    That means they were at the 95 on the other end.

9         Q.  Okay.  So was -- was doing what was

10   necessary to alleviate the low disk space, is that

11   something that could be done from the offices of the

12   bureau in Springfield, or did you have to go out in

13   the field?

14        A.  In order to replace the hard drives, to

15   upgrade the hard drives, it's the same similar

16   situation as the other.  The ILO and the remote

17   office conversions.  Where we had to make a plan

18   with the customer, we had to have a time where they

19   could have a down time.  And we'd have to send a

20   technician to wherever the site was, and have them

21   physically do a backup.  And also all the tasks that

22   were -- that were part of that, where I had to do

23   the other team members that had to be involved in

24   that process and make sure I can coordinate their

25   time as well.  And then get a plan where that's --

JOHNSON - DIRECT                              397

1    that I could get one of my technicians to one of

2    those sites to do that upgrade.  What they do is add

3    more hard drive space to the server.

4          Q.  Okay.  Now --

5          A.  And some of the things you could do like

6    remotely, but some of them we had to physically go

7    there and change them out.

8          Q.  Okay.  So as I understand it, you -- you

9    kind of prioritized and did -- or attempted to do

10   the servers that were at 95 percent capacity or

11   more?

12         A.  Yes.  Some of the things that we could do.

13   Like some things I tried to mitigate by, you know,

14   we had to try to work with the remote office

15   liaison.  And we'd send out these emails and say,

16   "Clean up your servers."  And people have all kinds

17   of things on their server and stuff.

18         But that never really happened because nobody

19   didn't want to get their pictures off of their

20   computers and stuff.  So that really didn't work.

21   Some that was just one avenue that we tried to get

22   their servers to get more free space on it.

23         And then when it came down to the point, then

24   we had to do either upgrade or -- their server and

25   add more space to it.

JOHNSON - DIRECT                    398

1        Q.  With respect to this -- these servers that

2   were earmarked at 95 percent capacity --

3        A.  Yes.

4        Q.  -- were you able to do this task with

5   respect to those servers within the timeline Mr.

6   Nance set?

7        A.  No.  And I couldn't even get a schedule.

8   Because if I had to go out to the site, no one is

9   going to let you schedule something five or six

10  months down the road.  I mean if you couldn't get it

11  right away, you can't get a commitment from the

12  customer.  You couldn't, you know -- you just

13  couldn't get that time commitment from them to make

14  a schedule.

15       And then at the same time, I only have certain

16  amount of staff that could do all these other events

17  and plus this that week.

18       Q.  Okay.  You see the objective I'm pointing

19  to?

20       A.  Yes.

21       Q.  What is a decommission list?

22       A.  It was a list of servers that we had a

23  change ticket for them for to be decommissioned.

24  And that means they needed to be taken out of

25  service.

JOHNSON - DIRECT                        399

1           And that's another activity that required my

2      staff to have to probably visits a site someplace,

3      whether it was local or on the road some pace.

4           Q.  Okay.  As I understand it, all you had to do

5      here was to prepare a list?

6           A.  Originally, I had to -- by 9:00 I just have

7      to have a list of all the servers that were

8      scheduled to be decommissioned.  And then put the

9      date they were expected to be removed from service

10     and the date they were removed from service and the

11     date they actually came out of the rack and the date

12     they were actually picked up for surplus to go to

13     warehouse.

14          Q.  What did you have to do to do all that?

15          A.  Well, in order to create this report, I

16     just -- I had to go and look at all the decommission

17     tickets and see what the status of them were.  And

18     see when -- when I was gonna have staff.  I had to

19     know when I could have staff who could actually go

20     and turn the server off and bring the equipment

21     back.  And so I would have to see when I can get all

22     that done.

23          And then I had a list of all those servers and

24     what the site was and when we think we can go pick

25     them up.

JOHNSON - DIRECT                          400

1        Q.  Now, the preparation of the list, was that

2   your responsibility?

3        A.  Yes.

4            THE COURT:  Preparation of what list?

5        Q.  Beg your pardon?

6            THE COURT:  Preparation of what list?

7        Q.  Decommission list.

8            THE COURT:  Thank you.

9        Q.  How long did it take you to put that list

10  together, Cheryl?

11       A.  It would take, you know, probably a few

12  hours, because I would have to go and look at all

13  the decommissions, I need to figure out where the

14  server was.  I need to figure out when I can work

15  with other teams to do their part.  And when someone

16  can actually go pick it up.  And try and be as

17  accurate as I could on a piece of paper to say that

18  all this is gonna happen on these different days.

19       Q.  Was it ever explained to you by Mr. Nance

20  why it was important that that list be prepared

21  every week?

22       A.  No.

23       Q.  If you go back, go down toward the bottom

24  where it says, paragraph that begins, (as read:)

25  Effectively manage staff resources via Remedy.

1      A.  Yes.

2      Q.  Is that -- is that basically the same task

3  that we're talked about, or is there something new

4  there?

5      A.  There's something new there.

6      Q.  And what is new?

7      A.  Well, initially, I had to take the help desk

8  tickets and assign them to a staff member; let them

9  run with it and get their work done.

10     The second -- the next level of this same

11 objective was then I had to assign the help desk

12 ticket to myself, recreate and duplicate all the

13 information that was in the main ticket and assign

14 it to the technician, and then verify with every

15 single customer.  And then -- within a day of staff

16 closure.

17     Now, the new objective reads that I manage all

18 the help desk tickets must be assigned to the

19 manager, with a task created and assigned to the

20 staff with one day.  All help desk tickets must have

21 a verified task that the manager will have assigned

22 to them.  And all help desk tickets must be verified

23 with the customer with one day of staff closure.

24     Q.  So is the new part the verification?

25     A.  Yes.  Then all of the sudden, there was

1    another ticket that was in my name, another task, a

2    verify task now in my name.

3         Q.  Okay.  And that was something you had to do,

4    you couldn't pass it off to a technician?

5         A.  Yeah.

6         Q.  So that would involve communicating with the

7    customer to find out if everything was okay?

8         A.  Every single customer.

9         Q.  For every ticket?

10        A.  For every ticket.

11        Q.  Or every help desk ticket?

12        A.  Every help desk ticket.

13        Q.  Okay.  Once the work was done, were the

14   customers always responsive to your request for

15   verification?

16        A.  No.  Lot of times, you have to make phone

17   calls over and over.  Send emails.  And the same

18   email over and over to the same customer and saying

19   that, this work is done, could you please let us

20   know if the verification is complete.  Every time I

21   had to type that.  Then I had to send it, and then

22   retype it the next time, or add more:  This has been

23   done, can you give us a verification that this is

24   okay.

25        Q.  Was doing this verification work

JOHNSON - DIRECT                                403

1    time-consuming?

2         A.  Very time-consuming; yes.

3         Q.  Cheryl, with respect to the objectives we

4    talked about in 3C --

5         A.  Yes.

6         Q.  -- how did Mr. Nance, in the following

7    evaluation, rate you in terms of satisfying those

8    objectives?

9         A.  Everything was not met.

10        Q.  Okay.  Can you go to -- hold on just a

11   second here.

12        Can you go to Exhibit 3E.

13             THE COURT:  3E?

14        Q.  3E.  And turn to Part 4 on page 3.

15        A.  Yes.

16        Q.  Part 4 would be objectives you would be

17   given for the next reporting period; am I correct?

18        A.  Yes; that's correct.

19        Q.  And this is an evaluation covering the time

20   period between February 1, 2010, and May 1st, 2010?

21        A.  Okay.

22        Q.  So it's a three-month evaluation?

23        A.  Yes.  Okay.

24        Q.  Are any of the objectives here new or

25   different from earlier objectives?

JOHNSON - DIRECT                              404

1        A.  Yes.

2        Q.  Can you go through the ones that are new or

3   different?

4        A.  Okay.

5            THE COURT:  New or different from what?

6        Q.  From the objectives she had in earlier

7   evaluations.

8            THE COURT:  Thank you.

9        A.  Okay.  The weekly decommission now had to

10  have make, model, serial number, tag number.  Date

11  added to the decommission list.  When is expected

12  remove from serve.

13       Q.  Which -- where are you?

14       A.  I'm on the second objective.  The first one

15  was still the same.

16       Q.  Okay.  So how is the second objective

17  different from what you're objective was with the

18  decommission list earlier?

19       A.  With the decommission list earlier, now all

20  the documentation, there's all this additional

21  documentation that needed to be added.  They said

22  the AMAF form, notifications, WUG, TVD, other

23  documentation as generated from a server

24  decommission.  It was like a blanket all other

25  documentation.

1      Q.  So the report was due the same; every

2  Wednesday?

3      A.  Yes.

4      Q.  But this is different because more detail

5  was required?

6      A.  Yes.  And a lot of other things that were

7  added was kind of subjective, because other

8  documentation as needed, that could mean anything.

9  So they always left a big hole that can be like,

10  okay, well, this thing get met or this thing get met

11  because it wasn't specific.  Okay now -- so that's

12  just one area.

13      Q.  In this objective there is a sentence that

14  says, (as read:)  All documentation for server

15  decommissions must be maintained on the unit Share

16  Point site --

17      A.  Yes.

18      Q.  -- in addition to being distributed to the

19  correct teams?

20      A.  Yes.

21      Q.  What does that mean?

22      A.  Well, that meant that the next thing was

23  about me having to create tasks for all the

24  different teams that had anything to do with the

25  decommission.  And so I was responsible for making

JOHNSON - DIRECT

1   sure -- like a lot of those different pieces really

2   belonged to other teams.  So I was responsible for

3   creating the task for those other teams.  And since

4   I had the verify task at the very end, I held -- I

5   was personally held responsible for all those

6   different pieces that most, like we saw earlier, my

7   team may only hd to do two pieces out of ten tasks,

8   but I still was the main person that had to hold

9   that ticket and became personally responsible for

10  it.

11      Q.  So you might be responsible for Ed Gordon's

12  team?

13      A.  Yes.

14      Q.  Have we talked about how --

15          THE COURT:  Mr. Baker, I think we better

16  take our afternoon break.

17      Q.  Can I just ask one more question --

18          THE COURT:  Absolutely.

19      Q.  Just one, I promise.

20      Cheryl, have we basically talked about the

21  change with the -- in your responsibilities when it

22  came to a decommission list?

23      A.  Yes.

24      Q.  Okay.

25          THE COURT:  Good time?

JOHNSON - DIRECT                          407

1          MR. BAKER:  Sure.

2          THE COURT:  Fine.  Let's take our afternoon

3    break, ladies and gentlemen.  Please remember the

4    admonition; don't discuss the case.  And we will see

5    you in about twenty minutes.  Thank you very much.

6          We'll stand in recess.

7          (The jury left the courtroom.)

8          (A recess was taken.)

9          THE COURT:  Thank you, everyone.  Please be

10   seated.

11         Thank you, by I way, for being so quick in

12   responding to the bell and getting in place.

13         All right, Mr. Baker, you may proceed.

14         MR. BAKER:  Thank you, Your Honor.

15         Q.  (BY MR. BAKER:)  Cheryl, I want you to turn

16   to the paragraph I've just marked with an arrow.  Is

17   that a new -- a new objective or a different

18   objective from the one you had earlier been given?

19         A.  Yes.

20         Q.  And before you talk about the change, what

21   is an ESR ticket?

22         A.  It's the same as a change ticket.

23         Q.  Okay.  So basically, you had to provided Mr.

24   Nance with a weekly status report on tickets?  Some

25   tickets?

JOHNSON - DIRECT

1      A.  Yes.

2      Q.  What is the change here?

3      A.  I had -- originally, had the weekly status

4   report of Remedy tickets.  Then it became more

5   specific for help desk, task, and ESR tickets.  And

6   that was due by 10:00 each Monday.

7      And then it became that and I had to have a

8   weekly status of any outstanding tickets over

9   30 days old.  And now the new addition is, and the

10  reasons or reason why that the tickets are still

11  open must be included in the report.  But in

12  addition to that, the Remedy tickets that are on the

13  report, that means all the tickets assigned to my

14  group, whether they were -- whatever their status

15  was, I had to have an update, a weekly updated added

16  into the ticket myself.

17     Q.  Okay.  You recall this morning, in response

18  to a line of questioning by the Attorney General,

19  Ms. Higgerson testified to a handful of tickets?

20     A.  Yes.

21     Q.  And I believe the body of that ticket listed

22  tasks?

23     A.  Yes.

24     Q.  Who was responsible for preparing and

25  assigning the tasks?

JOHNSON - DIRECT

1      A.  I was.

2      Q.  All right.  You rather than the -- than the

3  technician?

4      A.  Yes.  Because the -- the change ticket was

5  in my name.  I had to create all the tasks to all

6  the different -- the different groups.  And then

7  have also a verified tasks.

8      Q.  So when it came to -- giving a status report

9  on -- on these tickets, could you simply go to the

10  Remedy system, look up on a computer screen and

11  gather that information, and put it in a report?

12      A.  That would be the best way to do it, but as

13  we saw this morning, not everyone would even update

14  their work log.  There was -- one of the examples

15  that they showed earlier this morning was three

16  people updated the work log, but there was 10 or 11

17  people that were really assigned tasks.  So that

18  showed that 8 or 9 people didn't update anything in

19  the Remedy system to say their status of their work.

20      Q.  So these people in your group that you

21  supervised, or were people in other groups?

22      A.  As it showed earlier, only two maybe out of

23  12 tasks belonged to my group.

24      Q.  Did you have any clout in getting people in

25  the other group to update their tickets?

JOHNSON - DIRECT                          410

 1        A.  Unfortunately not, because it wasn't a
 2   vested interest for them.
 3        Q.  What do you mean?
 4        A.  What I meant is that they didn't hold the
 5   ticket in their name, so they didn't have any reason
 6   why to have any kind of vested interest in getting
 7   it closed on time.  Because they wouldn't be held
 8   responsible for the ticket if it didn't get closed
 9   on time.
10        Q.  So prioritizing work that they were
11   responsible for?
12        A.  Yeah.  A lot of times, I would never get
13   updates at all.  And I would have to send tons of
14   emails trying to figure out where things were.  But
15   at any rate, one way or another, I still had to
16   update something in the ticket.
17        Q.  I think what I would like to do is to turn
18   to Exhibit 3F.  If you can pull that out.
19        And can we agree that 3F is an evaluation Mr.
20   Nance did of you for a period beginning on May 1st,
21   2010, and running to August 1st, 2010?
22        A.  Yes.
23        Q.  Okay.  I'd like you to turn to Part 4 of
24   that document.  And that part contains objectives
25   for the next reporting period.  Do you see that?

JOHNSON - DIRECT                         411

1         A.  Yes.

2         Q.  And can we agree that part of that appears

3    on, I believe, page 3.  And then it continues on

4    over to another page?

5         A.  Yes.

6         Q.  Okay.  Was there an objective you were given

7    dealing with server rack consolidation?

8         A.  Yes.

9         Q.  Is that on this page or the following page?

10        A.  It's on the following page.

11        Q.  Okay.  And can you point out where that

12   objective appears?

13        A.  It's about the 15th objective down or so.

14   It's the next -- the third from the bottom.

15        Q.  Okay.  Does the arrow point toward that

16   objective?

17        A.  Pardon me?

18        Q.  Does the arrow point toward that objective?

19        A.  Yes, it does.

20        Q.  What was the server rack consolidation?

21        A.  That was bringing all of the servers that we

22   could into the Data Center that we were able to

23   bring into the Data Center.

24        Q.  Okay.  So that would be taking servers that

25   are out in the field and relocating them in the Data

1    Center?

2         A.  Yes.

3         Q.  And it looks like the -- a plan was due by

4    September 1st?

5         A.  Yes.

6         Q.  How did you go about preparing that plan?

7         A.  Did the best I could to determine every

8    server at every location and try to do the best to

9    determine -- a lot of things had to go into trying

10   to figure out if it's feasibly to even bring it to

11   the Data Center.  Because some of the servers that

12   are out in the field, if -- since the connections

13   were slow, that means like if we brought it into the

14   Data Center, it would take them twice as long to get

15   the information back because the connections that we

16   had, the wires that were underneath the ground were

17   slow.  They weren't the best technology.

18        So we had to make decisions about whether they

19   had to come to the Data Center, if it was feasibly.

20   A lot of the local ones in Springfield did come.

21        Q.  So what -- how did you go about preparing

22   this plan?

23        A.  Worked with the remote offices and -- and

24   worked -- there was a team that we pulled together

25   to determine if this needed -- which servers had to

JOHNSON - DIRECT                    413

1    come over.  And I had to do all the scheduling.  And

2    I had to work with all the different agencies to

3    have down time.  I had to make sure there was staff

4    members, like the networking team, the backup and

5    storage team, all these teams would be available

6    like a weekend for -- to do a group of servers at

7    one time.

8         Q.  Okay.  And then it says, last line says, (as

9    read:)  Must complete at least half of the

10   consolidations by November 1st, 2010.

11        Am I reading it correctly?

12        A.  That's correct.

13        Q.  So does that mean that at least half the

14   servers had to be relocated from the field to the

15   Data Center?

16        A.  Yes.

17        Q.  Best estimate, how many servers are we

18   talking about?

19        A.  Well, at one time -- there would be

20   thousands of servers that had to come to the Data

21   Center.  At the time we first -- there was a certain

22   amount already at the Data Center.  There was

23   thousands more that still had to come to the Data

24   Center.

25        Q.  Okay.  What is involved in taking a server

JOHNSON - DIRECT                    414

1    out of the field and bringing it to the Data Center?

2         A.  It involved making an agreement with the

3    customer when they could -- the least -- the time

4    that would least impact their day-to-day services

5    where we could take the server offline.

6         And we'd have -- sometimes there would be like

7    a backup server, like what they call a fell over

8    server, where you can temporarily put their data

9    there.  So if it was like a location like the

10   Department of Transportation, they would have,

11   especially in the winter, 24/7 servers they had to

12   keep up.  And something like the DHS hospitals, they

13   always had to have their servers up.

14        So we had to try to figure out ways that we can

15   put their data somewhere temporarily in order for us

16   to move their server into the Data Center and

17   reconnect it.

18        Some of them, we found that if there's a

19   location that may be closed at five or six in the

20   afternoon, in the evening, then we would do their

21   server after hours or on the weekend.  And we could

22   take it down where it wouldn't impact.  Try to have

23   it up or running by the next morning or the Monday

24   morning.

25        Q.  Okay.  So did the technician have to go out

JOHNSON - DIRECT                                          415

1    and physically remove the server?

2         A.  Yes.

3         Q.  And back up the data?

4         A.  Yes.

5         Q.  And then deliver that server to the Data

6    Center?

7         A.  Yes.

8         Q.  And then install it at the Data Center?

9         A.  Yes.

10        Q.  And then make sure the data got to the Data

11   Center?

12        A.  Yes.

13        Q.  Best estimate, how long would it take a

14   technician to do that for one server?

15        A.  It could take the whole day, you know.

16   It's -- it's according to how long the backups took.

17   And for to go and disconnect the server, it's

18   according where it was located.  If it was local, it

19   could take a few hours, but if it was in another

20   town or -- it could take the whole day.

21        Q.  Okay.  Was it realistic to complete the

22   relocation or consolidation of half the servers by

23   November 1st, 2010?

24        A.  No.

25        Q.  Why not?

JOHNSON - DIRECT                          416

1        A.  Because it was impossible.  The plan was due

2   on September, October, November, that's a couple

3   months to try to get all the servers in.  And plus

4   my staff, the Hardware Group, even though there were

5   other teams also, you had to coordinate all the

6   activities for all the other groups.  And also, at

7   the same time, they were working on the other

8   projects; the remote office conversion projects, the

9   ILO projects, and low on hard drive projects.

10       Q.  Now, these servers were functioning out in

11  the field?

12       A.  Yes.

13       Q.  Was there any sense of urgency that you were

14  aware of that made it important that the

15  consolidation be completed --

16       A.  Other than what's that the bigger -- the

17  higher-ups wanted.  I guess.  I mean I just -- I

18  don't know exactly why.  It wasn't that urgent that

19  they had to be done.

20       Q.  Okay.  You see the objective that says, (as

21  read:)  Monitor and maintain the CMS EPN system?

22       A.  Yes.

23       Q.  What -- what is the EPN system?

24       A.  Well, it has do with the project management

25  systems.  But that was something that was came for

JOHNSON - DIRECT                        417

1    one reporting period then and wasn't applicable in a

2    later reporting period.  So it would have to do

3    with, at one point in time I had to -- there was a

4    list that came out of all the projects that were

5    open.  And for whatever reason, I had to go to the

6    meetings and report to the -- I was able to go to

7    that meeting to report why everybody didn't have

8    their work done on those different projects.

9         Q.  Did the EPN system have anything to do with

10   hardware?

11        A.  No.  Not really.

12        Q.  See down at the bottom of that page where

13   the arrow is?

14        A.  Yes.

15        Q.  Is that a new objective?

16        A.  Yes.

17        Q.  And can you tell us what basically that

18   required of you?

19        A.  That was another remote -- it was a

20   conversion project for another office.  And that was

21   for the DES offices.

22        Q.  Is DES the Department of Employment

23   Security?

24        A.  Yes.

25        Q.  And that basically is the unemployment

JOHNSON - DIRECT                        418

1    office; right?

2        A.  That's correct.

3        Q.  And were there servers located at each of

4    the unemployment offices?

5        A.  There were servers located all over the

6    state in different offices.

7        Q.  And what -- what, basically, were you

8    supposed to do with respect to servers at the

9    unemployment offices?

10       A.  I had to gather the information about the

11   server--serial number tag, hardware installed--and

12   get a conversion plan to get all those servers

13   upgraded.  And that included having parts ordered

14   and having a schedule where I had staff that was

15   assigned to those and I had customer approval for a

16   scheduled upgrade date.

17       Q.  So you were converting what?  What were you

18   attempting to do with these servers?

19       A.  Converting older equipment to newer

20   equipment.

21       Q.  Okay.  So you were replacing servers?

22       A.  Or either upgrading to some parts of the

23   server.

24       Q.  Okay.

25       A.  To new -- you know, some of them had servers

JOHNSON - DIRECT                              419

1    that were a point where you can just add more stuff

2    to it to make it a better server.

3        Q.  Okay.  And these servers that we are talking

4    about, were they located out in the field or were

5    some of them in the Data Center?

6        A.  Some of them -- most of them were out in the

7    field.  Some were local here in Springfield.  There

8    may have been some in the Data Center.

9        Q.  So you had to provide a report by

10   September 1st, 2010?

11       A.  Yes.

12       Q.  Which basically was a conversion plan?

13       A.  Yes.

14       Q.  And basically, was that the schedule for

15   making the conversions?

16       A.  I had to have every upgrade scheduled.  And

17   the plan was I would have to know -- all the

18   information about the server, what kind of equipment

19   that was gonna be needed.  I would have to have a

20   definitive date from a customer to say it's okay for

21   you to have -- us to have their server down for a

22   couple days.  Then I would have to have some kind of

23   staff assigned to actually do the conversion.

24       Q.  And then it looks like you had to convert

25   ten servers by November 1st?

JOHNSON - DIRECT                              420

1        A.  Yes.

2        Q.  Was this objective reasonable?

3        A.  It wasn't reasonable because of the fact

4   that I still had to do the DHS conversions which

5   they added more servers that were due during that

6   time same period, all the ILO conversions in which

7   they add more servers that were due at the same time

8   period.  Also, the Data Center rack consolidation

9   project.  And also, the low on disk space issues

10  that we were still working on getting those servers

11  upgraded.

12       Q.  Okay.  I think we skipped one.  You see the

13  new arrow?

14       A.  Yes.

15       Q.  That deals with a DHS conversion?

16       A.  Yes.  That one is; yes.

17       Q.  That's the Department of Human Services;

18  right?

19       A.  Yes.

20       Q.  And can you tell us basically what that

21  involved?  What was the conversion project?

22       A.  Well, that's -- that's still the same

23  project that was implemented in a previous

24  objective.  However, it added more servers that

25  needed to be upgraded during this same time period

JOHNSON - DIRECT                              421

1    as all these other upgrades.

2         Q.  Okay.

3         A.  So it was still -- I had to have a customer

4    approved for all the server upgrades.  And if

5    anything new changed, then all the documentation I

6    had already updated, I had to resubmit all the

7    documentation and any updates or changes.  I had to

8    have a schedule in place.  And I also had to have

9    staff assigned and customer's approved all of the

10   upgrades.  And have someone able to go and do the

11   upgrades; one of the two staff that I can have out

12   there.

13        Q.  Okay.  And then it looks like you had to

14   have ten servers -- or excuse me, 20 servers

15   replaced by November 1st?

16        A.  Yes.  And that's to piggyback on the other

17   ones that were still in progress because of --

18        Q.  Now, this is in addition to all the other

19   tasks you were assigned?

20        A.  Yes; and the other conversions that were

21   already scheduled already.

22        Q.  Okay.  And we may have already covered this,

23   but the servers at the DHS remote locations, they

24   would be throughout the State of Illinois --

25        A.  That's correct, because --

JOHNSON - DIRECT                          422

1        Q.  -- Not just here in Springfield?

2        A.  -- they could be in Schaumburg, up there by

3   Chicago, they could be in Peoria.  They could be

4   near East St. Louis, down in that area.

5        Q.  Cheryl, let me turn to another topic.

6   Before we do, I don't want to belabor the point by

7   going through all of these evaluations, but would it

8   be fair to say in each evaluation you were given a

9   new assignment?

10       A.  Yeah.  There was another one in 3D, a couple

11  of more that we didn't talk about --

12       Q.  In what?

13       A.  In 3D.

14       Q.  In 3D.  Okay, let's talk about 3D.  What

15  objectives were you given in 3D that were new?

16       A.  Well, after my A, B, and C evaluation, where

17  I had been doing server builds, then in this -- in

18  this evaluation then I had to develop a documented

19  server build process.  The document would include

20  all steps necessarily -- necessary to stand up a

21  server and build a process and everything is

22  documented.

23       So in other words, there was never really an

24  official server build process.  I had to develop

25  here after building servers for several --

JOHNSON - DIRECT                              423

1        Q.  Okay.  So let me -- let me ask you this:

2   Backup.  3D is an evaluation covering the period

3   between 11/1/09 and February 1st, 2010; am I

4   correct?

5        A.  Yes.

6        Q.  And you had to prepare a document basically

7   identifying what the process was to build a server?

8        A.  Yes.  I had to create a process that shows

9   all the steps necessary to build a server and all

10  the tasks.  Because at this time, started developing

11  a certain amount of tasks and everything; I've done

12  it so many times now.  So that I know what we have

13  to task this group, we have to task this group, we

14  have to provide this information.  And all those

15  documents that I had to do with the server build,

16  there was never really a standard, so I was required

17  to document it here.

18       Q.  Okay.  Yesterday, Mr. Gordon testified to

19  what he did when he came into the Hardware Group?

20       A.  Yes.

21       Q.  At the time you came aboard to that group.

22  Was there any process in place?

23       A.  There wasn't a documented standard in place

24  that was Step A, Step B, Step C, Step D of building

25  a server.  There was bits and pieces of information

1    that talked about server builds, but there was no

2    document that pulled it all together.

3        Q.  So Mr. Nance wanted you to pull everything

4    together?

5        A.  Yes.

6        Q.  Okay.  Any other new objectives in 3D?

7        A.  Develop a document server decommission

8    process.

9        Q.  All right.  So that would be a process

10   showing the steps for decommissioning a server?

11       A.  Yes.  I had been doing decommissions, and

12   after a period of time, I realized, well, we had to

13   do Step A, Step B.  We had to task this group, task

14   that group.  We had to put this paperwork in place,

15   that paperwork in place.  So I had to document the

16   process and make it a standard.

17       Q.  So essentially, you were preparing a report

18   explaining the various steps in the process of

19   decommissioning a --

20       A.  It ended up being a document that talked

21   about the different -- all the steps necessary.  And

22   I did provide that information that I was required

23   to.

24       Q.  Okay.  Now, I'm assuming that when

25   Mr. Gordon left the group and you came on board,

JOHNSON - DIRECT                           425

1    there was no process document in place?

2         A.  Not a full process.  It was like I said,

3    there was a Share Point site that had things like a

4    form in there.  It might have different parts of a

5    process.  But there was nothing that pulled it all

6    together that said you had to do this first, you had

7    do this second, do this third, do this fourth, you

8    have to task this group, task that group.  Because I

9    had been doing it, obviously, for the last few

10   months.

11        Q.  So Mr. Nance essentially wanted you to pull

12   together the entire process?

13        A.  Yes.

14        Q.  Okay.  Any other new objectives in 3D?

15        A.  I think these are in addition to a lot of

16   other objectives that kept coming from other

17   evaluations.

18        Q.  Cheryl, would it be -- and again, I don't

19   want to go through all the evaluations; we've been

20   at it for quite a while?

21        A.  Yes.

22        Q.  But would it be an accurate statement that

23   if one were to read the objections in each of your

24   subsequent evaluations, there would be new and

25   additional tasks assigned to you?

JOHNSON - DIRECT                     426

1        A.  New and additional tasks, and plus a new

2   version of previous tasks.

3        Q.  Okay.  Most of the tasks did not go away?

4   They stayed with you?

5        A.  They all stayed, and they either grew or and

6   new ones added.

7        Q.  Sounds like your plate was pretty full?

8        A.  Very much so.

9        Q.  As we get into 2010 and 2011, how many hours

10  a week were you putting in?

11       A.  About at least a minimum 50, 60 hours a

12  week.

13       Q.  Okay.  And were you able to keep up putting

14  in those hours?

15       A.  I wasn't able to keep up even putting in

16  those hours, because it's literally impossible to

17  update every single ticket, coordinate all these

18  activities, and be personally responsible for every

19  single ticket to be updated yourself.  I mean it

20  was -- and verifying with every single customer

21  myself.  And managing other people's team members.

22       Q.  And I won't cover this in any great detail,

23  but it would be safe to say that you started to be

24  disciplined because of your failure to meet these

25  objectives?

1          A.  100 percent; yes.

2          Q.  And it was progressive?

3          A.  It was progressive; yes.

4          Q.  And over a period of time?  It started small

5     and got large?

6          A.  Yes.

7          Q.  I want you to turn -- well, let me ask you

8     this:  Some of the disciplines involved suspensions;

9     am I correct?

10         A.  That's correct.

11         Q.  So you were away from work without pay?

12         A.  That's correct.

13         Q.  And when you were away from work without

14    pay, who covered what you were supposed to do?

15         A.  When I'd come back from being on suspension,

16    I would have tons of tickets assigned to the group,

17    assigned to nobody, or either that was assigned

18    directly to my name while I was gone.

19         Q.  Okay.  So tickets either were assigned to

20    your name while you were gone --

21         A.  Yes.

22         Q.  Was that done by Mr. Nance?

23         A.  Yes.  On several occasions I saw that was

24    the case.

25         Q.  Or the tickets were in the group and hadn't

1    been assigned to anyone?

2        A.  Yes; that's a hundred percent correct.

3        Q.  And when you came back to work, were the

4    tickets already past due for completion?

5        A.  Based on my requirements of having to have

6    tickets assigned in a day, they were already past

7    due, they were already late.  They had already

8    missed at least four different of the objectives I

9    had about either having them assigned in a day or

10   having them acted upon within four days.  And every

11   task had to be completed by the due date.  That was

12   at least three that was already not met right away.

13       Q.  So when you would come back from -- from a

14   period away from work, in addition to all of other

15   things, what did you have to do with these tickets

16   that accumulated?

17       A.  I would have to go and start assigning every

18   single ticket to myself.  And then go through the --

19   first of all, I had to go and do analysis of the

20   ticket to see what needs to be done.  A lot of

21   times, there would be help desk tickets out there

22   that hadn't been assigned to anybody.  Or either

23   they were assigned to my name.

24           So then I would have to go and do the extra

25   steps of assigning all the tasks that go with those

JOHNSON - DIRECT                                429

1    tickets, determining who needs to get the tickets,

2    and then also assigning a verifying task to myself

3    in those tickets.

4         Q.  I want to take you back to October of 2010.

5         A.  Yes.

6         Q.  Were you away from work for several days in

7    that month?

8         A.  I was.

9         Q.  And was that unrelated to any discipline?

10        A.  Yes, that was unrelated to any discipline.

11        Q.  Why were you away from work?

12        A.  For my aunt's funeral.

13        Q.  How long were you gone?

14        A.  At least a couple of days and I think the

15   weekend that followed after that.

16        Q.  All right.  While you were gone, what

17   happened to the tickets that were coming into the

18   unit?

19        A.  They accumulated in the group.  And several

20   help desk tickets were assigned to my name

21   personally while I was gone.

22        Q.  Rough estimate, when you came back, how many

23   tickets had come into the group either in your name

24   or just to the group while you were gone?

25        A.  Well, I know at least 70 help desk tickets

JOHNSON - DIRECT                               430

1    and several change tickets also had come to the

2    group and not assigned to anybody.  And help desk

3    tickets were assigned to my name.

4        Q.  So by the time you came back, were you past

5    the one-day deadline for getting the tickets

6    assigned?

7        A.  Yes; on every single one of them.

8        Q.  Okay.  So you're already not meeting an

9    objective?

10       A.  That's correct.

11       Q.  And were those tickets able to be assigned

12   by you and the task completed within those four-day

13   requirement?

14       A.  Not at all.  Each of the help desk tickets

15   that was assigned to my name, so I already was late.

16   And then I had to copy and paste every single ticket

17   into a task ticket for the technicians to have all

18   the information they needed to do the work on the

19   help desk ticket.

20       Then I had to also assign a verify task in that

21   help desk ticket to myself.  And so by the time I

22   did that, it was already maybe two or -- by the time

23   I got through all of them, some of them were already

24   two or three days late.  Or four days late already.

25       Q.  So you were already not meeting your

1    objective?

2        A.  I already met the first day that I was gone

3    because they wasn't assigned to anybody, a staff

4    member.

5        Q.  Cheryl, can you turn to Exhibit 19 for me,

6    please.

7        A.  Yes.

8        Q.  Can you identify Exhibit 19?

9        A.  Yes.

10       Q.  And -- and it's a series of email exchanges;

11   am I correct?

12       A.  That's correct.

13       Q.  And let's put them in context.  You wrote an

14   email on the morning of April 18th, 2012, to Don

15   Warren?

16       A.  That's correct.

17       Q.  Why did you write that email?

18       A.  I wrote that email because I was on a

19   suspension for a 30-day suspension from 3/19, 2012,

20   to 4/16, 2012.  And during my absence, I was able to

21   go -- there was all these tickets assigned to the

22   group.  Changes and tasks that were in the group

23   during that time period.

24       And I was able to know that because I was

25   able -- as we saw this morning, you can go into

JOHNSON - DIRECT                                    432

1    Remedy and look at the day the ticket was assigned.

2    That's how I knew that these were assigned during

3    that time period.

4         Q.  Okay.  Your Honor, I would like to offer

5    Exhibit 19 into evidence.

6              MS. BARNES:  No objection.

7              THE COURT:  Admitted.

8         (Plaintiff's Exhibit 19 admitted.)

9         Q.  And I'd like to publish it to the jury?

10             THE COURT:  You may.

11        Q.  Okay.  Cheryl -- so Exhibit 19, at the

12   bottom of the page, is the email you wrote to Don

13   Warren on April 18th?

14        A.  That's correct.

15        Q.  And you identify maybe nine or ten tickets

16   on this page that had come in during your absence?

17        A.  Yes.  Just on that page.

18        Q.  Okay.  Is this the second page?

19        A.  Yes.  That's the second page, yes.

20        Q.  And it identifies --

21        A.  The change tickets and task tickets that

22   were assigned during the time period I was away.

23        Q.  Okay.

24        A.  Assigned to the group, but not to anyone to

25   work on.

JOHNSON - DIRECT                                    433

1          Q.  All right.  And is this the third page of

2     tickets?

3          A.  Yes, it is.

4          Q.  Okay.

5          A.  It has the dates associated with each

6     ticket.

7          Q.  All right.

8          A.  And some of them didn't fall in the range.

9          Q.  And this is the fourth page?

10         A.  Yes.

11         Q.  Why did you write to Don Warren?

12         A.  The reason I wrote to Don Warren was because

13    of the fact that all these tickets were assigned to

14    the group and not assigned for anyone to work on

15    during my absence.  And then -- so that made a

16    backlog.  Especially when every single ticket is

17    supposed to be acted upon within four days.

18         And so then I guess there was a response from

19    my supervisor when I said that.

20         Q.  All right.  So --

21         A.  It could have been --

22         Q.  -- these tickets were basically tickets that

23    should have been assigned during your absence.  And

24    when you came back, you had to assign them in your

25    name?

JOHNSON - DIRECT                        434

1        A.  Yeah.  Every single one I had to assign to

2    my name.

3        Q.  And these tickets all seem to begin with the

4    letters CHG.  Is that a change ticket?

5        A.  Yes, it is.

6        Q.  Okay.  And all these tickets came in over a

7    roughly 30 day time span?

8        A.  Yes.

9        Q.  So when you came back, what -- what did you

10   have to do with respect to these tickets?

11       A.  Well, these tickets, I had to assign every

12   single one of them to me, my name personally.  And

13   then I had to create tasks to all the different

14   people in all the groups, because these are -- most

15   of them are referring to decommission tickets.  Most

16   of them are decommissions.

17       Q.  Okay.  I want to refer you to the email that

18   appears in the middle of that page.

19       A.  Yes.

20       Q.  And that's an email that was sent by Rod

21   Nance on April 24th?

22       A.  Yes.

23       Q.  About six days later?

24       A.  Yes.

25       Q.  To Don Warren and yourself?

1      A.  Yes.

2      Q.  And you see where he says, (as read:)  I

3  have gone through all these tasks and have added the

4  dates that these tasks were assigned.

5      Who are they assigned to?

6      A.  All of these tickets are assigned to my

7  name.

8      Q.  Okay.

9      A.  I mean after I came back and assigned them

10  to me.

11      Q.  Okay.  And then he says, (as read:)  Please

12  note, all of the decommission tickets have a minimum

13  60 day window for completion.  30 days from the

14  assigned date before they are to be started, and

15  another 30 days before they are required to be

16  completed.  This is our standard process for these.

17      You see that?

18      A.  I do see that.

19      Q.  Now, back -- and I think we talked about

20  that earlier?  That that was the standard process?

21      A.  Yes.

22      Q.  If we go to April of 2012, was that the

23  standard process for Cheryl Johnson at that time?

24      A.  No.

25      Q.  And what was -- what was expected of you?

JOHNSON - DIRECT                         436

1          A.  What was expected of me was to start a

2     decommission within three days and have it totally

3     completed in 35 days?

4          Q.  Okay.  I'm going to ask you to go

5     Exhibit 19A.

6          A.  Okay.

7          Q.  Can we agree that that is two pages of one

8     of your performance evaluations done by Mr. Nance?

9          A.  Yes.

10         Q.  And the full evaluation is part of Group

11    Exhibit 3?

12         A.  That's correct.

13         Q.  Your Honor, I would like to offer

14    Exhibit 19A.

15              THE COURT:  Any objection?

16              MS. BARNES:  No objection.

17         Q.  Cheryl, so this is an evaluation that was

18    given to you for the time period between 11 --

19    11/1/2010 and 11/1/2011?

20         A.  That's correct.

21         Q.  And I want you to go to page 4 --

22         A.  Yes.

23         Q.  -- which is employee objectives for the next

24    reporting period.  Do you see that?

25         A.  Yes.

1          Q.  And you see the paragraph that deals with --
2     where the arrow is located?
3          A.  Yes.
4          Q.  Is there any correlation between what is in
5     that paragraph and the change tickets that are in
6     Exhibit 19?
7          A.  Yes.
8          Q.  What is the connection?
9          A.  The connection is that they are all
10    decommission tickets.  And according to my
11    objective, it said, along with all the other things
12    that were added as far as a decommission task that
13    was even more information than before.  But in
14    addition to that it says, (as read:)  This is due
15    for hardware that is under Wintel control.  All
16    decommissions must be started within three days of
17    receiving request, and must be removed from the
18    racks -- from the rack within 35 days of the
19    shutdown.
20         Q.  Okay.  What does it mean to be removed from
21    the rack?
22         A.  That means it needs to be taken away from
23    wherever that location is.  That meaning a staff
24    member have to go through, physically get the
25    physical hardware, and bring it back to the Data

JOHNSON - DIRECT                            438

1    Center.

2        Q.  So is that another way of saying the

3    decommissioning must be completed?

4        A.  That means everything.  That means, when it

5    says completed, that means all those steps, all the

6    paperwork had to be done.  It had to be started

7    within three days, that mean in three days the

8    server is shut down, instead of 30 days.

9        And then instead of having 30 days to shut the

10   server down, I had three days to shut the server

11   down.  Instead of having another 30 days after that

12   to pick the server up, I had to have -- I had to

13   have the whole server shut down within 35 days and

14   picked up and all the paperwork done and returned to

15   the warehouse.  All done within 35 days.

16       Q.  So what Mr. Nance, in his email said, was

17   the standard process --

18       A.  Yes.

19       Q.  -- was not the Cheryl Johnson process?

20       A.  Absolutely correct.

21       Q.  Cheryl, I want to take you to August of

22   2012.

23       A.  Okay.

24       Q.  Did anything happen at that time related to

25   your employment with the Department of Central

JOHNSON - DIRECT                    439

1    Management Services?

2         A.  I was terminated.

3         Q.  Okay.  And can we agree that you were

4    terminated because you were not meeting the

5    objectives established for you by Mr. Nance?

6         A.  That's correct.

7         Q.  And can we agree that you were not meeting

8    those objectives?

9         A.  That's correct.

10        Q.  Why were you not meeting them?

11        A.  They were humanly impossible to meet those

12   objectives.  No one could meet those objectives.

13   They were designed not to be met.

14        Q.  Okay.  And I think we've talked about a lot

15   of the objectives and what was involved; right?

16        A.  Yes.

17        Q.  Okay.  You indicated that you are now

18   employed in state government?

19        A.  Yes.

20        Q.  And this gets a little confusing, I think.

21   But did you at one time, after leaving CMS, go to

22   work for the Department of Human Services?

23        A.  Yes.  A couple years, about two years after

24   leaving the state, I did.

25        Q.  And are you doing the same work today for

JOHNSON - DIRECT                           440

1    DOIT that you did for the Department of Human

2    Services?

3         A.  Yes.

4         Q.  And essentially, you're doing Department of

5    Human Services work, but you're apparently a part of

6    DOIT now?  Is that a fair way of putting it?

7         A.  Yes; that's correct.

8         Q.  What is your job classification?

9         A.  It's called Information Service Specialist

10   2.

11        Q.  And if you were doing information specialist

12   work 2, what work would you be doing?

13        A.  I would be doing things like entry level

14   basic analysis of programs with a lot of guidance

15   and leadership.  I would be like a junior level

16   person; that's an entry-level position.

17        And it's a position where you probably just

18   have really minimal job responsibilities.  Very

19   simple programs with specific guidance and

20   directions and step-by-step instructions on how to

21   do the work.

22        Q.  Okay.  Is that what you're doing?

23        A.  No.

24        Q.  Can you take me through the types of work

25   you've done for the Department of Human Services

JOHNSON - DIRECT                              441

1    since joining it?

2        A.  I started working in the accounting and

3    reporting system.  And I would start off doing major

4    projects, doing analysis, design and development of

5    major computer systems.

6        And based on that and my performance, then I

7    started doing leadership roles where I was the lead

8    for some major project conversions where we were

9    converting one of the systems where -- it's called

10   Eligibility System that we were converting from a

11   certain standard to a new standard.  So I was the

12   lead analyst and the project leader for that entire

13   project.

14       Q.  So you were the lead analyst and the project

15   leader?

16       A.  I was the project leader for that.  I was

17   responsible for all the system interfaces, so I was

18   responsible for all the systems that interface with

19   any system at DHS.  And some of those systems were

20   like the Comptroller that we interface with, and HFS

21   and some other agencies that we're responsible for

22   interfacing with.

23       Q.  So as a project leader, did you head a team?

24       A.  I did.

25       Q.  And how many members were there of that

JOHNSON - DIRECT                    442

1   team?

2       A.  Well, that -- for that particular project, I

3   had to work with team members from all different

4   groups.  Not just in the CARS team specifically.

5   The two analysts that were in the CARS teams, and

6   plus analysts from all other different groups since

7   the accounting system was like the core of all of

8   the agency that we interface with almost every

9   single unit.

10      Q.  All right.  So was it your responsibility to

11  bring that project in?

12      A.  Yes.

13      Q.  And do it in a timely way?

14      A.  Yes.

15      Q.  And do it correctly?

16      A.  Yes.

17      Q.  Did you complete that assignment?

18      A.  Yes.

19      Q.  Is that the only project you've been the

20  project leader on?

21      A.  No.  Now, because of that, for me completing

22  that project successfully, then I was asked to

23  become part of the project management team.  And by

24  being part of the project management team, that I

25  manage projects all the time.  And so what I'm

JOHNSON - DIRECT                                    443

1    responsible for is some major projects that we're

2    managing that has to do with different state

3    agencies, all the different aspects.

4        I worked a lot with the chief technology

5    Officer, our cluster CIO.  And project I'm working

6    on right now is a special project for the Secretary

7    at DHS.  And I'm responsible for all the

8    stakeholders that are in there doing the project

9    plan.  Design and developing all the aspects of the

10   project.  Making sure that I report the project --

11   the progress of the project.

12       Also, in addition to that, that we're working

13   on getting new technology.  So I had to do all the

14   analysis and work with different vendors on getting

15   the right technology solution for this project.

16       Q.  Okay.  So in your job at DHS, how much of

17   your actual work was system analysis work and how

18   much was project leadership work?

19       A.  I would say over the time most of it been

20   project management work.  I started off very -- at

21   the very first year getting in there and proving

22   myself.  And then, you know, they start giving me

23   more since they knew I had the knowledge and skills

24   to do the more senior-level work.

25       Q.  Okay.  You were a -- you were a group

JOHNSON - DIRECT                           444

1    manager at CMS?

2        A.  Yes.

3        Q.  And the skills that were required of the

4    group manager position at CMS, each of those you

5    hold --

6        A.  Yes.

7        Q.  -- were those skills that were translatable

8    and required in your DHS positions?

9        A.  Yes.  A hundred percent, yes.

10       Q.  Cheryl, I'm gonna ask you to go to Plaintiff

11   Exhibit 4.

12           THE COURT:  What number was that,

13   Mr. Baker?

14       Q.  4.

15       Can you identify what Plaintiff Exhibit 4 is?

16       A.  It's my performance evaluation for 2016 and

17   2017.

18           MS. BARNES:  Your Honor, may we approach?

19           THE COURT:  Yes, you may.

20       (The following sidebar discussion was held at

21       the bench, out of the hearing of the jury.)

22           MS. BARNES:  It is clear these are

23       evaluations for what she's doing now.  It's

24       not a managerial position, it's an entry

25       level positions; it's a completely

JOHNSON - DIRECT                              445

1          different job.  And it's got nothing to do

2          with whether she was discriminated against

3          by Rod Nance at the other job.

4          It's not relevant; how she's doing now.  It

5          is not the same supervisor, not the same

6          duties, it's completely different.  What's

7          that got to do with whether she was

8          discriminated against?

9              MR. BAKER:  Judge, I think this is

10         already dealt with in your ruling on the

11         motion in limine.  But Cheryl testified to

12         what her job duties actually were in this

13         position at DHS and the skills required of

14         that position.  What she was actually doing

15         are comparable to the skills required for

16         the job she did at CMS.

17         That document would, together with her

18         first evaluation, sandwich what other

19         individuals assess her performance at, and

20         it would tend to undermine and discredit

21         Mr. Nance's assessment of her performance.

22             MS. BARNES:  No, it does not.

23         Completely different people, completely

24         different job.  It's not a PSA Option 3

25         which is a very high level, managerial job.

1    She testified this is an entry-level job.

2    I don't care what she does.  So she has

3    projects at an entry-level job, and she

4    does those well.  So what?  It's not as

5    high a level as what she was doing.  And so

6    to come in and say, "I'm doing well at this

7    job proves that I was discriminated against

8    at that job," that's -- there's no merit to

9    that argument.

10        MR. BAKER:  Judge, the whole issue in

11   this case is whether Cheryl, had she been

12   given reasonable expectations, could have

13   satisfactorily performed her job.  It's our

14   position that the --

15        MS. BARNES:  No --

16        MR. BAKER:  -- objectives that were

17   given to her were not reasonable.  That's

18   our position.  I think that's what the

19   evidence is.

20   We have two evaluations--one when she first

21   went to CMS and one now at DHS--each of

22   which involved jobs where the actual duties

23   she performed were quite comparable to the

24   duties she did under Mr. Nance.  They

25   required the same skills.  We're not saying

JOHNSON - DIRECT

1     they were identical, but the same skills.

2     I think that's probative to the quality of

3     her work and to the quality of her skill

4     level which is an issue in this case.

5          MS. BARNES:  No.  The issue in this

6     case is whether she was fired because she's

7     was a black female.  That is the only issue

8     in this case.

9          MR. BAKER:  But to get to that issue,

10    we have to deal with her performance

11    because that's the reason she was fired.

12         MS. BARNES:  And this is a completely

13    different job with different supervisors,

14    different duties, lower level, different

15    agency.

16         THE COURT:  Well, I agree with you,

17    Ms. Barnes, that it is totally different.

18    But it's still within the realm of dealing

19    with these machines and these computers and

20    all of this within the state framework.

21    You can point out every single one of these

22    differences.  And I agree with you, I think

23    it certainly will have persuasive ability.

24    But I think Mr. Baker's position is valid

25    that we must allow this to come in, and

1        then you can make every distinction in the

2        world you can make.  And I'm gonna let you

3        do it.

4        It just seems to me that this is the theory

5        of his case, it's close enough that we're

6        talking about two jobs, both in state

7        government, both of them under the

8        umbrella.  But you are free to make every

9        distinction possible between them, and then

10       tie in what the -- what you consider to be

11       the issue.

12       So I think that if I'm gonna error, I'm

13       going to error to let it in rather than

14       keep it out.

15            MS. BARNES:  All right.

16            THE COURT:  Thank you very much.

17       (The following proceedings were held in open

18       court.)

19            THE COURT:  Mr. Baker, back to you.

20            MR. BAKER:  Your Honor, I'd like to offer

21  into evidence Plaintiff Exhibit 4.

22            THE COURT:  All right.  Plaintiff's

23  Exhibit 4.  How many pages is that, by the way?  Six

24  pages; right?

25            MR. BAKER:  I think it's two evaluations,

 1    each of which are six pages.

 2              THE COURT:  You're correct, thank you.

 3         Q.  (BY MR. BAKER:)  Cheryl, in the evaluation

 4    for the year 2015 to 2016, how were you rated by

 5    your supervisor?

 6         A.  In Part 1, Appraisal Objectives, I had five

 7    objectives.  I have four exceeded and one met.

 8         Q.  And with respect to the evaluation for the

 9    time period between July 2016 and June of 2017, how

10    were you evaluated by your supervisor?

11         A.  For those objectives is also another page

12    that has other parts to the objective, but for this

13    one, 2016 to 2017, there was six objectives.  And I

14    had four exceeds and two mets.

15              MR. BAKER:  Thank you.  I have no further

16    questions, Your Honor.

17              THE COURT:  Very well.  Ms. Barnes,

18    Mr. Okon, I think that it might be wise to recess --

19              MS. BARNES:  Yes, Your Honor.

20              THE COURT:  -- for the night.  And it's ten

21    minutes 'til five.  I know that we're going to be

22    going some length, and it would not -- is there any

23    objection to leaving early?  Ten minutes early?

24         No?

25         Everybody where it counts, over there in that

1  box, agrees with me.  Excellent.

2      Well, let's do that.  And then we'll start

3  fresh in the morning.

4      So we will stand in recess, ladies and

5  gentlemen, until 9:00 tomorrow morning.  Please

6  remember the admonition.  Don't discuss any of this

7  at home.  Okay?

8      See you tomorrow.  Have a please ant evening.

9      (The jury left the courtroom.)

10          THE COURT:  All right.  The record may show

11  the jury has left the courtroom.  And now, counsel,

12  is there anything more that we need to do this

13  evening?  Or do you have any projections or anything

14  regarding timewise?  I set the whole week aside for

15  the case, and so we're not really being pushed to do

16  anything.  And I leave it to you to call the shots

17  as far as how you want to proceed.

18          MR. BAKER:  Sure, Judge.  I have one more

19  witness to call, and I suspect that that witness

20  will be fairly short.  I don't think she's gonna be

21  a witness that's gonna take much time to testify, at

22  least on direct examination.

23          THE COURT:  Okay.  Ms. Barnes.

24          MS. BARNES:  And then we'll be ready --

25  we'll probably have a motion, and we'll be ready to

1    begin our case in chief.

2           THE COURT:  All right.  That will be fine.

3    That will be fine.

4        Okay.  Let's go home.  See you all at nine in

5    the morning.

6        (Court was recessed for the day.)

7

8    I, KATHY J. SULLIVAN, CSR, RPR, CRR, Official Court

9    Reporter, certify that the foregoing is a correct

10   transcript from the record of proceedings in the

11   above-entitled matter.

12

13

14

15

16                  This transcript contains the

17                  digital signature of:

18

19                  Kathy J. Sullivan, CSR, RPR, CRR

20                  License #084-002768

21

22

23

24

25