E-FILED
Wednesday, 19 December, 2018 03:04:35 PM
Clerk, U.S. District Court, ILCD

452

1    IN THE UNITED STATES DISTRICT COURT
     FOR THE CENTRAL DISTRICT OF ILLINOIS
2           SPRINGFIELD DIVISION

3
     CHERYL L. JOHNSON,            )
4                                  )
              PLAINTIFF,           )  14-CV-3001
5                                  )
          VS.                      )  JURY SELECTION
6                                  )
     THE ILLINOIS DEPARTMENT OF    )  SPRINGFIELD, ILLINOIS
7    CENTRAL MANAGEMENT            )
     SERVICES,                     )  VOL. 3
8                                  )
              DEFENDANT.           )
9

10           TRANSCRIPT OF PROCEEDINGS
       BEFORE THE HONORABLE RICHARD MILLS
11         UNITED STATES DISTRICT JUDGE

12   AUGUST 29, 2018

13   A P P E A R A N C E S:

14   FOR THE PLAINTIFF:        JAMES P. BAKER
                               BAKER, BAKER & KRAJEWSKI
15                             415 SOUTH SEVENTH STREET
                               SPRINGFIELD, ILLINOIS
16

17   FOR THE DEFENDANT:        DEBORAH BARNES
                               JOSEPH OKON
18                             ILLINOIS ATTORNEY GENERAL
                               500 SOUTH SECOND STREET
19                             SPRINGFIELD, ILLINOIS

20

21

22

23   COURT REPORTER:          KATHY J. SULLIVAN, CSR, RPR, CRR
                              OFFICIAL COURT REPORTER
                              U.S. DISTRICT COURT
24                            600 E. MONROE
                              SPRINGFIELD, ILLINOIS
25                            (217)492-4810

453

1                         I N D E X

2   WITNESS              DIRECT    CROSS    REDIRECT   RECROSS

3   DONALD WARREN        457       492      520
    LISA RUSH            521       528      529
4   EDWARD GORDON        547       549      551
    RODNEY NANCE         552       598      619        623
5   VICKI SPENCER        627       650
    CHERYL JOHNSON       668

6

7

8

9

10                      E X H I B I T S

11  PLAINTIFF'S EXHIBIT
    NUMBER                    IDENTIFIED    ADMITTED
12
    EXHIBIT 7                    672          673
13  EXHIBIT 14                   689          690

14

15

16

17
    DEFENDANT'S EXHIBIT
18  NUMBER                    IDENTIFIED    ADMITTED

19  EXHIBIT 39                   565          567

20

21

22

23

24

25

P R O C E E D I N G S

\*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*

(The jury entered the courtroom.)

THE COURT:  Thank you, Madam Clerk.

Good morning, everyone.  Thank you all for being prompt and on time this morning.  After that very nice rain that we had last night and this morning.

All right.  We are all in place.  And I believe that Ms. Johnson is still on the stand and under oath and we're now ready for the cross-examination.

MS. BARNES:  Your Honor.  We will not cross-examine.

THE COURT:  No cross-examination.

Back to you, Mr. Baker?

MR. BAKER:  Your Honor, may we approach the bench?

THE COURT:  Why of course.  Have I ever said no yet?

(The following sidebar discussion was held at the bench, out of the hearing of the jury.)

MS. BARNES:  You need a stool for short lawyers.

THE COURT:  I know.  I'm going to put in a requisition at lunch.

1          MR. BAKER:  Judge, our next witness is

2     Lisa Rush.

3          THE COURT:  Is what?

4          MR. BAKER:  Is Lisa Rush.  We asked

5     her to be here at 10:00, anticipating that

6     there would be cross-examination of

7     Ms. Johnson.  So we're a witness shy that

8     we don't have right now.

9          THE COURT:  All right.  These things

10    happen.

11         MR. BAKER:  If Ms. Barnes is prepared

12    to put a witness on to keep the case going,

13    that's fine with us.

14         MS. BARNES:  We could put Mr. Warren

15    on.

16         THE COURT:  Now that would be all

17    right.  Should I explain to the jury what

18    we're talking about here?  What we have

19    said?  I think that would be wise.

20         MR. BAKER:  Sure.

21         THE COURT:  That would be wise so

22    they're not left in the dark as to what's

23    going on.

24         MS. BARNES:  Okay.

25         THE COURT:  Everything up on top of

1        the table, see.

2        Very good.  Thank you.

3        (The following proceedings were held in

4        open court.)

5            THE COURT:  Ladies and gentlemen, it was

6    anticipated that there was going to be

7    cross-examination of the plaintiff.  However, they

8    have determined to.  So, therefore, we are going

9    back to Mr. Baker, and Mr. Baker's next witness

10   won't be here for about an hour.

11       So in that case, in order to alleviate any kind

12   of loss of time and problem, and loss to you, we are

13   going to move over to the state and allow them to

14   begin by putting on some evidence.

15       Now, that's acceptable to all of you?  We'll do

16   that without loss of time.

17       Everybody seems to be nodding approval, and so

18   that's what we will do.  Excellent.

19       Very well.  Back to the government now, and you

20   may proceed.

21           MS. BARNES:  We will call Don Warren.

22           THE COURT:  All right.  Mr. Warren was

23   already on the stand, so you've already been sworn.

24   You may retake the stand if you would.

25

1              DONALD WARREN

2  called as a witness herein, having been duly sworn,

3  was examined and testified as follows:

4              DIRECT EXAMINATION

5  BY MS. BARNES:

6      Q.  Good morning, Mr. Warren.

7      A.  Good morning.

8      Q.  I'm not going to plow the same ground again,

9  but I do want to explain to the jury your role in

10 evaluating Ms. Johnson's performance.

11     First of all, while I'm still thinking about

12 it, we left off yesterday with Mrs. Johnson entering

13 into evidence some evaluations of her, the job she

14 holds now.

15     A.  Yes.

16     Q.  You heard that testimony?

17     A.  Yes.

18     Q.  And I asked you to take a look at those

19 exhibits and compare the job duties that she has now

20 with the job duties and the job requirements that

21 she had when she worked under you.

22     Were there any differences?

23     A.  Yes.  The job that she holds now is a much

24 lower-level position.  The responsibilities aren't

25 quite as large as what she had before.  She's more

WARREN - DIRECT                           458

1    responsible for single application as opposed to

2    lots of pieces of equipment and people and things

3    spread across the state.

4         Q.  And did her job description in the current

5    job that she has now specifically require managerial

6    skills?

7         A.  No.

8         Q.  Okay.  Mr. Warren, in your experience, would

9    it be fair to say that some people could be very

10   good at information technology in a certain area,

11   but not be quite as good in the managerial sphere?

12        A.  Yes; that's correct.

13        Q.  Okay.  And in fact, would it be fair to say

14   that the duties of the IT people that you supervised

15   who, of course, needed to know IT, revolved

16   primarily around being able to manage these tickets?

17        A.  Yes.

18        Q.  Okay.  When Ms. Johnson was hired, who hired

19   her?

20        A.  Rod Nance and I were on the panel that hired

21   her.

22        Q.  Okay.  And when -- after you hired her, you

23   put her in what unit?

24        A.  She was in -- don't know the exact title,

25   but it's the Administration Unit is what it was.  I

WARREN - DIRECT                            459

1    do know that.

2         Q.  Okay.  I think she has said software.  Is

3    that accurate?

4         A.  It's kind of a software side.  Is manages

5    security.  It's the user accounts and security for

6    the network basically.

7         Q.  Okay.  So, for example, if I'm an office

8    employee and I need to get into a particular

9    database and I need user rights, I would contact the

10   Administration Unit?

11        A.  Correct.

12        Q.  Or if I'm having issues with my password, I

13   would contact the Administration Unit?

14        A.  Yes.

15        Q.  Okay.  How is that different from the

16   Software Unit that Mr. Gordon is managing now?

17        A.  His is application.  So when a server is up

18   and running, they install certain software on there

19   for team members, people to use.  And I do not

20   recall exactly which applications he's responsible

21   for right now, but basically, it was his

22   responsibility to install software systems and make

23   it available for others to use.

24        Q.  Okay.

25             THE COURT:  Excuse me.  What is that unit

WARREN - DIRECT                              460

1    called?

2         Q.  Mr. Warren?

3         A.  The Software Unit?  Is that --

4         Q.  That's what I thought it was called,

5    software.

6         A.  That's not the complete title.  I would have

7    to see an org chart.

8         Q.  Oh, the official title?

9         A.  Yes.

10        Q.  I thought we had some.

11        A.  I'm sorry, I've just been away for a long

12   time.

13        Q.  It just has a fancy name.

14        A.  There was an Application Group, a Software

15   Group, an Administration Group.  That's the general

16   titles of them.

17        Q.  Okay.  They can look for it.  I think I had

18   org chart -- we'll go on, and if they find it.

19             THE COURT:  No, please, please.  I didn't

20   mean to delay.

21        Q.  That's okay.  We'll go on, and if Joe finds

22   it, we can clear it up.

23        Anyway, I had asked you -- Ms. Wang, could you

24   turn to Defendant's Exhibits 46 and 47.  And put

25   those up on the screen.  46 first.

1            THE COURT:  We can back up and do this

2       later.

3            MS. BARNES:  Oh, I am.  I'm putting on

4       records of training.  I'm sorry.

5            THE COURT:  Okay.

6            THE CLERK:  I'm sorry.  It should be coming

7       on, but --

8            MS. BARNES:  We have an IT person in the

9       room.

10            THE COURT:  We do.  Great Scott.

11            MS. BARNES:  Is that like asking if there's

12       a doctor in the house?

13            THE COURT:  I don't know.  Is there a

14       doctor on the jury?  Nobody raises their hand.

15       There's certainly not one on the bench, I can tell

16       you that.

17            MS. BARNES:  All right.  We'll do this the

18       old-fashioned way.

19            MR. BAKER:  Excuse me.  What exhibit number

20       is this?

21            MS. BARNES:  46.

22       Now, Mr. Warren, I had asked you to take a look

23       at these.

24       Actually, counsel and I have agreed that these

25       are records of CMS.  And I would ask that they be --

WARREN - DIRECT                                462

```
1   46 and 47 be admitted into evidence.

2           THE COURT:  Very well.  Any problem?

3           MR. BAKER:  No, sir.

4           THE COURT:  Very well, they are admitted.

5   And you may proceed according to the -- your plan.

6       Q.  (BY MS. BARNES:)  Now, Mr. Warren, I had

7   asked you to take a look at these.  And what is

8   this?

9       A.  These are the training classes that Cheryl

10  Johnson attended while she was employed by CMS.

11      Q.  Now many -- now, some of these training

12  classes -- I want to pull this over just a little

13  bit.  Well, let me talk about the substance of some

14  of them first.

15          Many of these appear to be non-IT related.

16  Would that be fair?

17      A.  That is correct.

18      Q.  And are these non-IT related training

19  classes required of all of the people who worked

20  under you?

21      A.  Some of them are; yes.

22      Q.  Okay.  And just -- could you just pick

23  out -- let's look at, for example, down there at the

24  bottom.  In 2006, she got a new employee

25  orientation?
```

WARREN - DIRECT                                    463

1        A.  Yes.  That's required of everybody.

2        Q.  Am I supposed to be able to underline this.

3   There we go.  Okay.

4        And then --

5            THE COURT:  Can we blow that up a little

6   bit?

7        Q.  Big enough?

8            THE COURT:  Yes.  Pull it over.

9        Q.  Now, I'm going to go to the bottom.  And

10  we're going to talk about some of these training

11  classes.

12       Since we have established that they've been

13  taken by Ms. Johnson, I'm going to pull it over here

14  and we're going to talk about the topics.

15       Now, it looks like right off the bat, in 2006,

16  she got some training in Microsoft Server

17  Environment.  What would that involve?

18       A.  That would have been managing and

19  maintaining a server environment.  So more than

20  likely, that would have been about what's called

21  active directory.  And so that explains user

22  accounts, groups.

23       A user account is what you use to log on to the

24  system with.  A group is how you provide access

25  through security measures.  So you would put people

WARREN - DIRECT                          464

1    into groups and make that group available to a

2    certain application; like email.  So if you're in

3    this group, you can access email.  If you're not in

4    this group, you cannot access email.

5          So it would kind of be a base for something

6    like that more than likely.  Without reading the

7    actual description of the class, that is just my

8    interpretation of it.

9          Q.  Okay.  And the -- let's go up a little to

10   implement and -- well, let me ask you this:  Would

11   this have assisted her in her administration --

12   managing her administration group?

13         A.  Yes.

14         Q.  That was intended to do that?

15         A.  Yes.

16         Q.  Okay.  And let's go up there to Implement an

17   Administration Security in a Windows Server Network.

18   What would that have been?

19         A.  In that -- that would have been more of the

20   same basically.

21         Q.  Okay.

22         A.  And these are probably different levels of

23   the class.  So one might be a lower level, then the

24   next level.

25         Q.  Okay.

WARREN - DIRECT                              465

1          A.   And again, that's just a guess on my part.

2          Q.   While we're looking at it, what would this

3     have been, Leadership Boot Camp?

4          A.   That was something that was made available

5     to managers.  So various managers attended that, and

6     it would teach them leadership skills related to

7     managing people.

8          Q.   Okay.  What's a Network and Certification

9     class?

10         A.   That one I'm not positive about --

11         Q.   Okay.

12         A.   It's probably related to network.  How

13    things communicate.

14         Q.   Up here, she talked yesterday about ESR.

15    What does that stand for again?

16         A.   Enterprise Service Request.

17         Q.   Okay.  And she got some training in that

18    too; correct?

19         A.   Yes.

20         Q.   And that was in '07?

21         A.   Yes.  That was our ticketing system.  So

22    most people went through that so they knew how to

23    use it.

24         Q.   Okay.  And she got, looks like another

25    training in '07 which was Implement, Manage and

WARREN - DIRECT                          466

1    Maintain a Windows 03 Infrastructure?

2         A.  Yes.

3         Q.  Do you know anything about that?

4         A.  And it would be related to the others.

5         Q.  Okay.  Another training here, Planning,

6    Implementing and Maintaining a Windows Server 03

7    Directory Infrastructure.  What would that be about?

8         A.  And that would have been more related

9    directly to her job when she was the administration

10   manager.  That would have been more of what I talked

11   about, the directory structure, setting that up.

12        As we brought the other agencies into the --

13   our network, we had a consolidation project.  We

14   started shutting down agency Data Centers, bringing

15   them into our Data Center.  Then we came up with a

16   common directory and started doing away with their

17   independent systems and bringing them into ours.

18        So in order to do that, we had to implement and

19   add infrastructures, active directory

20   infrastructure.  So this class would have been

21   related to that and how to set it up and implement

22   the security and those types of things.

23        Q.  Okay.

24        A.  And it would have been a little more -- it

25   would have been related to the other classes that

WARREN - DIRECT                                467

1    she took also.

2        Q.  Let's talk about -- looks like she had

3    another Planning, Implementing and Maintaining a

4    Server -- isn't that like the other one?

5        A.  Which are you looking at?

6        Q.  Well, I'm looking at '07 here.

7        A.  Yes.  And like I said, they were varying

8    levels more than likely.

9        Q.  Okay.

10       A.  Each one would be a little more complex than

11   the previous.

12       Q.  Okay.  These other trainings--Grammar,

13   Writing, Interview and Selection, Technical

14   Writing--why would she have taken those?

15       A.  Just to enhance her skills.

16       Q.  Okay.

17       A.  And I'm not sure whether those were classes

18   she requested or classes we recommended.

19       Q.  Okay.  Motivating Employees and Work Teams,

20   would that have been a management --

21       A.  Yes.

22       Q.  Okay.  Time Management, Your Plan to

23   Organizing Time.  Did Ms. Johnson have issues with

24   time management?

25       A.  Yes, she did.

WARREN - DIRECT                    468

1      Q.  And so in 2009, she was given a class on how

2  to do that?

3      A.  Yes.

4      Q.  This was your -- would it be fair to say

5  that this was your effort to assist Ms. Johnson in

6  doing her job?

7      A.  And that I cannot say.  I don't remember

8  whether she requested that class or whether we

9  recommended the class for her.

10     Q.  Okay.  But it would be fair to say that it

11 would assist her in doing her job?

12     A.  Yes.  Yes.

13     Q.  Okay.  There's another one here, Basic

14 Management and Leadership Rules.  That's probably

15 self-explanatory?

16     A.  Yes.

17     Q.  How to Write, Work, and Program Objectives.

18 Did she have issues with writing, work, and program

19 objectives?

20     A.  Objectives, yes.  Sometimes she had issues

21 with that.

22     Q.  Okay.

23     A.  Helping her objectives and meetings those.

24     Q.  Now -- this thing is not cooperating.

25     There.  Some of these classes cost a lot of

1    money?

2        A.  Yes.  The -- can I say something?

3        Q.  Well, yeah, what -- some of them have zeros

4    here over in this right-hand column, and some of

5    them have $1,500, 1350.  1795 for a Network

6    Certification Class.  Where were those taken?

7        A.  More than likely those were taken at LRS.

8        Q.  That would be Levi, Ray, and Shoup here in

9    town?

10       A.  Yes.  That was someone that we contracted

11   with.  There could have been other places that she

12   went for those, but that was the one most -- that we

13   used more than anyone else.

14       And then the zero dollar classes would have

15   been classes that CMS provided or else brought

16   someone in and taught them in-house.

17       Q.  All right.  So would it be fair to say that

18   the department that you were managing was willing to

19   spend a lot of money on helping Ms. Johnson be

20   trained for her job?  Would that be fair to say?

21       A.  Yes.

22       Q.  Okay.  I also asked you to take a look at

23   Exhibit 47; correct?

24       A.  Yes.

25       Q.  And what is that?

WARREN - DIRECT                     470

1        A.  That is Ed Gordon's training record.

2        Q.  How does his training record in terms of

3   number of classes taken compare to Ms. Johnson's?

4        A.  He received fewer classes than she did.

5        Q.  Why is that, do you think?  Or if you have

6   an opinion.  If you don't, that's fine?

7        A.  He didn't require as many classes --

8        Q.  Okay.

9        A.  -- in order to understand his duties and

10  perform them.

11       Q.  There's been an issue made in the testimony

12  here about hardware training.  There's been some

13  testimony that Mr. Gordon knew hardware.  But did

14  Mr. Gordon receive any hardware training?

15       A.  No, he did not.

16       Q.  Okay.  He got -- I can hand you the paper,

17  but I want to ask you to take a look at these two

18  exhibits.  And did Mr. Gordon get any training that

19  Ms. Johnson did not?

20       A.  And from this, I cannot tell.

21       Q.  Okay.

22       A.  And that is because, for Mr. Gordon, he took

23  a class MS2279, and in the status column it has

24  completed.  Whereas that class, Ms. Johnson was

25  approved to take, but it doesn't say completed.  So

WARREN - DIRECT                              471

1    I don't know whether they didn't update the record

2    or whether she was approved and never attended.

3         Q.  Okay.  She might have completed it, they

4    just might not have updated the record?

5         A.  That I don't know.  I can't say for sure.

6         Q.  Okay.  But it was offered to her as well as

7    Mr. Gordon?

8         A.  Yes.  She was approved for it, I'm just not

9    sure she completed it or not.

10        Q.  Okay.  That's fine.

11        A.  And then I mean that's really the only --

12   other than -- let me look at that one here.

13        The only one I'm not seeing is Security

14   Awareness For Administrators.

15        Q.  And who got that one?

16        A.  That was Ed.  But other than that, I mean

17   Cheryl, she received five other classes that related

18   to active directory and server administration that

19   Ed did not receive.

20        Q.  Okay.  Count up the number of training

21   classes that Cheryl received and then count up what

22   Ed received.

23        A.  Cheryl received 33.  And that's only the

24   ones marked completed.

25        Q.  Okay.  And what did Ed receive?

WARREN - DIRECT                                    472

1        A.  18.

2        Q.  Okay.  Let's talk about when Cheryl became

3    the group administrator for the first group, the

4    Administration Group.  How did she do?  I mean we've

5    seen her evaluations, she met expectations.  But as

6    time went on, and overall before she moved, how did

7    she do?

8        A.  She began to have issues while managing that

9    group.  We received lots of calls from customers.

10   My supervisor spoke with me several times about it.

11   I spoke with Cheryl about it, I spoke with Rod about

12   it.

13       Q.  Who's your supervisor?

14       A.  My supervisor at that time was Kevin

15   Rademaker.

16       Q.  Well, let's be a little more specific.  What

17   kinds of -- who were the customers?

18       A.  The customers were the various

19   agencies--Department of Human Services, Department

20   of Revenue, Department of Transportation--the ones

21   that we were consolidating.

22       Q.  And what kinds of issues were raised in

23   these calls from the customers?

24       A.  Mostly things weren't being completed in a

25   timely manner.  Accounts weren't being created and

1  security wasn't being set up.  People weren't being

2  added to groups.

3      Q.  Did you have -- did you talk to Cheryl about

4  that?

5      A.  Yes.

6      Q.  And what were -- what was the nature of

7  these discussions?

8      A.  And usually it was more of a direct talk

9  with her.  You know, I need these things done, can

10  you please take care of it.

11      Q.  How long did that last before the -- before

12  she went to hardware?

13      A.  And I don't have the dates on that.

14      Q.  It can be sort of general.  A year, two

15  years, three years?

16      A.  I mean it probably went on for, I imagine,

17  about a year.  Nine to twelve months maybe.

18      Q.  Okay.  Then the evidence has shown she was

19  moved into hardware.  Were you involved in the

20  decision to move her into hardware?

21      A.  Yes.

22      Q.  Will you tell the jury, please, why that

23  decision was made?

24      A.  My supervisor, Kevin Rademaker, came to me.

25  We discussed the matter.  Things were not getting

WARREN - DIRECT                              474

1    done, and they were not improving.  We talked about

2    it.  The Hardware Group was set up, running

3    smoothly, documented.  They had fewer

4    responsibilities.

5         So rather than go through the procedure to fire

6    her, we decided to move her into another area.  Give

7    her a chance.

8         Q.  Okay.  When you say hardware was running

9    smoothly, what do you mean?

10        A.  Well, Ed Gordon had things organized and

11   documented.  The processes and procedures were set

12   up, so things were running smoothly.

13        Q.  Okay.

14        A.  He had things well-organized.

15        Q.  Okay.  So after then you moved her into

16   hardware -- well, there's been a lot of discussion

17   about whether or not some -- that she didn't have

18   any training for hardware.

19        In your view, Mr. Warren, as her manager, and

20   based on the background she had and the skills that

21   she claimed she had, would that have been an issue,

22   that she didn't have any specific knowledge about

23   how to build or decommission or unscrew something?

24        A.  No.  It shouldn't have been.  I mean she was

25   managing people, so it would be her responsibility

1   to task them.  And the people that worked for her

2   understood the processes and procedures.  They had

3   been doing it for years, so they were familiar with

4   it.

5        Q.  Okay.  And are you talking about the

6   technicians that actually did the work?

7        A.  Yes.

8        Q.  Okay.  And I think you testified that you

9   were confident that Ed had set up the protocols,

10  which are instructions, sufficient that she could

11  just take a look at those and manage the people who

12  did the work?

13       A.  Yes.

14       Q.  That was her primary -- would it be fair to

15  say that's her primary job?

16       A.  Yes.

17       Q.  Okay.  I don't want to belabor the point,

18  but how did that go?

19       A.  It did not go well.

20       Q.  Could you tell the jury -- give them kind of

21  an overview then of how things went and -- and what

22  lead up to the decision that she could not be kept

23  on anymore?

24       A.  We experienced similar issues.  Things were

25  not getting completed in a timely manner.  We were

1    getting complaints from our customers, the various

2    agencies.

3        I met with Rod on that several times.  He would

4    meet with her and discuss things.  Later on, we met

5    and we decided in order to assist her, we put

6    additional duties into her objectives for her

7    review.  Those were things that she should have been

8    doing on a regular basis, such as ensure there was

9    sufficient disk space on machines, making sure help

10   desk tickets were completed.  Assigned and

11   completed.  So we included those duties.

12       And then also, the disk report that was

13   required, I mean that's something that was -- she

14   should have been keeping track of to make sure that

15   no server ran out of disk space.

16       Q.  Okay.

17       A.  So those were attempts to assist her to

18   point her in a direction of things that she needed

19   to watch and make sure that she was aware of the

20   status.

21       Q.  Yeah.  And you've been listening to the

22   testimony.  You're talking about the evaluations

23   that she was addressing yesterday with respect to

24   the addition of duties?

25       A.  Yes.

1      Q.  Were those duties not required of Ed Gordon?

2      A.  No, he was required to do them all.  We

3  didn't have any issues with them being completed, so

4  they were not directly spelled out.

5      Q.  Oh, so -- so would it be fair to say then

6  that the spelling them out in the performance

7  evaluation for Ms. Johnson was an attempt to assist

8  her in doing her job?

9      A.  Yes.

10     Q.  Okay.  There's been a lot of discussion

11  about placing the tickets -- all the tickets in her

12  name.  And we heard a lot of testimony from Jo

13  Higgerson and Ms. Johnson about that issue.

14     Did you discuss with Mr. Nance putting the

15  tickets in her name?

16     A.  Yes.

17     Q.  Would you tell the jury the rationale for

18  that?

19     A.  She was having problems tracking tickets and

20  the work of her people.  We use a system called

21  Remedy in order to do that.  So within Remedy, you

22  assign jobs and everyone's assignments are in there.

23  And if it's in your name, when you pull it up, when

24  you log on, everything shows.  It's easy to track

25  it.

WARREN - DIRECT                         478

1          It seemed as though she was having difficulties

2     tracking the status of people's work because she'd

3     have to go through other steps to do that.  So we

4     decided to have her put them in her name and it made

5     it easier for her to track.  She knew -- or at least

6     it would be easier for her to see what was going on.

7          Q.  Well, there's a -- did this create more work

8     for her?  Or should it have?

9          A.  It -- it did create a little more work for

10    her because, I mean, she did have to put the ticket

11    in her name and assign it to someone.  Which she had

12    to do that anyway.  She at least had to assign it to

13    someone anyway, whether it was in her name or not.

14    And then at the end, there was a verification task.

15         Q.  Well, how long did that additional work --

16    or how long should that additional work have taken?

17    That is, what was the nature of the additional work?

18         A.  The additional work was minutes.

19         Q.  Okay.  For the -- in other words, clicking

20    to put her name in the ticket and then clicking to

21    verify that the work had been done by the

22    technicians?

23         A.  Yes.

24         Q.  Okay.  How long did this last?

25         A.  As far as?

WARREN - DIRECT                              479

1        Q.  Putting the tickets in her name?

2        A.  Until she was dismissed, I believe.

3        Q.  Okay.  Did it work?

4        A.  No.

5        Q.  Apparently it didn't?

6        A.  No.

7        Q.  Yeah.

8        Could I consult with my co-counsel a minute?

9             THE COURT:  Of course.

10       (Sotto voce discussion among counsel.)

11       Q.  There was also an issue -- I couldn't read

12  my co-counsel's writing.  There was also an issue

13  yesterday about her office and where she was placed?

14       A.  Yes.

15       Q.  And you heard that testimony about her being

16  moved?

17       A.  Yes.

18       Q.  From what she said was a regular office to

19  an area near her subordinates.  Were you familiar

20  with that area?

21       A.  Yes.

22       Q.  Were you involved in the decision to move

23  her?

24       A.  Yes.

25       Q.  Would you tell the jury why she was moved?

1      A.  She was having problems keeping track of her

2   employees, and had complained to Mr. Nance about

3   that.  Not knowing where they were.  So in an

4   attempt to help her, we moved her into the area with

5   them.

6      Q.  The -- was there a separate office space,

7   room available in that area to put her in?

8      A.  No, there was not.

9      Q.  Okay.  So --

10      A.  They were at one end and she was at the

11   other.

12      Q.  Okay.  Well, did you have the issue -- that

13   issue with other supervisors not keeping track of

14   their technicians?

15      A.  No.  And her's were different because her

16   people were more out in the field a lot.  And we had

17   servers at other locations, so they did have to go.

18   Whereas the other individuals were mostly keeping

19   track of things in-house in the Data Center.

20      Q.  Okay.  So again, you said this was done in

21   an effort to assist her?

22      A.  Yes.

23      Q.  I want to show you Plaintiff's Exhibit 15.

24          THE COURT:  That's number 15, did you say?

25      Q.  Yes, Your Honor.  This is Plaintiff's 15

WARREN - DIRECT                          481

1    that we talked about yesterday.

2            THE COURT:  Thank you.

3        Q.  Mr. Nance, you remember listening to the

4    testimony about this yesterday?

5        A.  Mr. Warren.

6        Q.  I'm sorry, Mr. Warren.

7        Mr. Warren.

8        A.  Yes.

9        Q.  What were your observations as you listened

10   to that testimony?

11       A.  Related to Cheryl's testimony yesterday?

12   Ms. Johnson's testimony yet?

13       Q.  Yes.  Did she -- to put it bluntly, did she

14   know what she was talking about?

15       A.  No, she did not.

16       Q.  Could you explain to the jury what --

17       A.  Yes.  There are two lines, two columns on

18   here that show space utilization.  One of them is --

19       Q.  I'm gonna zoom in here.

20       A.  Okay.  Can you go to the headings.

21       Okay.  Some of the information is just the CPU

22   type --

23       Q.  You can point on that screen.

24       A.  The CPU type, the CPU speed; just basic

25   stuff like this.

WARREN - DIRECT                                482

1          And this is the system volume.  The system

2     volume is where the operating system is stored.  So

3     that's like your Windows operating system on home

4     computers or your Apple IOS.

5          So that runs, and the way that we did things is

6     you had a system volume, or where the operating

7     system was, and then you had a Volume 1.  And that's

8     generic name right there, so Volume 1.  That's where

9     all the user data is held.  Those were separate

10    environments on the disks.

11         Q.  Okay.  So the system environment is the

12    brains?

13         A.  Yes.

14         Q.  The brains that are running your Word

15    application or your -- whatever application you're

16    in?  And that takes up space?

17         A.  Yes.

18         Q.  And then this environment right here is your

19    typing your documents --

20         A.  All your documents that are stored, your

21    spreadsheets, all those types of things.  Pictures,

22    whatever.

23         Q.  Okay.  And so that's -- these programs

24    monitor these two different spaces?

25         A.  Correct.

WARREN - DIRECT                      483

1        Q.  Okay.  Go on, I interrupted you.

2        A.  Okay.  So basically, you have the system

3    size.  System size, the amount used.  And then you

4    have the percentage used.  So 82 percent,

5    59 percent, and 66 percent.  And the same thing with

6    Volume 1.  You've got the size, you've got the

7    amount used, and then it's the percent used.

8        Q.  And what was she supposed to keep track of?

9        A.  Actually, both of those.

10       Q.  Okay.

11       A.  Just if you run out of system volume and --

12   because whenever you start up a computer, it writes

13   to the system volume also itself.  And so if you run

14   out of space there and it can no longer write there,

15   basically it locks up and it can't be used.

16       Q.  So if the end user here on -- has

17   73.3 percent, they put in roughly 25 more percent of

18   stuff, they're gonna crash?

19       A.  The user.  This -- they're on volume one.

20       Q.  Yeah?

21       A.  Yes.  So if you've got -- and I'm just

22   gonna -- 20 bytes of storage available, and somebody

23   tries to save a file and it's 21 bytes, well, it

24   can't be done.  So it's gonna give them an error

25   message.

WARREN - DIRECT                              484

1          The system volume is a little different.  If it

2     runs out of space, it shuts down the computer.

3          Q.  Okay.

4          A.  Where the other one just doesn't let you

5     save.  It gives you an error message where it's out

6     of space or something like that.  Then you call you

7     the help desk.

8          Q.  Okay.  And as you listened to her talk about

9     this yesterday, what were your observations?

10         A.  Well, she didn't understand, looking at

11    this, what the difference between the system volume

12    and Volume 1 was.

13         Q.  Okay.  Did Ms. Johnson, yesterday during her

14    testimony, describe having to do anything that

15    wasn't required of Ed Gordon?

16         A.  No.

17         Q.  When the time came to make the decision to

18    discharge, I guess would it be fair to say that any

19    supervisor comes to that decision reluctantly?

20         A.  Yes.

21         Q.  Could you please tell the jury what finally

22    made you and your fellow supervisors -- and let me

23    ask you this:  Was Mr. Nance involved in this

24    decision?

25         A.  Yes.

WARREN - DIRECT                                      485

1        Q.  Okay.

2        A.  I mean we discussed it.

3        Q.  What made you come to the conclusion that

4    you finally had to make the unfortunate decision to

5    discharge?

6        A.  Things were not improving.  I mean we --

7    there was a backlog of tickets.  We would get

8    complaints from our various users.  Customers.  I

9    would get complaints from my supervisor.

10       Q.  Okay.  How long have you worked with Mr.

11   Nance?

12       A.  I first began working with him in -- I was

13   at Illinois Department of Transportation before I

14   came to CMS.  And I first began working with him on

15   a regular basis anyway in 2000 -- in 2000.  I think

16   it was April of 2000.

17       I had met him before.  He was responsible

18   for -- he worked with a CADD team, Computer Added

19   Design and Drafting.  And at that time, I was

20   located in a district office in Collinsville, and

21   they would come in and do software upgrades.  But he

22   worked in Springfield.

23       Then later on, I took a position in Springfield

24   at the office there for Transportation, and that's

25   where I met him.

WARREN - DIRECT                                  486

1          Q.  In your work experience with Mr. Nance, had

2     you ever seen him treat women or people of color any

3     differently than anyone else?

4          A.  No.

5          Q.  Okay.  Did -- let me ask you this:  As the

6     supervisor of the entire group, you were the guy

7     over all the -- Mr. Nance, Ms. Johnson, Mr. Gordon,

8     and all the other supervisors?

9          A.  Yes.

10         Q.  Was there -- was there a Human Resources

11    Office that you could consult?

12         A.  Yes.

13         Q.  Okay.  Did Ms. Johnson ever complain to you

14    directly that Rod Nance was discriminating against

15    her based on her race or her gender?

16         A.  No.

17         Q.  If she had such issues, what avenues would

18    she have had available to her other than talking to

19    you?

20         A.  She would have approached the -- she had a

21    couple of options.  She could have either talked to

22    her union steward about it, in which case that

23    person would have directed her to our Office of

24    Personnel.  Or she could have went directly to the

25    Office of Personnel and complained.

WARREN - DIRECT

1    Q.  As manager of all those groups, if she had

2  gone to those -- to those arenas, would you have

3  been notified?

4    A.  Yes.

5    Q.  Were you ever notified that Ms. Johnson had

6  lodged a complaint about being discriminated against

7  based on her race or her gender?

8    A.  No.

9    Q.  Did she supervise people of color?

10   A.  Yes.

11   Q.  Who was that?

12   A.  Warren Foster.

13   Q.  Did Mr. Foster ever make any complaints to

14  you about Ms. Johnson's work performance?

15   A.  Yes.

16   Q.  What were they?

17   A.  Basically, she lacked organization, couldn't

18  assign things properly; things such as that.

19   Q.  And were the observations of the people

20  whom -- that she supervised relevant to your overall

21  assessment of the -- her work performance?

22   A.  Yes.  I mean we would take that into

23  consideration.

24   Q.  And was that -- was Mr. Foster's

25  observations the only -- the observations of the

1   only person she supervised that you received

2   complaints?

3        A.  No.  I received complaints from at least one

4   other individual.

5        Q.  And who was that?

6        A.  Tad Nall.

7        Q.  And what was -- what were his complaints?

8        A.  She didn't know what she was doing.

9        Q.  That's a pretty broad brush?

10       A.  Yes.  That's why I was hesitant there for a

11  minute.

12       Q.  Okay.  Mr. Nance, what -- I mean Mr. Warren,

13  what was your management style?

14       A.  I'm pretty open.  I'm pretty laid back.  I

15  mean it's an open office, anybody can come into my

16  office; it could be a manager, it could be an

17  employee, I didn't care.  I kept M&Ms and cashews on

18  my desk.  People came in all the time.

19       Q.  Did you stay in your office or were you out

20  on the floor?

21       A.  No.  I was out on the floor quite a bit.  I

22  was checking on things.  We had lots of

23  responsibilities.  I mean it wasn't just the

24  Midrange Group.  I had Storage, I had Mainframe, I

25  had another Midrange UNIX Group.  I mean we got

1    calls from customers all the time, so I was always

2    out checking on things.

3        Q.  Would you tell the jury then how your method

4    of managing informed your conclusions about

5    Ms. Johnson's work performance?

6        A.  Well, I would see things going on.  I mean

7    like I said, I mean I had her employees in my office

8    complaining.  I had my boss complaining.  I would be

9    out, I would see her, most of the time she seemed to

10   be unorganized.

11       Q.  Would you tell the jury why the mission of

12   the entire unit, you know, including the Hardware

13   Unit, maybe especially the Hardware Unit, was

14   important to the business of running the state?  And

15   why people who could do this competently is

16   important?

17       A.  Well, all parts are important, but I mean

18   you have to -- you have to start with the hardware.

19   If you don't have a piece of hardware, you can't do

20   any of the rest.  So you have to have the hardware

21   and the operating system installed and up and

22   running, then other teams can start installing

23   various pieces of software.  Then we can make it

24   available to the agencies, and that's critical.

25       I mean nowadays, as everybody knows, computers

1    are into everything.  You just -- when I first

2    started, computers -- I've been with the state for

3    30 years prior to my retirement.  When I first

4    started, most things were still paper-based then.

5    Now, almost everything is electronic based.  Your

6    documents are electronic based, spreadsheets, all

7    your personnel systems, everything.  So it's

8    critical to the operations of the state.

9         Q.  Okay.  And I guess it's fair to say the

10   evidence has shown that that relatively little group

11   was responsible for the -- the day-to-day operations

12   of the individual employees throughout the state;

13   would that be fair to say?

14        A.  Can you state that again?

15        Q.  Well, what I'm -- what I'm trying to get at

16   is the work -- the work you guys did affected Joe

17   Blow out --

18        A.  Yes, yes.

19        Q.  -- in an agency firing up his computer

20   trying to get his job done?

21        A.  Yes.

22        Q.  Okay.  Did you ever receive or hear of any

23   information that Ed Gordon had the same or similar

24   performance deficiencies that Ms. Johnson did, and

25   that Mr. Nance was ignoring all of this?

WARREN - DIRECT                          491

1        A.  No.

2        Q.  Okay.  What was your -- would it be fair to

3    say that you have the same ability to evaluate

4    Ms. Gordon as you did Ms. Johnson?

5        A.  Yes.  When we needed things done, I would go

6    talk to -- like I said, I didn't necessarily go to

7    the next manager below me and say, "Hey, go do

8    this."  I'd talk to people.  So I would talk to Ed

9    Gordon, and he was aware of what was going on.  And

10   if there was something I needed, it was taken care

11   of.

12       Q.  Okay.  Could I have a moment, Your Honor?

13          THE COURT:  Of course you may.

14       Q.  When Ms. Johnson vacated the position, who

15   took it?  I'll help you out, was it Vicki Spencer?

16       A.  She might have -- I don't know if she was in

17   that position before I retired or not.

18       Q.  Oh, okay.

19       A.  That's the only thing.  She might have been

20   temporarily assigned, or Rod might have taken over,

21   Mr. Nance might have taken over leadership.  I don't

22   recall.  But I -- I retired.

23       Q.  Okay.  You retired right about the time that

24   Ms. Cheryl -- or Ms. Johnson had been discharged?

25       A.  Yes; near that time.  I had some health

1    issues and stuff, so there was a lot going on.

2         Q.  Okay.  Thank you, Mr. Warren.

3              THE COURT:  All right.  To you, Mr. Baker.

4                   CROSS EXAMINATION

5    BY MR. BAKER:

6         Q.  Good morning.

7         A.  Good morning.

8         Q.  I'm gonna try and go in the order you talked

9    about, if my notes will let me.  Can you go to, I

10   believe Plaintiff Exhibit 4?

11        Is Plaintiff Exhibit 4 what you relied upon in

12   differentiating the work Cheryl Johnson did at CMS

13   from the work she does at the Department of Human

14   Services?

15        A.  Yes.

16        Q.  So you didn't observe what she did at the

17   Department of Human Services?

18        A.  No.

19        Q.  And you don't know exactly what her

20   day-to-day work responsibilities were over there?

21        A.  That is correct.

22        Q.  Okay.  You looked at a job classification,

23   Information Service Specialist 2.  And you're

24   familiar with that job classification?

25        A.  Yes, I am.

1          Q.  So basically, based upon your understanding

2    about what a normal Information Service Specialist 2

3    does, you concluded that there was a difference,

4    significant difference between what Ms. Johnson did

5    at CMS and what she did at Department of Human

6    Services?

7          A.  Yes.

8          Q.  Is that a fair statement?

9          A.  Yes.

10         Q.  Were you involved in the hiring process of

11   Ed Gordon?

12         A.  Yes.

13         Q.  And my understanding is that when an

14   employee is hired into state government from outside

15   the state, there is a process called the Rutan

16   interview?

17         A.  Yes.

18         Q.  And were you a member of the Rutan interview

19   panel?

20         A.  Yes.

21         Q.  And was Mr. Nance a member of that panel?

22         A.  I believe so; yes.

23         Q.  And that would have been true for both

24   Mr. Gordon and Ms. Johnson?

25         A.  Yes.

WARREN - CROSS                                    494

1       Q.  And basically, the Rutan interview panel

2   process involves preparing a set of questions geared

3   to the particular job that the candidate applied

4   for --

5       A.  Yes.

6       Q.  -- am I correct?  And you would have been

7   involved in preparing those questions?

8       A.  Yes.

9       Q.  Okay.  And essentially, each candidate is

10  graded by the information she has or he has that

11  corresponds to those questions?

12      A.  Yes.

13      Q.  And was -- when Ms. Johnson was applying for

14  the position, she was applying for her first

15  position at CMS; am I correct?

16      A.  Yes.

17      Q.  And the questions were geared for that

18  position?

19      A.  Yes.

20      Q.  Okay.  And basically, Ms. Johnson scored the

21  highest of all individuals that were applying or

22  were interviewed for that position?

23      A.  Yes.  At that time; yes.

24      Q.  Okay.  And the same with Mr. Gordon?  He was

25  applying for the hardware position.  And the

1    questions posed to him were geared to his experience

2    and knowledge of hardware issues?

3         A.  Not necessarily.  Without going back and

4    looking at -- the way it is set up, it's job

5    knowledge, experience.  There are different

6    categories, and that's the way -- and the questions

7    are asked within there.  But without knowing the

8    exact questions, there -- yes, there could have been

9    a hardware question in there.

10        Q.  Well, they were geared to testing the

11   knowledge and experience an individual had that was

12   relevant to the job that he applied for?

13        A.  Yes.

14        Q.  Ms. Barnes, could you give me Exhibit 46

15   that --

16            MS. BARNES:  It should be there.

17        Q.  Okay.  Good.  I want to show you Exhibit 46.

18   You see that?

19        A.  Yes.

20        Q.  And you testified about that?

21        A.  Yes.

22        Q.  Will you agree with me --

23            THE COURT:  Is that Defendant's 46?

24        Q.  Yes, it is.

25         Would you agree with me that it was in May of

WARREN - CROSS                                    496

1    2008 that Ms. Johnson was transferred to the

2    Hardware Unit?

3        A.  I'll say yes based upon your telling me

4    that.  I don't know the exact date, but yes, that's

5    possible.

6        Q.  Okay.  Let's assume it was 2008.  Are there

7    any courses she attended between May of 2008 and the

8    date she was terminated that the state had to pay

9    any money for?

10       A.  No.

11       Q.  I take it back, I think there is one.

12       A.  Yes.  That's the digital government summit.

13       Q.  That was 10 bucks; right?

14       Are there any courses that were geared toward

15   hardware technical issues between May of 2008 and

16   the end of 2012?

17       A.  No.

18       Q.  Okay.  Is it an employee's supervisor that

19   makes recommendations concerning the training needs

20   of an employee?

21       A.  That's usually partially the supervisor and

22   partially the employee.

23       Q.  Okay.  I want you to turn for a moment to

24   Plaintiff Exhibit 26.

25       A.  Okay.

1       Q.  Can we agree that that's the performance

2   evaluation for Ed Gordon between May of 2007 and May

3   of 2008?

4       A.  Yes.

5       Q.  That would have been why he -- while he was

6   the Hardware Unit manager?

7       A.  Yes.

8       Q.  And in defining objectives for the next

9   evaluation period, does a supervisor normally put in

10  training recommendations?

11      A.  Yes.  Usually, in the objectives they do.

12      Q.  Can you go to Part 4 --

13      A.  Yes.

14      Q.  -- of Mr. Gordon's evaluation?

15      A.  Yes.

16      Q.  Can we agree that Part 4 sets forth his

17  objectives for the next evaluation period?

18      A.  Yes.

19      Q.  And were those prepared by Mr. Nance?

20      A.  Yes.

21      Q.  Can you go down to Objective 3, please.  The

22  second 3?

23      A.  Okay.  I was gonna say there's two of them.

24  Yes.

25      Q.  Will you read that objective?

1      A.  (As read:)  Attend the training class

2  Implement, Plan, and Maintain a Windows 2003 Server

3  Infrastructure, and that's MS2279.

4      Q.  Okay.  Without being hyper-technical, would

5  that involve, in one respect or another, the

6  technical aspects of hardware?

7      A.  No.  That's more software related.

8      Q.  Would that be training that would have been

9  relevant to Mr. Gordon's job in the Hardware Unit?

10     A.  It would have assisted him; yes.

11     Q.  Okay.  And can you go down to Exhibit 4?

12     A.  Yes.

13     Q.  Can you read that for us?

14     A.  (As read:)  Attend the training class HP

15  System Administration C Class Course HE646S.

16     Q.  Okay.  That may well have been written in

17  Greek to me.  Can you tell me what that is?

18     A.  Yes.  We were moving to new technologies at

19  the time.  Servers, back in the day, they used to be

20  just like your PC, they were a box.  In the box it

21  had hard disks and network connections that were in

22  a rack.

23     New technology came out called Blaze Systems.

24  And basically what that is is it's a little bit

25  bigger box, and then you have individuals blades

1    that go in that box and each one of those blades are

2    a server.  So instead of one server taking up this

3    much space, you might have a little bigger box, but

4    you could get 16 blades into that box.  So

5    basically, you'd have 16 servers inside one box.

6         Q.  Okay.  Would it be safe to say that that was

7    training of a technical nature?

8         A.  Yes, that was.

9         Q.  And that would have assisted Mr. Gordon in

10   his job in the Hardware Unit?

11        A.  Yes, it would have.

12        Q.  If Mr. Nance recommended technical training

13   for Cheryl Johnson, would that be something that

14   would be included in her performance evaluation?

15        A.  More than likely; yes.

16        Q.  Okay.

17        A.  Should have been; yes.

18        Q.  All right.  I'm not going to go through all

19   of Cheryl's performance evaluations and the

20   objectives that were established for her.  Needless

21   to say, that would put us through a lot of time that

22   we went through yesterday.  But let me ask a few

23   questions.

24        Was Mr. Gordon ever required to personally

25   verify with a customer the completion of a task?  Or

1    completion of a ticket?

2         A.  I don't believe in his performance

3    evaluation it was a requirement; no.

4         Q.  Okay.  Can we agree that Ms. Johnson was

5    required to, for lack of a better word, relocate

6    some servers from remote locations to Springfield

7    for -- that were held in state agencies?

8         A.  Yes.

9         Q.  Okay.  And I don't want to go through all

10   the details, I just want to move through this

11   quickly.  And she was given a timeframe to do it?

12        A.  Yes.

13        Q.  And she was given a timeframe to at least

14   conduct an inventory of where the servers were, some

15   information concerning them, put in a plan to

16   schedule the time for removal, and then relocate

17   servers within specified timeframes?

18        A.  Yes.

19        Q.  Did --

20        A.  Without looking at the evaluation; yes.

21        Q.  I understand yesterday when we were going

22   through Ms. Johnson's testimony you were following

23   along with her evaluations?

24        A.  Yes.

25        Q.  Was Mr. Gordon ever required to do that?

1          A.  Yes, but it was -- yes, he had -- he had

2     similar job duties to Ms. Johnson.

3          Q.  Did he have similar job duties as her with

4     respect to the relocation of servers of other state

5     agencies?

6          A.  Yes.  Yes.

7          Q.  Do you know what time requirements he had to

8     meet?

9          A.  Whatever we -- whatever was required of the

10    project at that time, he had to meet those.  He

11    continued to meet his requirements, so we never had

12    to go beyond maintaining, blah, blah, blah.

13         Q.  Well, my question is:  What were those

14    requirements?

15         A.  It varied depending upon the project.  I

16    mean we had a big project when we started to

17    relocate everything.  And then afterwards, we were

18    going out and getting bits and pieces and

19    everything.  So it was depending upon the project we

20    were working on at the time.

21         Q.  Okay.  Well, you know the timeframes that

22    Cheryl Johnson was required to work under?

23         A.  Yes.

24         Q.  Are you saying here, under oath, Mr. Gordon

25    had to work under similar timeframes?

1      A.  Yes.

2      Q.  You're sure about that?

3      A.  Yes.

4      Q.  Did it --

5      A.  It's all depended upon the project that was

6  being worked on.

7      Q.  That was my question.  Were the time periods

8  similar?

9      A.  Yes.

10      Q.  Are you sure about that?

11      A.  Yes.  It -- go ahead.

12      Q.  You seem to be hesitant?

13      A.  That's because I'm not sure what you're

14  talking about without looking at the particular

15  requirement.  There was one thing that she was

16  discussing yesterday, the server rack consolidation,

17  in which she was saying she had to go out to all

18  these agencies, get all these servers, bring them

19  back in.  And it had nothing to do with that.  It

20  was all servers located in the Data Center.  There

21  was -- excuse me.

22      We have ten racks.  We've been doing the

23  virtualization project into the blade servers.  So

24  you get ten racks with ten servers each, that's a

25  hundred servers.  All of the sudden, you virtualize

1    50 of these servers and they're no longer in use.

2    So what we wanted done was the racks consolidated.

3    You take all of them and move in the racks, do away

4    with five racks, you open up floor space.  It had

5    nothing to do with servers in other areas.

6        Q.  Well, without belaboring the point, the

7    project objectives for Ms. Johnson were very

8    specific concerning what she was to do, what she was

9    to plan, the information, the time period, and the

10   number of servers that had to be relocated; can we

11   agree with that?

12       A.  Yes.  Yes.

13       Q.  Did Mr. Gordon have to engage in any work

14   involving the installation of ILOs?

15       A.  I don't know if that technology came after

16   him or if we were doing that when he was still in

17   charge of the group.  I don't know for sure.

18       Q.  Okay.

19       A.  If you give me dates, you know, I would

20   know.  But I don't.

21       Q.  Well, let's talk about 2010-2011.

22       A.  Okay.

23       Q.  Was -- let's go back.  Mr. Gordon was in the

24   Hardware Unit, I believe, up until May of 2008?

25       A.  Okay.

WARREN - CROSS                    504

1      Q.  Prior to May of 2008, were there any ILO

2  installations?

3      A.  Probably not at that time.

4      Q.  Okay.  Now, as I understand it, you are

5  alleging that there were performance deficiencies on

6  Cheryl's part that lasted for a year or more before

7  she was removed from her first position --

8      A.  Yes.

9      Q.  -- is that correct?

10     A.  Yes.

11     Q.  Now --

12     A.  I don't know if it was quite that long, but

13  it was about that long; yes.

14     Q.  Okay.  Can you go to Plaintiff Exhibit 2.

15     A.  Okay.

16     Q.  Plaintiff Exhibit 2 is a performance

17  evaluation for Cheryl in her first position.  Am I

18  correct?

19     A.  Yes.

20     Q.  And it covers a period November 2006 to

21  November of 2007?

22     A.  Yes.

23     Q.  So maybe covers a time period up to six

24  months before she was relocated --

25     A.  Yes.

1      Q.  -- is that right?

2      A.  Yes.

3      Q.  How long have you held management positions

4  for the State of Illinois?

5      A.  27 years.

6      Q.  And back in 2008, if you know, how long had

7  Mr. Nance held management positions with the State

8  of Illinois?

9      A.  In 2008, that would have been probably about

10  eight years.

11      Q.  Eight years.  So collectively, you had

12  nearly 30 years of experience managing state

13  employees?

14      A.  Yes.

15      Q.  As a manager, did you receive any training

16  on doing a performance evaluation for a subordinate?

17      A.  Yes.  I believe so.  I'm pretty sure I did.

18      Q.  Okay.  And can we agree that at the time

19  Plaintiff Exhibit 2 was prepared, you had lost count

20  of the number of performance evaluations you had

21  been involved with with a subordinate employee?

22      A.  Yes.

23      Q.  Now, you signed this document, did you not?

24      A.  Yes.

25      Q.  And you had, in signing it, you approved the

1    evaluation; is that also correct?

2         A.  That is correct.

3         Q.  All right.  Was it your practice in

4    evaluating state employees to be honest with them?

5         A.  Yes.

6         Q.  To tell them what they were doing well?  If

7    they were doing well, you would tell them that?

8         A.  Yes.

9         Q.  And if they were not doing well, you would

10   so indicate in the performance appraisal?

11        A.  Usually; yes.

12        Q.  It's like a report card, isn't it?

13        A.  Yes.

14        Q.  You give grades based upon performance?

15        A.  Yes.

16        Q.  Now, can we agree that there is nothing in

17   Plaintiff Exhibit 2 identifying any of the

18   shortcomings you claim Cheryl had in her first

19   position?

20        A.  That is correct.

21        Q.  Can we also agree that at no time between

22   May of -- between November of 2007 and May of 2008,

23   you did any counseling or remediation of Cheryl

24   concerning her performance?

25        A.  That is correct.

1       Q.  So Cheryl was a rotten employee, but you

2   didn't tell her she was a rotten employee?

3       A.  No.  I spoke with her unofficially

4   throughout the course of days.  You know, it's --

5   like I -- I followed up on things that needed to be

6   taken care of.

7       Did I sit down and talk to her about being

8   better organized or anything like that?  No.  It was

9   mostly -- there was a lot of stuff going on.  It was

10  mostly, I need this done, I need this done, I need

11  this done.

12      Q.  Okay.  So you had something you wanted done,

13  you wanted to know where it was, you would ask

14  Cheryl, and she would respond to it?

15      A.  Yes.

16      Q.  Okay.  But you never sat down and said,

17  "Cheryl, I think you could do better?"

18      A.  No.  Not officially, no.

19      Q.  Well, I'm not sure what the difference is

20  between official and unofficial?

21      A.  Official.

22      Q.  Okay.  Well, did you ever sit down, just

23  call her into your office, you had an open door

24  policy, call her into the office and say, "Hey,

25  Cheryl, I think we've got some problems here?"

1       A.  I'd say I spoke with her at times about

2   organization.

3       Q.  Do you recall any of those times as you sit

4   here?

5       A.  No.  I mean can I give you a specific date

6   or the topics discussed?  No.

7       Q.  Did you make any note of the conversation?

8       A.  No.

9       Q.  Okay.  Now, you indicate there were customer

10  complaints?

11      A.  Yes.

12      Q.  Customers being other state agencies

13  sayings, "where are things?"

14      A.  Yes.

15      Q.  Okay.  Would these customers typically voice

16  these complaints in written form like an email?

17      A.  A lot of them were calls.  Some could be

18  emails.  Yes, a lot of them were phone calls.  And a

19  lot of them were phone calls to my boss.

20      Q.  Okay.  Did you ever get any emails

21  complaining about Cheryl?

22      A.  I don't remember.

23      Q.  Okay.

24      A.  I can't say yes or no.

25      Q.  All right.  Do you recall any of the

1    agencies that complained about Cheryl?

2        A.  DHS, DOT, Revenue.

3        Q.  Do you recall what their complaints were?

4        A.  Just things weren't getting taken care of.

5    I can't give you specifics, user accounts weren't

6    being created, people weren't being -- no, I can't

7    give you specifics.

8        Q.  Did you ever look into why things weren't

9    getting done?

10       A.  No.  Other than going and talking to Cheryl

11   and Rod and trying to get things done; no.

12       Well, I can't say that, because I knew why

13   things weren't getting done.

14       Q.  How did you know?

15       A.  Through observation.

16       Q.  So you were personally observing Cheryl's

17   work?

18       A.  There was a pattern; yes.

19       Q.  Pattern of observation?

20       A.  Pattern of things not being completed in a

21   timely manner.

22       Q.  Okay.  So things weren't getting completed

23   in a timely manner, it was going on, there was a

24   pattern and you never did nothing either officially

25   or in writing to raise those concerns with Cheryl?

1          A.  Nothing in writing; no.  Not at this time;
2    no.
3          Q.  All right.  Now, I take it early on things
4    were going well with Cheryl?
5          A.  Yes.
6          Q.  Okay.
7          A.  I'll say yes.
8          Q.  Okay.  She completed her probation?
9          A.  Yes.
10         Q.  And if she was not competently performing
11    her job, she would not have completed her probation?
12         A.  Correct.
13         Q.  Okay.  I'm going to ask that you turn to
14    what I believe is Exhibit 15.
15              THE COURT:  Which one?
16              MR. BAKER:  Plaintiff's, I'm sorry.
17              THE COURT:  Plaintiff's 15.
18         Mr. Baker, would it be a good time to take a
19    break?
20              MR. BAKER:  That would be fine.
21              THE COURT:  Any objection?
22         No, all right.  Let's take a break.  Let's take
23    twenty minutes, and we'll be ready to go again.
24         Thank you, everyone.
25         (The jury left the courtroom.)

1          (A recess was taken.)

2          (The jury entered the courtroom.)

3              THE COURT:  Thank you, everyone.  Please be

4     seated.

5          All right, we're all in place.  Mr. Baker, you

6     may continue.

7              MR. BAKER:  Thank you.

8          Q.  (BY MR. BAKER:)  Mr. Warren, I have put on

9     this screen the infamous WUG report.  And I have

10    some questions about it.

11         A.  Yes.

12         Q.  Taking a step back and looking at the broad

13    picture, what is the WUG report supposed to

14    identify?

15         A.  Servers that are in need of additional disk

16    space.

17         Q.  All right.  And I believe there are --

18         A.  Actually, more nearing capacity would be a

19    better term.

20         Q.  All right.  So there are 50 servers on this

21    page, if my count is correct.  Would you agree with

22    that?

23         A.  Yes.

24         Q.  And can we agree that the WUG report is

25    typically a multi-page report?

WARREN - CROSS                        512

1          A.  Yes.

2          Q.  Okay.  So there can be as many as several

3     hundred servers on the WUG report?

4          A.  Possibly thousand plus.

5          Q.  Okay.  So I may not be asking this question

6     correctly, but Mr. Gordon, Monday, talked about a

7     97 percent.  Is 97 percent kind of at the point that

8     it's critical that something be done about disk

9     space?

10         A.  It's very critical.  We prefer it not get

11    that close.

12         Q.  Okay.  I guess that's my question.  When is

13    close?  When is a point where you really need to do

14    something?

15         A.  90 percent -- I mean you need to start

16    planning for it then.  That gives you some heads-up.

17    It allows you time to get the equipment that you

18    need or the additional drives, and plan for, you

19    know, to upgrade it.

20         Q.  Okay.

21         A.  So that's 90 percent.

22         Q.  All right.  Now, on this document, I see two

23    columns that have percentages?

24         A.  Yes.

25         Q.  Okay.  And as I'm looking at them, and maybe

1    I'm missing something, I don't see any that are at

2    90 percent?

3        A.  That is correct.

4        Q.  Okay.  So does this mean that these servers

5    are not at the point where some planning needs to be

6    done?

7        A.  That is correct.

8        Q.  Okay.  So this is not necessarily servers

9    that are low on disk space?

10       A.  Correct.

11       Q.  Okay.  Typically, how many servers in a WUG

12   report would be at the point where something needed

13   to be done?

14       A.  And I can't now say -- I mean it might be

15   for -- you may go months where nothing needs to be

16   done, then you might have a few that need to be

17   done.  I mean it could vary.

18       Q.  All right.

19       A.  It depends on how much -- usually, the

20   system volume is fairly consistent.  Unless you

21   upgrade to a new version of the operating system,

22   then it may take more space.  The data volume where

23   the users store that just continues to grow usually

24   over time, so it increases gradually.

25       Q.  Okay.  So if a server is at 90 percent, and

1    that's the point where you really get started on

2    doing something --

3        A.  Mm-hmm.

4        Q.  -- what would be the best estimate of how

5    long you would have before it got to the 97 percent

6    or higher?

7        A.  It varies from server to server.  So if you

8    have a server and say you have 2,000 users on that

9    server saving data to it, that could fill that up 7

10   percent quickly.  It could be a day, it could be a

11   week.

12       Now, if you only have 200 users on that server,

13   and they're the only ones writing to it, you could

14   go months maybe before you'd reach that.

15       Q.  Okay.  So when you go through the process of

16   putting additional disk space in a server, what is

17   involved with that?

18       A.  It depends.  You have so many slots of --

19   available for disk drives to go into a box.  If

20   those are already full, then you have to basically

21   go to larger disk drives and replace them all or you

22   have to replace the entire box; put a new server in.

23       So -- and if you've only got five slots in it,

24   or five drives and you've got a six-slot box, then

25   all you have to do is put another disk in.

1          But no matter what, you still have to, more

2     than likely, make sure you've got a good backup, you

3     have to coordinate with the agency the outage, and

4     then have you to do the work.

5          Q.  Okay.  And do you have to order parts too?

6          A.  It depends.  You might have spare parts on

7     hand, additional drives on hand.  If you're gonna

8     replace a server, you may have a server on hand with

9     the needed capacity or you may have to order one.

10         Q.  Okay.

11         A.  So that's why you got to give a little bit

12    of leeway.  You know, some time -- some lead time to

13    be able to make sure you've got everything you need.

14         Q.  Okay.  So it takes a while to do it?

15         A.  Yeah.

16         Q.  Do you recall when Warren Foster complained

17    to you about Cheryl?

18         A.  Specific date?  No.

19         Q.  Did you seek him out or did he come to you?

20         A.  He came to me.  And in actuality, I think it

21    was more of just, I don't remember -- he brought up

22    the topic, I know that.  I mean I didn't approach

23    him on it, he brought it up.  And I don't remember

24    whether it was in my office or Rod's office.

25         Q.  Okay.  And you don't remember the context

1    for that conversation, I take it?

2        A.  There was something that he had been told to

3    do, and there had been several other things that he

4    was upset about, and he just brought it up.

5        Q.  So he was upset because he was told to do

6    something?

7        A.  He was told to do something, but it wasn't

8    necessarily the correct thing to do or the -- I

9    can't remember the exact conversation other than him

10   complaining about something.  And it wasn't, no,

11   "I've been told to do work."  No, it wasn't like

12   that.  It was something that she had asked him to

13   do, but it wasn't what needed to be done.

14       Q.  Okay.  Mr. Foster was a hardware technician?

15       A.  Yes.

16       Q.  He had training in that particular area?

17       A.  Yes.

18       Q.  Okay.

19       A.  He had years of experience.  He came from

20   another agency, DHS.  I don't know what training he

21   had.  I assume he did though.

22       Q.  Fair enough.  He was not a rookie when it

23   came to --

24       A.  No.

25       Q.  -- hardware technology?

1       A.  No.

2       Q.  He had done it for a long time?

3       A.  Right.

4       Q.  And he was concerned or he was upset because

5  of something he was supposed to do?

6       A.  Yes.

7       Q.  And in passing, he said, "Cheryl doesn't

8  seem to understand this?"

9       A.  Yes.  Because --

10      Q.  That's about it; right?

11      A.  Yes.

12      Q.  And was it something of a fairly technical

13  nature?

14      A.  And that I don't recall.  I don't remember

15  the exact context.

16      Q.  Okay.  Does Mr. Foster still work at CMS?

17      A.  I believe he's retired.  I'm not sure.

18      Q.  All right.  You've known Rod Nance for a

19  long time?

20      A.  Fair amount; yes.  14, 16 years.  2000 --

21  sorry, probably 20 years.

22      Q.  Okay.  Most of the time when he worked for

23  the state and you worked for the state, you worked

24  together?

25      A.  Since 2000.

1    Q.  Okay.  Would you say that Rod Nance is a
2  friend?
3    A.  Yes.
4    Q.  Did you frequently go to lunch with him?
5    A.  Yes.  Constantly; yes.
6    Q.  I'm sorry?
7    A.  Constantly.  Almost every day until he got
8  mad at me.
9    Q.  He didn't like your choices of lunch places?
10    A.  It wasn't that.
11    Q.  Okay.  And when you worked together, did you
12  socialize away from work?
13    A.  No.
14    I mean he lived in Springfield, I live down by
15  St. Louis, so it wasn't -- you know.  I don't know
16  if we ever met, you know, somewhere at night or
17  anything like that.  But no, we never really
18  socialized.
19    Q.  End of the day, you got on the road to head
20  south?
21    A.  Yes, yes.
22    Q.  Okay.  You identified one other person that
23  complained about Cheryl, and my notes are very poor.
24  It --
25    A.  Tad Nall, N-a-l-l.

WARREN - CROSS                          519

1       Q.  Okay.  T-a-d?

2       A.  T-a-d, yes.

3       Q.  All right.  And was he also a hardware

4  technician?

5       A.  Yes, he was.

6       Q.  And would --

7          THE COURT:  Who was that again?

8       Q.  Tad, T-a-d, Nall, N-a-l-l?

9          THE COURT:  Thank you.

10      Q.  And Mr. Nall, like Mr. Foster, had a lot of

11  experience in hardware technology?

12      A.  Yes.

13      Q.  Do you recall the context of him talking to

14  you?

15      A.  No.  I mean it was similar to Warren

16  Foster's complaints.

17      Q.  So he didn't come to you directly

18  complaining about Cheryl, her name came up in the

19  conversation?

20      A.  In Tad's case, I believe he came to me

21  directly complaining.

22      Q.  Do you recall what his complaint was?

23      A.  No, I do not.

24      Q.  Was it similar to Mr. Foster's, that Cheryl

25  didn't seem to know what she was doing?

1      A.  Yes.

2      Q.  She didn't have the hardware experience to

3  know --

4      A.  And I don't remember the context, so I can't

5  say whether it was directly related to the hardware

6  side or something else.

7      Q.  Okay.  So best you can say from your chair

8  is that at some point in time, Tad spoke to you and

9  complained about Cheryl, but you don't recall the

10  nature of the complaint?

11      A.  No.  Not the exact context, no.

12      Q.  Okay.  I have no further questions.

13          THE COURT:  Thank you, Mr. Baker.

14      All right.  To the defendant.

15          MS. BARNES:  Could I have one question?

16          THE COURT:  Surely.

17                  REDIRECT EXAMINATION

18  BY MS. BARNES:

19      Q.  Mr. Warren, Mr. Baker asked you about your

20  relationship with Mr. Nance.  Could you look at this

21  jury and tell them whether you are testifying

22  falsely just to protect your friend?

23      A.  No.

24      Q.  Thank you.

25          MR. BAKER:  I have nothing further.

```
 1              THE COURT:  All right.  Redirect.

 2              MR. BAKER:  No.

 3              THE COURT:  None.  Very good.  Very well,

 4   you may step down, sir, Mr. Warren.

 5         (The witness was excused.)

 6              THE COURT:  Now, are we ready to come back

 7   with a witness on your side?

 8              MR. BAKER:  Yes, we are.

 9              THE COURT:  Thank you, Mr. Baker.

10         All right.  Now, we're going back to the

11   plaintiff's.

12         (The witness was sworn.)

13              THE COURT:  Right up here, please.

14                   LISA JANE RUSH

15   called as a witness herein, having been duly sworn,

16   was examined and testified as follows:

17                 DIRECT EXAMINATION

18   BY MR. BAKER:

19         Q.  Good morning, Ms. Rush.

20         A.  Good morning.

21         Q.  Would you state your name and address for

22   us?

23         A.  Lisa June Rush.

24         Q.  Can you speak a little more in the

25   microphone and pretend like I'm way back at the end
```

RUSH - DIRECT                          522

1    of the room?

2         A.  Lisa June Rush.

3         Q.  Ms. Rush, where are you employed?

4         A.  At the Data Center.

5         Q.  All right.

6              THE COURT:  At where?

7         A.  The Data Center.

8         Q.  The Data Center.

9              THE COURT:  Thank you.

10        Q.  Before we get to your job, can we agree

11   you're an African-American female?

12        A.  Yes.

13        Q.  All right.  You're not employed by the State

14   of Illinois, are you?

15        A.  No.  I'm a contracted employee.

16        Q.  And what company do you work for?

17        A.  Allied Universal.

18        Q.  Okay.  And how long have you had a job at

19   the Data Center?

20        A.  17 years.

21        Q.  And can you tell me generally what your job

22   is at the Data Center?

23        A.  I'm a security officer.  And anything that

24   goes in and out, we have to check it.

25        Q.  All right.  When you say anything that goes

RUSH - DIRECT                    523

1    in and out --

2         A.  Far as equipment.

3         Q.  Far as equipment?

4         A.  Mm-hmm.

5         Q.  Okay.  And back in the time period say

6    between 2008 and 2012, would your job have involved

7    checking in equipment?

8         A.  Yes.

9         Q.  What type of equipment would you check in?

10        A.  It would be servers, server racks.

11        Q.  And once the equipment was checked in, where

12   would it go?

13        A.  To the third floor usually.

14        Q.  All right.  And did you check equipment out

15   as well?

16        A.  Yes.

17        Q.  And can you tell me what your process was in

18   checking equipment in?

19        A.  To match the serial numbers with the serial

20   numbers on the paper with the servers that went in

21   and out.

22        Q.  Okay.  So you matched the serial number on

23   the paper with the actual serial number --

24        A.  Yes.

25        Q.  -- to make sure they were correct?

RUSH - DIRECT                            524

1        A.  Correct.

2        Q.  All right.  Did you do anything else with

3    respect to checking the servers in?

4        A.  Just we had to match the numbers and

5    everybody had their copy that they kept.

6        Q.  So you -- when you matched the numbers, you

7    put something in writing?

8        A.  Yes.  You had to check it off of the paper

9    that it matched to the server you were checking in.

10       Q.  All right.  So there was something on paper

11   identifying the server and the serial number?

12       A.  Yes.

13       Q.  And your job was to check the server and the

14   serial number and make sure it matched?

15       A.  Matched.

16       Q.  And if it matched, then you'd check it off?

17       A.  Yes.

18       Q.  All right.  Back in the time period we're

19   talking about, 2008 to 2012, how frequent was it

20   that servers would either come into the Data Center

21   or leave the Data Center?

22       A.  Two or three times a week.

23       Q.  And typically, when servers came in, how

24   many would come in?

25       A.  It would be different amounts of numbers.

RUSH - DIRECT                      525

```
1              THE COURT:  I beg your pardon, what was

2    that?

3        A.  It would be different amount of number of

4    servers that went in and out.

5              THE COURT:  Thank you.

6        Q.  Okay.  And when servers -- was -- was there

7    a process to relocate servers at the Data Center

8    back at this time period?  If you know?

9        A.  They were changing out a lot of different

10   servers.  They were going from the bigger servers

11   down to the smaller.

12       Q.  Okay.  So that increased the volume of

13   servers either coming in or going out?

14       A.  Yes.

15       Q.  All right.  Do you know Cheryl Johnson?

16       A.  Yes.

17       Q.  How did you meet her?  Was it in connection

18   with your work?

19       A.  Yes.

20       Q.  And was Cheryl Johnson, can you tell me how

21   you doing your work and Cheryl doing her work

22   brought you together?

23       A.  Because when Cheryl would come down to check

24   in servers, I had to be on the dock with her also to

25   compare the numbers to the servers that were going
```

RUSH - DIRECT                                    526

1    upstairs or going out the building.

2         Q.  Okay.  So Cheryl had to account for servers

3    as well, I take it?

4         A.  Yes.

5         Q.  And she would prepare some sort of document?

6         A.  Yes.

7         Q.  Based upon her examination of the servers?

8         A.  Yes.

9         Q.  And then you and she would compare your

10   documents?

11        A.  Yes.

12        Q.  And why would you do that comparison?

13        A.  Because I'm responsible for what goes in and

14   out of that Data Center.

15        Q.  Okay.  Cheryl had some responsibility in

16   that area as well?

17        A.  Yes.  Right.  She was head of that

18   department that took the servers in and out.

19        Q.  Okay.  So was it important that your

20   document reconciled with Cheryl's document?

21        A.  They had to match.

22        Q.  All right.  What would happen if it didn't

23   match?  What would you do?

24        A.  We have to figure out if it was just a

25   mistake in the number made, or they would have to

1    find out why the numbers didn't match up.

2        Q.  Okay.  And all that would be done while you

3    and Cheryl were together?

4        A.  Yes.

5        Q.  How frequently would you and Cheryl do this

6    process?

7        A.  Two to three times a week sometimes.

8        Q.  Every time servers either came in or went

9    out?

10       A.  Mm-hmm.

11       Q.  Okay.  Generally, did Cheryl's numbers and

12   your numbers match?

13       A.  Yes.

14       Q.  And in the situation where they didn't

15   match, what would you do before Cheryl left and went

16   back to her area of work?

17       A.  She would have to figure out what to do, or

18   call and make sure that what was sent to them was

19   the proper numbers on the paperwork.

20       Q.  And she would do all that before she left?

21       A.  No.  She would go upstairs and match it up,

22   what she had to do, then she'd come back with the

23   stuff on the dock.  It didn't leave the dock until

24   it matched up with the paperwork.

25       Q.  Okay.  So before anything left the dock,

1   your paperwork had to match up with her paperwork?

2        A.  Yes.

3        Q.  And did it, before anything left the dock?

4        A.  Yes.

5        Q.  Okay.  I have no further questions.

6             THE COURT:  Okay.  You may cross.

7                    CROSS EXAMINATION

8   BY MR. OKON:

9        Q.  Good afternoon, Ms. Rush.

10       A.  Good afternoon.

11       Q.  So you previously testified that when pieces

12  of equipment would come in or out, you would create

13  a piece of paperwork and Ms. Johnson would also

14  create a piece of paperwork?

15       A.  They would give me the paperwork.  They had

16  to give me the paperwork before the equipment went

17  out or the equipment came in.  They did all the

18  writing, I just checked off to make sure that the

19  serial numbers matched up to the paperwork that I

20  had.

21       Q.  Okay.  And after that happened, each of you

22  would have a separate document; correct?

23       A.  Right.

24       Q.  With the same information?

25       A.  Yes.

RUSH - REDIRECT                      529

1        Q.  Now, did Cheryl -- excuse me, did

2    Ms. Johnson ever come down to you asking for your

3    copy of the documents because she lost her's?

4        A.  She would ask to see the paperwork, but they

5    couldn't leave because we had to be accountable for

6    our own paperwork.

7        Q.  So was it your understanding that she was

8    coming down to see your copy because she misplaced

9    her's or couldn't find it?

10       A.  She misplaced it or couldn't find it, she

11   wanted to make sure the specific servers or whatever

12   came in on that day.

13       Q.  Okay.  And did that help -- excuse me, did

14   that occur more than once?

15       A.  Oh, yes.

16       Q.  Quite often?

17       A.  Several different times it did.

18       Q.  Okay.  No further questions.  Thank you.

19            THE COURT:  All right.  Back to you.

20                 REDIRECT EXAMINATION

21   BY MR. BAKER:

22       Q.  Just to clarify; when Cheryl had lost her

23   paperwork, she'd come down to reverify what had

24   already been done?

25       A.  Yes.

RUSH - REDIRECT                    530

1      Q.  Okay.  And you recall several times during

2  this four year time period that she came down and

3  had misplaced or didn't have her paperwork --

4      A.  Yes.

5      Q.  -- is that correct?

6      A.  Yes.

7      Q.  All right.  And what would happen then?

8      A.  She would review the paperwork to make sure

9  that what came in on that day was there, or

10  whatever, and look at the paperwork.  And I'd have

11  my paperwork back.

12     Q.  Okay.  And that occurred after you and

13  Cheryl had earlier verified paperwork?

14     A.  Mm-hmm.

15     Q.  So at the time Cheryl came down, that was

16  after you and she had gone through the process you

17  described earlier?

18     A.  Yes.

19     Q.  Okay.  Thank you.

20         MR. OKON:  No follow-up, Your Honor.

21         THE COURT:  Thank you.

22  All right.  Ms. Rush, you may step down.

23         THE WITNESS:  Thank you.

24         THE COURT:  Thank you very much.

25         THE WITNESS:  You're welcome.

1           (The witness was excused.)

2               MR. BAKER:  Your Honor, I believe we have

3    offered all of plaintiff's exhibits.  And assuming

4    that's the case, the plaintiff will rest.

5               THE COURT:  All right.  All exhibits have

6    been, I believe.  Do you understand that to be true,

7    Ms. Barnes?

8               MS. BARNES:  I believe so, Your Honor.

9               THE COURT:  All right.  Good.

10          All right.  All the exhibits have been

11   admitted, and we are here and the plaintiff has

12   rested her case.

13          All right.  To the defendants.

14              MS. BARNES:  We have a motion, Your Honor.

15              THE COURT:  Fine.  Please come up.

16          (The following sidebar discussion was held at

17          the bench, out of the hearing of the jury.)

18              MS. BARNES:  I have some brief

19          argument on our Rule 50 with respect to --

20              THE COURT:  Do you have it in writing?

21          You're gonna give it orally?

22              MS. BARNES:  I have it in writing, but

23          I could give it orally.  I planned -- you

24          know what we do, we plan to -- I will have

25          a written draft at the end of everybody's

 1          case.

 2               THE COURT:  Sure.

 3               MS. BARNES:  But I'd like to make a

 4          few points.

 5               THE COURT:  Okay.  Can we do that

 6          right now in here, or would you prefer to

 7          have the jury removed from the courtroom

 8          and we'll hear you in-depth?

 9               MS. BARNES:  Well, I prefer to make

10          that record at the close of the plaintiff's

11          case with the jury out.

12               THE COURT:  Yeah, okay.  Any problem

13          with that?

14               MR. BAKER:  I think that's her right.

15               THE COURT:  I think it is too.

16               Very good.  I tell you what, why don't

17          we -- I'm going to send them out.

18               MS. BARNES:  Okay.

19               THE COURT:  And then I'll hear your

20          motion and we'll have them come back in.

21          All right.  Fine.

22          (The following proceedings were held in

23          open court.)

24               THE COURT:  Ladies and gentlemen, we're

25          going to have some motions argued.  And I think it

RUSH - REDIRECT                         533

1   best that it be done here in the courtroom and, of

2   course, on the record.  But it must be out of your

3   presence.

4        So I'm going to ask you all to step back into

5   the jury room, if you don't mind.  And we'll take

6   care of the paperwork and the procedure and give you

7   an opportunity to have a cup of stale coffee or

8   whatever is available back there.

9        Okay.  Thank you so much.  Please follow the

10  bailiff.

11       (The jury left the courtroom.)

12       THE COURT:  Very good.  The record may show

13  that the jury has left the courtroom.

14       Please be seated, everyone.

15       (A discussion was held off the record.)

16        THE COURT:  The defense has a motion that

17  we are going to hear on the record here in open

18  court.

19       Ms. Barnes, you may proceed.

20        MS. BARNES:  Thank you, Your Honor.

21       The case here, as we know, is about racial and

22  gender discrimination.  And I would like to note

23  that we recognize that at this stage, the Court

24  doesn't go through the familiar steps set forth in

25  McDonnell-Douglas; that is, whether the plaintiff

1    has met a prima facie case.  The Court's decision on

2    a Rule 50 motion is whether there has been

3    sufficient evidence to permit a jury to consider the

4    ultimate question of discrimination.  That is,

5    whether the evidence was sufficient to pave a

6    rational path to the jury's finding of intentional

7    discrimination.  And that's Davis versus Wisconsin

8    Department of Corrections 445 F3d 971.

9        Now, the evidence has been that there's been no

10   direct evidence of discrimination.  No one has

11   testified that Rod Nance said or did anything

12   directly that indicated that he harbored a

13   discriminatory animus either based on race or gender

14   toward Ms. Johnson.  No direct evidence.

15       So the plaintiff is relying on a theory of

16   liability that relies on the indirect evidence which

17   is she's targeting Ed Gordon, and Ed Gordon is a

18   similarly situated supervisor, manager, that was

19   treated better than she was, and therefore, that

20   creates an inference because she was discharged and

21   he wasn't, of discrimination.

22       Well, the Seventh Circuit has flatly stated

23   that an employee who does not have a similar

24   disciplinary history and performance record as the

25   plaintiff is not similarly situated.  That is

RUSH - REDIRECT                           535

1    Simpson versus Franciscan Alliance, 827 F3d 656.

2         The employee must be directly comparable in all

3    material respects.  This includes showing that this

4    co-worker who is the similarly situated comparator

5    was engaged in comparable rule or policy violations.

6    And that is Naik, N-a-i-k, versus Boehringer

7    Ingelheim Pharmaceuticals, 627 F.3d 596.

8         And I'd like to talk about what lack of

9    evidence there is that Ed Gordon was similarly

10   situated.  And the first thing I would like to point

11   out is that the Seventh Circuit has said that the

12   plaintiff's own self-serving testimony disputing her

13   performance evaluations, standing alone, is not

14   sufficient to prove discrimination by a

15   preponderance of the evidence.  That is Aungst,

16   A-u-n-g-s-t, v. Westinghouse, 937 F.2d 1216.

17        So we can discount Ms. Johnson's testimony

18   that, "Well, I was doing a good job."  That falls

19   out of the mix.  What she must show is that Ed

20   Gordon was similarly situated to her.

21        And what we have is a failure to show that Ed

22   Gordon had the same deficiencies in his performance

23   evaluation and that his supervisors overlooked them

24   and gave him good evaluations compared to the

25   plaintiff's.

1      The plaintiff has offered no evidence that

2  Gordon engaged in the same type of deficient work

3  performance for which she was disciplined, and that

4  Rod Nance, the man she claims is discriminating

5  against her, ignored these shortcomings.  In fact,

6  there is no evidence other than that Ed Gordon was a

7  good employee who kept up with his work obligations.

8      Now, we acknowledge that the Seventh Circuit

9  has said that a -- whether a comparator is similarly

10  situated is usually a question for the fact-finder.

11  But the Seventh Circuit has also stated that summary

12  judgment is appropriate when no reasonable

13  fact-finder could find otherwise.  And that is

14  Coleman versus Donahoe, 667 F.3d 835.

15      The United States Supreme Court addressed this

16  whole issue of the sufficiency of the evidence in an

17  employment case in the Reeves case.  And it said the

18  Court should not treat these discrimination

19  questions differently from any other ultimate

20  questions of fact.  And apply the same analysis to

21  whether a reasonable jury could find whether there

22  is a reasonable path to discrimination.

23      That Reeves case is Reeves versus Sanderson

24  Plumbing, 530 F.3rd 533.

25      And in Reeves, the Court reminded the District

1     Courts that to hold otherwise is this, would be to

2     effectively insulate an entire category of

3     employment discrimination cases from review under

4     Rule 50.  And the Court stated, "We have reiterated

5     that trial courts should not treat discrimination

6     differently from other ultimate questions of fact."

7          In other words, the Reeves Court said, for

8     instance, and I'm quoting:  "An employer would be

9     entitled to judgment as a matter of law if the

10    record revealed some other non-discriminatory

11    decision for the employer's decision, or the

12    plaintiff created only a weak issue of fact as to

13    whether the reason was untrue, and there was

14    abundant and uncontroverted independent evidence

15    that no discrimination had occurred.  And that is on

16    page 148 of the U.S. -- of the case.

17         And what we have here is there has been no

18    evidence that the employer's decisions made here are

19    untrue.  There's been no evidence of pretext.

20         So we believe, Your Honor, that because Ed

21    Gordon -- there's no direct evidence that Ed Gordon

22    is not, as a matter of law, similarly situated

23    because he did not have these shortcomings, and was

24    winked at or overlooked and permitted to stay while

25    Ms. Johnson was fired.

1      Mr. Baker and I have discussed this, and

2  Mr. Baker says, "Well, the reason he got good

3  employment decisions is because Rod Nance

4  discriminated against her and favored him."  That's

5  not what the law says.  The law says the behavior,

6  the conduct, has to be the same.  And she had to be

7  fired for it and he didn't.  And there is no

8  evidence in this case that Ed Gordon was anything

9  but an exemplary employee.

10     And therefore, as a matter of law, we are

11  suggesting, he is not similarly situated.  There's

12  no direct evidence, there's no similar situation,

13  and there is no evidence suggesting that the reasons

14  given by these -- this employer are unworthy of

15  belief.

16     And so that is why, at the close of plaintiff's

17  case, Your Honor, we believe the defendant is

18  entitled to judgment as a matter of law.

19          THE COURT:  Thank you, Ms. Barnes.

20     Mr. Baker.

21          MR. BAKER:  Thank you, Your Honor.

22     May it please the Court?

23          THE COURT:  It does.

24          MR. BAKER:  In this case, it is the

25  ultimate burden of Ms. Johnson to convince a jury by

1    the preponderance of the evidence that if everything

2    else had been the same but for her status as a black

3    female, she would not have been terminated.

4        I will concede--and we never attempted to make

5    an issue of this--that Ed Gordon was a good

6    employee.  We're not contending that he screwed up

7    in the hardware unit and got a pass.  That's --

8    that's not our point.

9        What we are saying, though, is that if you

10   compare Cheryl Johnson's work duties with Ed

11   Gordon's work duties, they were significantly

12   different.  Significantly different in the sense

13   that they were more burdensome, more time-consuming

14   than those of Ms. Johnson.

15       We had, yesterday, Ms. Higgerson testify

16   concerning tickets that were assigned in the name of

17   Ms. Johnson and tasks that were assigned in the name

18   of Ms. Johnson.  And just one report produced a

19   stack of paper 18 inches high of tasks and

20   assignments she had that Mr. Gordon did not.

21       The evidence in this case is that prior to

22   Ms. Johnson going to the Hardware Unit, she was a

23   good employee.  She met her requirements for

24   becoming a regular employee.  She satisfied her

25   probation.  She got a good job evaluation.  There

1   were no issues raised concerning her performance.

2        The evidence is she was assigned to a work unit

3   where she had virtually no -- no prior experience

4   which contrasted with Mr. Gordon who had 20 plus

5   years of hardware experience before he went to work

6   for the state.

7        The evidence is that -- and Ms. Johnson did

8   more than pat herself on the back and said, "I'm a

9   good employee."  In fact, she didn't say that she

10  had completed her objectives.  Instead, in almost

11  tedious detail yesterday, she went through the

12  assignments given to her, what they required, and

13  the burden she had in meeting them.

14       And it's almost like building a wall of bricks.

15  Started with some tasks, another layer of tasks is

16  put in, another layer of tasks are put in, another

17  layer of tasks were put in.  Where it got to the

18  point that she conceded she could not do everything.

19       Now, Ms. Barnes, I think, is treading slippery

20  ground legally.  Her argument is Mr. Gordon did a

21  good job, so therefore, they're not similarly

22  situated.  And the Donahoe case, Coleman versus

23  Donahoe, which I think she cited, basically says

24  that a person does not have to be a mirror image to

25  be comparable.  There has to be some sort of common

RUSH - REDIRECT                        541

1    sense inquiry so that you can make a valid

2    comparison.

3         And in this case, we have individuals that did

4    the same job, each supervised the Hardware Unit, and

5    reported to the same supervisor.  The difference is

6    the job duties each was assigned there.  And those

7    duties go directly to the adequacy of performance.

8         Our position simply is if -- if Ms. Johnson had

9    been given reasonable job requirements, like

10   Mr. Gordon, there would have been no performance

11   issues.  And that didn't occur.  And the question

12   is, why did it not occur?  Was it because of her

13   performance?  Was it because of her status as an

14   African-American?

15        Based upon the record at the close of the

16   plaintiff's case, I think a reasonable jury could

17   conclude, based upon the evidence, that Ms. Johnson

18   was not treated the same as Mr. Gordon, and the

19   difference in that treatment led to her termination.

20        I think that this is a case that is clearly

21   well suited for a jury.  CMS can, of course, advance

22   the arguments Ms. Barnes made.  The way she

23   presented them, it's clearly a fact issue that

24   should be decided by the jury.

25        We, therefore, ask that the motion be denied.

RUSH - REDIRECT                      542

1           THE COURT:  Thank you, Mr. Baker.

2      Ms. Barnes, back to you.

3           MS. BARNES:  The only note I would like to

4  make is that that big stack of paper was explained

5  by Jo Higgerson as, of course it was a big stack of

6  paper, it was because it was all the tickets that

7  were assigned in her name.  Joe Higgerson explained

8  that.  Jo Higgerson said that that didn't mean she

9  did all the work on the ticket.

10      So Cheryl Johnson has produced no evidence that

11  in that big stack of paper, with all those tickets

12  assigned to her name, she had to do all the work on

13  those tickets.  In fact, it was -- the evidence was

14  stark that her group got 1600 change records and Ed

15  Gordon's got 9,000.  The work -- and was -- he got

16  three times as much, his group got three times as

17  much work as her's did and accomplished it.  And

18  that's been -- that's not rebutted.

19      So we still believe we are entitled to judgment

20  as a matter of law.

21           THE COURT:  Thank you, Ms. Barnes.

22      Would you like to respond?

23           MR. BAKER:  Briefly, Your Honor.

24           THE COURT:  Surely.

25           MR. BAKER:  We have never claimed that

RUSH - REDIRECT                     543

 1    Ms. Johnson had to do all the work in the tickets
 2    that were assigned in her name.  However, the
 3    tickets that were assigned in her name imposed
 4    addition responsibilities on her.  She had to go
 5    through a process of opening the tickets and
 6    preparing tasks and assigning the tickets.  She had
 7    to go through the process of coordinating the work.
 8    That was normally done by technicians.  She had to
 9    go through the process of verifying the completion
10    of work with the customer.  That was normally done
11    by technicians.  And that's how it was done when
12    Mr. Gordon was in the group.  So even though she
13    didn't have to do the actual work, each of those
14    tickets imposed burdens on her which occupied her
15    time.
16        The other thing that should be noted is that
17    there were task tickets assigned to her, and they
18    were in the thousands; I don't recall the precise
19    number.  But when I questioned Ms. Higgerson
20    yesterday, I asked her if those task tickets were
21    basically the summary total, was an accumulation --
22    that the tickets identified a specific task that
23    Cheryl was given.  And each of those tasks involved
24    work that she was expected to do, that she actually
25    did.

1          Mr. Gordon, I think that the number of task

2     tickets he got you could count on one hand.  They

3     were not in the thousands.

4          The other anything that I think is noteworthy

5     is that Ms. Barnes is somehow comparing apples to

6     oranges.  She's saying that Mr. Gordon got -- group

7     got thousands of tickets and Ms. Johnson's group got

8     a whole lot less.  Well, there are two points.

9          First point is that those assignments that

10    Mr. Gordon had were not when he was in the Hardware

11    Group.  It covered a broad period of time when he

12    was in another group.  The other thing is, according

13    to Mr. Johnson -- or Mr. Gordon's count, he had

14    eight technicians to handle those tickets, and

15    Ms. Gordon -- Ms. Johnson's group, she had three.

16    So he had five more.  Multiple times.  So I think

17    that comparison is flawed.

18               THE COURT:  Thank you.  Ms. Barnes, any

19    last bite?

20               MS. BARNES:  No, Your Honor.

21               THE COURT:  All right.  Thank you.

22         The motion is denied.  And we will proceed with

23    the trial as is.

24         Now, it is 11:30.  I'll give counsel the option

25    to pick right back up now or have early lunch so

RUSH - REDIRECT                    545

1   that we will be back here at 1:00 instead of 1:30,

2   if we break now, or we will call the jury back in.

3   So I give this -- and continue until 12.  I give

4   counsel the option.  Whichever you would like.

5        Do you want to confer?  And since the jury

6   isn't here, you can make your statements right from

7   the -- from the counsel tables, if you'd like.

8                MS. BARNES:  When do you want us back if we

9   leave now?

10               THE COURT:  Oh, we'd be back here at say

11  quarter after one.

12               MS. BARNES:  Okay.  Well, all we have left

13  now is Mr. Nance and Vicki Spencer.

14               THE COURT:  Okay.

15               MS. BARNES:  I think I would rather go to

16  lunch now and then coast through and get this put to

17  rest.

18               MR. BAKER:  I'll defer to Ms. Barnes.

19  Whatever she wants to do is fine with me.

20               THE COURT:  Well, by deferring to her, that

21  means you'd rather -- you're agreeing.

22               MR. BAKER:  Correct.

23               THE COURT:  So I think that's probably a

24  wise thing to do.

25       Madam Clerk, would you please be good enough to

RUSH - REDIRECT                     546

1    step to the jury room, along with the Marshall, and

2    advise the jury that we are going to recess for

3    lunch now, and we will be back at, did I say 1:15?

4    Is that an hour and a half?  A little more good?

5    Then I'm sure nobody will argue with an extra

6    15 minutes.  Very good.

7         All right.  Then let's stay in recess for

8    lunch, and we'll be back at, what did I say, 1:15?

9         1:15 it is.  Nobody disagrees with that, so I

10   assume that the vote is unanimous.

11        We'll stand in recess until 1:15.  Thank you,

12   everyone.

13        (A lunch recess was taken.)

14        (The jury entered the courtroom.)

15             THE COURT:  Thank you, everyone.  Please be

16   seated.

17        All right.  Everybody have lunch okay?

18        All right.  We've all been to the trough, so

19   we're all back in place and ready to proceed.

20        Now, let's see, we are now at that point where

21   the defense will take the lead, and we're ready for

22   first witnesses on behalf of the defendant.

23             MS. BARNES:  Yes.  And, Your Honor, mind if

24   I remind the Court that Mr. Warren testified as

25   defense's first witness in the defense case.  We had

1   to take him out of order.

2           THE COURT:  Yes.

3           MS. BARNES:  Okay.  Our next witness will

4   be Ed Gordon.

5           THE COURT:  Oh, that's right.  We did do

6   that, did we not?

7           MS. BARNES:  Yeah.

8           THE COURT:  Excellent.

9       (The witness was sworn.)

10          THE COURT:  Please, right up here to the

11  chair.

12                  EDWARD GORDON

13  called as a witness herein, having been duly sworn,

14  was examined and testified as follows:

15                  DIRECT EXAMINATION

16  BY MR. OKON:

17      Q.  Good afternoon, Mr. Gordon.

18      A.  Hello.

19      Q.  And welcome back to the stand.

20          THE COURT:  You understand you're still

21  under oath?

22      A.  I do.

23          THE COURT:  Okay.  Thank you.

24      Q.  I will represent to you that there's been

25  testimony from Ms. Johnson that the hardware manager

1   position was so difficult that it required prior

2   experience within hardware.

3       Was there, on any occasion, that Ms. Johnson

4   ever made a comment to you suggesting otherwise?

5       A.  There was.  We were -- Cheryl and I were in

6   a training class for -- CMS had at the time for

7   managers with, I don't know, another dozen or more

8   of our peers.  And as part of the class, the

9   instructor interacted with each of the students,

10  which was us, and asked kind of a little bit about

11  our job details and what we do.

12      And at one point, they were asking Cheryl.  And

13  she became a little flustered, and she just blurted

14  out that not everybody could have a job like Ed

15  Gordon.

16      Q.  And when she said this, what position did

17  you hold?

18      A.  I was the hardware manager.

19      Q.  And when you were the hardware manager and

20  she said, "And not everybody could have a job like

21  Ed Gordon," what did you take that to mean?

22      A.  I took it as that it was kind of a simple,

23  easy, cake-walk type of the position.

24      Q.  Okay.  No further questions, Your Honor.

25

1                   CROSS EXAMINATION

2    BY MR. BAKER:

3        Q.  I can't resist asking, Mr. Gordon, a

4    question or two.

5        What was your interpretation of what you

6    thought chasm or chasm was in her comment; right?

7        A.  Well, based on the reactions of my peers as

8    well, I believe that was definitely my

9    interpretation.

10       Q.  Okay.  At that point in time, she was in

11   another job?

12       A.  Yes.

13       Q.  So she really didn't know the day-to-day

14   details of your job, did she?

15       A.  Never.

16       Q.  Okay.  Did you disagree with her?  Did you

17   think it was a simple, ordinary, easy job?

18       A.  I was just so shocked at the time by her

19   saying that in front of our peers that I didn't

20   really think much about beyond it was an insult.

21       Q.  Okay.  Well, putting aside the insult, and

22   having thought about your interpretation of what she

23   said, do you believe she was correct that the

24   hardware job was simple and easy?

25       A.  Well, no, I don't think it was simple and

GORDON - CROSS                              550

1   easy.  No.

2        Q.  It was a hard job?

3        A.  It was a challenging job.  It was obviously

4   different than the five different groups that you

5   had asked me about last time.  So it had its own set

6   of challenges and there -- they were unique to that

7   job.

8        Q.  Right.  So in difficulty, it was comparable

9   to other jobs?

10       A.  Probably the difficulty level; sure.  The

11  level of difficulty.  But they were all challenging

12  in their own way.  I didn't have the other jobs, so

13  it would be hard to compare myself either.

14       Q.  Sure.  And as I recall from your testimony

15  on Monday, when you came to the hardware job, you

16  brought with you the 20 years of hardware

17  experience?

18       A.  Well, you said inventory experience.  But

19  e24 years of inventory experience, I --

20       Q.  What about hardware experience?

21       A.  Working on hardware.  Probably 20 years.

22       Q.  Okay.  I have no further questions.  Thank

23  you, Mr. Gordon.

24       A.  You're welcome.

25            THE COURT:  Back to you, Mr. Okon.

1                    REDIRECT EXAMINATION

2    BY MR. OKON:

3         Q.  Just a brief follow-up, Mr. Gordon.

4         Despite not being the manager of hardware at

5    that time, would Cheryl have any idea what the

6    Hardware Group did?

7         A.  It would be hard to determine.  I can't

8    speak to that.

9         Q.  Would you say that the groups interact with

10   one another to some extent?

11        A.  Cheryl was the manager supervisor of the

12   Administration Group at the time.  So there would be

13   some interaction.  We did server -- servers were

14   being moved into the Data Center where we both --

15   all worked.  So there'd be some awareness that

16   you're working with physical hardware.  Her group at

17   the time did the permissions, and was helping with

18   the migrations.  In other words, when the agency

19   staff started to integrate in with CMS at the time

20   from whatever respective agency they came from.

21        So there would be some understanding about

22   servers, and certainly from the permission

23   standpoint and the physical asset side of it.

24        Q.  And isn't it true that there would be these

25   tickets, these work logs that would have numerous

NANCE - DIRECT                    552

1    tasks under them, and oftentimes, they would require

2    technicians from other groups; correct?

3         A.  Frequently.

4              MR. OKON:  No further questions.

5              MR. BAKER:  I have no further questions,

6    Your Honor.

7              THE COURT:  Thank you.

8         Are we all finished?

9              MS. BARNES:  Yes, Your Honor.

10             THE COURT:  Everybody finished?  All right.

11        Then, Mr. Gordon, you may step down.  Thank

12   you.

13             THE WITNESS:  You're welcome.

14        (The witness was excused.)

15             MS. BARNES:  Our next witness is Rod Nance.

16        (The witness was sworn.)

17             THE COURT:  Please come right up here to

18   the witness chair.  And be sure to pull in close to

19   the mic.  Thank you.

20                      RODNEY NANCE

21   called as a witness herein, having been duly sworn,

22   was examined and testified as follows:

23                    DIRECT EXAMINATION

24   BY MS. BARNES:

25        Q.  Good morning, Mr. Nance.  Good afternoon,

NANCE - DIRECT                          553

1    Mr. Nance.  Would you state your name for the

2    record, please.

3        A.  My name is Rodney Nance.

4        Q.  Where do you live?

5        A.  In rural Petersburg.

6        Q.  Do you work or are you retired?

7        A.  I'm retired.

8        Q.  And when did you retire?

9        A.  April of this year.

10       Q.  Where did you retire from?

11       A.  The Department of Innovation and Technology.

12       Q.  Could you tell the jury your work history,

13   starting -- and I'm primarily interested in the work

14   history that got you into information technology?

15       A.  Sure.  In 1989, I was hired by the

16   Department of Transportation as an engineering

17   technician.  And after approximately one year of

18   being a technician, I was asking some questions of

19   the computer people that the computer people had

20   problems answering.  So in turn, the computer people

21   hired me to be part of the computer staff.

22       So at that point, I progressed my way up from

23   an entry person in the computer systems up into in

24   1995, I took over the Computer Aided Design

25   Department.  I managed that department up until

NANCE - DIRECT                          554

1    2000.  In 2000, I became the network manager for the

2    Department of Transportation.  And in 2005, I

3    believe it was, was when CMS consolidated and I was

4    brought to CMS.

5         Q.  And what did you do when you came to CMS?

6         A.  When I first came to CMS, I was really given

7    a chance to -- about six months just to learn the

8    lay of the land to see what was going on because it

9    was such a different environment from the

10   environment I came from.

11        And then at that point, I started managing a

12   group of staff that had begun to be consolidated

13   over from one of the agencies.  So I took over the

14   DHS staff at that point in time as they became CMS

15   employees.

16        A little bit after that, the person who was the

17   data -- the Wintel manager left the department.  And

18   at that point, I moved into managing the Wintel

19   Group.

20        Q.  Now, the jury has heard a lot of testimony

21   about the Wintel Group.  And just to reiterate, that

22   was a group that administered the--correct me in I'm

23   wrong--sort of the computer needs of all the offices

24   out there?  The desk -- would it be the desktop

25   needs or everything?

1          A.  No.  The desktops were handled by a

2     different group.  Wintel handled the back-end server

3     piece of the environment.  So the place where the

4     applications actually ran; like where email ran or

5     where the databases ran or things of that nature.

6          Q.  Okay.  And the testimony has been that --

7     that there were five groups.  There was

8     Administration, Systems Software, Applications,

9     Planning, and Hardware.  Is that right?

10          A.  That's correct.

11          Q.  Okay.  When you went into that arena for

12     Wintel, what did you do?

13          A.  I was the Planning manager and I was the

14     overall manager of the group.

15          Q.  So you sort of did double duty?

16          A.  Yes, ma'am.

17          Q.  Okay.  Do you know the plaintiff in this

18     case, Cheryl Johnson?

19          A.  Yes.

20          Q.  Could you tell the jury when -- well, how

21     did you get to know her?

22          A.  Well, originally, we interviewed her and

23     hired her for a position at the Data Center.

24          Q.  You interviewed her with whom?

25          A.  Don Warren.

NANCE - DIRECT                    556

1        Q.  Okay.  Did -- did you weigh in on the

2     decision to hire her?

3        A.  Yes.

4        Q.  I'm kind of short, Mr. Nance, and this is

5     like driving with a steering wheel that's too low or

6     something.

7        When she first came to work for the Wintel

8     Group, were you her supervisor?

9        A.  No.

10       Q.  Would you tell the jury how that was -- how

11    the supervisory hierarchy was structured at that

12    time?

13       A.  Well, it was kind of a -- since everything

14    was in flux, I would call it at the time, because we

15    were -- we were doing a consolidation of trying to

16    bring in all these agencies to the Data Center under

17    the Governor.  So things were in flux at times as to

18    who worked for who and where.

19       So there were -- at that time, the Admin Group

20    I believe reported directly to Don, and the other

21    groups reported to me.

22       Q.  Now, the --

23          THE COURT:  Excuse me.  Kind of let us know

24    what year we're talking about?

25       Q.  Oh, I'm sorry.

NANCE - DIRECT                      557

1            THE COURT:  That's all right.

2       Q.  What year is this?

3       A.  '06 or '07.

4       Q.  Okay.  Yeah, I think Ms. Johnson has

5   testified that she came to work for that group in

6   '06.  Yeah, about November '06?

7            THE COURT:  So when we're talking about

8   2006?

9       Q.  Yes.

10           THE COURT:  Okay.  Thank you.

11      Q.  There should be a book up there that says

12  Plaintiff's Exhibits.  It says Witness Copy?

13      A.  Sorry.

14      Q.  Would you turn to Plaintiff's Exhibit 2,

15  please.

16      Do you recognize what that is?

17      A.  Yes.

18      Q.  And turn to the last page.

19      A.  Yes.

20      Q.  Did you sign that -- well, what is it?

21      A.  It's an evaluation.

22      Q.  You have to talk into the microphone or

23  nobody can hear you.  You can move it.  That's it.

24      A.  It's an evaluation for Ms. Johnson.

25      Q.  Okay.  And did you sign that?

1    A.  Yes, I did.

2    Q.  All right.  Would you explain to the jury

3  then how you came about signing and -- or signing

4  this as Ms. Johnson's supervisor?

5    A.  I'm not quite sure what you mean.

6    Q.  Well, were you her direct supervisor --

7    A.  Yes.

8    Q.  -- in November of -- from November, '06 to

9  November, '07?

10   A.  Yes.  If I signed it; yes.

11   Q.  Okay.  And at that time, what was her

12  position?

13   A.  She was a Public Service Administrator --

14   Q.  Well, that's her payroll title, but what was

15  she doing for Wintel?

16   A.  It doesn't -- it didn't note on here.  And I

17  -- my memory is not one -- I couldn't answer that.

18   Q.  Okay.  You don't remember what she was doing

19  at that time?

20   A.  No.

21   Q.  Well, let's take a look at the evaluation

22  that you signed off on at page 2.

23   A.  Okay.

24   Q.  Would you have participated in filling those

25  out?

NANCE - DIRECT                    559

1        A.  Yes.

2        Q.  And at that time, this evaluation, she

3    apparently was, according to her supervisor,

4    meeting -- meeting expectations; right?

5        A.  Correct.

6        Q.  Do you recall anything about that period of

7    time that would suggest otherwise?

8        And I'm talking about drawing on your memory of

9    the work performance beginning in the very start of

10   the time you started supervising her which would

11   have been when she was in the Administration Group?

12       A.  Well, there were issues when she was in

13   Administration also of performance problems where

14   there were things not getting done.  And some along

15   those lines.

16       Q.  Okay.  You've got to keep talking into the

17   microphone.

18       A.  Sorry.

19       Q.  That's all right.

20       The fact that there may have been some

21   problems -- well, did the fact that there may have

22   been some performance problems dissuade you from

23   indicating that she was meeting expectations shortly

24   after she started working there?  Within a year that

25   she started working there?

NANCE - DIRECT                          560

1        A.  I'm not sure I understand.

2        Q.  Well, you have met expectations here, and

3    then you said she had some performance problems.  So

4    how do you square those?

5        A.  They probably weren't significant enough to

6    have been brought to the attention in an evaluation.

7        Q.  Okay.  At some point during the time she was

8    working for Administration, did performance issues

9    become more problematic?

10       A.  Yes.

11       Q.  Could you tell the jury how that happened?

12   Or your observations during that period of time?

13       A.  Well, there was more -- more feedback was

14   coming in, I guess, from staff and from other people

15   that were working with her.

16       Q.  Just staff?

17       A.  Staff and the other people who were working

18   with her.  In other words, the people who were

19   requesting the work to be done.

20       Q.  Would that be the customers?

21       A.  Yes.

22       Q.  Okay.  And what was the nature of that

23   feedback?

24       A.  That it wasn't being done in a timely manner

25   or wasn't being done -- you know, in a timely

NANCE - DIRECT                          561

1    manner.

2        Q.  Okay.  At some point, did you participate in

3    a decision to move Ms. Johnson to the Hardware Unit?

4        A.  I was not involved in that decision.

5        Q.  You were not?

6        A.  No.

7        Q.  Okay.  Once that was done, who was her

8    supervisor?

9        A.  I was.

10       Q.  Okay.  Once she became the group manager of

11   the Hardware Unit, did she do well?

12       A.  No.

13       Q.  When did issues -- or when did the problems

14   start popping up?

15       A.  Pretty quickly.

16       Q.  What was the nature of those problems?

17       A.  Boy.  Trouble keeping track of work to be

18   done.  Trouble assigning work.  Trouble keeping up

19   on things that needed to be done.  Trouble with

20   keeping things moving or working.

21       Q.  Okay.  What did you do about that?

22       A.  Well, I started documenting things and

23   started to write some objectives for her to try to

24   help her and to determine what things needed to be

25   done.  And how.

1      Q.  Did those objectives appear in her

2  performance evaluations?

3      A.  Yes.

4      Q.  Okay.  Ms. Johnson got more than an annual

5  evaluation; is that correct?

6      A.  Correct.

7      Q.  In fact, she was getting quarterly

8  evaluations?

9      A.  Correct.

10      Q.  And why was that?

11      A.  They're required by -- they're required by

12  personnel when more than two or three objectives are

13  not met.

14      Q.  So you did not require the quarterly

15  evaluations, CMS rules required them?

16      A.  Correct.

17      Q.  Okay.  There has been -- I'm not going to go

18  over ad nauseam everything that has been testified

19  to, but let's just talk about some of the broad

20  issues that she was required to address as a

21  hardware manager.

22      There's been an issue about monitoring Monday

23  morning Low Hard Drive Space Reports.  Did Ed Gordon

24  have to do this?

25      A.  He did.

NANCE - DIRECT                        563

1       Q.  Tell the jury what that is?

2       A.  Basically, it's keeping track of servers so

3   they do not run out of space so they crash, is

4   basically what it is.  It's a -- it's a --

5   eventually, I mean, a hard drive will fill up.  When

6   the hard drive fills up, the server crashes.  Server

7   crashes, people can't work.  So it's a task to keep

8   track.

9       Q.  Did Ed Gordon have to provide Monday morning

10  Low Hard Drive Space Reports?

11      A.  No, Ed did not have to provide reports.

12      Q.  Why not?

13      A.  Because Ed was keeping track of servers on

14  his own and was making sure they weren't running out

15  of space.

16      Q.  And so why did you have to -- well, tell the

17  jury why you imposed this requirement on

18  Ms. Johnson?

19      A.  Well, we continually started having servers

20  that were running out of space.  So in order to try

21  to help her to determine the lists that were there

22  and the servers that needed to be worked on, we

23  asked that she start compiling reports so she would

24  know which ones needed to be there to be dealt with.

25      Q.  Okay.  What is -- there's been some

NANCE - DIRECT                                564

1   testimony about what a decommission is.  It's

2   essentially bringing a server -- taking it offline;

3   is that correct?

4        A.  Correct.

5        Q.  Okay.  And you required her to provide a

6   weekly decommission list for servers at some point.

7   Did Ed Gordon have to do this?

8        A.  Ed did not have to provide a list; no.

9        Q.  Why not?

10       A.  Because Ed was keeping track on his own of

11  which ones needed to be decommissioned and was

12  getting them decommissioned in a timely manner.

13       Q.  Okay.  And you imposed this requirement on

14  Ms. Johnson for what reason?

15       A.  For the same reason as the other, to try to

16  help her, to show her a list of what things -- what

17  items there were and what items needed to be worked

18  on.

19       Q.  Did this requirement that she make weekly

20  lists to tell her what needs to be done help?

21       A.  No.

22       Q.  Okay.  Did her performance improve?

23       A.  No.

24       Q.  At some point, Mr. Nance, did you begin

25  taking daily notes of the issues with respect to her

1    performance?

2        A.  Yes, I did.

3        Q.  And why did you start doing that?  Or what

4    was the occasion for doing that?

5        A.  Well, I was asked to by my supervisor.

6        Q.  Who was that?

7        A.  Don Warren.

8        Q.  Do you know why he asked you to do that?

9        A.  My assumption is so we could keep track --

10   help keep track of the issues that we were having.

11       Q.  Okay.  Now, I am going to show you on the

12   screen Defendant's Exhibit 39.  And I'm going to ask

13   you if you recognize that first page?

14           MR. OKON:  This hasn't been admitted yet.

15       Q.  It shouldn't be shown yet.  Yeah, we will

16   lane a foundation for it.

17       Do you recognize what this is?

18       A.  Yes.

19       Q.  Now, I'm going to hand you the paper copy of

20   it.  And ask you if that's the set of notes that you

21   took?  And ask you to identify from what date to

22   what date you kept these notes?

23       A.  I started November 9th of 2009, and they end

24   on July 23rd of 2012.

25       Q.  November 9, 2009, was how long into her

1   tenure as the hardware manager?

2       A.  Probably approximately a year to year and a

3   half.

4       Q.  Okay.  And then the very -- the last date

5   here, July 2012, that's the day she was discharged;

6   right?

7       A.  I don't know the answer to that question.

8       Q.  Okay.  That's fine.  The record shows --

9   will show that.

10      I want to -- I want to -- I'm not gonna go

11  through -- Ms. Wang here was kind enough, at my

12  request, to count how many of these entries that you

13  made over the period of time from November '09 to

14  July 2012, and Ms. Wong counted 673 entries.

15      So it would be fair to say that you were fairly

16  assiduous about your -- the request by Mr. Warren

17  that you keep some documentation and keep track of

18  what's going on; right?

19      A.  That would be correct.

20      Q.  Okay.  Now, I'm going to ask you about a few

21  of them.  I think the room will be relieved to know

22  that we're not going to go through every single one

23  of them.

24      But I want to -- take a look at December 2nd,

25  '09.

NANCE - DIRECT                                    567

1          Oh, I need to admit it into evidence.

2          Your Honor, I'd like to admit these notes into

3     evidence so that the jury can follow along as we

4     talk about them.

5               MR. BAKER:  No objection.

6               THE COURT:  Very well, so admitted.  And

7     you may pop it on the screen.  All right.

8          (Defendant's Exhibit 39 admitted.)

9          Q.  Now, on December the 2nd of '09, there was a

10    comment about -- what was the issue on that date?

11         A.  Well, there were two issues that date.  Are

12    we talking the second one or the first one?

13         Q.  Oh, well, both of them for that matter.

14         A.  Well, the first one, apparently, I asked for

15    a training plan for her staff that was due on the

16    1st and I hadn't received that, so I sent her an

17    email concerning that, telling her.

18         And then in the second one, I had sent her an

19    email telling her that she had missed whatever the

20    Wednesday objective was.  And then I had a

21    discussion with her where she said that she had --

22    she needs 21 days.  She said it a couple of times.

23    When I asked what that meant, she said it was a

24    psychological thing, and after doing something for

25    21 days, she would get it right.

NANCE - DIRECT                          568

1          She also told me she had several degrees.  I

2    have caught her multiple times telling me one thing,

3    and when I questioned her on it, she suddenly

4    changes her story to tell me something different.

5          Q.  Where did that come from?  I mean, tell the

6    jury the context of that?

7          A.  To be honest, I don't think I could.

8          Q.  Well, you made an observation about asking

9    her to do something in 21 days and her response was

10   she needed a couple of 21 days to get it right?

11         A.  That is correct.

12         Q.  Okay.

13         A.  That's what I noted.

14         Q.  All right.  Well, let's take a look at

15   February the 1st, 2010.  Did a lot of your

16   observations look like this?

17         A.  Yes.

18         Q.  Okay.  And tell the jury what this is

19   supposed to document?

20         A.  Basically, it's -- what it is, it's -- I'm

21   sending an email to her showing her the outstanding

22   tickets that she has that have not either been

23   worked on or are waiting to be worked on or need to

24   be worked on or that.  But basically, the backlog of

25   work that she has at this time.

NANCE - DIRECT                          569

1          Q.  Okay.  Now, there's another note -- notation

2     for February 1st, 2010.  If you need an opportunity

3     to read that, go ahead, because it's kind of

4     lengthy.  And I'll ask you some questions about it.

5               MR. BAKER:  What was the date again?

6          Q.  February 1st, 2010.

7           Did you finish that?

8          A.  Yes.

9          Q.  Okay.  It looks as if you actually met with

10    Cheryl to discuss her quarterly evaluation; which is

11    a notation that you made; right?

12         A.  Correct.

13         Q.  And her response was what?

14         A.  Her response was that she believes she's

15    working towards her goals.

16         Q.  And you gave her -- according to this

17    notation, you gave her a copy of her evaluation.

18    And what was her response?

19         A.  That she stated that she wasn't looking

20    closely at her objectives in her eval, which is why

21    she did not meet any of them.

22         Q.  Okay.  The next -- or the second to the next

23    sentence says, (as read:)  I talked to Cheryl to try

24    and explain that of the objectives, this one is

25    probably the least critical.

1        Was that an effort to talk to Cheryl and

2   counsel her on assigning priorities to what she

3   needed to be doing?

4        A.  It was.  And it's in reference to the

5   sentence above to where she stated that her goal is

6   to get a met on a Wednesday objective for

7   decommissions at least once.  And I was trying to

8   explain to her that of all the objectives that there

9   was, that that one was probably the one that was the

10  least critical of the things that she had to be done

11  to try to concentrate on.

12       Q.  Okay.  And then the rest of it, apparently,

13  was a discussion of some other issues.  And you gave

14  her a list.  That last sentence, (as read:)  I also

15  provided Cheryl with two additional lists of

16  misplaced or mislabeled equipment.

17       Do you remember what was going on there?

18       A.  We were actually in the middle of an

19  inventory at that time.  And there was equipment

20  that couldn't be found.  The auditors had provided

21  us a list of equipment that couldn't be found.  So

22  it was -- in turn, I gave that to her in order to

23  try to find the equipment that was missing.

24       Q.  Okay.  Let's go to February 8th, 2010.  And

25  not the first one, but the second one.

1              Well, let's stop on the first one for -- this,

2      again, was an email you sent to her about some

3      objectives not met on tickets; right?

4              A.  Correct.

5              Q.  And what about the second one?

6              A.  The second one is where I had -- I had

7      created a -- or I had created or I had given her a

8      help desk ticket on January 22nd to find six

9      servers.  And she had stated that she couldn't find

10     the six servers.  And in turn, I went to the third

11     floor of the Data Center and I found five of the six

12     of them before lunch.  And after a little bit of

13     investigation on the remaining item, I found that

14     one also around 2:00 that same day.

15             Q.  Okay.  Let's go to March 31st, 2010.  Looks

16     like there are several entries there.  Starting with

17     the first one, was this the same issue?

18             A.  Yes.

19             Q.  And would you tell the jury what was going

20     on there?

21             A.  Basically, inventory, as it's done, is

22     tracked via sheets, AMAF sheets --

23             Q.  What are AMAF sheets?

24             A.  I knew you was probably going to ask me what

25     that stood for.

NANCE - DIRECT                          572

1          Q.  What is it suppose it track?

2          A.  Tracks the specific hardware that we're

3    moving from location to location.  So it would have

4    the serial number, the state tag ID, and a

5    description of the device.  And location of where it

6    was coming from and where it was going to.  So

7    basically, it was a tracking document for a piece of

8    hardware is what it was.

9          Q.  Okay.  And on March the 30th, 2010, there's

10   still inventory issues; correct?

11         A.  Correct.

12         Q.  Or the 31st, I'm sorry.

13         And the final one there is, (as read:)  More

14   inventory is continuing to be found.

15         What was going on there, do you know?

16         A.  Well, additional staff had started looking

17   for devices so that we could try to determine where

18   the equipment that we couldn't find was located.

19         Q.  Okay.  Let's move ahead to April 29th, 2010.

20         Now, I have to tell you, Mr. Nance, I took a

21   look at these, and -- so you started doing this in

22   December of 09.  So by April of 2010, this

23   observation, (as read:)  While I do not normally

24   document this, today is unbearable.

25         This was an observation on some office attire

1    and hygiene.  Before we start talking about it, out

2    of the 673 items that you noted over this several

3    year period, was there any other observation in this

4    packet about office attire and hygiene?

5         A.  No.

6         Q.  Well, it kind of pops up here, so could you

7    tell the jury why you documented the observation --

8    well, observations about hygiene and attire on that

9    date?

10        A.  Well, I had had several complaints that day

11   and -- from other staff.  And when I met with Cheryl

12   about something, I don't even know what it was we

13   were meeting about that day, but I noticed that

14   myself.  So in turn, I documented what I noted and I

15   took it to my supervisor to let them know.

16        Q.  Okay.  And who was that?

17        A.  Would be Don Warren.

18        Q.  So you had a discussion about her -- this

19   thing does not work.  There we go.  Her office

20   attire and hygiene that day; right?

21        A.  That would be correct.

22        Q.  Were other -- did you ever notice this with

23   any other people you supervised?

24        A.  No.

25        Q.  Okay.  In your experience no.  All right.

1          Did you talk to her about it?

2          A.  No.

3          Q.  Why not?

4          A.  It's not my -- that's not my job to -- I

5     don't -- I'm union.  I was union, she was union.  So

6     it wasn't up to me to be getting involved in any

7     disciplinary actions.  Or any type of actions like

8     that.

9          Q.  Okay.  As a supervisor, however, do you

10    think it's important that you sort of monitor the

11    people -- the office attire and hygiene of the

12    people you supervise?

13         A.  Yes.

14         Q.  Okay.  And you had been asked by Mr. Warren

15    to document work performance, and you decided to put

16    this in there as part of that package?

17         A.  Correct.

18         Q.  Okay.  Was she ever disciplined for hygiene

19    or office attire?

20         A.  Not to my knowledge, but I didn't do

21    discipline.

22         Q.  Okay.  And you did not make this an issue in

23    any of your evaluations that you signed; is that --

24    would that be fair to say?

25         A.  That would be correct.

1          Q.  Would it be fair to say that you were more
2     concerned about her performance in doing her job?
3          A.  That would be correct.
4          Q.  Okay.  Did you, by this note, mean to make
5     anything -- well, you didn't share this note with
6     anyone, did you?
7          A.  No.
8          Q.  In fact, no one -- you shared this first
9     with me when this lawsuit arose; right?
10         A.  That would be correct.
11         Q.  Because you told me you had these notes, and
12    I asked you to give them to me; right?
13         A.  Correct.
14         Q.  So this was not published to anyone;
15    correct?
16         A.  Correct.
17         Q.  And it was only discussed with your direct
18    supervisor; correct?
19         A.  Correct.
20         Q.  And it doesn't appear anywhere else in any
21    of these observations?
22         A.  Correct.
23         Q.  And you just went on?
24         A.  Correct.
25         Q.  All right.  Let's go to June 14th, 2010.

1    There's a couple of June 14th, 2010s there.

2        Looks like you sent another email about updates

3    on some HD, is that --

4        A.  Help desk.

5        Q.  Help desk and change tickets.  And how did

6    you know these were behind?

7        A.  I physically went into the Remedy system and

8    looked.

9        Q.  Because you were -- that was -- you were

10   told to keep track of her --

11       A.  Correct.

12       Q.  Yeah.  So you went in and looked at what was

13   pending?

14       A.  Correct.

15       Q.  Compared to what should have been done, and

16   then noted it?

17       A.  Correct.

18       Q.  Which is exactly what Mr. Warren had asked

19   you to do?

20       A.  That is correct.

21       Q.  All right.  Look at the next note, 6/14/10.

22   (As read)  Email received from Cheryl concerning

23   DOT -- is that computer-assisted design?

24       A.  Yes, computer-assisted design and drafting.

25       Q.  Talk to the microphone?

NANCE - DIRECT                                    577

 1          A.   Computer-assisted design and drafting.

 2          Q.   All right.  What happened there?  What was

 3     your observation?

 4          A.   Cheryl -- it appears she missed doing some

 5     of the paperwork for the servers to be completely --

 6     to be built.

 7          Q.   That microphone will move if it will make

 8     you more comfortable.

 9          A.   But I keep having to go back and forth.

10          Q.   Well, you're trying to read and talk at the

11     same time, so I was trying to help you out.

12          A.   Thank you.

13          Q.   Okay.  So explain to the jury what's going

14     on here?

15          A.   Well, we had gotten a request from one of

16     the agencies, Department of Transportation, to build

17     some servers.  And the servers were -- according to

18     that note, the servers were due on the 15th of June.

19     And here it is the 14th and none of the paperwork

20     had been done yet to ensure that the IP addresses,

21     which are the numbers that the computers use to talk

22     to each other, have been gotten.

23          Q.   Okay.  So the next item is you asked her

24     what was up.  And what happened there?

25          A.   I was told by one of her staff that some of

1   the hardware was missing.

2       Q.  And what happened after that?  What did she

3   say?

4       A.  That's an email to her at 2:52.  She still

5   had not told me of the missing equipment yet.  And

6   then finally her response to me was yes, one of the

7   cards was missing.  I then asked her what the plan

8   was, and she answered that, "We need to come up with

9   a plan."

10      Q.  What was your response -- I mean what did

11  you think when she said that?

12      A.  I mean -- what do you think?  It's like, you

13  know -- I'm it's -- I'm sorry, I keep moving away

14  from the --

15      I mean your first thought is how am I going to

16  explain to the agency that the work they requested

17  to be done by that date isn't going to be done,

18  right?  I mean that's my first responsibility is to

19  them.

20      Q.  Okay.  Do you remember whatever happened

21  with that?

22      A.  No.

23      Q.  Okay.  Up here with all these tickets, let

24  me ask you something about that.  Were these tickets

25  that she was required to do all the work on herself?

1     A.  No.

2     Q.  How did -- tell the jury what your

3  expectation was with respect to her administration

4  of those open tickets?

5     A.  I might expect -- my expectation was for her

6  to manage those tickets in order to get them

7  completed by the assigned dates that they were due.

8     Q.  Okay.  Let's take a look at -- jump to

9  August 30, 2010.  On -- it looks like on 8/23, she

10  had asked you to take a class on 8/24.  And there's

11  been some testimony here about how Cheryl had asked

12  you if she could take certain classes.

13     So this note indicates that about a week

14  before, she'd asked to take a class on 8/24.  And

15  what was your response to that?  Tell the jury what

16  you did according to your notation here?

17     A.  Well, I immediately went to my supervisor

18  with the request.  Since it was such short notice

19  that, you know, I went to him for guidance.

20     Q.  Okay.  And what happened?

21     A.  He denied it.

22     Q.  Okay.  And then you just documented that.

23  (As read:)  This morning, 8:30, Don Warren signed

24  and denied the class request?

25     A.  Yes.

1    Q.  Okay.  Did you -- did you yourself have the

2  ability to deny or prevent her from taking the

3  classes?

4    A.  I -- excuse me.  I -- there -- I did.  I was

5  first-level supervisor --

6    Q.  Okay.

7    A.  There were four level of supervisors that

8  signed off on a training request.  So any one of the

9  four could have denied or overridden and approved

10  the class.

11    Q.  All right.  So if you denied it, Don Warren

12  could have overridden that?

13    A.  Absolutely.

14    Q.  She could have taken it to Mr. Warren?

15    A.  Absolutely.

16    Q.  Did she know that?

17    A.  I would assume.

18    Q.  Okay.  Do you remember if she ever said,

19  "Now, Rob, I need to take some specific classes on

20  hardware."  Did she ever talk to you about that?

21    A.  I -- I'm I know she did at times bring

22  classes to the attention of us; yes.

23    Q.  Okay.  Just so you know, her training record

24  is in the record, and I'm not gonna ask you to

25  comment on that, but I just want to let -- I just

NANCE - DIRECT                          581

1    wanted you to tell the jury about what your role was

2    in her attending classes.

3         A.  Well, in her evaluation every year, I always

4    went through and set some class goals for her to try

5    to help her in areas that I thought would help her

6    in her job.

7         Q.  Okay.  Let's skip up to October 12, 2010.

8    Once you take a look at that, would you tell the

9    jury what was going on there?

10        A.  Yeah.  I was approached by Nick, and Nick is

11   one of the union stewards at the Union Center.  And

12   he approached me and said Cheryl wanted to have a

13   meeting and have Nick there.  And I asked Nick what

14   for.  And Nick said that Cheryl wanted to discuss

15   having one thing she can focus on for the week.

16        We talked about a few things, tickets, hard

17   drive space issues, upgrades.  And after some

18   discussion, that Cheryl couldn't not just focus on

19   one thing and let everyone -- and let everything

20   else lapse.  It was determined that the hard drive

21   space issue was a focus.

22        Q.  Well, what does that mean, Cheryl cannot

23   just -- let me ask you this:  Did the -- did the

24   managers of these groups, for lack of a better word,

25   have to multi-task?

1        A.  Absolutely.

2        Q.  Okay.  And tell the jury, in the context of

3    what their responsibilities were and what you

4    expected of them, that meant?

5        A.  Well, I mean you have to juggle many things

6    at once.  I mean it wasn't just you could

7    concentrate on maybe one area.  You could have, in

8    one case, in that case, there could be a server that

9    needed to be built, there could be a server that was

10   low on hard drive space, there could be -- I mean

11   there could be multiple things happening at one

12   time.  It was a very dynamic environment.

13       Q.  And all of the group managers were required

14   to do that?

15       A.  Absolutely.

16       Q.  Okay.  The upshot of the encounter with Nick

17   on October 12, 2010, was what?  I mean all you say

18   is hard drive space was a focus.  What happened?

19       A.  Well, I think Nick probably went back to her

20   at that point to --

21            MR. BAKER:  I'm going to object.  I think

22   the witness is speculating.

23            THE COURT:  Say that again?  I didn't hear

24   what you said, Mr. Baker.

25            MR. BACKER:  I think the way the witness

1  was answering the question, he was speculating on

2  what occurred.  I don't think that's his direct

3  knowledge.

4              THE COURT:  Okay.  Let's nail it down.

5       Q.  Just -- don't guess what Nick did, just tell

6  the jury what happened after this?

7       A.  I mean it appears that Cheryl was told that

8  she can't just focus on one thing and let everything

9  else lapse.  It was determined the hard drive space

10  issue was a focus.  I --

11       Q.  Okay.  Was she ever able to manage the hard

12  drive space issues?

13       A.  No.

14       Q.  Okay.  Let's look at November 18, 2010.  If

15  you need some time -- wait a minute.  There's two

16  rather lengthy notes here.

17       Oh, this is a day when a lot was going on.

18  Could you take a look at -- there are three entries

19  on 11/18/2010, if you need some time to take a look

20  at those.  And would it -- would you read faster if

21  I give you the paper?

22       A.  No.

23       Q.  Okay.  I just want you to read those and

24  then tell the jury what was going on on that day?

25       A.  Are we starting 11/18/10 on the 17th?

NANCE - DIRECT                           584

1        Q.  Yeah.

2        A.  Okay.  Basically, on the 17th, I'd asked

3   Cheryl for an update on some new servers that were

4   asked to be built.  And they were asked to be built

5   by 11/4.  Refer above to that incident, so there

6   must be some information above on that.

7        And then on 11/4, she stated that she would

8   like to do the build sheets for the servers.  I

9   received the form on the 18th that stated, "Rod, I

10  did put in server orders on the 3rd November, and

11  some of the server I found were delivered on the

12  9th.  I planned to work on these last week, but was

13  not able to be here for two days.  I've been

14  catching up.  And Tuesday I was completely without a

15  computer the entire day because of Windows 7

16  install.

17       And then Mark Jarvis, who is one of her staff,

18  would not work on these even though he had talked to

19  Mark Anderson, who was the guy who had requested

20  these, on the 3rd of November.  Mark Jarvis was here

21  last week when the servers were delivered, but would

22  not work on them because he did not have

23  step-by-step details on a form.

24       Q.  Was Mark Jarvis a problem employee or

25  something?

1          A.  I never had any issues with Mark Jarvis.

2          Q.  Okay.  At any rate, the rest of this note is

3     you completed the server build form and gave her

4     some instructions and emailed it to her; right?

5          A.  That's correct.  I went ahead and completed

6     the form for her and told her she could copy the

7     form that I did to make the forms for the other five

8     servers that needed to be built.

9          Q.  Okay.  The next notation, she came -- you

10    noted that she had come into your office.  Could you

11    explain to the jury what was going on there?

12         A.  Well, she was rather upset that day with her

13    staff.  And then she -- she had stated to me that

14    she needed to go after her guys, as she put it.  And

15    I talked to her for a while about that, trying to

16    explain to her that she needed to document issues

17    that she's having, bring me the documentation, and

18    then I could review it and it would be sent on.

19         I asked her if she had documented anything; she

20    said no.  I then asked her what was going on, and

21    she said that Mark Jarvis is refusing to do work.

22    When I asked her what happened, she said that she

23    asked Mark to fill out a server build sheet and he

24    told her no.  I asked her did he specifically tell

25    you no.  She replied that, well, no, he didn't say

1    that.  He then stated that he said it's not my job

2    to do it, it was my job to do it.

3        Asked Cheryl if she had created a task with

4    that request in it and assigned it to Mark.  Cheryl

5    stated no.  I told her to create the request and

6    assign it to Mark; let's see what he does with the

7    task.

8        Q.  So you were trying to help her there manage

9    her employee?

10       A.  Absolutely.  He was supposedly refusing to

11   do some work, so I told her to create a task, assign

12   it to him, and tell him to do so.

13       Q.  Okay.

14       A.  And let's see what he does.  If he refuses

15   at that point, we have some documentation.

16       Q.  All right.  Keep going.  What happened?

17       A.  Let's see.  She also asked about

18   something -- about doing something to Tad, who was

19   another person who worked for her, in relationship

20   to the issue on the 17th where another staff person

21   asked her where the server that she requested was

22   and it was assigned to Tad, but Tad had not worked

23   on it.  Yet.

24       I asked her if she had documented it.  She said

25   no.  I talked to Cheryl concerning her getting her

NANCE - DIRECT                              587

1    staff's evaluations completed and up-to-date so that

2    she could write some of these issues she's having in

3    their evaluations as objectives.  Also told her that

4    she should use her evaluation as a basis to write

5    their evaluation objectives.  I told her I would go

6    over the objectives after she had them completed in

7    order to help her get them worded correctly.

8         Q.  Okay.  So you were telling her to document

9    the shortcomings of her employees; correct?

10        A.  Correct.

11        Q.  Just as you were told to document the -- the

12   work performance of Ms. Johnson by your supervisor?

13        A.  Correct.

14        Q.  And did she do that?

15        A.  No.

16        Q.  All right.

17        Let's look at December 9, 2010.  What was going

18   on there?

19        A.  What are we talking about?  10/28?

20        Q.  Yeah, that one.  That one.

21        A.  Okay.  On every two or three years, I can't

22   remember, the -- DOS supervisor would require us to

23   create a five-year plan for the group.

24        So each one of the areas was responsible for

25   coming up with a plan of their vision of the next

1    five years for their areas.  So I had asked all of

2    my managers for input and updates to what their

3    vision was for their sections of the roadmap so I

4    could incorporate it into what mine were and then

5    present an overall plan.

6          Q.  Okay.  And what happened?

7          A.  Well, I'd given them a due date of

8    November 3rd for updates to the doc that we had, and

9    a timeline by November 5th.  And on December

10   the 6th, Cheryl asked me if she was gonna turn in

11   anything on her portion of the road map.  I told her

12   I needed it by the 8th.  I also assigned a calendar

13   event for Cheryl and myself for Wednesday at

14   eight -- Wednesday the 8th at 1:00.

15         Q.  So you put a reminder on her calendar

16   yourself.  Apparently, it was on her calendar?

17         A.  Yes, I did.

18         Q.  Okay.

19         A.  So then on the 9th, which is this day,

20   Cheryl came into my office and said that she didn't

21   have anything on the roadmap.  When I asked why, she

22   told me she forgot.

23         Q.  Even though you put it on her Outlook?

24         A.  Yes.

25         Q.  All right.

NANCE - DIRECT                        589

1        A.  Yes.

2        Q.  Take a look at May 9, 2011.  So we're

3   jumping ahead a little bit.

4        Would you tell the jury what was going on on

5   that day?  Looks like there's a couple of entries.

6        A.  Well, it looks like at the beginning of it,

7   she had -- Cheryl had closed some tickets that

8   should not have been closed.  We discussed closing

9   some of her old tickets, and I told her previously

10  that I would consider closing them if she could

11  produce some paperwork that went with the tickets so

12  at least I could tell that some of the work had been

13  done on them.  No paperwork was given to me, and

14  Cheryl closed the tickets anyway.  I've asked for

15  the supporting paperwork and have not gotten it yet.

16       Q.  So the -- the paperwork that went for the

17  tickets would reflect that the work had been done;

18  right?

19       A.  Correct.

20       Q.  But she closed the ticket anyway?

21       A.  Correct.  While I was gone.

22       Q.  What about the next entry?  There was an

23  email about meeting an objective to maintain -- or

24  manage and maintain an effective stock of hardware?

25       A.  Yeah.  That -- what we tried to do was, in

1    order to minimize some of the costs associated with

2    serve breakdowns and things like that, is we would

3    cannibalize some of the old hardware that would come

4    in and keep parts of it that were viable to

5    equipment that we already had out in the field.

6         So we would keep track of that equipment so we

7    knew what we had in inventory to help save money

8    basically is what we were doing.

9         Q.  Okay.

10        A.  And it looks like that the information that

11   she turned in that day for that equipment that we

12   supposedly had was incorrect.  And it's just spare

13   number 4, which I don't know -- I would assume that

14   meant in spare cabinet number 4, but I --

15        Q.  Okay.  At any rate, you had incorrect

16   paperwork, but we're not gonna run down and check

17   that?

18        A.  Correct.

19        Q.  All right.  Our final -- let's talk about

20   one last one.  October 28th, 2011.

21        First thing I note is that you say auditors are

22   in-house.

23             THE COURT:  That's October 28th?

24        Q.  Yes.  10/28/11, Your Honor.

25             THE COURT:  Thank you.

NANCE - DIRECT                          591

1          Q.  Auditors are in-house.  Does that perk up

2     the ears of every supervisor?

3          A.  Absolutely.

4          Q.  Tell the jury what was going on that day?

5          A.  They were --

6          Q.  Well, tell them what the significance of

7     auditors is?

8          A.  Well, I mean auditors --

9          Q.  What do they do?

10         A.  How do you explain an auditor?  I mean, they

11    compare physically what you have to what you say you

12    have.  And if there are any discrepancies between

13    the two things, they write bad reports about you, is

14    basically what an auditor does.

15         Q.  Well, an auditor makes sure that you're

16    keeping track of your inventory; right?

17         A.  Correct.

18         Q.  So that state employees aren't walking out

19    the back door with all of it; right?

20         A.  That's correct.

21         Q.  And that's why it's so important?

22         A.  Correct.

23         Q.  Okay.  What was going on that day with

24    respect to that?

25         A.  Well, we had 277 discrepancies.  That

1    devices that showed that they were in-house or at

2    the Data Center, but they were not there, is

3    basically what that's saying.  So we had 277 devices

4    that weren't found.

5             THE COURT:  Now, what are devices?

6        A.  A device could be any -- many things.  It

7    could be a big tape drive, it could be a server, it

8    could be a monitor.  It could be anything along

9    those lines.

10             THE COURT:  Parts of equipment?

11        A.  Parts of equipment; yes.  Parts of server

12    equipment; yes.

13             THE COURT:  Thank you.

14        A.  You're welcome.

15        Q.  Was this all part of hardware?

16        A.  Yes.

17        Q.  What happened after this?  Do you remember?

18    I realize this is seven years ago.

19        A.  No, I don't really recall.

20        I mean, eventually, we would find parts and

21    pieces over time.  I mean eventually, we would track

22    stuff down and find it there.  But I know there is

23    some stuff that's never been found.  At least when I

24    left.

25        Q.  Okay.  I'm not suggesting at all that

1    Ms. Johnson is walking out the back door with

2    equipment.  My point here is is that when the

3    auditors come in and they can't track 277 people --

4    or 277 devices, how does that reflect on how CMS is

5    managing its hardware?

6         A.  Not very well.

7         Q.  Okay.  We can take the rest of that down

8    now.  Let's move to a different topic.

9         There's been some testimony that Ms. Johnson

10   had all kinds of different duties added to her that

11   Ed didn't have to do.  And I want you to kind of

12   tell the jury about that -- about that.

13        The process of changing over to a centralized

14   location for all of the state's computers was --

15   would it be fair to say sort of a dynamic process?

16        A.  Absolutely.

17        Q.  So when Ed had Hardware, was it like he was

18   doing -- would he be like a robot, doing exactly the

19   same thing every day.  And then when Cheryl

20   inherited it, it would have been robotic; she had to

21   do exactly the same thing every day?

22        A.  No.

23        Q.  Okay.  Would you explain to the jury how the

24   dynamic environment changed in the requirements of

25   hardware as you all worked to bring computer -- the

```
 1    computer system into a central location for the

 2    state?

 3         And what I'm talking about is explain why

 4    additional or different duties would have been in

 5    or -- her evaluations, or required of her, that may

 6    not have been -- that Ed may not have been doing?

 7         A.  First of all, a lot of the same duties would

 8    have still been required --

 9         Q.  Okay.  I understand that.

10         A.  I mean it's monitoring servers for being up,

11    down, hard drive space, those kind of things would

12    always have been there.  And still are to this day,

13    I would hope, you know.

14         But as the environment was -- it was growing.

15    I mean is basically the best way to put it.  I mean

16    we started out by -- with DHS, I believe, was the

17    first agency that we pulled in.  And then we went to

18    DCEO and then -- I'm sorry about the --

19         Q.  DCEO means Department of Commerce and

20    Economic Opportunity?

21         A.  Economic Opportunity, yes.  And then I

22    forget after DCEO.  But anyway, we targeted certain

23    agencies as we went along to incorporate their

24    computer equipment and their people at the same

25    time.  So as we took their computer equipment, we
```

NANCE - DIRECT                                    595

1    also took their people and brought them into the

2    Data Center.

3              THE COURT:  And brought them what?

4        A.  Into the Data Center.

5              THE COURT:  Thank you.

6        A.  You're welcome.

7        Q.  I want to establish who else you supervised

8    at this time besides Ms. Johnson.  Who was Leslie

9    Domgowski?

10       A.  She was in charge of the Administrative

11   Group.

12       Q.  And Randy Anderson?

13       A.  He was in charge of the Systems Software

14   Group.

15       Q.  Okay.  And then there was Ed Gordon?

16       A.  He was in charge of the Application Group.

17       Q.  So there was Ms. Johnson, Domgowski,

18   Anderson, Gordon --

19       A.  Planning.

20       Q.  And who did that?

21       A.  I did.

22       Q.  Okay.  And why is it that you did those

23   groups and you also had to supervise all these

24   people?

25       A.  Ask that guy.

1          Q.  Ask Don?

2          A.  Yes.

3          Q.  Okay.  That was -- he just told you what to

4    do and you did it?

5          A.  Absolutely.

6          Q.  Okay.

7          A.  Blindly.

8          Q.  Who ran the Hardware Group after Ms. Johnson

9    was discharged?

10         A.  A short time after there, we did interviews,

11   and we hired Ms. Vicki Johnson -- or Vicki Spencer.

12   I'm sorry.

13         Q.  And who decided to hire her?  Was that your

14   decision or somebody else's?

15         A.  No.  We did -- we did a Rutan interview

16   process.  Which I did sit in on.

17         Q.  Let me go back for a minute.  Leslie

18   Domgowski; was that a woman?

19         A.  Yes.

20         Q.  Okay.  So you supervised two women and two

21   men?

22         A.  Yes.

23         Q.  Okay.  And was Ms. Domgowski a Caucasian or

24   African-American, person of color?

25         A.  She was Caucasian.

1        Q.  Okay.  Now, let's go to Ms. Spencer.  When

2   Ms. Spencer took over the Hardware Group, you were

3   still supervising her; correct?

4        A.  Correct.

5        Q.  How did she do?

6        A.  Excellent.

7        Q.  Who evaluated her?

8        A.  I believe I did initially.

9        Q.  Okay.  How did her performance compare to

10  Ms. Johnson's?

11       A.  There was no real comparison.

12       Q.  Well, explain that to the jury, please?

13       A.  Well, Vicki, in a very short time, had

14  cleaned up a lot of the issues that we had in the

15  Hardware Group.  A lot of the open tickets that were

16  there were now closed.  Inventory that had been lost

17  had been found.  I mean it was a one hundred percent

18  turn around.

19       Q.  Okay.  May I have a moment with my

20  co-counsel, Your Honor?

21            THE COURT:  You may.

22            MS. BARNES:  Thank you, Mr. Nance.

23            THE COURT:  You may cross.

24            MR. BAKER:  Thank you, Your Honor.

25

1                    CROSS EXAMINATION

2    BY MR. BAKER:

3         Q.  Good afternoon, Mr. Nance.

4         A.  Good afternoon.

5         Q.  We've not met before.  My name is Jim Baker.

6    I just have a few questions to ask you.

7         As I understand it, when Cheryl first joined

8    CMS, you did not directly supervise her; am I

9    correct in that respect?

10        A.  Yes.

11        Q.  And what was it that brought about the

12   change so you did supervise her?

13        A.  It was not a decision that I made.  Don

14   Warren and -- it's my understanding Don Warren and

15   Kevin Rademacher decided to move her into the

16   Hardware Group.

17        Q.  Okay.  So you began supervising her when she

18   went into the Hardware Group?

19        A.  Correct.

20        Q.  Okay.  While she was in the -- is it the

21   Administration Group?  Do I have that correct?  You

22   did not supervise her?

23        A.  No.

24        Q.  Okay.  So if you go to Plaintiff Exhibit 2,

25   that's a performance evaluation for Cheryl; am I

 1    correct?

 2         A.  Yes.

 3         Q.  And it covers a period of time between

 4    November 2006 and November 2007.  Is that how you

 5    read it?

 6         A.  Yes.

 7         Q.  Assuming that it was May of 2008 when Cheryl

 8    went into the Hardware Unit, you would not have been

 9    able to offer any input into how well she was

10    performing her job during the period covered by

11    Plaintiff's Exhibit 2; would you?

12         A.  I don't know how to answer that question.

13    That -- that -- I mean Don would have discussed

14    things with me during -- at any time, so --

15         Q.  Sure.  Well, you were kind of, in a dotted

16    line sort of way, Cheryl's supervisor at that point

17    in time?

18         A.  Yes.

19         Q.  But actually, she worked under Mr. Warren?

20         A.  Yes.

21         Q.  So what you knew about how well she was

22    doing her job came from Mr. -- what Mr. Warren told

23    you?

24         A.  Yes.

25         Q.  And if she was rated as a satisfactory

 1    employee, that would have come from information

 2    Mr. Warren shared with you?

 3         A.  Yes.

 4         Q.  Okay.  Now, as I understand it -- well, let

 5    me ask you this, because you were involved in hiring

 6    Cheryl:  Are you familiar with the term Rutan

 7    interview?

 8         A.  Yes.

 9         Q.  That's a process that the state goes through

10    in interviewing candidates for positions; am I

11    correct?

12         A.  Yes.

13         Q.  And from time to time, you served on Rutan

14    interview panels?

15         A.  Yes.

16         Q.  Is the way the interview panel works, a

17    prepared set of questions is given to each candidate

18    and the candidates answer the questions, and then

19    they're scored on whose responses were the best?

20         A.  Yes.

21         Q.  And whoever got the highest score was

22    generally the person that was recommended for the

23    score?

24         A.  Yes.

25         Q.  Okay.  And so what you did, essentially, was

1    be a scorekeeper?  You were -- you were evaluating

2    Cheryl's responses to test -- to questions in

3    comparison with how others were answering those

4    questions?

5         A.  Correct.

6         Q.  Okay.

7              THE COURT:  Could I ask, are these written

8    or are they oral?

9              THE WITNESS:  Well, the questions --

10   they're -- they're -- they're a written set of

11   questions that we have.  We read the written

12   question and then we document, by hand, what the

13   answer is that the person gives.

14             THE COURT:  So the person responds orally

15   to you?

16             THE WITNESS:  Yes.

17             THE COURT:  Okay.  So you ask the question

18   in writing, it's in front of you in writing --

19             THE WITNESS:  Correct.  It's in front of

20   us, we read it --

21             THE COURT:  And they answer it?

22             THE WITNESS:  Then they answer it.

23             THE COURT:  Okay.  Thank you.

24             THE WITNESS:  Correct.

25             THE COURT:  Okay.

1    Q.  (BY MS. BAKER:)  So the first time you had

2    experience in supervising Cheryl is when she went

3    into the Hardware Unit?

4    A.  Yes.

5    Q.  And you did not participate in the decision

6    that she would go into the Hardware Unit?

7    A.  No.

8    Q.  No, you did not.

9    When Cheryl went into the Hardware Unit, how

10   was she oriented concerning what her job would

11   entail?

12   A.  I'm not quite sure what you're asking, but

13   she was set with Ed Gordon.  So Ed helped mentor her

14   into the environment that Ed had already set up and

15   running for her to move into.

16   Q.  All right.  So if I understand correctly,

17   whatever orientation she got, she received from Ed?

18   A.  Concerning the hardware; yes.

19   Q.  Okay.  You didn't offer any input in that?

20   A.  No.

21   Q.  Okay.  I'm not sure what exhibit number this

22   is?  Can you help me, counsel?

23        MS. BARNES:  Oh, that's Exhibit 39.

24   Q.  Thank you.  I want to you ask just a couple

25   of questions about Defendant Exhibit 39.

1        What I see periodically in this document, is a

2   comment you --

3             MS. BARNES:  Here, I'll give him my copy.

4        Q.  Could you go to the entry on February 8,

5   2010.

6        A.  Okay.

7        Q.  I see this type of entry frequently on this

8   exhibit, and it deals with Cheryl not meeting a

9   Monday objective.  See that?

10       A.  Yep.

11       Q.  And her Monday objective was to provide

12  what, an update on change and help desk tickets?

13       A.  Yeah.  It's on the very first page what the

14  objective is.

15       Q.  So she was to provide some sort of update

16  report on the status of all change and help desk

17  tickets that were assigned to the Hardware Group?

18       A.  Yes; that's correct.

19       Q.  Do you have any idea typically how many

20  tickets would, at any one time, be in that group?

21       A.  No.

22       Q.  No idea at all?

23       A.  No.

24       Q.  Can't even give an estimate?

25       A.  No.

1          Q.  Okay.  Would Cheryl be in a better position

2     to give an estimate as to number of tickets?

3          A.  Pardon me?

4          Q.  Would Cheryl be in a position where she

5     could have given a better estimate as to the number

6     of tickets?

7          A.  I can't answer.

8          Q.  This document, it looks like it's a running

9     diary you prepared?

10         A.  Correct.

11         Q.  Did you ever provide a copy to Cheryl?

12         A.  Pardon me?

13         Q.  Did you ever provide a copy to Cheryl?

14         A.  Yes.  She was provided copies at her pre-D,

15    I'm pretty sure.  I'm certain of it.

16         Q.  Okay.  So she was not proved a copy of this

17    until she was disciplined; is that what you're

18    saying?

19         A.  I was never involved if any discipline, so I

20    cannot answer that.

21         Q.  So you don't know whether she was provided a

22    copy at her pre-D or not?

23         A.  I believe she was, but I cannot answer --

24         Q.  All right.  You were not involved in the

25    pre-D process, so you don't know --

1        A.  I never --

2        (Parties speaking simultaneously; court

3        reporter requested clarification.)

4        Q.  Did you personally ever share any portion of

5   this document with Cheryl Johnson?

6        A.  I don't believe so.

7        Q.  Now, I could -- I could spend some time

8   going through the annual evaluations and each of the

9   quarterly evaluations that you did of Cheryl.

10  That's the bad news; I could.  The good news is I'm

11  going to spare you that.

12       What I am going to do is ask you about your

13  process in setting objectives for her.  Okay?

14       Can we agree that in each quarterly evaluation

15  and in each annual evaluation, there is a portion of

16  the evaluation devoted to setting performance

17  objectives for the employee during the next

18  evaluation period?

19       A.  The quarterly evaluation objectives would

20  never have changed from the yearly evaluation

21  objectives, I don't believe.  I think the objectives

22  were set at the beginning of the yearly process, and

23  then the quarterlies were just going over what those

24  were as they went to the next yearly.

25       Q.  Are you sure about that?

1        A.  No.

2        Q.  Okay.  And out of fairness to you, I'm not

3    asking you that question necessarily because the

4    evaluations are in evidence and the jury can look

5    and see what they are.  But my question is:  The

6    objectives that are in her evaluation, were you the

7    draftsman of those objectives?

8        A.  I worked with my supervisor, Don, to come up

9    with those.

10        Q.  Okay.  Who wrote them out?

11        A.  I wrote them.

12        Q.  Okay.  And then you submitted to him for his

13    approval?

14        A.  Yes.

15        Q.  Okay.  And can we agree that the objectives

16    are very explicit about what Cheryl was expected to

17    do, how she was expected to do it, and the time

18    limits she had to complete the objective?

19        A.  Over time they got that way; yes.

20        Q.  Okay.  There was no wiggle room in them, was

21    there?

22        A.  I don't know what you mean by -- well, I

23    mean she had certain things that were due on certain

24    dates; yes.

25        Q.  Quite a few things that she had to do that

NANCE - CROSS

 1    were due on certain dates?

 2         A.  But they weren't -- they weren't all at

 3    once, I guess is what I'm gonna say there, but

 4    things were --

 5         Q.  Okay.  I mean she had reports that she had

 6    to prepare weekly?

 7         A.  That's correct.

 8         Q.  And there was a specific date and time those

 9    reports were due?

10         A.  That's correct.

11         Q.  And it was very explicit what was to be

12    included in those reports?

13         A.  That was correct.

14         Q.  Okay.  And there were also assignments that

15    she had dealing with decommissioning and relocating

16    and consolidating servers; am I correct there?

17         A.  That's correct.

18         Q.  And the evaluation was very explicit

19    concerning specifically what she was to do, the time

20    period she had to do it, what detail was included,

21    and when the project should be completed?

22         A.  Correct.

23         Q.  Did you ever discuss those with Cheryl?

24         A.  Absolutely.

25         Q.  Are you sure about that?

1          A.  Yes.  If there was -- yes.  In the

2     evaluations, you sit down with the employee in the

3     evaluation, when you do the evaluation, and you go

4     through that evaluation step by step; yes.

5          Q.  Well, at the time the evaluation is handed

6     to the employee, it's a typed up document, is it

7     not?

8          A.  It is.

9          Q.  And that document sets forth what the

10    employee's expectations are for the next evaluating

11    period; am I correct there?

12         A.  That's correct.

13         Q.  And that's all typed up?  And that was typed

14    up by you?  And are you saying at the time you gave

15    her the evaluation, you discussed those objectives

16    with her?

17         A.  Absolutely.

18         Q.  Did you ever talk with her about the

19    objectives before you submitted the evaluation to

20    her?

21         A.  Absolutely.

22         Q.  Is there any evidence in this document of

23    you speaking with Cheryl about her -- discussing

24    with her objectives for the next evaluation period?

25         A.  I can't answer that without reading back

 1   through --

 2        Q.  Well, I'm not gonna ask you to do it.  But

 3   if you did discuss with her, have an exchange with

 4   her about what her objectives would be in the next

 5   evaluation period, if you had that discussion with

 6   her, it would be in this document; am I correct?

 7        A.  I would believe so; yes.

 8        Q.  Okay, fine.  I'm gonna spare you the process

 9   of going through this document.  We'll let the jury

10   do that.

11        There was an entry, and I believe it is on

12   December 9th, 2009.

13        I think I got my date wrong.  But do you recall

14   testifying about an entry where you discussed -- had

15   a discussion with Cheryl, and in that discussion,

16   there was some conversation about her educational

17   background?  Does that ring a bell with you?

18   Because you testified to it a few moments ago.  Do

19   you recall that?

20        A.  No.

21        Q.  Did you have doubts about what Cheryl's

22   educational background was?

23        A.  I didn't -- I mean I didn't doubt.  I had no

24   reason not to believe.

25        Q.  Assuming for a moment that there is a

NANCE - CROSS                           610

1   question mark behind what Cheryl told you about her

2   educational background, do you know why that

3   question mark was there?

4       A.  I don't follow.

5       Q.  Okay.

6           MS. BARNES:  Mr. Baker, December the 2nd,

7   '09.

8       Q.  Thank you.  I appreciate that.  Can you go

9   to the entry for December 2nd, 2009?

10          THE COURT:  And this is what exhibit now?

11      Q.  Exhibit -- Defendant's Exhibit 39.

12          THE COURT:  Now, the entry again?

13      Q.  I was letting the witness review it.  Have

14  you read that entry?

15      A.  Yes.

16      Q.  You see midway through that entry there is a

17  sentence you wrote --

18          THE COURT:  I still don't know which entry.

19      Q.  I'm sorry, Your Honor.

20          THE COURT:  Which entry?

21      Q.  December 2nd, 2009.

22          THE COURT:  I've got it.  Thank you.

23      Q.  Okay.  This entry apparently relates to a

24  conversation you had with Cheryl on December 2nd,

25  2009.  Am I correct so far?

1      A.  Yes.

2      Q.  And during that conversation was there some

3   discussion about what degrees Cheryl had earned?

4      A.  Only the statement where she said she also

5   told me she had several degrees.

6      Q.  Okay.  And then how did you punctuate that

7   sentence?

8      A.  There's a question mark after that.

9      Q.  And why did you put a question mark?

10     A.  In the context I can't answer.  I mean it

11  could have been a typo.

12     Q.  Well, read the next sentence.  Out loud?

13     A.  Okay.

14     Q.  Will you read that out loud for us, please?

15     A.  Oh, sure.  (As read:)  I've caught her

16  multiple times telling me one thing, and when I

17  questioned her on it, she suddenly changes her story

18  to tell me something different.

19     Q.  Were you questioning whether she had

20  degrees?

21     A.  I cannot answer that.

22     Q.  Can you tell me the context for putting that

23  sentence in?

24     A.  The last sentence?

25     Q.  Yes, sir.

1          A.  I was just documenting my thoughts as I was

2     going through the day.

3          Q.  Okay.  Well, I guess that begs the question,

4     but what were your thoughts related to that

5     sentence?

6          A.  She doesn't always tell me the same thing

7     twice.

8          Q.  Okay.  It looks like the December 2nd entry

9     is near the beginning of this document.  Do you

10    recall any other situations prior to December 2nd,

11    2009, where Cheryl was inconsistent in what she told

12    me?

13         A.  If they're not documented; no.

14         Q.  Okay.  You made a comment, I want to explore

15    this.

16         You said in response to I guess a narration by

17    Ms. Barnes, rather than a question, that the

18    environment was growing and you were pulling in more

19    servers.  And I think that talked about the time

20    period Cheryl Johnson was in the Hardware Group in

21    comparison to when Ed Gordon headed the Hardware

22    Group.  Am I correct in that respect?

23         A.  No.

24         Q.  What did you mean that the environment was

25    growing?

1         A.  It was growing from day one.  I mean it was

2    a continuous -- it was a continuous influx of staff

3    and equipment.

4         Q.  Okay.  So the staff was growing?

5         A.  Absolutely.

6         Q.  When Ed Gordon was in the Hardware Unit, how

7    large was his staff?

8         A.  Three to four.

9         Q.  If I told you it was four to five, would

10   that sound about right to you?

11        A.  It could be; yes.

12        Q.  When Cheryl was in the hardware unit, how

13   large was her staff?

14        A.  Three to four.

15        Q.  If I told you three, would that be right?

16        A.  There's at least four, to begin with.

17        Q.  When she started?

18        A.  At least.

19        Q.  And did it stay at four?

20        A.  No.

21        Q.  Did it go up?

22        A.  No.

23        Q.  Did it go down?

24        A.  It did.

25        Q.  To what?

1        A.  It went down by one.

2        Q.  Down to three.  So when Cheryl was in the

3   Hardware Unit, she was, most of the time, working

4   with fewer staff members than Ed Gordon?  Would you

5   agree with that?

6        A.  It could be; yes.

7        Q.  Okay.  And then you say there were more

8   servers as a part of this changing environment and

9   growing.  What do you mean there were more servers?

10       A.  We were continually consolidating agencies.

11       Q.  Okay.  So this requires a bit of

12   explanation.  When you say consolidating agencies,

13   it's my understanding in state government that at

14   one time, each of the agencies that was under the

15   Governor's office had its own IT department and its

16   own set of servers that were managed by its own IT

17   department.  Am I correct?

18       A.  Yes.

19       Q.  And at some point in time, someone got the

20   idea that it made sense to consolidate all those

21   agencies into one area where IT services would be

22   provided.  Am I correct there?

23       A.  Yes.

24       Q.  And the lucky agency that got the

25   responsibility for dealing with servers after the

NANCE - CROSS                           615

1    consolidation was CMS?

2        A.  That's correct.

3        Q.  So when was it that this consolidation

4    began?

5        A.  Approximately 2005 or 6.  I can't remember

6    exactly.

7        Q.  Okay.  All right.  So at about the time Ed

8    Gordon went into the Hardware Unit?

9        A.  I don't believe that to be correct.  I don't

10   remember the exact date when he started, but it

11   wasn't -- he was not there at first.

12       Q.  All right.  And over the time period between

13   2005 or 2006 and 2012, more agencies came into CMS

14   at least in terms of IT?  Am I correct?

15       A.  Probably -- it probably leveled out around

16   2008 or so.  Somewhere in that vicinity, it leveled

17   out.

18       Q.  Leveled out meaning?

19       A.  We completed the first phase.

20       Q.  So the first phase was just what?

21       A.  Twelve agencies under the Governor that was

22   required.

23       Q.  Okay.  So what was involved in the first

24   phase?

25       A.  Pardon me?

NANCE - CROSS                           616

1        Q.  What was involved in the first phase?

2        A.  Physically going to their Data Center,

3    physically picking up their equipment, and

4    physically bringing it to our Data Center.

5        Q.  Okay.  And what about equipment that

6    remained in the field?

7        A.  As far as?

8        Q.  Servers?

9        A.  There was some servers that remained in the

10   fields if they were at remote locations; yes.

11       Q.  Okay.  For example, an agency like the

12   Department of Children and Family Services, they had

13   a lot of field offices?

14       A.  We didn't support DCFS, nor do we now.

15       Q.  Okay.  What about the Department of Human

16   Services?

17       A.  They do.

18       Q.  They have a lot of field offices?

19       A.  They do.

20       Q.  And a lot of those offices had servers?

21       A.  They do.

22       Q.  And would the same be true for the

23   Department of Unemployment Security?

24       A.  Yes.

25       Q.  They had a lot of field offices and they had

1    a lot of servers?

2         A.  They didn't have a lot of servers, but they

3    had a lot of field offices.

4         Q.  Okay.

5         A.  And DHS did a major job of combining a lot

6    of those offices too.

7         Q.  Okay.  So at the time, Cheryl Johnson took

8    over the Hardware Group, were you still in the

9    process of consolidation?

10        A.  Yes.

11        Q.  Okay.  And did that continue while she was

12   in the Hardware Group?

13        A.  For a little while; yes.

14        Q.  Okay.  And in fact, if there was

15   consolidation ongoing, and Cheryl had job objectives

16   related to the consolidation, those would be spelled

17   out in her evaluations; am I correct?

18        A.  Yes.

19        Q.  Your Honor, may I have a moment?

20            THE COURT:  Sure.

21        Q.  Oh, wait.  Before I do.  Ms. Barnes asked

22   you about the naughty word, audits and auditors.  Do

23   you recall who was conducting this audit?

24        A.  We got audited by different people, but the

25   main auditor was the Auditor General.  Oh, I can see

1    her face.

2         Q.  You don't have to give me a name.  Auditor

3    General is good enough.

4         A.  The Auditor General.

5         Q.  Typically when the Auditor General does an

6    audit, when the audit is completed it issues a

7    report of its findings?

8         A.  Correct.

9         Q.  And the findings will identify problem

10   areas.  Do you know if it identified this issue you

11   talked about as an audit finding?

12        A.  Would be above me.

13        Q.  Okay.  If it was, it would be in writing;

14   right?

15        A.  It would be above me.  I would -- I would

16   never have seen such a report if there was one that

17   came back.

18        Q.  Okay.  So you don't know if there was ever

19   an audit finding made concerning the server issue?

20        A.  Well, I heard there was, but that's

21   speculation, right?  So --

22        Q.  Okay.  If there was an audit finding made in

23   a report, it's the kind of document that could be

24   brought into court.  Am I correct?

25        A.  I would assume.  I don't know.

1        Q.  Okay.  Just a moment, Your Honor.

2             THE COURT:  Sure.

3             MR. BAKER:  I have no further questions.

4             THE COURT:  Thank you.

5        All right.

6             MS. BARNES:  I just have a follow-up, Your

7    Honor.

8             THE COURT:  Fine.  Please do.

9                  REDIRECT EXAMINATION

10   BY MS. BARNES:

11       Q.  Mr. Nance, Mr. Baker was asking you about

12   the amount of equipment being dealt with in hardware

13   during this whole period of time, consolidation.

14       How did virtualization reduce the number of

15   physical servers?  And before you answer that, what

16   is virtualization?

17       A.  Virtualization is the process of being able

18   to take one physical piece of server and combine

19   multiple virtual servers to run on top of it.  So in

20   other words, one server did one job in the past,

21   where when we started doing virtualization, one

22   server started doing, in the beginning, it was

23   around seven or eight jobs of what it did before.

24   By the time we got done, we were up to 18 and even

25   20 servers, virtual servers running on one physical

1    server.
2         So you would take one server, segment it into
3    however many pieces that you could get it segmented
4    into, and then you could run a server on top of that
5    server.
6         I hope that's --
7         Q.  Well, that would seem to reduce the physical
8    bulk of the equipment; right?
9         A.  Oh, absolutely.
10        Q.  And that would make hardware easier,
11   wouldn't it?
12        A.  Absolutely.
13        Q.  Did that affect remotely located servers?
14        A.  It did.
15        Q.  How?
16        A.  In the same way.  That to where there may
17   have been multiple devices -- where there may have
18   been multiple devices at remote locations, we could
19   now put one device at that location and have it
20   emulate three, four, five devices, or however many
21   devices they needed there.
22        Q.  So as you were going through the process of
23   this consolidating all of these agency servers into
24   one central giant data brain, you were actually
25   reducing the amount of hardware that you guys have

NANCE - REDIRECT                        621

 1   to deal with?

 2        A.  Absolutely.

 3        Q.  And that was the task of the Hardware Group?

 4   Accomplishing that?

 5        A.  As far as?

 6        Q.  What you were doing?  I mean --

 7        A.  There was a separate group that actually did

 8   the virtualization of the servers themselves.

 9        Q.  Oh, okay.

10        A.  But it was the responsibility of the

11   Hardware Group to actually have that hardware

12   available for the virtualization group to actually

13   used to do those reductions.

14        Q.  Okay.  All right.  Thanks.

15        A.  Your welcome.

16            MR. BAKER:  I have no questions.

17            THE COURT:  I do just have one.

18        This reduction in the amount of hardware, does

19   it also reduce the amount of people needed to

20   operate that hardware?

21            THE WITNESS:  From -- the physical side of

22   the house would become littler.  So what use to be

23   17 physical devices now could become one.  Okay?  So

24   in effect, yes, it could.

25        But the -- the other side of the house, the

NANCE - REDIRECT                          622

1    software side of the house where you had 17 servers,
2    you still have 17 devices, so you still require the
3    staffing to manage the 17 devices.
4            THE COURT:  Okay.  So it really doesn't cut
5    down on the amount of personnel?
6            THE WITNESS:  Not for the software side;
7    no.
8            THE COURT:  Now what other side is there?
9            THE WITNESS:  The hardware side.  The
10   physical server itself.
11           THE COURT:  All right.  Then does it take
12   more people to maintain that physical server?
13           THE WITNESS:  No.  It's a single device
14   now.  So it's able to -- it's able to split one
15   device into 17.  So there's only one physical device
16   to keep track of anymore.  But that one physical
17   device is now powerful enough that it can run 17
18   other devices.
19           THE COURT:  With the same personnel?
20           THE WITNESS:  With the same personnel on
21   the software side; yes.
22       Since you don't have 17 physical devices
23   anymore, there wouldn't be need for as many people
24   to handle 17 physical devices, but you still have 17
25   software devices.

1              THE COURT:  Within the consolidated?

2              THE WITNESS:  Correct.

3              THE COURT:  Okay.  Now, does that trigger

4    any additional questions?

5              MR. BAKER:  I do have one question to ask.

6    Or maybe one area.

7              THE COURT:  Fine.

8              MR. BAKER:  I'll be brief.

9              THE COURT:  Yes, this is -- you must

10   understand that I'm -- I'm a neophyte in this arena

11   of -- and I would assume that there are probably a

12   couple of numbers of the jury -- of the jury that

13   are probably not as well versed in this arena.

14   Perhaps more so than I, but --

15        In other words, go ahead, Mr. Baker.

16                   RECROSS EXAMINATION

17   BY MR. BAKER:

18        Q.  Mr. Nance, is -- kind of an

19   oversimplification perhaps, but virtualization meant

20   that there was not a need for as many servers as

21   there had been prior to virtualization?

22        A.  That's correct.

23        Q.  Okay.  And are we talking about, in

24   virtualization, putting a virtualized server in the

25   same physical location where the other servers were

NANCE - RECROSS                    624

1    located?

2         Well, let me ask you this:  Let's assume the

3    Department of Human Services had a server in

4    Pittsfield, for example, at a field office.  And

5    let's assume that it had another server in

6    Jacksonville.  Would virtualization be able to have

7    one server serve both Pittsfield and Jacksonville?

8         A.  Yes.

9         Q.  Okay.  So as I understand it, the process

10   that was in place was to reduce the number of

11   servers?

12        A.  Correct.

13        Q.  So when the number of servers were reduced,

14   that meant that the -- that the old servers were no

15   longer needed?

16        A.  Correct.

17        Q.  And what would your unit have to do when

18   there was a server that was no longer needed?

19        A.  It would be decommissioned.

20        Q.  And what -- decommission means what?

21        A.  That the paperwork would be started so that

22   it could be tracked through the inventory system so

23   it could be marked off the inventory so the auditors

24   wouldn't ding us for it next year when they couldn't

25   find it.

1          Q.  Okay.  So what becomes of the server?

2          A.  It goes to the surplus area.  And then they

3     end up selling it, I believe.

4          Q.  Okay.  So someone has to remove the server?

5          A.  Say again?

6          Q.  Someone would have to remove the server say

7     from the Pittsfield field office?

8          A.  Yes.

9          Q.  And who would do that?

10         A.  Normally it would have been the hardware

11    staff.

12         Q.  Okay.  So one of the tasks of the Hardware

13    Unit in this whole virtualization would be to remove

14    servers and get them to the surplus unit?  Have I

15    got that correct?

16         A.  Actually, they would remove them and bring

17    them to the Data Center so the paperwork could be

18    done correctly.

19         Q.  And then who -- excuse me.

20         A.  To the Data Center.  So -- and normally what

21    they would do is that they would leave it so there

22    would be four or five or six servers that needed to

23    be picked up in an area.  So they would take a swoop

24    and swoop through and pick up all six servers, bring

25    all of them back to the Data Center.  And then the

 1   paperwork would be completed at the Data Center in

 2   order to start moving it to where they could be

 3   moved to the surplus.

 4        Q.  Who would complete the paperwork?

 5        A.  It should have been the staff picking them

 6   up.

 7        Q.  The Hardware Unit?

 8        A.  Yes.

 9        Q.  And who put together the plan for picking

10   them up?

11        A.  It should have been hardware manager.

12            MR. BAKER:  Fine.  I have no further

13   questions.  Thank you very much.

14            THE COURT:  Thank you.

15        All right, back to Government.  Any questions?

16            MS. BARNES:  No.  No, Your Honor.

17            THE COURT:  Okay, fine.

18        Anyway, well, I think perhaps I understand it

19   just a little bit better.  But in any event, thank

20   you for the explanation.

21            THE WITNESS:  You're welcome.

22            THE COURT:  Okay.  You may step down.  And

23   it's time for us, in fact, just a little past time

24   for us to take our afternoon break.  So let's stand

25   in recess for 20 minutes, and we will reconvene at

SPENCER - DIRECT                          627

1    3:30.  Okay?

2        (The jury entered the courtroom.)

3        (A recess was taken.)

4            THE COURT:  Thank you, everyone.  Please be

5    seated.

6        All right.  Where are we now?

7            MS. BARNES:  Your Honor, the defense has

8    one final witness.

9            THE COURT:  Very well.  Mr. Okon.

10           MS. BARNES:  Vicki Spencer.

11           THE COURT:  Come right in.

12       (The witness was sworn.)

13           THE COURT:  Right up here, please.  That is

14   the second best seat in the house.

15           THE WITNESS:  Thanks.

16                   VICKI SPENCER

17   called as a witness herein, having been duly sworn,

18   was examined and testified as follows:

19                 DIRECT EXAMINATION

20   BY MR. OKON:

21       Q.  Good afternoon, Ms. Spencer.

22       A.  Good afternoon.

23       Q.  Would you please state and spell your name

24   for the record?

25       A.  It's Vicki Spencer.  V-i-c-k-i.

1    S-p-e-n-c-e-r.

2        Q.  And, Ms. Spencer, where do you currently

3    live?

4        A.  In Florida.  Ft. Myers, Florida.

5        Q.  And are you currently employed?

6        A.  No.

7        Q.  Retired?

8        A.  Yes.

9        Q.  And prior to your retirement, where did you

10   work?

11       A.  I worked for CMS.

12       Q.  And were you employed at CMS within the IT

13   field?

14       A.  Yes.

15       Q.  Okay.  And before we dive a little further

16   into your work history, just want to briefly discuss

17   your educational background.

18       Did you complete any higher education courses

19   following high school?

20       A.  I have some college.

21       Q.  And what type of classes did you complete in

22   college?

23       A.  They were actually is psychology and

24   sociology.

25       Q.  Okay.  So you didn't take any IT courses in

1    college?

2         A.  No.

3         Q.  Okay.  How did you eventually work your way

4    into the IT field?

5         A.  Well, I started right out of high school and

6    I worked my way up starting out mounting tapes.

7    Then into what we call the command center which was

8    kind of the main area for all the Data Center.  It

9    was used -- we watched all the computers throughout

10   the state for any problems.

11        Then I eventually went into EUC which was more

12   computers, installing computers.  And then we got

13   consolidated into -- back over to the Data Center.

14   I was currently DHS.

15        Q.  Okay.  So were you ever employed within the

16   Midrange Wintel Group at CMS?

17        A.  Yes.

18        Q.  And when did that start?

19        A.  Around 2007, I believe was when we got

20   transferred into the agency.

21        Q.  And what were you employed as initially?

22        A.  An Information Systems Software Specialist

23   2, I believe.

24        Q.  Is that --

25        A.  Or Analyst 2.

1        Q.  Is that a technician, is that a fair --

2        A.  Yeah, it was a technician.

3        Q.  Okay.  And do you recall what group you were

4    initially a technician within?

5        A.  Yes.  I was in the Software Application --

6    or Midrange Software Server Group, Application

7    Group, I can't remember.  It was under Ed Gordon.

8        Q.  Okay.  So Ed Gordon was your immediate

9    supervisor?

10       A.  At the time, it was first John Meneghetti,

11   but he left and it was Ed.

12       Q.  Was Ms. Johnson ever your direct supervisor

13   during your tenure at CMS?

14       A.  No.

15       Q.  Okay.  But you said at least initially -- or

16   your second supervisor, I guess, was Mr. Gordon;

17   correct?

18       A.  Yes.

19       Q.  Any thoughts as how Mr. Gordon was as a

20   supervisor?

21       A.  He was a fair supervisor.  I never had any

22   problems with him.  He pretty much gave me my

23   assignments and I did them.  He was available

24   whenever I needed any help.

25       Q.  Did your group run efficiently under Mr.

SPENCER - DIRECT                    631

1    Gordon?

2         A.  Yes.

3         Q.  Okay.  And despite never having Ms. Johnson

4    as your direct supervisor, did you ever work with

5    Ms. Johnson or collaborate with her?

6         A.  Yes.

7         Q.  How so?

8         A.  We had a lot of inventory that we took care

9    of that I believe Ed brought over from the Hardware

10   Group.  And a part of it, we had what we call the

11   asset management forms which had to do with our

12   inventory.  And it was keeping track of where the

13   inventory was.  And at the time, we used a system

14   called Remedy.  And I was kind of the lead worker

15   for the Remedy system.  So I did a lot of making

16   sure the AMF forms were correct and in the right

17   place.  I'd have to go into the Remedy system and

18   check to see that the location codes were where they

19   were supposed -- the servers or equipment were where

20   they were supposed to be within the location codes.

21        Q.  Okay.  And I'm gonna get to those AMF asset

22   management forms briefly, but just before that;

23   would Ms. Johnson just kind of generally, maybe in

24   regards to that or other things, ask you for help

25   with assignments?

SPENCER - DIRECT                           632

1          A.  Yes.  And I also would have to go to her and

2     work with her on some of the paperwork.

3          Q.  And during this time period, was she the

4     supervisor of the Hardware Group?

5          A.  Yes.

6          Q.  Would she often times ask you the same

7     questions on similar topics?

8          A.  Yes.

9          Q.  Anything stand out in particular?

10         A.  There was a lot of asking about how we did

11    our forms.

12         Q.  Okay.  And after you helped her, did she

13    seem to grasp and understand what you were conveying

14    to her?

15         A.  No.

16         Q.  And why do you say that?

17         A.  Because there were a lot of discrepancies

18    within the forms.

19         Q.  And discrepancies within forms that

20    Ms. Johnson was filling out?

21         A.  Yes.  Her and her staff.

22         Q.  Okay.  And despite Ms. Johnson kind of

23    continual asking for assistance on the same topics,

24    would you still help her?

25         A.  Yes.  I did for a while.  And it got to the

1    point that it was affecting my work and my job, so I

2    final had to go to Ed and talk to Ed.  And then we

3    talked to her supervisor, who was Mr. Nance.

4         Q.  Okay.  So despite not being in her group,

5    her performance was affecting you as a technician in

6    other group; is that correct?

7         A.  Yes.

8         Q.  Okay.  Did you ever believe that Ms. Johnson

9    ever improved her ability to manage her Hardware

10   Group?

11        A.  Not if my opinion.

12        Q.  And why would you say that?

13        A.  Because the mistakes just -- they just kept

14   piling up.  And it really affected our inventory

15   system.  There was a lot of times when one of our

16   servers was supposed to be moved to a certain

17   location and the location code would be entered

18   wrong on the form and it would come back to me.  And

19   then I would have to track down to where it actually

20   went.

21        Q.  Okay.  Are you aware of when Ms. Johnson's

22   employment from CMS was terminated?

23        A.  I don't remember when exactly it was.

24        Q.  If I were to represent to you that there's

25   testimony that that occurred in 2012, does that

SPENCER - DIRECT                           634

1    sound accurate?

2        A.  Yes.

3        Q.  Okay.  And following her departure, who

4    became the next manager of the Hardware Group?

5        A.  I did.  I actually went through a Rutan

6    interview and got the job.

7        Q.  And how soon after her departure were you

8    moved to manage the Hardware Group?

9        A.  I think the next year.  In 2013, I believe.

10       Q.  Okay.  And again, if my memory serves me

11   correctly, I believe she was terminated towards the

12   end of 2012, around November I believe?

13       A.  Yeah.  And it was probably -- it usually

14   takes a while to actually fill the position.  So it

15   was probably later in the next year.

16       Q.  Sure.  When you become manager of the

17   Hardware Group, who was your immediate supervisor?

18       A.  Mr. Nance.

19       Q.  And prior to Ms. Johnson's termination, did

20   you ever see Mr. Nance interact with Ms. Johnson?

21       A.  No, not really.

22       Q.  Okay.  And you previously -- or let me back

23   up.  In regards to Mr. Nance, describe your attitude

24   or opinion of his management style?  What would you

25   say?

1          A.  He was fair but he was not lenient when it

2     came to doing your job.  He believed that you should

3     do your job and he should not hear from anybody else

4     that your job wasn't being done.

5          Q.  So he, as a manager, required his

6     subordinates to complete their job; correct?

7          A.  Absolutely.

8          Q.  And you've brought these up a couple times,

9     these AMAF forms?

10         A.  Uh-huh.

11         Q.  And can you just explain.  These forms were

12    filled out by Hardware Group in order to track

13    assets out in the field; correct?

14         A.  Yes.

15         Q.  And were the duties associated with this

16    form, did they fall under the umbrella of the

17    Hardware Group?

18         A.  Yes.  There would be occasions where if

19    someone else moved a server, they would also have to

20    do the form.

21         Q.  Okay.  And what aspect of these forms did --

22    was completed by Ms. Johnson?

23         A.  Well, the form was supposed to be done, the

24    serial numbers, the tag numbers, the location to and

25    from.  Then it had to have a signature by the person

SPENCER - DIRECT                           636

1   at the office, or at the Data Center, depending on

2   where it went.  It had to have a signature from

3   whoever was accepting it.  And it had to go through

4   the guard also in the building.

5        Then the forms would get attached to the tasks

6   that fell within the change tickets.  And there was

7   always a lot of times when the ticket wasn't

8   attached in the change ticket.

9        Q.  And what was your involvement with these

10  forms?

11       A.  I had a task after they had finished, like,

12  moving them, I had a task to go in and update the

13  Remedy system.  So I would have to have that

14  paperwork in order to do that.

15       Q.  Okay.  So correct me if I'm wrong.  In

16  regards to kind of tracking and locating where

17  different assets are going, there's the front end,

18  completing the paperwork, completing these forms,

19  and that was done by Ms. Johnson; correct?

20       A.  Correct.

21       Q.  And then there would be you on the back end

22  with those forms and you have to take the data

23  that's reflected within those forms and enter it

24  into the Remedy application system; correct?

25       A.  Correct.

SPENCER - DIRECT                          637

1        Q.  And in regards to entering that data into

2    the Remedy system, was it time-consuming?

3        A.  Yeah, it was very time-consuming.

4        Q.  And what -- again, what was the purpose of

5    physically entering that data into the Remedy

6    system?

7        A.  Well, we needed to keep track of all the

8    inventory.  If it got lost, the auditors would come

9    in and they would want to know where it was.

10       Q.  Okay.  And those duties, as far as entering

11   data from the AMAF forms into the Remedy system, did

12   those belong to hardware managers?

13       A.  It started out as -- in the Hardware Group.

14       Q.  Okay.  And did you perform those duties

15   while Ms. Johnson was the hardware manager?

16       A.  Yes.

17       Q.  Were you ever a technician within the

18   Hardware Group?

19       A.  No.

20       Q.  Did Ms. Johnson instruct you to complete

21   this duty?  Delegate it to you?

22       A.  No.

23       Q.  If you were not a technician within the

24   Hardware Group, but you assisted in these duties

25   that fall under the umbrella of hardware managers,

SPENCER - DIRECT                638

1    how did you get involved in doing these duties as

2    far as entering the form data into the Remedy

3    system?

4         A.  Well, at the time, Ed Gordon was my boss.

5    And he, I believe, had brought it from the Hardware

6    Group.  So I kind of was the one, since I was in

7    charge of the Remedy, he would assign tasks to me to

8    manage that.

9         Q.  So your understanding is that Ed Gordon,

10   when he was manager of Hardware Group --

11        A.  Yes.

12        Q.  -- he took that back-end duty of entering

13   the data into Remedy with him when he left hardware;

14   correct?

15        A.  That's correct.

16        Q.  And as he was your immediate supervisor, he

17   tasked those responsibilities to you to enter the

18   data into Remedy; correct?

19        A.  That's correct.

20        Q.  And this is a duty that falls under the

21   umbrella of hardware managers; correct?

22        A.  Correct.

23        Q.  And this is something that Ms. Johnson never

24   had to complete; is that your understanding?

25        A.  Correct.

1      Q.  And when you took over as hardware manager

2  in early 2013 or so, did you also assume these

3  duties and continue entering data into the Remedy

4  system?

5      A.  Yes, I did.

6      Q.  Yes?

7      A.  Yes.  I did that, and I also had to do some

8  of my old job before it got transferred into -- or

9  to other technicians.

10     Q.  So aside from doing the complete duties in

11 regards to these forms and Remedy system that

12 Ms. Johnson did not have to do, you also continued

13 doing duties from your previous job as a technician;

14 correct?

15     A.  Correct.

16     Q.  And this is all going on when you were

17 manager of the Hardware Group?

18     A.  Correct.

19     Q.  When you became manager in 2013, did you put

20 all change tickets into your name?

21     A.  Yes.

22     Q.  Why would you do that?

23     A.  Well, I felt like it was the only way I

24 could keep track of them.  When there was a change

25 ticket, there were multiple tasks underneath that

1    change ticket.  And it -- for me, I wanted to keep

2    track of how the work was going on and how it was

3    getting done.

4         Q.  So when you put these change tickets into

5    your name as the manager, did this create more work

6    for you?

7         A.  Yes, it created some more work.  But I just

8    wanted to make sure that the change tickets were

9    done correctly.  And I followed up, more or less.

10   It probably wasn't so much more work, it was just

11   being able to keep track of what was going on as a

12   manager.

13        Q.  And I suppose it would require you to put

14   the ticket in your name; correct?

15        A.  Yes.

16        Q.  And then would you also complete

17   verifications for completed tasks and completed

18   tickets?

19        A.  Yes.  At the end of the ticket, there was a

20   verification task.  And that would also be assigned

21   to myself.  And I would have to close -- make sure

22   everything was closed out, close that ticket out,

23   and then the change would be closed out.

24        Q.  So you had all of these change tickets in

25   your name.  Did that mean that you had to complete

SPENCER - DIRECT                          641

1    every single task associated with those tickets?

2        A.  No, not at all.

3        Q.  And as the manager of hardware, regardless

4    of whether a ticket was specifically in your name or

5    assigned to somebody in your group, who was

6    responsible for completion of that ticket?

7        A.  Well, the change ticket would have been the

8    hardware manager, but underneath that change ticket

9    were multiple tasks.  Those tasks would all get

10   assigned to different groups and different

11   technicians, so those technicians would actually do

12   all the work.

13       Q.  Correct.

14       A.  You were just really managing the ticket.

15       Q.  Sure.  And what would you do as manager if

16   those technicians started to not doing that work?

17       A.  I would either send them an email, or their

18   immediate supervisor, and ask what the status of the

19   task was.

20       Q.  So would it be fair to say that as a

21   manager, you managed your staff?

22       A.  Yes.

23       Q.  And would it be fair to say that as the

24   manager, the buck stops with you?

25       A.  Absolutely.

SPENCER - DIRECT                              642

1        Q.  Okay.  And you kind of touched on it a
2    little bit.  How would you describe the management
3    position of the Hardware Group?  Was it -- was it
4    very technical as far as getting into the system
5    itself and undoing stuff and building stuff, or was
6    it more so management and organization?
7        A.  It was more management and organization.
8        Q.  Why do you say that?
9        A.  Well, you had to organize because there were
10   lots of tasks that were in some of the same
11   districts.  And in order to do that, you didn't want
12   to send your technician out to do one task and then
13   the next day be sending him back to do another one.
14   You wanted to manage that so that you could do
15   multiple tickets and tasks while you were going out.
16       There was a lot of times when we would have to
17   do break/fix calls.  And if there was something
18   going on at that site, you could have them fix
19   the -- fix the server and also do maybe another task
20   while they were there.
21       Q.  And so you previously testified that you
22   were the next manager of the Hardware Group
23   following Ms. Johnson; correct?
24       A.  Correct.
25       Q.  Upon your arrival in the Hardware Group,

1    what were your initial impressions?

2         A.  It was in disarray.  There were many

3    tickets.  There were probably over 300 change

4    tickets that needed to be cleaned up.  There was a

5    lot of servers that were out of hard drive space

6    that needed to be cleaned up.  There was still

7    projects going on that I had to take over and do.

8         Q.  Did it seem organized?

9         A.  No, not at all.

10        Q.  Did it seem like it was well managed?

11        A.  No.

12        Q.  And when you were a technician under the

13   management of Ed Gordon, within his group, did it

14   ever fall into disarray much like how Ms. Johnson's

15   Hardware Group did when you inherited it?

16        A.  No.  At least not to my knowledge.

17        Q.  And approximately how long did it take --

18   well, let me back up.  Did you -- were you able to

19   correct and fix those issues you inherited from

20   Ms. Johnson's group?

21        A.  Yes.  In about six, maybe eight months.

22        Q.  Six to eight months?

23        A.  Hm-mmm.

24        Q.  And did you have to work 60 hours a week

25   every single week to complete that within the six to

1    eight months to get the Hardware Group again running

2    efficiently?

3         A.  No, I did not.

4         Q.  You did not.  What would you say you would

5    work to complete this?

6         A.  I would work my normal work week.  There

7    would be an occasion when there would be an issue

8    that a server would go down, that we'd have a

9    problem like in the middle of the night or something

10   like that, and I'd have to go in and get ahold of

11   staff to go out and fix things.  But no, I mostly

12   worked my normal work week.

13        Q.  Okay.  And again, this took you about six to

14   eight months to get the Hardware Group running

15   efficiently again as it should; correct?

16        A.  Correct.

17        Q.  Now, Ms. Spencer, I will represent to you

18   that Ms. Johnson previously testified that

19   initially, at least, she had four technicians under

20   her supervision within hardware during a portion of

21   her tenure, but at least for majority of it, she had

22   three technicians during her time as a manager.

23        Immediately when you became manager of Hardware

24   Group, how many technicians did you have under your

25   supervision?

SPENCER - DIRECT                                    645

1        A.  I had two.

2        Q.  Two technicians under your supervision?

3        A.  Correct.

4        Q.  And with the two technicians you had, were

5    these two technicians that were previously under the

6    supervision of Ms. Johnson?

7        A.  Correct.

8        Q.  And any thoughts -- or let me back up.  Who

9    were those two technicians you had?

10       A.  Mark Jarvis and Warren Foster.

11       Q.  And any thoughts on the abilities or

12   competence of those two technicians you inherited?

13       A.  Their abilities were fine.  I felt like they

14   needed to be managed.  They had a lot of problems

15   with their own time management.  But other than

16   that, they were perfectly capable of doing the job.

17       Q.  And with those two technicians you

18   inherited, were you able to correct the disarray, as

19   you stated, of the Hardware Group within that six to

20   eight-month period?

21       A.  Yes.  I also had use of a company that we

22   called Sentinel which I believe had been around for

23   quite a while that we could use for any issues that

24   we had also.

25       Q.  Sure.

1      A.  So I -- I did use those, besides my two

2   technicians.

3      Q.  Absolutely.  And Sentinel, we've heard some

4   testimony on Sentinel.  That would be a group

5   that -- our understanding is that there are no

6   limits to how much you could use them; correct?

7      A.  Correct.

8      Q.  And as the manager of Hardware Group, you

9   could put in a request for them to complete

10  something you needed done; correct?

11     A.  Correct.

12     Q.  But those people, they weren't state

13  employees; correct?

14     A.  Correct.

15     Q.  And they were considered the two technicians

16  you had within your group; correct?

17     A.  Correct.

18     Q.  And also, the Sentinel -- those people could

19  be utilized by Ms. Johnson as well?

20     A.  Absolutely.

21     Q.  Okay.  Now, again, during this entire time

22  period, the six to eight months you had two

23  technicians, who was your immediate supervisor?

24     A.  It was Mr. Nance.

25     Q.  And did you think Mr. Nance was helpful

SPENCER - DIRECT                          647

1    during this time period?

2        A.  Yes.

3        Q.  And how so?

4        A.  Any time I had any issues, I could go to him

5    and he would either show me or train me or go with

6    me and help me figure out the issues that I had.

7        Q.  And did you think Mr. Nance was helpful

8    following the six to eight months it took to get the

9    Hardware Group running efficiently?

10       A.  Yes.

11       Q.  Okay.  And did that continue until the --

12   until you retired?

13       A.  Yes.

14       Q.  Okay.  Ms. Spencer, I will again represent

15   to you that Ms. Johnson testified that when she was

16   manager of Hardware Group, she had a really big

17   project called the ILO project.  Are you aware of

18   what the ILO project is?

19       A.  Yes.  It's Integrated Lights Out Boards.

20       Q.  And was the ILO project still ongoing when

21   you inherited the Hardware Group?

22       A.  Yes.

23       Q.  So you complete -- you continued to do this

24   project; correct?

25       A.  Yes.

1          Q.  Were you able to finish that project?

2          A.  Yes.

3          Q.  Okay.  Did you have any other large-scale,

4    time-consuming projects after you started and took

5    over as manager of hardware?

6          A.  Yes.  At the time, we started our Novell

7    migrations.  We were taking servers and turning them

8    to like DM servers so that we wouldn't have so much

9    hands-on; that we could do a lot of stuff from the

10   Data Center.

11         Q.  And this big project was called the Novell

12   migration?

13         A.  Mm-hmm.

14         Q.  Okay.  And between the ILO project and --

15   well, excuse me.  Were you doing both the ILO

16   project and the Novell migration project at the same

17   time?

18         A.  Yes.

19         Q.  You were?

20         A.  Yes.

21         Q.  And between the ILO project and the Novell

22   migration project, which would you say was more time

23   consuming?

24         A.  The Novell migration project.

25         Q.  And how so?

1          A.  Well, it required a change ticket.  We had

2     to -- we had to request servers from the warehouse.

3     We had to go to every site there was to -- that we

4     have Novell server at to replace it.

5          Q.  Okay.  And again, you were able to work on

6     the Novell migration project and the ILO project,

7     and complete the ILO project; correct?

8          A.  Yes.

9          Q.  When you became manager of hardware, did you

10    have any previous experience within the Hardware

11    Group?

12         A.  No.  I had just started -- started to go

13    over some of the server stuff with some of the

14    Novell guys, but I didn't have hardly any hardware

15    experience.

16         Q.  So without any -- or hardly any previous

17    experience within hardware--and correct me if I'm

18    wrong--within six to eight months, you were able to

19    address a backlog of hundreds of tickets that you

20    inherited from Ms. Johnson, and you did so when

21    starting with only two technicians under your

22    supervision; correct?

23         A.  Correct.

24         Q.  And you did all of that while assuming

25    additional duties of entering data into the Remedy

1    system, which Mrs. Johnson never had to complete;

2    correct?

3        A.  Correct.

4        Q.  And you had all change tickets entered in

5    your name; correct?

6        A.  Correct.

7        Q.  And Rod Nance was your manager during this

8    entire time period; correct?

9        A.  Correct.

10           MR. OKON:  No further questions.

11           THE COURT:  Thank you, Mr. Okon.

12       To you, Mr. Baker.

13           MR. BAKER:  Thank you, Your Honor.

14                  CROSS EXAMINATION

15   BY MR. BAKER:

16       Q.  Welcome to the sunny north, Ms. Spencer.

17       A.  Thank you.

18       Q.  I just have a few questions to ask you.

19       A.  Okay.

20       Q.  When did you retire from the State of

21   Illinois?

22       A.  I retired three years ago.  So 2015.

23       Q.  All right.  And when, precisely, did you

24   become manager of the Hardware Group?

25       A.  I want to say it was middle of September --

SPENCER - CROSS                              651

1    the middle of 2013.  Maybe September of 2013.

2         Q.  Okay.  So if Cheryl Johnson left CMS in

3    August of 2012 --

4         A.  Mm-hmm.

5         Q.  -- you would have taken over the Hardware

6    Unit roughly 13 months later?

7         A.  Correct.

8         Q.  Who was managing the Hardware Unit between

9    Ms. Johnson leaving and you coming?

10        A.  Well, Mr. Nance would have been -- I mean

11   taking over it, but he had a couple technicians and

12   I also helped with some of the work.

13        Q.  Okay.  Who was assigning tickets during that

14   13-month period?

15        A.  It was either Mr. Nance, or he had Randy

16   Anderson or Ed Gordon doing it.

17        Q.  Okay.  By the way, when you were managing

18   the Hardware Unit, did you ever take a vacation?

19        A.  I'm sure I did.

20        Q.  And when you were on vacation, what would

21   happen to the tickets that came into the Hardware

22   Unit?

23        A.  Well, I would try to set it up while I was

24   on vacation so that my technicians would take care

25   of the tickets and the tasks.

1          Q.  So the tickets would go directly to the

2     technicians?

3          A.  They would go in my name, but the

4     technicians would know that they had their tasks

5     underneath them.

6          Q.  How did that work?

7          A.  As --

8          Q.  Ticket came into --

9          A.  Someone would put the ticket in my name

10    because they knew I was the hardware manager.  So

11    they would put it into my name.  And then probably

12    Ed or Randy would assign those tickets out.

13         Q.  Okay.  So Ed or Randy would do the actual

14    assigning of the tickets?

15         A.  Or Rod.

16         Q.  Or Rod.  So there was someone in a

17    management position that was assigning tickets when

18    you were gone?

19         A.  I would believe so.

20         Q.  And assuming Randy or Ed went on vacation --

21         A.  Mm-hmm.

22         Q.  -- from time to time, do you know who

23    assigned tickets for their group?

24         A.  I do not know.

25         Q.  Okay.  You said you put tickets in your

1    name.  And I know you indicated you put change

2    tickets in your name.  What about help desk tickets?

3         A.  Help desk tickets would go to whoever was --

4    whoever was responsible for doing them.

5         Q.  Okay.  So let me ask you this:  When a help

6    desk ticket would come in, it would be assigned in

7    the name of the technician that was actually doing

8    the work?

9         A.  Correct.

10        Q.  Okay.  How frequently did help desk tickets

11   come in?

12        A.  Daily.

13        Q.  Average day, how many tickets?

14        A.  Oh, possibly ten.

15        Q.  Okay.  Sometimes more, sometimes less?

16        A.  Yeah.

17        Q.  And did you do any of the verification for

18   the help desk tickets?

19        A.  Yes.  As a manager, I would write down the

20   help desk tickets and then I would keep track of how

21   they got done.

22        Q.  And how did you do that?

23        A.  How would I write them down?  Because you

24   could go into the system and see what was assigned

25   to the Hardware Group.  You could see any change

```
 1    tickets, you could just -- there was a field in
 2    there that you could go in and type in Midrange
 3    Wintel Hardware and it would show you change
 4    tickets, help desk tickets, tasks.
 5        Q.  So you would basically track the progress of
 6    a ticket by clicking on the Remedy system?
 7        A.  Yes.
 8        Q.  Okay.  And with the verification process,
 9    that again would involve you looking at the Remedy
10    system?
11        A.  Yes.
12        Q.  With help desk tickets, did you make any
13    personal contact with the customer?
14        A.  Yes.
15        Q.  To verify it?
16        A.  Yes.
17        Q.  Did you do that with each help desk ticket?
18        A.  No, not every help desk ticket.
19        Q.  How many?
20        A.  It would depend on if I got an email or a
21    phone call, then I would check in on the help desk
22    ticket to see how it was progressing.
23        Q.  Okay.  So if a customer called you, or
24    someone else called you about a specific ticket,
25    then you would perhaps contact the customer?
```

1        A.  If I saw that a ticket sat out there for

2    more than a couple of days, especially a help desk

3    ticket--because help desk tickets were supposed to

4    be done pretty quick--then I would reach out to

5    someone to find out where it was, what was going on

6    with it.

7        Q.  When you say you would reach out; you're

8    talking about reaching out to your staff?

9        A.  I would reach out to the staff.  And then I

10   would also check with the office sometimes to see

11   what the update was there.  It could have been a

12   Sentinel tech that was going out and working on it,

13   so --

14       Q.  Okay.  But would you contact the customer?

15       A.  On occasion.

16       Q.  But not every time?

17       A.  No.

18       Q.  Okay.  And as a matter of course, you didn't

19   contact the customer to verify the satisfactory

20   completion of a help desk ticket?

21       A.  No.  Usually, I would possibly get an email

22   saying that they were satisfied.  But no, not all

23   the time.

24       Q.  You relied upon the technician to take care

25   of that?

SPENCER - CROSS                          656

1          A.  Yes.

2          Q.  And with respect to change tickets, do I

3     understand a change ticket is usually a little

4     larger project than a help desk ticket?

5          A.  Correct.

6          Q.  Average day, how many change tickets would

7     you get?

8          A.  It would just depend.  There could be three,

9     there could be 15 that came in.

10          Q.  Would typically there be more help desk

11     tickets that your unit would deal with than change

12     tickets?

13          A.  Yes.

14          Q.  Just looking at the volume of tickets?

15          A.  Yes.

16          Q.  And with respect to change tickets, when the

17     project was completed, what did you do to verify

18     that the work was done?

19          A.  Well, most of the time it was calling the

20     office and checking to see if everything was done

21     satisfactory before I close out my change ticket.

22          Q.  When you say the office, you're talking

23     about what office?

24          A.  Like most of the change tickets dealt with a

25     certain person, whether it be upgrading a server or

SPENCER - CROSS                           657

1    changing out a board or something like that.

2         Q.  So would that be the customer you would

3    contact?

4         A.  Correct.

5         Q.  All right.  Roughly how frequently would you

6    contact a customer in that respect?

7         A.  I would try to do it on quite a few of my

8    change tickets.

9         Q.  Quite a few?

10        A.  Yes.

11        Q.  But not all?

12        A.  The majority of them.

13        Q.  Okay.

14        A.  There were -- I mean there were some that I

15   wouldn't feel it was necessary to.  We always had,

16   in our tasks or ticket, you could put notes in

17   there.  And sometimes there would be notes in there

18   that made me feel like the ticket was completed and

19   I didn't need to follow-up on it.

20        Q.  So if the note on a change ticket indicated

21   that the task was completed and the technician had

22   contacted the customer, in that situation, you

23   probably would not contact the customer?

24        A.  No, I would not.

25        Q.  Okay.  I'm not going to ask you a whole lot

 1    of detail about this Novell migration project, but I

 2    am going to ask you when the project began?

 3         A.  The project began as soon as I started

 4    there.

 5         Q.  Okay.

 6         A.  I think it was actually a little bit in the

 7    works before, but it started pretty much when I took

 8    over.

 9         Q.  Okay.  That would have been roughly

10    September 2013?

11         A.  Correct.

12         Q.  When was the project completed?

13         A.  The project wasn't completed when I left.

14    There were a lot of Novell servers, and it was very

15    time-consuming, so the project was still ongoing

16    when I left.

17         Q.  Okay.  How many servers are we talking

18    about?

19         A.  There's probably -- I know DHS alone had

20    over 300, so --

21         Q.  That sounds like a lot?

22         A.  Yeah.  So counting the other agencies, there

23    was probably close to 1500 maybe, I would say, or

24    more.

25         Q.  Okay.  And these were servers that had been

1    with the customer?

2         A.  Yes.

3         Q.  And were they out in the field?

4         A.  Yes.

5         Q.  And what exactly did your unit have to do

6    with respect to these servers as a part of this

7    migration project?

8         A.  Well, we had to send a technician to every

9    site and they did a Novell migration.  Which lasted

10   most of the evening.  And then once the migration

11   was successful, then they would have to wait around

12   and they would have to bring the server back.

13        As far as my part of it, I assigned the change

14   ticket and the tasks to who they belonged to.

15        Q.  Okay.  Between the time you started and the

16   time you left, how many servers had you migrated?

17        A.  We had probably done maybe close to a

18   hundred.

19        Q.  Okay.  Hundred servers migrated in a span of

20   what, two years?

21        A.  Roughly little less than two years.

22        Q.  Okay.  Were you under any timeline to

23   complete that project?

24        A.  Yes.

25        Q.  And what was that timeline?

1        A.  Well, they were broke up into agencies.  And

2    so the timeline was sort of that you would get this

3    many servers done in this many days.  So the

4    timeline just depended on whether we had the servers

5    in the inventory, whether we could get them from the

6    warehouse.  It was just a long process.  So the

7    timeline was kind of like we would set a timeline

8    and try to meet that.

9        Q.  Did you always meet it?

10        A.  Not always.

11        Q.  Did you have to coordinate that work with

12    the customer?

13        A.  Yes.

14        Q.  Was the server taken out of service while

15    this migration was ongoing?

16        A.  We usually did them at night.  During the

17    evenings.

18        Q.  During their down -- the customer's down

19    time?

20        A.  Yes.  Right.

21        Q.  So that meant the technician would go out in

22    the evening?

23        A.  Mm-hmm.

24        Q.  And his work shift would be changed to --

25        A.  Correct.

 1        Q.  -- working a night rather than a day?

 2        A.  Correct.

 3        Q.  Do you recall how many servers -- how many

 4   servers you had to migrate per month or per quarter?

 5        A.  Well, like I said, it really -- it wasn't --

 6   it was more that we set a goal and tried to meet

 7   that goal.  It wasn't always that we would get that

 8   many done.

 9        We would try to do -- we would set up a

10   schedule for like a month, and we tried to do one a

11   night.  But that always depends.  Like in December,

12   you know, we would have bad weather, so a technician

13   couldn't drive to Chicago for that one, it would get

14   canceled.

15        Q.  So you tried to do one a month?

16        A.  One a night.

17        Q.  One a night.

18        A.  Yes.

19        Q.  Okay.

20        A.  We might do four a week and have one night

21   of not doing them.

22        Q.  Okay.  Who set the schedule?

23        A.  I did.

24        Q.  Okay.  Mr. Nance did not?

25        A.  No.

SPENCER - CROSS                          662

 1        Q.  You indicated that you supervised a

 2    Mr. Jarvis and a Mr. Foster?

 3        A.  Correct.

 4        Q.  I think you said there was some sort of

 5    problem that each had in time management?

 6        A.  Yes.

 7        Q.  What was that problem?

 8        A.  At first, they just had -- not managing

 9    their time basically.  Being able to set up where

10    they needed to go and how long it was gonna take

11    them.  And so I just would set up schedules for

12    them.

13        Q.  And how diligent were they in following the

14    schedules?

15        A.  Very good.

16        Q.  Did you ever have to make follow-ups with

17    them about completing tasks and assignments?

18        A.  No.

19        Q.  Never did?

20        A.  No.

21        Q.  I'm a little confused about this asset

22    management form.

23        A.  Uh-huh.

24        Q.  I do understand that's a form that sets

25    forth what exists in terms of inventory and has

 1    information relating to each piece?

 2         A.  Yes.

 3         Q.  Like the serial number?

 4         A.  Yes.

 5         Q.  All right.  As I understand it, you didn't

 6    prepare those forms?

 7         A.  No.

 8         Q.  That was not your responsibility?

 9         A.  No.

10         Q.  And I'm a little unclear about what Ed

11    Gordon brought to his new unit with respect to

12    inventory?

13         A.  Well, the inventory -- the AMAF forms were

14    something that you filled out if you were going to

15    take a piece of equipment from one location to

16    another location.  I believe that started out in the

17    Hardware Group, but it was brought over with Ed.

18    And that form was really important because the

19    auditors would ask us where equipment was, so it was

20    important to make sure that you got that entered

21    into the system, that it got moved from one location

22    to another.

23         Q.  Okay.  And you were the person that entered

24    it into the system?

25         A.  Yeah -- well, the tag number, the serial

SPENCER - CROSS                          664

1    number, everything would be in the system.  It would

2    be my responsibility to move it to its new location.

3    To where it's going or where it's coming from.

4         Q.  Okay.  But as I understand it, you were

5    taking information from a paper report and putting

6    it into the Remedy system?

7         A.  The location of it.

8         Q.  You were just inputting some information?

9         A.  Yes.

10        Q.  You didn't prepare the form?

11        A.  No.

12        Q.  Do you know who did?

13        A.  I think it was Ed and his group -- when he

14   was in the Hardware Group.  He started the form.

15        Q.  After Ed left the Hardware Group, did the

16   responsibility for preparing the form follow Ed to

17   his group or did it remain in the Hardware Group?

18        A.  I believe it followed Ed to his group.

19        Q.  Okay.  So then what was Cheryl Johnson's

20   responsibility for the AMF form?

21        A.  Well, any technician that were to take a

22   piece of equipment -- if they were to pick up this

23   monitor and take it to a building across the street,

24   any technician had to fill out that form.  And then

25   there was a task within all the change tickets or

1    help desk tickets that that form was supposed to go

2    into.

3         Q.  So assuming that a technician was given the

4    assignment of installing a new server at the

5    Jacksonville Correctional Center --

6         A.  Right.

7         Q.  -- that technician would go to the storage

8    site where the servers were, would take the server,

9    and he was expected to fill out a form?

10        A.  Correct.

11        Q.  Is that the asset management form?

12        A.  Correct.

13        Q.  All right.  And then what would become of

14   the form after he did that?

15        A.  Well, the form would be signed.  It would be

16   signed by him, and it would also be signed by I

17   believe the -- I don't know if the guard signed it

18   or just got a copy of it; I can't remember.  But

19   then the person at the site they were taking it to

20   would sign it.  And then they would bring it back,

21   bring back the form and attach it to the task.  Or

22   the help desk ticket or whatever they were doing.

23        Q.  Okay.  So basically, the responsibility for

24   preparing the form rested with the technician?

25        A.  Technician.

SPENCER - CROSS                          666

1        Q.  Maybe I asked you this question, and I

2   apologize for being redundant.  During that time

3   span, 13 months when you were -- before you came

4   into the Hardware Unit, who assigned the tasks, the

5   tickets that came in.

6        A.  Like I said, I believe it was Rod or Ed

7   Gordon or Randy Anderson.

8        Q.  You did answer that.  I apologize for asking

9   you again.

10       Could I have a moment, Your Honor?

11          THE COURT:  Surely.

12       Q.  Just one last area.

13        When you became the manager of the Hardware

14   Unit, what responsibilities did you have for

15   overseeing the hardware inventory?

16       A.  I was responsible for it.

17       Q.  What did you do?

18       A.  Well, we did inventory every year.

19       Q.  We?

20       A.  Well, I had the job before and it continued

21   to be my job --

22       Q.  Okay.  So you --

23       A.  -- as the hardware manager.  We did an

24   annual inventory.

25       Q.  Okay.  When a piece of equipment came into

1   the Data Center --

2        A.  Hm-mmm.

3        Q.  -- did you have to do anything in terms of

4   logging it in?

5        A.  Me personally?

6        Q.  Yes.

7        A.  If I had taken it out and brought it back in

8   I would.  But otherwise, it would be the

9   responsibility of the technician.

10       Q.  Okay.  So let's assume that some new servers

11  come in from Chicago that are being relocated to

12  Springfield.

13       A.  Hm-mmm.

14       Q.  Would you have any responsibility in terms

15  of logging those servers in when they came in?

16       A.  No.  I don't think so.

17       Q.  Okay.  And when servers left the Data

18  Center, or other pieces of equipment left the Data

19  Center to go elsewhere, did you have any personal

20  responsibility for accounting for them?

21       A.  No.

22       Q.  Okay.  I have nothing further.  Thank you.

23            THE COURT:  Okay.  Mr. Okon?

24            MR. OKON:  No further questions, Your

25  Honor.

JOHNSON - DIRECT                                668

1              THE COURT:  Very good.  Are we all finished
2    then?  All finished with Ms. Spencer?
3         Very good.  You are excused, you may step down.
4    Thank you, Ms. Spencer.
5         (The witness was excused.)
6              THE COURT:  All right.  Next?
7              MS. BARNES:  Defendant rests, Your Honor.
8              THE COURT:  Thank you.  Defense rests.
9    And back to the Plaintiff.
10             MR. BAKER:  I'd like to call Ms. Johnson.
11             THE COURT:  I beg your pardon?
12             MR. BAKER:  I'd like to recall Ms. Johnson.
13             THE COURT:  Of course.  Come right up.
14   Ms. Johnson has been sworn before, so she may take
15   the stand.  You are still under oath.
16             THE WITNESS:  Yes, Your Honor.
17                  CHERYL JOHNSON
18   recalled as a witness herein, having been duly
19   sworn, was examined and testified as follows:
20                  DIRECT EXAMINATION
21   BY MR. BAKER:
22        Q.  Cheryl, I'm going to hand you what is marked
23   as Defendant's Exhibit 39.
24        A.  Yes.
25        Q.  And as I have reviewed this document, it

JOHNSON - DIRECT                        669

1   seems like there's a reoccurring entry that Mr.

2   Nance made about your Monday objective not being

3   met --

4        A.  Yes.

5        Q.  -- with respect to not updating many change

6   and hard desk tickets.  And then he identifies the

7   tickets, I assume, by reference to a ticket number.

8   You understand what I'm talking about?

9        A.  Yes, I do.

10       Q.  Your responsibility when it came to updating

11  tickets in your Monday report, did that include all

12  tickets that were in the Hardware Unit?

13       A.  Every help desk, every change, and every

14  task ticket had to have my personal update in it.

15       Q.  Regardless of when the ticket came into the

16  unit?

17       A.  Yes.

18       Q.  Okay.  Best estimate, at any one time, how

19  many tickets would be in the Hardware Unit being

20  worked on at some level?

21       A.  Hundreds at one time.

22       Q.  And in this report you had to do, what did

23  you have to do for each ticket?

24       A.  I had to have some type of update in each of

25  those tickets personally.

JOHNSON - DIRECT                                670

1        Q.  All right.  If Mr. Nance wanted to find out

2    what the status was of a ticket, could he have gone

3    to the Remedy system to find that out?

4        A.  Yes.

5        Q.  Would it have been a difficult task for him

6    to did?

7        A.  No.

8        Q.  I'm going to ask you to go to the entry on

9    April 29th, 2010.

10       Do you have that entry in your -- in front of

11   you?

12       A.  Yes.

13       Q.  I apologize for having to ask you these

14   questions, but --

15       A.  Yes.

16       Q.  This entry relates to something about you

17   that Mr. Nance said, quote, is unbearable?

18       A.  Yes.

19       Q.  And he says that you had an odor that was so

20   intense that he had to get a can of air freshener?

21       A.  Yes.

22       Q.  And he said that there was urine on your

23   clothing?

24       A.  Yes.

25       Q.  And there were many stains on your clothing?

JOHNSON - DIRECT                      671

1      A.  Yes.

2      Q.  And you -- you looked like you brought --

3  wore dirty clothes over and over?

4      A.  Yes.

5      Q.  When did you first become aware of anyone in

6  your chain of command having any concern about your

7  appearance?

8      A.  None.

9      Q.  In this case, you received a copy of this

10  document --

11      A.  Yes.

12      Q.  -- did you not?  And can we agree that at no

13  time prior to this case being initiated had anyone

14  from CMS provided this to you?

15      A.  That's correct.

16      Q.  You didn't receive it in any kind of

17  disciplinary proceeding?

18      A.  No.  The norm is that if something -- if

19  someone had that type of odor, or if they were --

20  had that kind of problem, then they would have to be

21  referred to Human Services.  And then they would

22  have to have a union representative talk to them in

23  the presence of Human Resources.  And they would

24  have it documented or given some kind of counseling

25  on it.

JOHNSON - DIRECT                    672

1      Q.  Sure.  I noticed Mr. Gordon has come into

2   court wearing blue jeans?

3      A.  Yes.

4      Q.  Was that typical of the way he dressed at

5   work?

6      A.  Yes.

7      Q.  I understand technicians dress casually?

8      A.  Yes.

9      Q.  Much more causally than lawyers.  How did

10  you dress when you came to work?

11     A.  Similar to the way I've been dressing since

12  I been coming into court.

13     Q.  Okay.  So you didn't dress up a whole lot to

14  come into court --

15     A.  This is how I looked when I worked there and

16  this is how I look when I work at DHS.  I've always

17  taken good care of myself.  I've always taken pride

18  in my appearance.

19     Q.  How did you react to this entry?

20     A.  It was just really shocking.  I mean I

21  really cried when I saw it, to be honest with you.

22     Q.  I'm going to ask you to go to Plaintiff

23  Exhibit 7.  Do you have that in front of you,

24  Cheryl?

25     A.  Yes, sir.

JOHNSON - DIRECT

1          Q.  Can you identify it for me?

2          A.  Yes.  It's an email that I responded to Rod

3     on one of his, I say, quote, unquote, not met

4     objective emails I would get daily.

5          Q.  And let's talk about the context.

6          A.  Yes.

7          Q.  If you go to the bottom of the first page of

8     Exhibit 7.

9          A.  Yes.

10         Q.  That's an email from Rod Nance to you --

11         A.  Yes.

12         Q.  -- am I correct?

13         A.  That's correct.

14         Q.  And the top page is your response to Rod?

15         A.  That's correct.

16         Q.  Okay.  Your Honor, I'd like to offer

17    Plaintiff Exhibit 7.

18              MS. BARNES:  No objection.

19         Q.  And I'd like to publish this to the jury, if

20    I could?

21              THE COURT:  Yes, you may.

22         (Plaintiff's Exhibit 7 admitted.)

23         Q.  Cheryl, I'm gonna refer to the second page

24    of that document.  Is that typically the type of

25    response you would get from Mr. Nance concerning

JOHNSON - DIRECT                          674

1    failing to meet an objective?

2         A.  Yes.

3         Q.  Okay.  And he talks about providing an

4    incorrect tag on an AMAF form for a server with a

5    particular serial number?

6         A.  Yes.

7         Q.  Was that in a report?  Or was that in --

8         A.  It was probably -- it's saying from one of

9    the AMAF forms.

10        Q.  Typically -- typically, in a week, how many

11   servers would you account for in these forms?

12        A.  I could account for hundreds of servers in a

13   week.  If I'm looking at the inventory, all that had

14   to go on a form.  So I would -- hundreds and

15   hundreds of serial numbers.

16        Q.  And that would be something you would have

17   to account for weekly?

18        A.  Yes.

19        Q.  So -- and that was your objective to do it

20   weekly?

21        A.  Yes.

22        Q.  So you failed to meet that objective because

23   of out of these hundreds of servers, you got some

24   incorrect tag information on one server?

25        A.  Yes.

JOHNSON - DIRECT                    675

1        Q.  Did you agree with him on the assertion he

2   made that it was incorrect?

3        A.  No.

4        Q.  And how did you respond to him?

5        A.  I responded back with an email and said that

6   the tag number was written on a machine that looked

7   like a number which a technician passed to me.

8   Three different technicians verified the same

9   numbers.  And you know, somehow it was still said it

10  wasn't correct.

11       Q.  Okay.  Did you ever change his assessment of

12  your meeting or not meeting that objective?

13       A.  No.  It just made -- that one item made my

14  whole entire objective for every asset management

15  form that I sign all week long, or every piece of

16  equipment that I check, made the whole objective not

17  met for the whole entire week.

18       Q.  So with respect to failing to meet

19  objectives regarding asset management forms, was

20  this the only time where one mistake out of hundreds

21  of servers was considered not meeting an objective?

22       A.  No.  It happened frequently.

23       Q.  Mr. Warren testified this morning that you

24  were reassigned to the Hardware Unit because of

25  problems with your work performance; am I correct?

JOHNSON - DIRECT                          676

1          A.  Well, that's what -- I guess that's what he

2     said this morning; yes.

3          Q.  Did he ever tell you that?

4          A.  No.

5          Q.  Did Mr. Rademacher, his superior, ever tell

6     you that?

7          A.  No.

8          Q.  Did anyone in your chain of command ever

9     tell you you were being relocated because of

10    problems with your work?

11         A.  No.

12         Q.  At any time prior to being informed that you

13    were being relocated, did Mr. Warren ever meet with

14    you to talk about your need to improve your work?

15         A.  No.

16         Q.  Did he ever send you an email saying

17    anything about your need to improve your work?

18         A.  No.

19         Q.  So Mr. Warren, I think, conceded he never

20    had any official -- quote "official" conversations

21    with you about your performance.  Did he ever have

22    any quote "unofficial" conversations with you about

23    your performance?

24         A.  No.

25         Q.  I want to you to go, if you would, to

1    Plaintiff Exhibit 6.

2        Never mind, let's -- we don't need to cover

3    that.

4        You had an objective about dealing with low

5    disk space servers?

6        A.  Yes.

7        Q.  And we're probably treading on some area

8    that was covered yesterday, but you had to submit a

9    report each week?

10       A.  Yes.

11       Q.  And that report was due on Tuesday?

12       A.  Yes.

13       Q.  And it was based upon the WUG report which

14   was issued on a Monday?

15       A.  Yes.

16       Q.  And as I understand it, you had to develop a

17   plan for upgrading servers?

18       A.  Yes.  For each server.

19       Q.  Were these servers that were at the

20   97 percent of capacity?

21       A.  No.

22       Q.  Were they --

23       A.  Most of them weren't.  Some of them were,

24   but most of them weren't.

25       Q.  Were they servers of a 90 percent capacity?

JOHNSON - DIRECT                        678

1        A.  Most of them were not.

2        Q.  So what was the capacity that you had to

3   report on?

4        A.  Every single one that was on the report.

5        Q.  Irregardless of what the capacity was for

6   it?

7        A.  That's correct.

8        Q.  Okay.  Did anyone explain to you why you had

9   to do that every week?

10       A.  No.  It was just I had to have a

11  complaint -- a plan where the customer agreed with

12  the scheduled date, all the equipment ordered for

13  it, and technicians assigned to each and every one

14  of those that were on a low disk space.  According

15  to my objective.

16       Q.  Okay.  Mr. Warren indicated that at the time

17  you left to join the Hardware Group, Ed Gordon had

18  that group well organized and well documented.  You

19  recall him saying that?

20       A.  I do recall him saying that.

21       Q.  When you went into that group, how much of

22  an orientation did Mr. Gordon give you?

23       A.  Not much.  I mean -- not really anything,

24  just some -- I don't know, it wasn't anything

25  official.  I can't even really recall what kind of

JOHNSON - DIRECT                          679

1    orientation it would have been.

2        Q.  Okay.  You talked about some of your tasks.

3    And one of those tasks dealt with, as I recall,

4    locating or identifying the location of servers?

5        A.  That's correct.

6        Q.  These are these servers throughout the State

7    of Illinois?

8        A.  Yes.

9        Q.  Was there any documentation in the Hardware

10   Unit that Mr. Gordon had prepared that assisted you

11   in documenting the location of servers?

12       A.  There was not one place that I could go and

13   find a definitive list of every single piece of

14   equipment at every location.

15       Q.  But was there a list that had any equipment

16   at any location?

17       A.  I may be able to find some information here

18   or there.  There was -- it was random information in

19   different places that I would have to try to gather

20   up.  But really, a lot of it, when you checked it,

21   it wasn't accurate because when you look at it then

22   that equipment that used to be there is no longer

23   there anymore.  So really, I couldn't really count

24   on the information that I saw, I had to go and

25   verify it.

JOHNSON - DIRECT                          680

1        Q.  Was there any plan that was in place for

2   decommissioning servers?

3        A.  I didn't see any kind of decommission plan

4   in place where they had a schedule or list of

5   servers to be decommissioned or anything like that.

6        Q.  Did you look for one?

7        A.  I looked in the documentation, the Share

8   Point site.  It had some information, but it wasn't

9   a lot of detailed information.

10       Q.  Okay.  You were supposed to prepare, as I

11  recall, a schedule or plan for upgrading servers?

12       A.  Yes; that's correct.

13       Q.  And you talked yesterday about what that

14  involved.  When you went into the Hardware Unit, did

15  it appear to you that Mr. Gordon had any plan in

16  place?

17       A.  There was no place I could go and see a plan

18  that was already documented.  A schedule, a list of

19  locations or any equipment and staff assigned, or

20  customer approvals for any upgrades.

21       Q.  You had some, as I understand it, some

22  inventory responsibilities when you joined the

23  Hardware Group?

24       A.  Yes.

25       Q.  And without being horribly redundant, can

JOHNSON - DIRECT                           681

1    you identify what those were?

2        A.  One of the inventories that I had, I was

3    required to do a monthly inventory of all the

4    servers and all the equipment at the Data Center.

5    So that was something I had to go and count every

6    piece of equipment, all the parts, and all the spare

7    parts.  And there may be drawers that had little

8    pieces of cards and different things in it.  I had

9    to go through and count every single one, every

10   piece of equipment every month.

11       Q.  Okay.  And how frequently did you have to do

12   that?

13       A.  That was due once a month, but I had to keep

14   doing it ongoing just so by the end of the month, I

15   would have some kind of count.  But the problem with

16   that was that a lot of times technicians, maybe not

17   even from my own group, because there was a lot of

18   people other than mine.  Sometimes somebody will

19   come and get a spare part and wouldn't say anything

20   and they'll just go to -- and then all of the sudden

21   now the count is not the same.

22       Q.  Now, Mr. Warren said Gordon did a great job

23   of documenting things.  Did you find anything that

24   Mr. Gordon had done to document inventory?

25       A.  I didn't see a list of every part and every

JOHNSON - DIRECT                          682

1    peripheral and every server and every piece of

2    equipment at the Data Center anywhere, because I had

3    to develop it.

4         Q.  What did you see that would identify

5    Mr. Gordon accounting for inventory?

6         A.  I didn't see -- I didn't see an inventory

7    list.

8         Q.  Did you ever ask Mr. Gordon if he prepared

9    a --

10        A.  I asked -- every time I had these tasks, I

11   would go and ask Ed, say, "Do you have something I

12   can work with?"  And he'll say, "I didn't have to do

13   that."  So that was the reason I couldn't find some

14   of these things.

15        Q.  All right.  I think some of your objectives

16   dealt with relocating servers of state agencies at

17   remote locations?

18        A.  Yes.

19        Q.  Okay.  And you were given specific

20   timetables to do it.  And you were required to put

21   together a detailed plan specifying what you had to

22   do --

23        A.  That's correct.

24        Q.  -- am I correct?

25        When you were given that assignment, did you

JOHNSON - DIRECT                    683

1    look and see what Mr. Gordon had done in terms of

2    putting together a plan for removing servers at

3    agencies while he was managing the Hardware Group?

4         A.  I never saw any documentation of a detailed

5    plan.  Because if I had that, that would have been

6    something I can run with.  Everything I did, I had

7    to start from scratch.

8         Q.  Okay.  Well, my question is, when you were

9    given this assignment by Mr. Nance, did you search

10   out a plan?

11        A.  I did.  I certainly did.  Because why

12   duplicate information that's already done.

13        Q.  And did you -- did you find anything?

14        A.  No.

15        Q.  Did you ask Mr. Gordon if he had one?

16        A.  I did.

17        Q.  And what did he tell you?

18        A.  "I didn't have to do that."

19        Q.  Well, I'm not going to belabor the point,

20   but with respect to the tasks that Rod Nance gave

21   you, whether it was to prepare reports, to submit a

22   plan, was it your customary practice when you got

23   that assignment to look and see what had been done

24   previously in the Hardware Unit?

25        A.  Yes.  That's the thing about IT; why do the

JOHNSON - DIRECT                    684

1   same thing over if it's already done.  You can

2   duplicate a lot of things that's already done and it

3   will save time.

4        Q.  And with respect to these tasks, did you

5   ever find anything that had been done earlier by

6   Mr. Gordon that would be of assistance to you?

7        A.  Had it been -- had it been there, I would

8   have used it.  But it wasn't.

9        Q.  Okay.  And when you asked Mr. Gordon, he

10  said he didn't have to do that?

11       A.  Yes.

12       Q.  By the way, preparing these plans, was it

13  time-consuming?

14       A.  Very time-consuming; yes.

15       Q.  Okay.  Other than -- than your conversations

16  with Mr. Nance -- or Mr. Gordon, excuse me, when you

17  went into the Hardware Group, what orientation did

18  you get concerning what was needed to be done, the

19  timetable for it being done, those sorts of things?

20       A.  None.

21       Q.  Okay.  So you had to wing it?

22       A.  I did.

23       Q.  Was Mr. Nance of any assistance to you?

24       A.  Not really; no.

25       Q.  Okay.  You've heard Ms. Spencer say that Mr.

1    Nance was -- was very helpful when she asked for

2    things.  Do you agree with her assessment of Mr.

3    Nance?

4        A.  No.

5        Q.  Why not?

6        A.  Because it wasn't that for me.  I -- it was

7    hard for me, you know, I never really got any

8    guidance or direction.

9        Q.  In one of his more animated moments in his

10   testimony this morning, Mr. Warren spoke about a

11   rack consolidation project?

12       A.  Yes.

13       Q.  And I think what he was saying, and I'm

14   paraphrasing this and I'm hopefully accurate, that

15   the consolidation process really involved just

16   switching things around at the Data Center?

17       A.  Yes.

18       Q.  Was he correct in part?

19       A.  Yes.

20       Q.  And the part that he was correct in was just

21   a matter of unplugging one server and plugging in

22   another?

23       A.  Well, the part of the consolidation that he

24   was referring to is that we were making room for

25   servers to be relocated to the Data Center so that

1    we were -- there was servers spread all over the

2    place.  So we kind of put them together like based

3    on the agency and grouped them like that so it would

4    make space for when we brought servers from other --

5         Q.  So was it just a matter of physically

6    relocating the servers?

7         A.  Well, it was more than that really.  Because

8    even though the servers were just being moved, you

9    still had to do the same things as if you were

10   moving it from another location.  You still had to

11   have the server out of service, you had to have down

12   time, you had to have the network and storage team,

13   you would have to have backups.  And you would have

14   to have a staff member ready for the move.  And you

15   had to have the networking team ready to do their

16   part, and all the other teams ready to do their

17   parts.  It was still the same thing, but it was at

18   the Data Center.

19        Q.  So in terms of your work as a manager,

20   because as I understand it, you didn't go out in the

21   field?

22        A.  Yes.

23        Q.  With this relocation within the Data Center,

24   did you have to do the same things as if the server

25   was out in the field?

JOHNSON - DIRECT                    687

 1      A.  Yes.  Because I still had to work with the

 2 customer to get downtime for the server, and all the

 3 same things I would have to do if the server was

 4 being taken -- moved from a remote location, other

 5 than sending a technician on site.

 6      Q.  Okay.  Going back then to the other part of

 7 this rack consolidation, I think; was there another

 8 aspect that involved remote servers?

 9      A.  Yes.  Eventually, one of my jobs was gonna

10 be also doing some of the relocation to -- of the

11 servers to the Data Center as well.  Some of my --

12 our job was to bring some of the servers into the

13 Data Center as well.

14      Q.  Okay.  Prior to tickets being assigned in

15 your name, you were able to track the progress of a

16 ticket through the use of the Remedy system?

17      A.  Yes.  That's the purpose of Remedy, to be

18 able to track.

19      Q.  And what was your practice in terms of doing

20 that?

21      A.  Daily.  I would monitor the WUG system to

22 look for activity, just like, you know, like you can

23 see applications and all kinds of things on WUG.

24 And also, at the same time, it was -- may have been

25 a different monitoring system at that time, but we

JOHNSON - DIRECT                    688

1    still had monitoring system.

2         And also, in addition to that, I would daily

3    look into my tickets and see what activity is going

4    on with my staff.  Make assignments and such.

5         Q.  Okay.  When tickets were assigned in your

6    name, was that a help or a hindrance to you?

7         A.  It was a hindrance.

8         Q.  Okay.  Did it -- did it provide you with any

9    more access or control over identifying the progress

10   of a ticket?

11        A.  All it did was bog me down with a lot of

12   extra things I had to do.  You know, just hours and

13   hours of updating tickets.

14        Q.  Okay.  Both change tickets and help desk

15   tickets?

16        A.  And tasks.

17        Q.  And tasks as well?

18        A.  Yes.

19        Q.  Okay.  We heard this morning about

20   Mr. Warren had a conversation with a Mr. Foster?

21        A.  Yes.

22        Q.  And a Mr. Nall?

23        A.  Yes.

24        Q.  How would you characterize Mr. Foster and

25   Mr. Nall as technicians in -- as technicians?

JOHNSON - DIRECT                          689

1        A.  They seemed to know their jobs as far as

2    technician-wise; yes.

3        Q.  Did you run into difficulties in having them

4    make entries into the Remedy system?

5        A.  Yes.

6        Q.  Can you explain that?

7        A.  Because all of the tickets had to be

8    updated, one way it could be updated, if the

9    technician would update the ticket, then it would

10   have the weekly update in it.  And since I held

11   tickets in my name, then it didn't make the

12   technicians personally accountable for the tickets,

13   so it didn't really matter to them if they updated

14   their tasks or not in Remedy because they weren't

15   being held personally accountable for that.  So they

16   didn't really have any skin in the game, I would

17   say, when it came to that.

18       Q.  Can you go to Exhibit 14 for me.

19   Plaintiff's, I'm sorry.

20           THE COURT:  Is that Plaintiff's 14?

21       Q.  Yes, sir.

22       Can you tell me what -- Excuse me.  This is a

23   five or six-page document, is it not?

24       A.  Yes.

25       Q.  And each page represents an email?

JOHNSON - DIRECT                          690

1        A.  Yes.

2        Q.  Is the content of the emails generally the

3    same?

4        A.  Generally the same.

5        Q.  And can you tell me generally who the emails

6    were written to?  Not in terms of name, but in terms

7    of position?

8        A.  Technicians.

9        Q.  And would that be a request to the

10   technician to do something?

11       A.  Yes.  The work that they did in the Remedy

12   system, so I could know the status of the work that

13   they did.  Or either complete and close their task.

14   Because as long as their task remained open, then my

15   verified task couldn't be closed, and then that

16   would make my whole entire ticket late.

17       Q.  Okay.  Your Honor, I would like to offer

18   Plaintiff Exhibit 14 into evidence.

19            MS. BARNES:  No objection, Your Honor.

20            THE COURT:  Admitted.

21       (Plaintiff's Exhibit 14 admitted.)

22       Q.  Cheryl, I'm just gonna show you the first

23   page of Exhibit 14.

24       A.  Yes.

25       Q.  With -- would that be a typical way you

JOHNSON - DIRECT                          691

1   would communicate with a technician who had not made

2   an entry into the hardware -- into the Remedy

3   system?

4        A.  Yes.

5        Q.  Okay.  And would you -- do the documents in

6   Exhibit 14 comprise each time while you were the

7   hardware manager that you would do that?

8        A.  Yes.  And it applied to not my staff, but

9   even other people's -- other manager's staff that

10  had tasks open as well.

11       Q.  Okay.  Well, my question is, this document

12  is six pages?

13       A.  Yes.

14       Q.  And are you telling me that it was only

15  these emails on these six pages?

16       A.  No.  This is ongoing, all day, every day.

17       Q.  So this is an example?

18       A.  Yes, this is an example.  I did hundreds of

19  these because I was always in the tickets.  And I

20  had to go through every single ticket, and if there

21  was an update, then I had to make sure this was an

22  update.  And if the technician didn't update, I had

23  to make sure there was an update in there

24  personally.  And I would add this email inside of

25  the ticket each -- every week.

JOHNSON - DIRECT                          692

1          Q.  Was there a change in the practice of the

2    technicians in making entries and doing tickets

3    after the tickets were assigned in your name?

4          A.  Yes.

5          Q.  And what was the change?

6          A.  The change was that they didn't feel

7    obligated to have to update the task because it

8    wasn't being -- it wasn't counted against them

9    personally.  And so it didn't really matter to them

10   really.  I mean I would be sending emails constantly

11   to my staff and other staff, and -- just to get the

12   tasks updated.

13         And long as those tasks stayed open, then I

14   couldn't do the verify, and the whole entire ticket,

15   which was in my name, stayed open, and I was the one

16   that got every week a not met for that ticket being

17   open.

18         Q.  Mr. Warren spoke today about the options

19   available to you within CMS if you felt that you

20   were discriminated against?

21         A.  Yes.

22         Q.  Do you know a man named Fred Stewart?

23         A.  I do.

24         Q.  And back when you were at CMS, was

25   Mr. Stewart at CMS?

JOHNSON - DIRECT                          693

1        A.  Yes.

2        Q.  And what was his position?

3        A.  He was an EEOC officer.

4        Q.  At any time while Mr. Stewart was the EEO

5   officer, did you ever complain to him about the

6   treatment you were receiving?

7        A.  Yes.

8        Q.  And how did he respond to it?

9        A.  I didn't feel like he really --

10           MS. BARNES:  Your Honor, I object to this

11   hearsay.

12       A.  Okay.

13       Q.  Did Mr. Stewart do anything to help you with

14   your request?

15       A.  No.

16       Q.  Did he -- did he follow-up with you at all?

17       A.  No.

18       Q.  Did he seem at all interested in your

19   problem?

20       A.  No.

21           THE COURT:  Mr. Baker, it is five minutes

22   until five.  I assume you have additional questions?

23           MR. BAKER:  Um.

24           THE COURT:  And it seems to me that we

25   probably are pretty close to the time for us to --

1        MR. BAKER:  I agree, Your Honor.

2        THE COURT:  -- fish or cut bait tonight.

3        MR. BAKER:  I agree, Your Honor.

4        THE COURT:  All right.  We will change this

5   just a smidgen.  What we're going to do tomorrow

6   morning is we're going to come in at 10:00, not

7   nine.  And we will have no break from 10 until 12,

8   we will go straight through, and then proceed

9   accordingly.  But I thought I would give you a heads

10  up on that ladies and gentlemen.

11       Please recall the admonition.  Do not discuss

12  anything about this case at all until it's time for

13  you to deliberate among yourselves after I have

14  given you the final charge.  Okay?

15       Now, you have a very pleasant evening.  We're

16  going to stand in recess until 10:00 tomorrow

17  morning.  And there will be no break tomorrow

18  morning, so that means come loaded for bear at ten.

19  Okay?

20       Good night and have a very pleasant time and

21  recall my admonition.  Thank you.

22       (The jury left the courtroom.)

23       THE COURT:  All right.  The jury has left

24  the courtroom.  Please be seated, everyone.

25       Now, what is your projection here?  You've got

1    some more questions of your client, or close?

2            MR. BAKER:  I may have 15 minutes more.

3            THE COURT:  Okay.  That's fine.  That would

4    still have gone over our time tonight, you see.  So

5    I wanted to get us established for tomorrow.

6        And let me ask this from the state, do you

7    anticipate additional evidence in rebuttal?

8            MS. BARNES:  No.

9            THE COURT:  You intend none?

10           MS. BARNES:  Correct.

11           THE COURT:  Correct, none.  Okay.

12       Then we will be going from you straight into

13   apparently making our record first and then going

14   into our closing arguments.  Do I say that

15   correctly?

16           MR. BAKER:  I think you're correct.

17           THE COURT:  Okay, good.  Good.

18       All right.  So keep that in mind as we go.

19       Now, I'm not about to preclude either party

20   from doing your entire case.  Whatever you want to

21   do it completely up to you.  But keep this in mind

22   from our timeframes; I don't want to chop up, yet at

23   the same time, I want to keep the jury in mind.  So

24   we're gonna have lunch tomorrow to worry about and

25   so forth and so on.

1     So just keep that in mind if you would as we --

2  as we progress.  Nothing is carved in stone, as we

3  all know.  So we will still be pliable and

4  malleable, but at the same time, we do want to keep

5  the jury's comfort in mind as well as getting our

6  entire case in.

7     Okay.  You look like you're moved to say

8  something or other.

9         MR. BAKER:  I just have a comment and a

10  question.

11     The comment is, it's my sense--Ms. Barnes can

12  correct me if I'm mistaken--that we'll have a fairly

13  speedy jury instruction conference.  I think there's

14  one or two instructions that are at issue, but --

15         MS. BARNES:  Yes.  There are two

16  instructions I have not given your clerk yet.  I've

17  given them to Mr. Baker.  All I want to do is submit

18  a written motion, the Judge knows what that is, at

19  the close of our case.

20         THE COURT:  Mm-hmm.

21         MS. BARNES:  I will renew it at the close

22  of all of my evidence to make my record.

23         THE COURT:  Do you anticipate any rebuttal

24  or surrebuttal?

25         MS. BARNES:  No.

1           THE COURT:  Very good.

2           MR. BAKER:  So -- and I'll give your clerk

3     another copy of my instructions and a clean copy as

4     well so that --

5           THE COURT:  Fine.

6           MR. BAKER:  -- he has them.

7        I guess my question is, what is your thought

8     about scheduling the instruction conference?

9           THE COURT:  Well, that was certainly part

10    of the included thought process.  We're gonna have

11    to sandwich that in.  And so I was thinking that if

12    you -- if you are going to finish up with a few more

13    questions in say 15, 20 minutes, something like

14    that, and there's nothing additional from the state,

15    then it would seem to me that that would be the time

16    for you all to get together with Mr. O'Neill and get

17    these instructions remedied.

18        And we'll just let the jury have a repose at

19    that time.  There's plenty of coffee and soft drinks

20    and so forth back there for them.

21        How does that sound?

22           MS. BARNES:  That's fine.  When do you want

23    us here tomorrow morning?

24           THE COURT:  Well, I would think that --

25    we're gonna be here at 10:00 as far as the jury is

1    concerned.  And Mr. Baker will continue.

2        Now, if we want to do that after -- if you

3    would like to get here ahead of time and meet with

4    Mr. O'Neill, he's here in the courtroom as we speak.

5    And he has in his hands some of those documents that

6    have been submitted.  If you've got some fresh ones,

7    why don't you give them to him, and maybe get here

8    at 9:30.

9            MR. BAKER:  Sounds good.

10           MS. BARNES:  That's what I thought we could

11   do to discuss the instructions tomorrow morning.

12   And could I -- could I file this motion today?

13           THE COURT:  Oh, absolutely.

14           MS. BARNES:  Okay.

15           THE COURT:  Sure.  We'll make sure that

16   that is docketed at the proper time.

17           MS. BARNES:  Okay.

18           THE COURT:  Absolutely.

19       Now, the question is, do you want oral

20   arguments on the motion?

21           MS. BARNES:  Well, since I have thoroughly

22   addressed all of my evidence in my motion, I will

23   leave it to the Court -- if the Court has any

24   questions, I would be happy to answer them, but

25   otherwise, I would just like to make my record.

```
 1                  THE COURT:  Fine.  That's excellent.  Thank
 2       you.
 3           And I tell you what we'll do; if you will file
 4       that instanter, I will take that home and I will
 5       read it tonight.
 6                  MS. BARNES:  Okay.  I have a copy for you.
 7                  THE COURT:  That's a hell of a bargain,
 8       isn't it?
 9                  MR. BAKER:  Will I get a copy too?
10                  MS. BARNES:  You get a copy too.
11                  THE COURT:  All right.  And I'm sure,
12       Mr. Baker, that comes as no surprise to you.  Thank
13       you, very much.
14           All right.  Now, is there anything more for the
15       good of the order?
16                  MR. BAKER:  I don't believe so.
17                  THE COURT:  Or this lodge in particular?
18                  MS. BARNES:  We are fine.
19                  THE COURT:  Fine.  Have a pleasant evening.
20       And we will see you all in the morning.  Counsel
21       will meet with Mr. O'Neill at 9:30, is my
22       understanding.  And you are all at your own disposal
23       until 10:00.
24           Very good.  Thank you all.  Have a pleasant
25       evening.
```

1        I think it might be wise for us for us to give

2    an opportunity for both the movant state to make any

3    oral argument on this motion, and of course,

4    Mr. Baker to respond if that is a desire.  So we

5    will do that just before you meet with Mr. O'Neill

6    concerning the jury instructions.  All right?

7    That's in the morning.

8        Any problem with that?

9            MR. BAKER:  So what time should we be here?

10           THE COURT:  I beg your pardon?

11           MR. BAKER:  What time should we be here?

12           THE COURT:  Well, you're going to be here

13   at 9:30 to -- with him, why don't we say 9:15.  Does

14   9:15 work out all right?

15           MR. BAKER:  Yes.

16           THE COURT:  Okay.  Can anybody else think

17   of any glitches in the game plan?  Any problem, any

18   missed or overlooked?

19           MR. BAKER:  I don't think so?

20           THE COURT:  We certainly wouldn't want to

21   stub our feet at this stage of the game with

22   Ms. Barnes' last trial.

23           MS. BARNES:  Yeah, it is.

24           THE COURT:  And she is going to retire

25   after a wonderful career of many years and many of

1    them with me.

2          MS. BARNES:  Yes.  My first federal trial

3    was with you.

4          THE COURT:  Isn't that something.  Well, it

5    will be -- I'll be fortunate to be your first and

6    your last in the federal system then.

7       All right.  Have a good evening of them

8    everybody.  And we'll see you tomorrow morning.

9       (Court was recessed for the day.)

10

11   I, KATHY J. SULLIVAN, CSR, RPR, CRR, Official Court

12   Reporter, certify that the foregoing is a correct

13   transcript from the record of proceedings in the

14   above-entitled matter.

15

16

17

18

19                    This transcript contains the

20                    digital signature of:

21

22                    Kathy J. Sullivan, CSR, RPR, CRR

23                    License #084-002768

24

25