```
 1              IN THE UNITED STATES DISTRICT COURT
            FOR THE CENTRAL DISTRICT OF ILLINOIS
 2                   SPRINGFIELD DIVISION

 3
   CHERYL L. JOHNSON,            )
 4                              )
                PLAINTIFF,      )  14-CV-3001
 5                              )
           VS.                  )  JURY SELECTION
 6                              )
   THE ILLINOIS DEPARTMENT OF   )  SPRINGFIELD, ILLINOIS
 7 CENTRAL MANAGEMENT           )
   SERVICES,                    )  VOL. 4
 8                              )
                DEFENDANT.      )
 9

10              TRANSCRIPT OF PROCEEDINGS
          BEFORE THE HONORABLE RICHARD MILLS
11            UNITED STATES DISTRICT JUDGE

12 AUGUST 30, 2018

13 A P P E A R A N C E S:

14 FOR THE PLAINTIFF:       JAMES P. BAKER
                            BAKER, BAKER & KRAJEWSKI
15                          415 SOUTH SEVENTH STREET
                            SPRINGFIELD, ILLINOIS
16

17 FOR THE DEFENDANT:       DEBORAH BARNES
                            JOSEPH OKON
18                          ILLINOIS ATTORNEY GENERAL
                            500 SOUTH SECOND STREET
19                          SPRINGFIELD, ILLINOIS

20

21

22
   COURT REPORTER:          KATHY J. SULLIVAN, CSR, RPR, CRR
23                          OFFICIAL COURT REPORTER
                            U.S. DISTRICT COURT
24                          600 E. MONROE
                            SPRINGFIELD, ILLINOIS
25                          (217)492-4810
```

I N D E X

| WITNESS | DIRECT | CROSS | REDIRECT | RECROSS |
|---------|--------|-------|----------|---------|
| CHERYL JOHNSON | 718 | | | |

E X H I B I T S

| PLAINTIFF'S EXHIBIT NUMBER | IDENTIFIED | ADMITTED |
|---------|--------|-------|

| DEFENDANT'S EXHIBIT NUMBER | IDENTIFIED | ADMITTED |
|---------|--------|-------|

```
1                    P R O C E E D I N G S

2        *    *    *    *    *    *    *    *    *    *    *

3              THE COURT:  Thank you, Madam Clerk.

4         Good morning, everyone.  We're all in place.

5    The jury is not, n-o-t, in the jury box.

6         We have defendant's motion to be addressed this

7    morning.  And I think that I will advise you that I

8    have read in haec verba every single word of the

9    motion last evening.  And unless my feeble and

10   ancient brain has receded since that time, it's

11   still familiar to me.  And so I give you that.

12        I would like to hear, however, from both the

13   CMS, if you have any further comments to make, Ms.

14   Barnes, I'll hear those.  And then I will hear from

15   the plaintiff.

16        Please proceed.

17              MS. BARNES:  Thank you.

18        Your Honor, the only additional comment we

19   would have is that in addition to the comment we

20   made based on the case law at the end of the

21   plaintiff's case yesterday, at the end of the

22   defendant's case, abundant evidence was introduced

23   which established legitimate business reasons for

24   the decisions that were made in this case.

25        It is our position that the plaintiff must come
```

1   up with some -- some evidence that these

2   business-related decisions, which were connected to

3   the decision to discharge, were somehow pretextual

4   or phony.  We don't believe that there's been any

5   evidence of that, and that's why we believe, based

6   on the case law, CMS is entitled to judgment as a

7   matter of law at the close of the plaintiff's case

8   and the defendant's case.

9           THE COURT:  Thank you very much.

10      All right, Mr. Baker.

11          MR. BAKER:  Good morning, Your Honor.

12          THE COURT:  Good morning.

13          MR. BAKER:  It probably seems like a month

14  ago, but in reality was maybe two days, I argued in

15  response to the motion of CMS at the close of the

16  plaintiff's case.  And I don't want to repeat that

17  argument; I would like to say it applies equally

18  now.

19      What I would instead like to do is to respond

20  to Ms. Barnes' brief and specifically to the comment

21  she made a moment ago.

22      And let me begin this way:  In her brief, she

23  claims that Ms. Johnson had six years of bad

24  performance at CMS.  Six years.  That's not true.

25  Simply not true.  The evidence is, in her first

position, based upon her performance evaluations,
based upon her satisfactory completion of probation,
based upon not receiving any reprimands or
discipline concerning performance, her performance
was fairly adequate.

Her performance problems began when she went
under the supervision of Mr. Nance.  Now, that's
significant in a couple of respects, but
particularly, yesterday, Mr. Nance acknowledged that
he had nothing to do with evaluating her performance
in her first position.  So they cannot claim that
Mr. Nance said she was doing okay then, and then all
of the sudden, was bad.  All of her performance
problems began when she started working under Mr.
Nance.

Second point they make that is factually
inaccurate is that it didn't make any difference how
tickets were assigned, whether they were assigned in
her name or not, because she didn't work on the
tickets.  That also is false.  We concede that
technicians did a lot of the work on some of the
tickets, but the evidence in this case is that --
and this came from Ms. Higgerson, that a ticket
would assign various tasks that would have to be
performed and the person that would have to perform

1    them.

2         And the task report that Ms. Higgerson prepared

3    was an accumulation of the tasks Ms. Johnson was

4    required to perform on the tickets while she was in

5    the Hardware Unit.  And there are significant number

6    of tasks that were required of her and virtually no

7    tasks required of Mr. Gordon.  So the notion that

8    she didn't have anything to do work-wise with those

9    tickets is just not accurate according to the

10   defendant's witness.

11        The other thing is there were numerous help

12   desk tickets and fewer, but many, change tickets.

13   And even though Ms. Johnson did not have to actually

14   perform the work that was required completely in

15   those tickets, she did have some duties that Mr.

16   Gordon did not have.  She had to personally verify

17   the completion of the ticket which meant dealing

18   with the customer on thousands of tickets.  She had

19   to go through a process of assigning tasks on the

20   tickets which she said took, you know, ten minutes

21   or so per ticket.  So the notion she had to do

22   nothing is just not correct.

23        The second -- the third point that is made is

24   that the only way Ms. Johnson can demonstrate that

25   she and Ed Gordon were similarly situated is if she

1  can show that his conduct or performance was bad and

2  he was given more lenient discipline.  And that's

3  stated on page 5 of its brief.  And to support that

4  position, they cite the case Coleman versus Donahoe.

5      I submit they mis-cite Coleman versus Donahoe.

6  Because what the Coleman court said, and it kind of

7  reformed the whole notion of when is an employee

8  situated -- similar situated with another.  They

9  said three things, or maybe four.

10      First thing they said is it's usually a

11  question of fact for the fact-finder.  The second

12  thing that it's a flexible, common sense

13  requirement.  You don't need the same elements each

14  time.  The third thing they said is there has to be

15  enough information to allow some sort of common

16  sense comparison.

17      The flexibility notion means that discipline,

18  or lack of discipline could be a factor to be

19  considered, but it's not the only factor, it's not

20  the decisive factor.  There are multiple factors to

21  be considered.

22      Ms. Barnes is free to argue to the jury that

23  Mr. Gordon received no discipline, and therefore,

24  they're not similarly situated.  That presents an

25  issue for the jury to decide.  But we believe they

1    were similarly situated because they held the same

2    job, they reported to the same supervisor and the

3    difference they had was the volume and nature of the

4    work that were required of each of them.

5         And I guess going one step further, if we take

6    Ms. Barnes' argument to its logical conclusion,

7    there could never be a similarly-situated situation

8    here when one supervisor disproportionately assigns

9    a higher workload on one employee as against

10   another, and disciplines the employee because they

11   fail to meet the higher workload.  That's certainly

12   a differentiate in treatment.  But essentially, what

13   she is arguing, is that Mr. Nance should be excused

14   or condoned for his misbehavior.

15        The next point on page 6, Ms. Barnes says, and

16   she said a few moments ago at the podium, that

17   Ms. Johnson has the burden of producing evidence of

18   pretext.  And I will submit in this case there is

19   evidence of pretext.  But my point here is, without

20   getting into all of it, that's a misstatement of the

21   law.

22        Couple of things.  Our circuit has clearly

23   recognized that the McDonnell Douglas methodology of

24   proof is not a model to be used in presenting a case

25   to a jury.  When a case is resolved at summary

1   judgment, it slips out.

2       Now, certainly evidence of pretext can be

3   circumstantial evidence of discrimination.  I don't

4   argue that.  And it can -- it can be presented in

5   this case; that's true.  But it's not the only type

6   of evidence.  And I would cite to the -- to the

7   Court two cases which Ms. Barnes, I believe, omits.

8       The first is Troupe versus May Department

9   Stores which is cited at 20 Fed 3d 734.  It's a 1994

10  case from our circuit.  The second is Ortiz,

11  O-r-t-i-z, versus Werner Enterprise, Inc. Which is

12  reported at 834 Fed 3d 760, Seventh Circuit 2016.

13      And each of those cases discredits the argument

14  that Ms. Barnes makes here.  The Troupe case says

15  there can be various types of evidence that are

16  sufficient circumstantial proof of discrimination.

17  One of them can be a pretextual decision making.

18  Another could be a disparity in treatment between

19  employees; between someone in a protected group and

20  some in a non-protected group.  In other words,

21  there are a variety of means that a plaintiff can

22  produce circumstantial evidence to create an

23  inference of discrimination.  Pretext is not the

24  sole route.

25      More specifically is the Ortiz case which was

1    decided two years ago.  And it -- I believe that's a

2    Judge Easterbrook opinion; I may be mistaken on

3    that.  But it almost admonishes District Courts,

4    very stern language that says, you don't look at one

5    piece of evidence.  You look at the evidence in its

6    entirety in making a determination as to whether

7    there is sufficient evidence of discrimination.

8        In other words, pretext or lack of pretext

9    alone neither makes nor defeats a case.  It can be a

10   piece of evidence.  It can be highly probative

11   evidence.  Sanderson case said that.  But it need

12   not be the sole piece of evidence.

13       I don't want to get into a whole lot of

14   argument about the facts in this case.  We've heard

15   evidence concerning the disparity in job assignments

16   given to Mr. Gordon and Ms. Johnson.  We've looked

17   at help desk tickets and change tickets and various

18   reports; I don't want to rehash that.  We have

19   looked at training recommendations that Mr. Nance

20   made, significantly when he supervised Mr. Gordon.

21   In one year, he made two recommendations for him to

22   get technical training in hardware.  In four years

23   under supervising Ms. Johnson, notwithstanding his

24   claimed deficiencies in her performance, he never

25   made any recommendations for technical training.

1      We have evidence that when Ms. Johnson was

2  absent from work, nothing was done to assign tickets

3  that would -- came into her group; so when she came

4  back, she had a mountain of tickets.  While Mr.

5  Gordon and Ms. Spencer were there, someone else

6  would pitch in when they were gone to assign the

7  tickets.  We just go on and on about differences in

8  treatment.

9      Mr. Warren said he was sure that when Mr.

10 Gordon left the Hardware Unit, it was organized and

11 documented.  Ms. Johnson, when she came -- came in,

12 testified that she couldn't find any documentation

13 to help her do her job.  And that's borne out by one

14 of the evaluations that's in evidence where she was

15 required to establish the processes for doing

16 certain things.  I think building servers was one,

17 and there was another one as well, where she was

18 specifically required to establish a process which

19 obviously had not been done by Mr. Gordon.

20     So I guess what I'm saying here, Judge, is this

21 is a case that could go either way.  I'm not saying

22 it's a slam-bang that Ms. Johnson is going to win,

23 but there is enough evidence here to warrant this

24 case to go and be decided by a jury.  And for that

25 reason, I would respectfully ask that the motion be

1    denied.

2          THE COURT:  Thank you, Mr. Baker.

3      All right, back to you?

4          MS. BARNES:  I have nothing to add, Your

5    Honor.

6          THE COURT:  All right.  Well, I have very

7    attentively listened to all of the evidence.  And I

8    considered all of this last night as I read through

9    this and completely devoured the arguments.  This is

10   good law, there's no question about it, that has

11   been admitted -- has been submitted to me.

12     Mr. Baker's arguments are well-founded.  So

13   it's a close, very tight issue.  But I'm going to --

14   if I'm going to err, it's going to be in favor of

15   the plaintiff's case at this time, because we've

16   gone through an entire jury trial and we're going to

17   complete that.

18     If I have made an error, I still have time to

19   correct or resurrect my situation.  And I want to

20   say that both have made good arguments that are

21   valid, and because of that, I'm going to deny this

22   motion at this time.  And so we're going to go ahead

23   and complete the case.  Depending upon what happens,

24   there are still procedural safety valves.  But it

25   seems to me that the plaintiff has just gotten

1    through that threshold that has kept the case alive

2    and before this jury.

3         So I'm going to deny the motion with leave to

4    both parties to perhaps argue further after the

5    jury's verdict.

6         My point is simply this:  That the case is

7    still alive.  It's alive.  And there are some

8    technical thoughts and some tight questions of

9    evidence that are here.  And once this case is

10   completed, we have the benefit of the entire record

11   from Madam Reporter.  And I'll probably, if there is

12   a jury verdict, have another opportunity to look at

13   this.  But it seems to me that the plaintiff has

14   made a sufficient amount to stay within the ballpark

15   and the ball game continues.

16        So that's my quasi, semi-ruling at the moment.

17   As you can tell, I'm hesitant, because there are

18   arguments on either side here that seems to me to be

19   valid.

20        So having made that statement and that

21   quasi-ruling, we will proceed and continue the case.

22        Now, the jury has reported; they are here.  Let

23   us look at our closing arguments.

24             MR. BAKER:  I'm sorry, I didn't hear what

25   you said?

1          THE COURT:  I beg your pardon?

2          MR. BAKER:  I didn't hear what you said.

3          THE COURT:  I said that we're going to go

4   into closing arguments.

5          MR. BAKER:  Okay.  I think we've not taken

6   up the jury instructions yet, and --

7          THE COURT:  Well, we're going to do that

8   right now.  But I'm just saying let's discuss the

9   time.

10          MR. BAKER:  Okay.

11          THE COURT:  Mr. O'Neill is present in the

12   courtroom.  And he's ready to proceed with the two

13   of you, the two sides, to resolve whatever

14   instructions we have.  And he's ready to do that

15   right now.  In fact, he's been going over all of

16   those submitted instructions this morning, so we're

17   ready to get into that.

18      Now, I'm looking at the clock and it's almost

19   twenty minutes until ten.  Mr. O'Neill, do you think

20   that we would have them in twenty minutes?

21          MR. O'NEILL:  Approximately twenty minutes.

22   Twenty to thirty minutes probably.

23          THE COURT:  Okay.  Well, let's say how

24   about deferring until a quarter after TEN.  I think

25   that would give us enough time for you to get

1    everything and for them -- FOR me to put them in

2    order.  Okay?

3        So let's say -- let's say that we're going to

4    send word back to the jury that it will be about

5    twenty minutes after -- yeah, about twenty minutes

6    after ten when we will reconvene.

7        Is that -- is that acceptable to counsel?

8            MR. BAKER:  That's fine.  I have maybe 10

9    or 15 minutes more of rebuttal testimony from

10   Ms. Johnson.  And then we're ready to conclude our

11   rebuttal case.

12           THE COURT:  Okay.  For some reason, I

13   thought that everything was in.

14           MR. BAKER:  No.  I think she was testifying

15   at close to 5:00.

16           THE COURT:  Okay.  Well, then we've got

17   that to complete.

18       Well, why don't we say 9:15 to reconvene for

19   that.

20         (Court reporter requested clarification.)

21           THE COURT:  Well, 10:15.  That will give

22   you time to get those instructions taken care of and

23   then we'll be able to roll.  Okay?

24       Let's do that.  Let's do that.  And Madam

25   Clerk, you can advise the jury that we will be

1    reconvening at 10:15.

2              THE CLERK:  Yes, sir.

3              THE COURT:  All right.  Let's stand in

4    recess until that time.

5         (A recess was taken.)

6         (The jury entered the courtroom.)

7              THE COURT:  Please be seated, everyone.

8    Thank you very much.  It is almost 11:00.  And we

9    are all back in the courtroom.  The jury is in the

10   box, counsel are at table, the plaintiff is on the

11   witness stand.  And I think we're all ready to

12   proceed.

13        Mr. Baker, you may continue.

14             MR. BAKER:  Thank you, Your Honor.

15        (Resumed testimony of Cheryl Johnson.)

16                  DIRECT EXAMINATION

17   BY MR. BAKER:  (CONT'D)

18        Q.  Good morning, Cheryl.

19        A.  Good morning.

20        Q.  Are you acquainted with Warren Foster?

21        A.  I am.

22        Q.  And are you acquainted with Tad Nall?

23        A.  Yes.

24        Q.  Were both Mr. Foster and Mr. Nall

25   subordinate employees of yours?

JOHNSON - DIRECT                          719

1        A.   Yes.

2        Q.   And was Mr. Foster an African-American?

3        A.   Yes.

4        Q.   At any point in time, did either or both of

5   them become upset with you?

6        A.   Yes.

7        Q.   Both of them or --

8        A.   Both of them.

9        Q.   Do you recall when that was?

10        A.   Yes.

11        Q.   When was it?

12        A.   Well, it was because I had to have them out

13   on a regular basis over the weekends for to do the

14   upgrades and the office consolidations, the

15   upgrades.  So because of the staff, I usually had

16   two people out in the field at any one time.  So

17   that was one of the reasons.

18        And another reason was, when we first got

19   started in the group, they had just came from their

20   home offices and they were forced to come to the

21   Data Center, and they really wasn't happy about

22   that.

23        Q.   Okay.  Did you think they were justified in

24   being upset?

25        A.   I do.

JOHNSON - DIRECT

1    Q.  Why?

2    A.  We had a lot of work that we had to do in a

3    short period of time, based on my objectives, so I

4    had them pretty much out almost every weekend doing

5    some kind of upgrade, ILO conversion, or something.

6    Q.  Right.  We talked earlier in this case about

7    your objectives and having to install or upgrade

8    servers in specified periods of time?

9    A.  That's correct.

10   Q.  Is that what they were doing?

11   A.  Yes.

12   Q.  Mr. Warren testified that he felt confident

13   that Ed Gordon had set up instructions to assist you

14   when you came on board in the Hardware Unit.  Do you

15   recall his testimony?

16   A.  Yes.

17   Q.  Was that true?

18   A.  No.

19   Q.  Okay.  We talked yesterday about various

20   plans that you had to do?

21   A.  Yes.

22   Q.  And I don't want to belabor the point, but

23   if we went through the objectives you were given--to

24   submit reports, plans, that sort of thing --

25   A.  Yes.

JOHNSON - DIRECT                          721

1        Q.  -- was there anything in the Hardware Unit
2   that was available to assist you?
3        A.  It wasn't anything really available in the
4   Hardware Unit.  I had to reach out to a lot of the
5   agencies that like had their own inventory systems
6   to start with.  But once I got to their inventory
7   list and I found out a lot of it was outdated and
8   was inaccurate, so I really pretty much had to start
9   from scratch on everything.
10       Q.  Okay.  Mr. Nance said that he had tickets
11  assigned in your name to help you.  Do you recall
12  his testimony?
13       A.  I do.
14       Q.  How did assigning tickets in your name help
15  you?
16       A.  It didn't.
17       Q.  Was there anything of value in assigning
18  tickets in your name that was not available in
19  accessing the Remedy system?
20       A.  No.
21       Q.  Was assigning tickets in your name a
22  hindrance to you?
23       A.  It was.  It took a lot of my time.  I spent
24  a lot of time -- over the course, I had over 5,000
25  tickets in my name, and I had to update every single

JOHNSON - DIRECT                    722

1      one of them.

2          Q.  Okay.  By the way, Vicki Spencer I believe

3      testified yesterday that 13 months after you were

4      terminated, she came into the Hardware Unit.  And I

5      believe she said there were 300 tickets assigned in

6      your name that had not been closed.  Do you recall

7      her testimony?

8          A.  I do.

9          Q.  Okay.  So we have in evidence in this case

10     reports identifying the total number of tickets that

11     were assigned in your name; help desk tickets and

12     change tickets.  Do you recall that?

13         A.  Yes.  And tasks.

14         Q.  So if we went through the mathematic process

15     of subtracting from that total number of tickets

16     300, in other words, the ticket that Ms. Spencer had

17     to close, would the difference be the number of

18     tickets you closed?

19         A.  That's correct.

20         Q.  Yesterday Ms. Barnes went through some

21     entries in a log, I guess, for lack of a better

22     term, that Mr. Nance prepared.  And one of those

23     entries related to you asking him if you could only

24     focus on one objective a week.  You recall his

25     testimony?

JOHNSON - DIRECT                          723

1        A.  I do.

2        Q.  At any time, any time, did you ever ask him

3    to focus -- you would only focus on one objective a

4    week?

5        A.  No.  That's -- that's not realistic.  Any

6    management position I have ever had I had to

7    multi-task.  I've always had to work on multiple

8    assignments at one time.

9        Q.  Did you ever express to him a concern about

10   your workload?

11       A.  I did.

12       Q.  And why were you concerned about your

13   workload?

14       A.  Because the -- mathematically, if you add it

15   up, it was humanly impossible to get the amount of

16   upgrades done with the amount of staff that I had

17   without having them being there all the time.  You

18   know, I had to give them -- there's holidays,

19   there's breaks, and such like that.  So it was

20   impossible to ever keep up with those schedules.

21       Q.  Was it possible for you to keep up with

22   assigning tickets in a timely fashion given what was

23   involved in the assignment process?

24       A.  I spent most of my days going -- updating

25   tickets.  And that's why a lot of times I had to

JOHNSON - DIRECT                    724

1   come in early in the morning, because I knew that I

2   was already gonna have a backlog when I got into the

3   office.  So I came in early to start updating

4   tickets and trying to get tasks closed, and you

5   know, assigning tickets that came in the day before

6   into my name and doing all it all over again.

7        Q.  Okay.  Was it realistic for you to be able

8   to close every ticket in a four-day time period --

9   every help desk ticket in a four-day time period

10  given that you had to verify with the customer?

11       A.  It was impossible.  A lot of times, the

12  customer wouldn't even get back before four days.

13  You know, we might go back and forth between me and

14  the technician.  I mean I had to be kind of a middle

15  person for the technician instead of the technician

16  going directly to the customer.  I had to call the

17  customer, then go back to the technician if there

18  was any issues, then go back to the technician and

19  then back to the customer.  And then the technician

20  could have gone directly to the customer and they

21  would have had it resolved in a day rather than two

22  or three days.

23       Q.  So you were kind of the go-between?

24       A.  Yes.  For every single ticket.

25       Q.  Okay.  And is it true you were dependent

JOHNSON - DIRECT                          725

1     upon when the customer got back to you --

2          A.  Yes.

3          Q.  -- in terms of when you could close the

4     ticket?

5          A.  That's correct.

6          Q.  Again, getting back to Defendant Exhibit 39

7     which are the log maintained by Mr. Nance.  At any

8     time, did you ever tell him you needed 21 days to

9     figure something out?

10         A.  That I don't know.  The things I read in

11    there were really kind of ridiculous.  I mean it

12    made me look like I was this unefficient,

13    uncoordinated dingbat running around asking a lot of

14    stupid questions, and it really kind of -- I didn't

15    really understand why he said stuff like that.

16         Q.  Okay.  It's not true?

17         A.  It's not true; no.

18         Q.  Did you ever feel you needed 21 days or

19    longer or shorter to figure something out?

20         A.  No.

21         Q.  We heard some testimony from Mr. Nance about

22    auditors' concern about some inventory being

23    missing.  Do you recall that?

24         A.  Yes.

25         Q.  Are you aware that the auditors had that

JOHNSON - DIRECT

1    concern?

2         A.  I am.

3         Q.  And are you aware that there was some

4    inventory items missing?

5         A.  Yes.

6         Q.  And can you tell us how it was that those

7    inventory items were missing?

8         A.  As we consolidated other agencies into

9    Central Management Services, we took on their

10   inventory.  And we took on -- a lot of them already

11   had some form of inventory.  And once I inherited

12   their inventory, I would go to -- try to use that as

13   a base of inventory.  But when --

14        Q.  When you say base, you're talking about the

15   inventory the agency had?

16        A.  Yes.  As a baseline of the inventory to get

17   started someplace since I didn't have anything to

18   start with.  And then once I started verifying, I

19   found out that their information was obsolete.  A

20   lot of it will say it's at a remote location and

21   that location is no longer there anymore.  So it

22   wasn't accurate.  And a lot of the equipment that

23   was on that list was some of the audit findings that

24   we had.  It was from some of those original

25   inventory lists.

JOHNSON - DIRECT                        727

1        Q.  So what did you do to attempt to get to the

2   bottom of this and reconcile the actual equipment

3   with what was on the list?

4        A.  That became another assignment from my

5   technicians to do, was to go out to the customer

6   site and verify, or either try calling the remote

7   office liaisons and have them looking for the

8   equipment.

9        Q.  Did you do that?

10       A.  I did.

11       Q.  And at the time you were terminated, what

12  was the status of that verification?

13       A.  Some of the equipment never was found off

14  their original inventory lists.

15       Q.  Okay.  That would have been equipment that

16  the agencies had which they were to bring with them

17  to CMS?

18       A.  That's correct.

19       Q.  Not equipment that came into CMS that was --

20       A.  I was able to verify the equipment that came

21  into Central Management Service under my command.

22       Q.  Okay.  Vicki Spencer yesterday testified

23  that before, in her former position, before she took

24  over the Hardware Unit, she made inventory entries

25  into the Remedy system.  Do you recall that?

1        A.  I do.

2        Q.  And is that true?

3        A.  Yes, she did.

4        Q.  Now, did that relieve you of some inventory

5   responsibilities?

6        A.  Not at all.

7        Q.  Did it relieve you of responsibilities for

8   making any inventory entries into the Remedy system?

9        A.  No.

10       Q.  Can you -- can you describe for us what she

11   did in making entries as compared to what you did?

12       A.  One of the -- what she was talking about is

13   when we were having -- we had what we call a remote

14   office consolidation project that I was manager of.

15   I had to work with the customer, I had to make the

16   schedule, and I had to make all the tasks that were

17   in the ticket.  Since we had done a lot of these, it

18   was a sequence of events that we determined would

19   have to happen for each of these.

20       Now, the asset management form is a form that

21   captures the information about the equipment.  And I

22   was responsible for that personally.  I had to -- I

23   had to personally sign for and update every single

24   asset management form personally.  And I -- go

25   ahead.

JOHNSON - DIRECT                    729

1        Q.  No; go ahead.

2        A.  And I had to go ahead and enter that

3    information into the Remedy system.

4        So one of the tasks, once we had the remote

5    office consolidation, there was about a sequence of

6    12 tasks.  And one task in that whole entire

7    sequence of tasks was one task for Vicki Spencer.

8    And what she had to do in that one task was to

9    change the location of where that server was and

10   where it is now.  So she just had to change the

11   address information out of all the information that

12   I had already entered into the Remedy system.

13       Q.  Okay.  Now, I'm a little confused here.  But

14   I think she said that in some respect, the

15   information she was to input into the Remedy system

16   was somehow incorrect with the form.  Do you recall

17   her saying that?

18       A.  Yes, I remember that.

19       What happened was that one of the tasks that my

20   staff had when they moved the equipment, one of the

21   tasks they had was, right before Vicki Spencer's

22   task was they were supposed to attach the asset

23   management form to Vicki's task so that she can see

24   where the information was moved from.  So she was

25   saying that the -- that the equipment was missing.

JOHNSON - DIRECT                    730

1    It wasn't missing, the form wasn't added to her

2    task.

3         Q.  Okay.  So let me get this straight.  You had

4    some responsibilities preparing the form?

5         A.  Yes.

6         Q.  And you had some responsibilities entering

7    it into the Remedy system?

8         A.  Yes.

9         Q.  And then do I understand that between you

10   completing your task and Vicki beginning her's, the

11   technicians that worked under you had to do

12   something with this form?

13        A.  Yes.

14        Q.  And what was that?

15        A.  Attach the form to Vicki's task so she can

16   know where the equipment moved from, the new

17   location where it moved from, and what the new

18   location was.  And that was what her main task was,

19   to change the information in the Remedy system.

20        Q.  So was Vicki's concern that the asset

21   management form was not attached?

22        A.  That was her concern.

23        Q.  And that's something that typically was done

24   by the technicians?

25        A.  Yes.

JOHNSON - DIRECT                         731

1          Q.  I'm gonna ask you a technical question.  We

2     have -- we have heard about two processes in the

3     Hardware Unit.  We heard earlier from you, and maybe

4     other witnesses, about conversions?

5          A.  Yes.

6          Q.  And that essentially involved, in some

7     respect, upgrading or changing servers?

8          A.  Yes.

9          Q.  And then we heard yesterday from Vicki

10    Spencer about migrations.

11         A.  Yes.

12         Q.  Tell me how a migration differs from a

13    conversion?

14         A.  It doesn't.  What Vicki was doing was

15    continuing work that I had already started.  And the

16    conversion -- the conversion is the same as a

17    migration.

18         Q.  Okay.  And I -- I think she testified that

19    she thought she had done a hundred maybe, over the

20    two years she was in the unit?

21         A.  That's correct.

22         Q.  How many did you do?

23         A.  Probably about 500 in the four years that I

24    worked there, and -- but at the same time, I was

25    also doing the ILO conversions, the remote office

JOHNSON - DIRECT                          732

1    upgrades, the low on disk space, and the

2    decommissions all at the same time.

3        Q.  Okay.  We've heard testimony about this

4    infamous WUG report?

5        A.  Yes.

6        Q.  And it's my understanding that the WUG

7    report was a weekly report that listed servers that

8    were getting low on disk space?

9        A.  Yes.

10       Q.  If we go to the beginning of the time you

11   went into the Hardware Unit in May of 2008, and

12   compare it to when you left the Hardware Unit in

13   August of 2008, was there any difference typically

14   in the number of servers that were on the weekly WUG

15   report?

16       A.  Yes.

17       Q.  And can you explain why there was a

18   difference?

19       A.  Well, when I first started, we were in

20   the -- at the height of bringing all of the agencies

21   into Central Management Service.  So we had

22   thousands of servers that were on old equipment.

23   And their agencies had a lot of data on it and they

24   were all running out of space, all at the same time,

25   at the same time we were bringing them to the Data

JOHNSON - DIRECT                          733

1   Center, so there was thousands of them on the list.

2       Q.  And if we flash forward to August of 2012,

3   what was the status then?

4       A.  The status was that most of the conversions

5   were already done.  The Data Center consolidation

6   was complete.  And most of those servers were now

7   virtual servers as they talked about yesterday.

8   That means they were taken off of the old physical

9   hardware and made into a virtual environment which

10  then that responsibility moved to another group.

11      So it was not as many physical servers when

12  Vicki was the manager as it was when I was there.

13      Q.  Okay.  And I don't want to belabor this

14  point, but if we took a look at your performance

15  appraisals --

16      A.  Yes.

17      Q.  -- and looked at the objectives you were

18  given --

19      A.  Yes.

20      Q.  -- you were required to weekly submit

21  reports?

22      A.  Yes.

23      Q.  And you were required to prepare plans to

24  undertake certain projects such as upgrading servers

25  or decommissioning them or relocating them?

JOHNSON - DIRECT                          734

 1        A.  That's correct.

 2        Q.  And Mr. Nance had a very detailed

 3   expectation for what you would do --

 4        A.  That's correct.

 5        Q.  -- am I correct?

 6        A.  Yes.

 7        Q.  Okay.  When you left the Hardware Unit, did

 8   you take all those plans and reports with you?

 9        A.  No.  That -- what was so amazing is that I

10   had did all the analysis and all the research about

11   all the equipment.  That's why it would have been

12   beneficial to have the hardware knowledge because I

13   had to do analysis on the equipment that was already

14   out in the field, I had to do the type of analysis

15   to determine what the new hardware was going to be.

16   I had to have all of the hardware already ordered.

17   I had already had the whole process in place.  All

18   the plans were already done, all that part was

19   already -- that was due.

20        Q.  Okay.  So whomever succeeded you as the

21   hardware manager, did they have access to those

22   plans and reports?

23        A.  Yes.

24        Q.  Where were they?

25        A.  They were on our Share Point site where I

JOHNSON - DIRECT                          735

1    had built -- as Ed said, I had built up the Share

2    Point site with all the details.  They started off

3    with very general information and I built it up to

4    very specific documentation.

5         Q.  Okay.  So help us out here.  What was the

6    Share Point site?

7         A.  It's just like -- it's like a filing

8    cabinet.  If you would like at a filing cabinet, it

9    has a bunch of folders in it.  And you go through

10   the folder, and it has papers and documents in it.

11   Well, a Share Point site is an electronic filing

12   cabinet that has folders and documents inside of the

13   folders.

14        Q.  Okay.  How did the Share Point site differ

15   in August of 2012 from when you came in in May of

16   2008?

17        A.  It had very little details in it.  And by

18   the time I left, it had a decommission process, it

19   had a server build process and plan.  It had a

20   server upgrade and plan.  It had schedules already

21   done.  I had already went through the migration

22   several times, so we knew every single step that had

23   to be done, every single task that needed to be

24   created for every migration, every decommission,

25   every office consolidation, rack consolidation.  All

1    those plans were there, all the equipment was

2    already listed, and all the inventory was already

3    defined.

4         Q.  Okay.  Thank you, Cheryl.  I have no further

5    questions.

6              THE COURT:  Thank you.

7         All right.  Ms. Barnes?

8              MS. BARNES:  We have nothing, Your Honor.

9              THE COURT:  Very well.  Then you may step

10   down, Ms. Johnson.

11        (The witness was excused.)

12             THE COURT:  Mr. Baker, anything further?

13             MR. BAKER:  No, Your Honor.  We rest.

14             THE COURT:  Very well.  Thank you.

15        And any surrebuttal?

16             MS. BARNES:  No, Your Honor.  We renew our

17   motion at the close of all of the evidence.

18             THE COURT:  Very well.  And do you rest at

19   this time?

20             MS. BARNES:  Yes, Your Honor.

21             THE COURT:  Very well.

22        Then both sides have rested their case, ladies

23   and gentlemen.  And it is twenty minutes after

24   eleven.  It is my understanding that your lunches

25   have been -- your orders have been filled out.

1    Is that right?  You did fill them out.

2    And Madam Clerk has them all ready to be phoned

3  in.  And I think what we're going to do now is to

4  instruct you as to the law that is applicable to the

5  case.  And then when you retire to deliberate your

6  verdict, Madam Clerk will see to it that the lunches

7  are ordered for you and they will be brought in and

8  delivered to the jury room.

9    Now, before I proceed, let me ask counsel if I

10  have missed anything?  Have we got everything in

11  and -- very good?

12    All right.

13    Now, both sides have presented all the

14  evidence, ladies and gentlemen.  And now it is my

15  duty to advise you and to instruct you as to the law

16  that is applicable to the case.

17    So I ask you to please listen carefully to my

18  instructions.  And I will proceed to do that now.

19  Let me change my glasses.

20    All right.  Members of the jury, you have seen

21  and heard all of the evidence and the arguments of

22  the attorneys.  Now I will instruct you on the law.

23    You have two duties as a jury.  Your first duty

24  is to decide the facts from the evidence in the

25  case.  This is your job and yours alone.  Your

1   second duty is to apply the law that I give you to

2   the facts.  You must follow these instructions even

3   if you disagree with them.  Each of the instructions

4   is important and you must follow all of them.

5       Now, perform these duties fairly and

6   impartially.  Nothing I say now and nothing I said

7   or did during the trial is meant to indicate any

8   opinion on my part about what the facts are or about

9   what your verdict should be.

10      Now, during this trial, I have asked a witness

11  to question -- a question myself.  Now, do not

12  assume that because I asked questions, I hold any

13  opinion on the matters I asked about or on what the

14  outcome of the case should be.

15      The evidence consists of the testimony of the

16  witnesses, the exhibits admitted in evidence, and

17  stipulations.  A stipulation is an agreement between

18  both sides that certain facts are true.  You must

19  accept those facts as proved.

20      Now, certain things are not to be considered as

21  evidence.  And I will list them for you.

22      First, if I told you to disregard any testimony

23  or exhibits, or struck any testimony or exhibits

24  from the record, such testimony or exhibits are not

25  evidence and must not be considered.

1      Second, anything that you may have seen or

2  heard outside the courtroom is not evidence and must

3  be entirely disregarded.

4      Third, questions and objections or comments by

5  the lawyers are not evidence.  Lawyers have a duty

6  to object when they believe that a question is

7  improper.  You should not be influenced by any

8  objection and you should not infer from my rulings

9  that I have any view as to how you should decide the

10  case decide.

11      Fourth, the lawyers' opening statements and

12  closing arguments to you are not evidence.  There

13  purpose is to discuss the issues and the evidence.

14  And if the evidence, as you remember it, differs

15  from what the lawyers said, then your memory is what

16  counts.

17      In determining if any fact has been proved, you

18  should consider all of the evidence bearing on the

19  question regardless of who introduced it.

20      You should use common sense in weighing the

21  evidence and consider the evidence in light of your

22  own observations in life.  In our lives, we often

23  look at one fact and conclude from it that another

24  fact exists.  In law, we call this inference.  A

25  jury is allowed to make reasonable inferences.  Any

1    inference you make must be reasonable and must be

2    based on the evidence in this case.

3        You may have heard the phrases direct evidence

4    and circumstantial evidence.  Direct evidence is

5    proof that does not require an inference, such as

6    the testimony of someone who claims to have personal

7    knowledge of a fact.  Circumstantial evidence is

8    proof of a fact or a series of facts that tend to

9    show that some other fact is true.

10        As an example, direct evidence that it is

11    raining is testimony from the witness -- from a

12    witness who says, "I was outside a minute ago and I

13    saw it raining."  Circumstantial evidence that it is

14    raining is the observation of someone entering a

15    room carrying a wet umbrella.

16        The law makes no distinction between the weight

17    to be given to either direct or circumstantial

18    evidence.  You should decide how much weight to give

19    to any evidence in reaching your verdict.  You

20    should consider all the evidence in the case

21    including the circumstantial evidence.

22        You must decide whether the testimony of each

23    of the witnesses is truthful and accurate in part,

24    in whole, or not at all.  You also must decide what

25    weight, if any, you give to the testimony of each

witness.

In evaluating the testimony of any witness, you may consider, among other things:

The ability and opportunity of the witness -- that the witness had to see, hear, or know the things that the witness testified about;

The witness's memory;

Any interest, bias, or prejudice the witness may have;

The witness's intelligence;

The manner of the witness while testifying;

And the reasonableness of the witness's testimony in light of all the evidence in the case.

You may find the testimony of one witness or a few witnesses more persuasive than the testimony of a larger number.  You need not accept the testimony of the larger number of witnesses.

When I say a particular party must prove something by a preponderance of the evidence, or when I use the expression "if you find" or "if you decide," this is what I mean:  When you have considered all the evidence in the case, you must be persuaded that it is more probably true than not true.

The defendant is a public body and can act only

through its officers and employees.  Any act or
omission of an officer or employee within the scope
of his or her office or employment is the act or
omission of the department public body.  The
defendant public body.

The plaintiff, an African-American female,
claims in this case that the defendant violated her
rights under the Title 7 of the Civil Rights Act of
1964, causing her damage by discriminating against
her on the basis of her race, gender, or both.

Specifically, the plaintiff claims that the
defendant terminated her from employment with it
based upon her failure to properly perform her
duties as a Public Service Administrator.  She
further claims that the defendant treated her less
favorably than it treated a similarly-situated male
Caucasian employee in terms of the work assignments
given her and the manner in which her performance
was evaluated.

The defendant admits that it terminated the
plaintiff.  It denies that any similarly-situated
male Caucasian employee was treated better than she.
It denies that it discriminated against the
plaintiff on the basis of her race, gender, or both.

In order for a male Caucasian employee of the

department -- of the defendant to be considered
similarly-situated to the plaintiff, that employee
must have enough in common with the plaintiff to
make a meaningful comparison.  This does not mean,
however, that such an employee must be identical to
the plaintiff in every way.

In determining whether an employee of the
defendant was similarly situated to the plaintiff,
you may consider all relevant factors including
whether or not the employee and the plaintiff:

1.  Dealt with the same supervisor;

2.  Were subject to the same standards;

3.  Held similar positions; and

4.  Engaged in similar conduct.

The plaintiff claims that in being terminated
by defendant, she was treated differently and less
favorably because of her race, gender, or both.  In
other words, her race, gender, or both was a
motivating factor for her discharge.

To succeed on this claim, plaintiff must prove
it by a preponderance of the evidence to determine
whether the plaintiff, in being terminated, was
treated differently and less favorably because of
her race, gender, or both, you must decide whether
the plaintiff -- whether the defendant would have

1  terminated plaintiff had she been a Caucasian or a

2  male and everything else had been the same.

3      If you find that the plaintiff has proved this

4  by a preponderance of the evidence, then you must

5  find for plaintiff.  However, if you find that

6  plaintiff did not prove this by a preponderance of

7  the evidence, then you must find for defendant.

8      Now, upon retiring to the jury room, you must

9  select a presiding juror.  The presiding juror will

10  preside over your deliberations and will be your

11  representative here in court.

12      Forms of verdict have been prepared for you.

13  If you find for the plaintiff, use verdict Form A.

14  If you for the defendant, use verdict Form B.  Take

15  these forms to the jury room, and when you have

16  reached unanimous agreement on the verdict, your

17  presiding juror will fill in and date the

18  appropriate form and all of you will sign it.

19      Now that, ladies and gentlemen, concludes my

20  instructions.  You will note that I am placing them

21  together and holding them with a black clamp.

22  Please keep them all as a body and unit.  They are

23  not to be separated out and applied individually,

24  they all must be applied as a group.  So please keep

25  them all together.

1      Now, I would ask counsel, have I missed

2  anything?

3          MR. BAKER:  No, Your Honor.  I think we're

4  ready for closing arguments.

5          THE COURT:  Very good.

6      All right.  We are now ready for the closing

7  arguments in the case.  And the reason that I always

8  instruct the jury prior to those closing arguments

9  is so that you know in advance, and counsel knows

10  what I have instructed you.  And so that if they

11  refer to any of them, they know that I've already

12  given you the law, so that there's no discussion,

13  objections, or problems as we proceed.

14      All right.  I think we are ready to proceed.

15  First to the Plaintiff.

16          MR. BAKER:  Thank you, Your Honor.

17          THE COURT:  Surely.

18          MR. BAKER:  Might I prove the podium?

19          THE COURT:  Oh yes, please.  You may turn

20  it.

21          MR. BAKER:  I'll try and not disconnect

22  anything.

23      Good morning.  Before I present my argument, I

24  want to take a moment on behalf of both Cheryl and I

25  and Karen Mansfield in thanking you for your service

1    in this case.  However it turns out, we appreciate

2    the work you are doing.  I know that some, but not

3    all of you, are from Springfield.  And that means

4    you've gotten up a little earlier in the morning

5    than you usually would and have probably gotten home

6    a little later than normal dinnertime.  And we

7    appreciate that.

8         I also note this isn't exactly the OJ case.

9    You've heard about help desks and remedies and task

10   tickets and all sorts of other good stuff which is

11   good for a person that has insomnia.  And I

12   apologize that it couldn't be a little more

13   stimulating, but it is what it is.  And I have

14   noticed during the case you've been very patient and

15   very attentive to what's happened.

16        So up front, I'm gonna tell you that I am going

17   to ask you to find in favor of Cheryl Jones.  That's

18   why we're here.  And I suspect that Ms. Barnes is

19   gonna get up and say, "We want you to find in favor

20   of the Department of Central Management Services."

21   The only thing we really have a right to expect of

22   you is a fair verdict.  Whoever wins, we just want a

23   fair verdict.

24        And I guess the best way of getting there is to

25   take a step back, view the evidence you've heard.

1    Remember, I said it was gonna come in in bits and

2    pieces.  It's starting to emerge now.  It will

3    emerge a little greater when you actually see some

4    of the exhibits.

5        And the idea is that with the evidence you've

6    heard, you're gonna be able to assemble it and see a

7    picture of what happened.  And once that picture

8    comes into focus, you're gonna have to take a look

9    at Judge Mills' instructions and follow them.  The

10   instructions are a road map to get you from the

11   picture to the verdict.

12       And I guess the best analogy I can use--and

13   it's not a very good one, but it's the best I can

14   think of--is that when I had small children,

15   Christmas morning, they would get mechanical toys.

16   Each box of toys had an instruction.  And this is

17   kind of before the day of computer stuff, this is

18   just the electronic stuff.  And I'll have to

19   confess, one of my skills is not assembling things.

20       So my job was to assemble the toy, hopefully

21   following the instruction.  If I followed the

22   instruction and the toy worked, it was a good

23   Christmas afternoon.  If not, there was a price to

24   pay.  So that's what I'm asking you to do.

25       Now, I want to comment briefly on the

1    instructions.  The first instruction is that Cheryl

2    has the burden of proof.  CMS doesn't have to prove

3    its innocence.  But she has to fulfill that burden

4    by what's called a preponderance of the evidence.

5    And that simply means she tips the scale.  That

6    after looking at all the evidence, it's more

7    probably true what she claims than not.  It doesn't

8    need to be overwhelming beyond a reasonable doubt;

9    nothing like that.

10        The second thing is--and this is why you're

11    here--you have to determine whether Cheryl has

12    fulfilled that burden.  In other words, your job is

13    to say if Cheryl was -- was male, Caucasian, or

14    both, would she have been terminated?  Pretty

15    straightforward burden that you have.

16        The third thing I want to comment on, and Judge

17    Mills alluded to this when he talked about the rain

18    and the umbrella.  That you can prove the case by

19    circumstantial evidence.  And we are not claiming

20    that Don Warren, Rod Nance, or anyone else at CMS

21    made disparaging comments to Cheryl because of her

22    race.  We're not claiming that.

23        What we are claiming, though, is that if you

24    look at all the evidence, she was dealt with in a

25    different way and a different standard than a male

employee who had the same job and reported to the same supervisor as she.  And in doing that, I'm not suggesting at all that Ed Gordon was a bad employee. We have no reason to believe that he was not competently fulfilling his assignment for the State of Illinois.  What we are claiming, though, is that there was a double standard.  Cheryl was treated differently in the burdens that were imposed upon her than was Ed.  And I'll talk more about that later.

The last thing that I want to talk to you about with respect to the instructions is that you can use your observations in life in reflecting on your decision.  In other words, you don't need to leave your common sense at the courthouse doors.

So I want to talk with you a little bit about the position of the Department of Central Management Services.

They are claiming, or it is claiming, that Cheryl was incompetent.  Grossly competent; could not perform her job, and that's why she was terminated.  They're claiming that she was treated no differently than anyone else; she was just incompetent.  They're claiming that she was treated the same way that Ed Gordon was, she just could not

1    hack the job.  That's their position.

2         Now, I have -- I have a high regard for the

3    lawyers that represent the Department.  I consider

4    them friends.  But I have to tell you here, I don't

5    think they've been throwing you fastballs right down

6    the middle of the plate.  I think you've been

7    getting some curveballs in the evidence they

8    presented.  And I want to talk to you about that.

9         Let's talk about Cheryl's performance to begin

10   with.  And her performance has to be viewed in

11   context.  Beginning in 2008 -- excuse me, 2006, and

12   extending to today, Cheryl, when she has worked, has

13   worked in state government.  She's held three

14   different positions--two at the Department of

15   Central Management Services and one at the

16   Department of Human Services.

17        Based upon her testimony, the duties of each of

18   those positions involved management, leadership,

19   organization.  And if you look at her evaluations

20   which are in evidence, her current employer has

21   evaluated her not only as a satisfactory employee,

22   but as an employee who in many respects exceeds the

23   performance expectations.

24        Let's go back to her first job with the

25   Department of Central Management Services.  She was

a Public Service Administrator heading a group in the Wintel Unit.  She did that job from, I believe, November of 2006 until maybe -- 2007 so May of 2008, a span of maybe a year and a half.  I may have my years a little off, but it was roughly a year and a half.

Don Warren claimed in his testimony that she wasn't hacking it.  She wasn't doing that job very well.  That's the first curveball that's been thrown in this case.  He said, "Ah, there were some performance issues, and so he had to ship her off to another unit.

Well, what we know is she fully completed her probation.  She was -- if she hadn't completed her probation, she would have been out the door.  That's the rules in state government.

What we know is that her first performance evaluation was fully satisfactory.  And what we also know is Rod Nance had nothing to do with Cheryl in that position.  Cheryl acknowledged it, Rod Nance acknowledged it.  Don Warren was obviously the guy that offered input into that appraisal.  And it was a good appraisal.  You're not gonna find anything bad in it.

So then we come to her second appraisal.  And

1    the second appraisal covers a year, I think from

2    November to November.  And midyear is when Cheryl

3    transferred to -- was reassigned to the Hardware

4    Unit.

5        And what the evidence is, that with respect to

6    the work she did in her old unit, she was fully

7    satisfactory.  She was doing a good job.  Now,

8    Mr. Warren kind of stumbled and said, "Well, I may

9    have talked to her."  And then he uses these flimsy

10   terms officially and unofficially.  He said he never

11   talked to her unofficially, and he couldn't really

12   speak to what he did officially.

13       Cheryl threw a fastball at you, and she said,

14   "He never talked to me.  He never explained about my

15   performance.

16       You have no evidence in this record, no

17   evidence that Cheryl was not properly performing her

18   job.  Okay.

19       So we have two jobs that sandwich a four year

20   period when she worked under Rod Nance.  And both

21   slices of bread evaluate Cheryl as a fully-competent

22   employee.  Her problems began when she went under

23   Nance, and they began immediately.

24       Just look at Exhibit 3A.  That's her first

25   evaluation.  That's the one that was broken to half.

1    She did well when she worked under Warren, and all

2    of the sudden, she couldn't do anything right.

3    Okay?

4        Now, am I saying that Cheryl was a perfect

5    employee?  Absolutely not.  Am I saying that she

6    made mistakes in her job?  Yeah, probably she did.

7    But what I am saying is that during the passage of

8    time, Mr. Nance not only was critical of her, but

9    started to burden her with tasks.  Okay?

10       And I'm not going to go through all of them,

11   they're in Exhibit -- Group Exhibit 3, which is a

12   series of evaluations.  And if you read the

13   evaluations in the section marked objectives, what

14   the objectives were for the next reporting period,

15   you will see it's kind of building a wall.  Bricks

16   upon bricks upon bricks.  That the tasks became more

17   onerous, more burdensome.

18       Now, CMS is saying, and Mr. Nance is saying,

19   "Well, we did that to help Cheryl."  Don Warren is

20   saying, "We did that to help Cheryl."  I would

21   submit to you that's like having a doctor prescribe

22   cheeseburgers to a heart patient.  It did nothing to

23   help her, it burdened her.

24       She had available to her what's called the

25   Remedy system which allowed her to track work and

1  manage her staff.  Instead, what Rod Nance did was

2  say, "The Remedy system is not good, we're gonna

3  help you.  We're gonna help you by having you assign

4  all the tickets in your name."  Okay?

5       Now, I don't know why that was done.  Cheryl

6  would have been responsible as the manager without

7  them being in her name.  They did not offer any

8  explanation for how assigning them in her name would

9  be helpful to her.  What we know is it was

10  burdensome.

11       Now, we're not saying that with each of the

12  tickets assigned in her name, Cheryl did all the

13  work.  We're not saying that at all.  But here is

14  where another curveball is being thrown your way by

15  CMS.  Because they had Ms. Higgerson say, in the

16  wake of having these numbers--which I'll get to in a

17  moment--they're having her say, "Well, the reports

18  don't reflect that Cheryl actually did the work."

19  That's a half-truth.  Maybe it's not a full

20  curveball, but started to break a bit.

21       What is the truth is that Cheryl was given

22  additional duties with each ticket.  She -- once she

23  decided who the -- the task would be assigned to,

24  unlike Ed Gordon, and unlike Cheryl in her prior

25  position, she just couldn't make a click on the

1    computer and it was assigned.  She instead had to

2    write up tasks.  Which she said was kind of a cut

3    and paste operation.  All that did was increase

4    burden her.  This is one of those common-sense

5    things.  How did that help her?  How did that make

6    her a better employee?

7        The other thing is -- and Cheryl had one day to

8    assign these tasks, okay?  And she testified that

9    it -- in the span of a day, it took quite a bit of

10   time getting this work done.

11       She then had to, within a four-day time span,

12   verify that the work was completed.  Formerly, that

13   had been done by the technician.  Ed Gordon said

14   when he was there it was done by the technician.

15   And verification was not opening up a computer

16   screen and reading it.  She also -- she had to reach

17   out to the customer.  And if she didn't reach out to

18   the customer and get back within four days, she was

19   considered to not have met an objective.

20       Well, customers are real eager to get the work

21   done, but once it's up and running, that's one of

22   the things that they don't prioritize.  So two

23   problems.  The first is Cheryl had to exchange

24   emails, she had to make calls, she had to work

25   sometimes with the technician to get a response, and

1    she could not close until she got the response.

2    That took time.  And secondly, if she didn't get all

3    that done in four days, she did not fulfill the

4    objective.  Okay?

5         Cheryl -- and I'm not going to burden you with

6    this because Cheryl testified to it in-depth when

7    she testified earlier in this case.  And I ask that

8    you refer to Exhibit 3, and specifically Part 4

9    which sets forth her objectives.  And then compare

10   that to the evaluation of Ed Gordon when he was the

11   hardware manager and what his objectives were.

12        And significantly, Cheryl was given very

13   specific, detailed objectives that had to be

14   completed within a specified time period.  Now,

15   that's fair if it's reasonable.  And a manager,

16   under circumstances, has every right to impose

17   objectives if they're reasonable.  Mr. Nance did not

18   testify why those objectives were established and

19   why the timelines were specified.  You didn't hear

20   anything.

21        What we know is if you read the objectives and

22   the time span Cheryl would have to gather

23   information concerning a group of servers, just find

24   out where they were located, and then preparing the

25   report identifying what they were, where they were

1    located, what their serial numbers were.  And then

2    putting together a plan for doing the particular

3    project with it which basically required working out

4    with the customer to schedule the work and having

5    staff members available to do the work.  She had a

6    very short window to do that.

7         It wasn't just one project, there were multiple

8    projects like that where she had a limited amount of

9    time to do a whole lot of work.  And you don't have

10   any explanation here from Mr. Warren, from Mr.

11   Nance, or from anyone else at CMS why those

12   timelines were set the way they were.

13        I submit to you that Cheryl was put in -- I

14   hesitate to use the word impossible, but I can't

15   think of a better word to use, okay?  What we know

16   is that she had a lot of duties that stacked up over

17   a relatively short period of time to complete.

18        I want to offer several points here.  First

19   point, I'm -- I'm not --

20             THE COURT:  Mr. Baker, if you would excuse

21   me.  I think that we're going to take a short break

22   right now for -- I think this probably would be a

23   good time to do that.

24        Our time has been jumbled up here this morning.

25   And I apologize, but I think we'll take a ten-minute

1    break at this time, ladies and gentlemen.  Will that

2    be agreeable?

3              MR. BAKER:  Fine.

4              THE COURT:  Okay.  Now, this doesn't mean

5    lunch or anything like that, this is just a

6    ten-minute break.

7         We'll stand in recess for ten minutes.

8         (A recess was taken.)

9              THE COURT:  Please be seated, everyone.

10   Thank you.  We're all back if place after a brief

11   recess.

12        All right.  Mr. Baker, you may continue,

13   please.

14             MR. BAKER:  Thank you, Your Honor.

15        I was talking with you earlier about some

16   curveballs that the defendant was throwing, and I

17   overlooked one in progression of my presentation.

18        We offered into evidence reports prepared by Jo

19   Higgerson of tickets and tasks that were assigned in

20   Cheryl Johnson's name.  And in her

21   cross-examination, the lawyers from CMS said, "Well,

22   that doesn't mean Cheryl did all the work."  And Jo

23   Higgerson said, "No, it doesn't."

24        What they failed to cover with her, and I think

25   I brought out in my redirect examination, is that

1    there were tasks assigned in Cheryl's name.  And if

2    you recall, Ms. Higgerson said a task was a segment

3    of work that needed to be performed to complete the

4    ticket.

5        And it was flashed on the screen by Mr. Okon

6    some tickets.  And the tickets and columns had

7    people that did tasks, and then down at the bottom

8    there was a compilation of how many tasks were done.

9    And most of these tickets identified that several

10   tasks were done by Cheryl.

11       Now, what is significant is that the reports

12   prepared by Ms. Higgerson of tasks is a compilation

13   of all tasks assigned to Cheryl in tickets.  Okay?

14   And there were thousands.  So the notion that she

15   didn't have to do anything extra is just false.

16   It's not true.

17       Now, I want to briefly cover a couple of

18   background points.  First background point is that

19   when Cheryl went into the Hardware Unit, she had 30

20   plus years of experience in information technology,

21   but it was all on the software side.  Now, we're not

22   offering that as an excuse for poor performance.

23       But what we are saying is that when Cheryl went

24   in, she had no effective orientation.  None by Mr.

25   Nance.  And Mr. Nance acknowledged he didn't do

1    anything to get her up to speed.  Ed Gordon did

2    attempt to help her.  He did some things.  But as

3    Cheryl said, intuitively, he knew about this stuff,

4    and while he attempted to help, he was not really

5    good in explaining it.  And when she went to him

6    with questions about things she was assigned, he

7    would say, "I didn't have to do that."

8         What we also know is that -- and I can't recall

9    the name of this computerized file.  Cheryl

10   mentioned it a few moments ago.  But it was kind of

11   a resource of information of how things had been

12   done in the past.  Plans, inventories, reports.  And

13   you'll see in looking at the evaluations, Cheryl had

14   to do a lot of them.  I mean that was kind of a

15   constant weekly she'd have to prepare three or four

16   reports.

17        When she went and she was given these

18   assignments, she did what was pretty reasonable.

19   She said, "I'm not going to reinvent the wheel, I'll

20   go see what was done before."  And she went to the

21   file cabinet and it was empty.  There was none of

22   that stuff.

23        So Cheryl, during the span of four years in the

24   Hardware Unit, put together plans, put together

25   reports, and put them in the file so that when she

1    left and her successor came in, such as Vicki

2    Spencer, they weren't starting from scratch; they

3    had something to work with.

4        Vicki Spencer testified in cross-examination,

5    Mr. Nance was really helpful.  He would sit down

6    with me, he was reasonable.  He was supervisor of

7    the year according to her.  Cheryl testified,

8    without contradiction, that when she would ask Nance

9    for help, he would buzz her off.  Not once, but it

10   was a consistent theme.

11       What we also know here is that CMS employees in

12   the IT area get training from time to time.  In

13   fact, Cheryl, when she was in her former position

14   under Mr. Warren, got some trainings that cost the

15   state money.  And what we know is training

16   recommendations are put into an employee's

17   performance review as an objective.  And Mr. Warren

18   was quite reasonable in identifying training that

19   she needed to do her job.  For the four years she

20   worked in the help desk Unit, you know how much the

21   state spent for her training?  $10.  $10.

22       So we have an employee who has a lot of work to

23   do, who came into a unit without a whole lot of

24   information there to work from, and was given a lot

25   of work duties and no training.

1    You have in evidence a performance evaluation

2    for Ed Gordon when he was responsible for the help

3    desk.  It was prepared by Rod Nance.  And in that

4    evaluation, she -- he recommended, for a man who had

5    over 20 years of experience in hardware training,

6    two hardware classes.  That was his recommendation

7    of training he thought would be helpful to Mr.

8    Nance.  There was no technical training that he

9    thought would be helpful for Cheryl.  Why is that?

10    Another curveball that was thrown your way

11    yesterday.  Vicki Spencer testified that she put all

12    of the change tickets in her name.  And the whole

13    point was that, well, she had all these change

14    tickets just like Cheryl had change tickets in her

15    name.  So what's the beef here on Cheryl's part?

16    Well, couple of things.  First thing is, she

17    testified in cross-examination that she did not have

18    to do any verification other than look into a

19    computer screen, except in the instance where there

20    was some big issue that came up.  Cheryl, as a

21    consistent part of her job, had to do the

22    verifications for change tickets.

23    Second part, she didn't have to put any help

24    desk tickets in her name.  On the counsel's table,

25    in front of Ms. Mansfield, is 18 inches of help desk

1    tickets that were issued to Cheryl in her name that

2    she had to do work on.  So it's disingenuine to

3    compare Ms. Spencer's apples to Cheryl's oranges.

4        So let's talk about some of the differences

5    between the treatment of Ed Gordon and Cheryl

6    Jackson (SIC).  And let's start by saying they both

7    worked as managers of the Hardware Unit.  They both

8    had the responsibility to effectively manage the

9    Hardware Unit.  They both reported to Rod Nance, who

10    supervised them and did their evaluations.  So

11    they're pretty similar.

12        One of the differences between them is that

13    Cheryl, while she was in the Hardware Unit, was

14    always working with one less technician than Ed.

15    Okay?

16        So what we know is, because we already talked

17    about it, that Rod Nance wanted and recommended that

18    Ed get some technical training in hardware, not

19    withstanding his years of experience, but didn't

20    feel it was necessary for Cheryl.  In four years of

21    evaluations, you'll see no recommendation that she

22    get hardware training.

23        Second difference is, Cheryl, when she was in

24    her earlier unit, got to go to meetings.  Meetings

25    of Public Service Administrators, managers.  Ed

1    Gordon attended those meetings when he was in the

2    Hardware Unit.  And the meetings were helpful in

3    talking about projects; offering input for what

4    their unit could do and how if could be done.  The

5    type of thing managers would typically get involved

6    in in planning work.

7        Once Rod Nance became her boss, she wasn't

8    allowed to go to any of those.  That's undisputed.

9    And we have no explanation for why Cheryl was not

10   allowed to go to those.

11       What we know is that Cheryl was required to

12   provided detailed plans, detailed reports in each

13   week in a very short timeframe, engage in various

14   aspects of upgrading, changing, removing,

15   decommissioning servers.  And the way these

16   assignments were given to her is that you would have

17   to identify the location.  And you wonder if Ed

18   Gordon has been doing all of that stuff, why would

19   Cheryl have had to identify the location of servers.

20       And then she'd have to provide some information

21   concerning each of the servers, wherever they were

22   located.  And then she would have to put together a

23   plan for doing the particular task which typically

24   involved taking the server out of service and that

25   required coordinating it with the customer.  And

1    then she was given a timeframe for doing the work.

2    And Vicki Spencer said that in the two years,

3    roughly, that she was in the Hardware Unit, she

4    removed a hundred.  Cheryl removed multiple times

5    that while she was in the unit.  That's the

6    evidence.

7        We have no evidence of any reports that Ed

8    Gordon was required to submit.  We have no evidence

9    of any plans he was required to submit.  We have no

10   evidence of any work he did in constructing the

11   inventory.  Cheryl could not find it.  And

12   obviously, it doesn't exist, or CMS would have

13   provided it in this case.

14       So, let's -- let's do some comparison here.

15   Ms. Higgerson compiled some reports, and you'll see

16   them in evidence.  And I want to go through them.

17       Task tickets.  Remember task tickets are work

18   that is specifically done.  Okay?  Ed Gordon was

19   issued 200 task tickets.  200.  Cheryl was issued

20   3,727.  3500 more than Mr. Gordon.

21       Help desk tickets.  Mr. Gordon was issued 230

22   in his name.  Cheryl was issued 2,744.

23       Related task tickets.  Again, that's actual

24   work that Cheryl had to do and Ed had to do.  Ed was

25   issued one.  Cheryl was issued 1,845.

1       Change tickets.  Ed was issued 88.  Cheryl was

2   issued 1,845.

3       Related task tickets, 52.  Cheryl was issued

4   2100.

5       Even though Cheryl didn't have to do all the

6   work that was required on each of those help desk

7   tickets, she had to do some tasks associated with

8   them.  And she did have to do some work in assigning

9   them and in verifying it, so that was actual work

10  out.

11      Now, here's what I find interesting.  Vicki

12  Spencer came to the Hardware Unit 13 months after

13  Cheryl was terminated.  Okay?  There was someone

14  minding the shop during that time period.  And she

15  found only 300 tickets that had not been closed.

16  300.  If you do the math, there were over 5,000

17  tickets that Cheryl was responsible for.  That's CMS

18  records.  5,000, and of those, only 300 were not

19  closed.

20      So the question comes down to why was there

21  this disparity in treatment?  And a gross disparity

22  in treatment.  I submit to you that the only

23  explanation, because I don't think there's any

24  credit in any of the others, is that Cheryl was an

25  African-American female.  And for some reason, Nance

1    took issue with that.

2        What we know is that in the Bureau of

3    Communication and Computer Services, she was the

4    only African-American female in a management

5    position.  Only one.  I have scoured this record to

6    try and find another explanation.  It can't be

7    performance.  I don't think that's a truthful

8    explanation given the disparity of workload.  I'm

9    really struggling to come up with an another

10   explanation.

11       Now, one of your tasks is to evaluate the

12   credibility of witnesses.  They sat up here, each

13   answered questions, and you have to determine--based

14   upon how they performed, not only what they said,

15   but the way they said it, how detailed they were in

16   their responses--who is to be believed.

17       I've been trying cases since 1971.  I've lost

18   count the number of cases I've tried from judges to

19   juries.  I have never once, until this case, had a

20   situation where a plaintiff has testified and

21   testified at length and has never been subject to

22   cross-examination.  Anyone who has watched Law and

23   Order, you know cross-examination is an opportunity

24   to challenge the testimony a witness gives.  There

25   was no challenge made to Ms. Johnson's testimony,

1    neither yesterday nor today.

2        And I submit to you that I believe Cheryl was

3    forthright, I believe she was credible, I believe

4    she was detailed in explaining things, and I don't

5    think she overstated anything.

6        So I've talked enough.  I thank you for your

7    attention.  And I respectfully request that after

8    you deliberate, that you return a verdict in her

9    favor.

10            THE COURT:  Thank you.

11       Ms. Barnes, I have been advised that the lunch

12   for the jury has been delivered.  And it is now

13   12:30 right on the money.

14            MS. BARNES:  So you want me to wait?

15            THE COURT:  Would that inconvenience you if

16   we broke for lunch, and then after lunch, you would

17   immediately pick up?

18            MS. BARNES:  Sure.

19            THE COURT:  Is that acceptable?

20            MS. BARNES:  That's fine.

21            THE COURT:  Okay.  Very good.  Do you agree

22   with that, Mr. Baker?

23            MR. BAKER:  I do.

24            THE COURT:  Very good.  Anybody disagree?

25       Apparently not.  Let's break for lunch.  And we

1   will give you one hour.

2       One hour.  We will be back here at 1:30 sharp

3   to continue.  Very good.

4       Please recall my admonition because you do not

5   yet have the case for deliberation.  So do not

6   discuss it until that time comes.  Okay?

7       We'll stand in recess for 1:30.

8       (The jury left the courtroom.)

9           THE COURT:  All right.  The jury has left

10  the courtroom.  And everybody, we will see you at

11  1:30.  Enjoy your lunch.

12      (A lunch recess was taken.)

13          THE COURT:  All right.  We finished lunch,

14  we're all in place.  Everybody is in their assigned

15  seat.  And we're now ready for the closing arguments

16  by CMS.  Ms. Barnes.

17          MS. BARNES:  Thank you, Your Honor.

18  Counsel.  And thank you for your patience also on

19  behalf of CMS and my trial team and Don Warren.  We

20  thank you for your patience in this case.

21      Judge Mills has told you that you've got one

22  job to do today:  To decide whether one of the most

23  difficult decisions that an employer makes, which is

24  to discharge someone from their job, was motivated

25  by the wrong reasons.  And the wrong reason would be

1    that the plaintiff's discharge was motivated by the

2    fact that she is an African-American female.

3         Their claim is that she wasn't -- the proof of

4    this is that she was not treated fairly as compared

5    to a similarly-situated white male supervisor, who

6    was Ed Gordon, as you all know.  The right reason

7    would be that the decision was made in the best

8    interests of the State of Illinois and its employees

9    based on the conclusion of her supervisors that she

10   could not handle the requirements of the job.

11        And this is also a case, as I hope you've

12   concluded, by the skills required to manage one

13   aspect of the computer-based system that the

14   employees use to do the state's business.  And it's

15   whether Ed Gordon was favored over Cheryl Johnson.

16        When you consider that, I would like for you to

17   ask yourself, first, whether the evidence showed

18   that Ed Gordon had the same problems that

19   Ms. Johnson did.

20        The -- you are going to be instructed on one --

21   a crucial aspect of this case, which is whether

22   Ms. Johnson was discriminated against as -- with

23   respect to a similarly-situated white male.  And you

24   will get instruction, you've heard the instruction,

25   that the factors that go into this are four.  But

1    one of them is whether they engaged in similar

2    conduct.

3         What we would like you to consider is whether

4    Ed Gordon was a white male supervisor whose work was

5    deficient, and Don Warren and Rod Nance let him keep

6    his job while firing Ms. Johnson for the same

7    problems.

8         Now, the plaintiff wants to you believe that

9    Ron Nance and Don Warren changed the rules on her.

10   As soon as they, who hired here, put her in the new

11   position, they changed all the rules and started

12   piling on her.

13        That's not what the evidence has shown.  We

14   believe this case has shown that it's about the

15   skills required to manage people, to manage work

16   orders, and to manage inventory.  And the evidence

17   shows that Ed Gordon had those skills.  You heard no

18   evidence otherwise.  He set up the Hardware Group,

19   he established the set of steps to handle the work,

20   and when he moved over to the Software Group, the

21   Hardware Group was running efficiently.  You have

22   heard nothing to the contrary.  He was not

23   similarly-situated to the Plaintiff in this case.

24   Ms. Johnson was constantly behind on her work, and

25   Mr. Gordon was not.

1    Ed Gordon did not have to have quarterly

2  evaluations in order to get him focused on the tasks

3  required to get the work done.  The reason Ed Gordon

4  didn't have those objectives in his evaluations was

5  because he was doing the work.  And Rod Nance and

6  Don Warren testified that that was the problem, they

7  were constantly trying to get the plaintiff focused

8  on what her job was and -- and how to do that.

9    Ed Gordon was not the subject of complaints to

10 Don Warren and Rod Nance from the customers they

11 served.  That's the evidence.  That he -- she was

12 not -- or he was not the subject of complaints from

13 subordinate employees who worked under him, as the

14 plaintiff was.  You've heard no evidence that Ed

15 Gordon couldn't keep track of the inventory.  You've

16 heard no evidence that Ed Gordon couldn't manage the

17 Remedy ticketing system.

18    Plaintiff wants to you believe she was treated

19 differently because Rod Nance didn't make Ed Gordon

20 assign all the tickets to himself.  And she wants

21 you to believe that this created more work for her.

22 The evidence, if you think about it, does not bear

23 out this claim.

24    Jo Higgerson told you that she gathered the

25 data Ms. Johnson asked her to gather and compiled in

1    the way she asked her to do.  And the way

2    Ms. Johnson wants you to interpret that data is

3    misleading.  She asked Ms. Higgerson to compile it

4    in such a way that it showed who was assigned the

5    ticket.  We've argued over this ad infinitum.  And

6    she points to her having more tickets assigned to

7    her than Ed Gordon.  And we've told you why this is

8    misleading.  Rod Nance asked Ms. Johnson to put the

9    tickets in her name so she could keep track of them.

10    He didn't have to ask Ed Gordon to do that because

11    Mr. Gordon assigned the tickets to his technicians

12    and kept track of them.

13        Ms. Higgerson explained to you that putting the

14    tickets in her name didn't mean she did all the work

15    on the tickets.  And Ms. Higgerson showed you that

16    three, four, five, six people worked on these

17    tickets, including the Novanis and Sentinel contract

18    technicians who were at Ms. Johnson's disposal to

19    assign work to.  We never claimed that she -- that

20    these -- Rod Nance never told you that he assigned

21    the ticket -- that she was required to assign the

22    tickets to herself so she could do all the work on

23    the tickets.

24        And the point of the evidence that we showed

25    you through Jo Higgerson was that even when the

1     tickets were assigned to Ms. Johnson, yes, she may

2     have done some of the work on the tickets, but she

3     didn't have to do all the work on the tickets.

4     There were a number of people that did the work on

5     the tickets.  And the point was, she could not

6     manage those tickets.

7          All she had to do was open it, assign it, and

8     close it when the work was done.  And she couldn't

9     even do that.  And if you arrange the ticket data by

10    group, as Ms. Higgerson showed you, Ms. Johnson's

11    group had thousands of fewer tickets than Ed

12    Gordon's group.  And the same evidence that

13    Ms. Johnson wants to you believe showed that she was

14    piled on showed that overall, hardware had fewer

15    tickets than Ed Gordon's Software Group, a group he

16    managed to -- a group he continued to manage

17    capably.

18         Now, Mr. Baker said he couldn't remember the

19    name of that place where Mr. Gordon put the

20    information.  And he said that Cheryl went there

21    when she took over the Hardware Group and there was

22    nothing there.

23         Well, I went back to my notes.  And it's your

24    call because you heard the evidence too, but it is

25    my understand -- memory that Ed Gordon testified, in

1    April of '08, he said, "I took all the information

2    in the forms, when he left in April of '08, and

3    created a Share Point site, a location where you

4    could go look for instructions.  And Cheryl wants

5    you to believe that there was nothing there.  And

6    that's simply not true.

7         Ms. Johnson tries to tell you that she was on

8    top of everything and it was Rod Nance's fault that

9    she was behind because he emailed her all the time.

10   Well, you saw his notes about the emails.  He

11   emailed her to tell her which tickets were

12   outstanding.  He listed them for her.

13        She tried to tell you that Mr. Nance never

14   talked to her about her performance.  His notes say

15   otherwise.  We identified those for you yesterday

16   where he talked face-to-face with her about her

17   performance, about her employees, and about getting

18   her job done.  At Mr. Warren's direction, he made

19   673 entries in order to document the issues

20   Ms. Johnson was having.  And she claimed to you that

21   he never communicated with her about the issues.

22   Never talked to her about her job.

23        The evidence is otherwise.  You can flip

24   through the -- the dates that we talked about and

25   see that he talked to her.  He communicated with

1    her.  An email was sent on September 2nd, '09,

2    telling her: (As read:)  Had an hour discussion with

3    Cheryl.  She says she needs 21 days.

4        You know, next one, (as read:)  Met with Cheryl

5    to discuss her quarterly evaluation.  This is

6    February 1st, 2010.  I talked to Cheryl to try to

7    explain that of the objectives, this is probably the

8    least critical.

9        February 8th, 2010, email sent listing the

10   tickets.

11       Next entry, (as read:)  Talked to Cheryl for a

12   while about a task I had given her three weeks ago.

13       Next entry.  Let's see, it was 10/12.  He had a

14   conversation about -- with her union representative

15   about an issue she was having with work.  He talked

16   to the union representative about it, and they --

17   after some discussion, they determined that Cheryl

18   needs to learn to focus on more than one thing.  It

19   was determined that the hardware drive space or hard

20   drive space issue was a focus.

21       My point here is that there was communication

22   with Ms. Johnson from Mr. Nance.  He didn't just sit

23   in his office and email her.

24       On November 18th, 2010, email sent to Cheryl,

25   you know, about some issues, and specifically about

1  ticket numbers, what he didn't see.  He wanted to

2  know what was going on.  Please let me know, thanks.

3      I mean we aren't going to bore you with all--

4  every entry, but November 9th -- yeah, November 9,

5  2010, he emails her and asks -- all managers asking

6  for updates.  He put -- he put a calendar event on

7  her Outlook calendar to remind her, and then (as

8  read:)  This morning Cheryl came into my office and

9  said she didn't have anything.  When I asked why,

10  she told me she forgot.

11      And then our -- you know, May 9th, 2011.  (As

12  read:)  I discovered while I was gone, Cheryl had

13  closed tickets that shouldn't have been.  We

14  discussed closing some of her old tickets.  And I

15  told her previously I would consider them -- closing

16  them if she could produce paperwork that went to the

17  tickets.

18      The claim that Rod Nance did not engage with

19  her about her job performance is malarky.

20      Vicki Spencer told you that Ms. Johnson -- that

21  she talked to Ms. Johnson a lot before Vicki, you

22  know, took over for her, but during the time

23  Ms. Johnson was supervising the group.  She talked

24  to her so much that she had to talk to Mr. Gordon,

25  who was her boss, about the fact that Ms. Johnson

1    asked her how to do things so much that she couldn't

2    get her own work done.

3        The evidence shows that a whole bunch of

4    people--Don Warren, Rod Nance, Ed Gordon, Vicki

5    Spencer--tried to help Ms. Johnson succeed.  And she

6    asks you to conclude that the decision to discharge

7    her was based on her race and her gender.  And I

8    just want you to ask yourselves back there, where is

9    the evidence of that?  Where is the evidence that

10   the reasons you have been given by these supervisors

11   about the decision to discharge her were phonied up

12   just to cover up unlawful discrimination?  You have

13   a jury instruction on that.

14       And you heard Ed Gordon tell you what

15   Ms. Johnson's comments about the work of his group

16   being -- well, you can decide how you want to

17   interpret that, but we believe the reasonable

18   interpretation of the comment she made about Ed

19   Gordon's job was that he had the easy job.  And he

20   had the grace to take a portion of that job with him

21   when he went over to software to ease her burden.

22       You also heard Lisa Rush tell you that

23   Ms. Johnson and some other employees -- this was

24   Ms. Johnson's witness.  She told you that other

25   employees had to come to her to get inventory

1    paperwork because Ms. Johnson had lost it.

2        Finally, finally, you heard Vicki Spencer's

3    testimony about what she found when she took over

4    the Hardware Group.  It was in disarray, tickets

5    needed to be cleaned up, and the hard drive space in

6    the servers was not well-managed.  And you heard how

7    she dealt about it.

8        Ms. Johnson complained that she had four techs

9    and then only three.  Well, Ms. Spencer told you

10   that she had two technicians, Mark Jarvis and Warren

11   Foster.  And she used Sentinel technicians to help

12   pick up the slack.  And these are the same

13   technicians that Ms. Johnson blamed for not

14   permitting her to do her job.

15       And you heard what Ms. Spencer did about the

16   situation.  She put them on schedules, she managed

17   them.  She managed her employees and she managed her

18   tickets.  She told you that she put all the tickets

19   in her name because it helped her manage the

20   tickets; the same thing Ms. Johnson is trying to

21   tell you prevented her from doing her job.

22       And Ms. Spencer told you, "Yeah, it created a

23   little more work, but I wanted to make sure they

24   were done correctly."  Because she was a good

25   manager.  It didn't impair her management of the

1    tickets as Ms. Johnson wants you to believe it did

2    her's.

3        Ms. Spencer told you that the Integrated Lights

4    Out Project was pending.  That was something that

5    was on Cheryl Johnson's plate.  Vicki finished it.

6    She worked on Nobel Migration Project, she finished

7    it.  And she told you that she had hardly any

8    hardware experience.  And you know why she was able

9    to do this?  Because she managed.  That was the

10   criteria for this job, being able to manage, manage

11   tickets and manage people.

12       And contrast that with the plaintiff's

13   testimony of whining about subordinates, whining

14   about being piled on, whining about everything -- it

15   was everybody's fault but hers.  You've heard

16   nothing from the plaintiff in this case except that

17   it was never her fault.  It was always someone

18   else's, and everyone had it easier than she did.

19       And when you go back to the jury room, we ask

20   you to consider the testimony of Don Warren, Rod

21   Nance, Ed Gordon, and Vicki Spencer.  And discuss

22   this.  Was Ed Gordon similar to Cheryl Johnson?  We

23   don't think so.

24       Mr. Baker said that I made no challenge to

25   Ms. Johnson's testimony.  I submit to you that Ms.

1    Johnson's testimony was challenged by every single

2    one of these able, capable, competent people that

3    she worked with.  And it's going to be a matter of

4    who you believe.  Is there any -- is there any

5    evidence that what these people told you was phonied

6    up just to cover up for a discriminatory act?

7        And ask yourself too:  Did Vicki Spencer come

8    all the way here from Ft. Myers, Florida just to lie

9    to you?

10       When you go back in the jury room, I think when

11   you consider all of the evidence, we believe that

12   you will come to a decision in favor of the

13   Department of Central Management Services.

14       Thank you.

15           THE COURT:  Thank you, Ms. Barnes.

16   Mr. Baker, you may close.

17           MR. BAKER:  Thank you, Your Honor.  May it

18   please the court.

19           THE COURT:  It does.

20           MR. BAKER:  Heard a lot of back and forth

21   in this trial, and I'll attempt to be brief.

22       Have you ever heard the story the devil is in

23   the detail?  In this case, we felt it was important

24   to present detail.  Almost to the point of it being

25   ad nauseam, Cheryl testified about the work she was

1   assigned, what she was required to do, the order in

2   which she was required to do it.  Very detailed

3   explanation of her work environment.

4       Now, but for Mr. Nance's snitch report, the

5   defendant provided very little detail in this case.

6   They were painting with a broad brush.  Threw out

7   glittering generalities about what Vicki Spencer

8   could do and what Cheryl couldn't do.

9       And if you recall, there was some broad

10  painting of testimony by Vicki Spencer.  And when I

11  honed in on cross-examination, we found out that

12  although she claimed she had responsibility -- put

13  all change tickets in her name, she really didn't do

14  all the work with the change tickets in

15  administering them.  She didn't do any of the

16  verification with customers.  She didn't put any of

17  the help desk tickets in her name.

18      We've heard no explanation from the defendant

19  about why assigning Cheryl the responsibility of

20  having tickets placed in her name was a good tool to

21  help her organize her work.  None of that's there.

22      Now, I believe the evidence reflects that Ed

23  Gordon was similarly-situated to Cheryl.  They had

24  the same job, they worked under the same supervisor,

25  they had the same management responsibilities.  Now,

1    what Ms. Barnes is getting you to believe is, well,

2    they're not similarly-situated because Nance didn't

3    like the way Cheryl did her job and he liked the way

4    Ed did his job.  That's it.  There's no specifics

5    about what Cheryl did wrong.

6         For example, we went into great detail in terms

7    of what Cheryl had to do in terms of upgrading

8    servers and what she had to do when it came to

9    decommissions servers, and how she went about it.

10   Now, Mr. Warren and Mr. Nance had the opportunity to

11   kind of take apart what was wrong with how she did

12   those tasks.  That wasn't done.

13        Mr. Nance had very specific short-time

14   requirements for completing tasks.  He had the

15   opportunity to explain why it was important to have

16   those time requirements met.  He didn't do it, Don

17   Warren didn't do it, Ed Gordon didn't do it, Vicki

18   Spencer didn't do it.

19        Now, Ms. Barnes' argument would require you,

20   would require you to ignore everything Cheryl

21   Johnson said.  Would require you to ignore the

22   objectives in her performance appraisal.  Would

23   require you to ignore that stack of reports.  And

24   the whole idea here is for you to make a decision

25   based upon the totality of the evidence.

1        We're not suggesting Ed Gordon was a bad

2     employee.  Have no reason to.  But what we are

3     suggesting is he was not set to the same standard

4     Cheryl Johnson was.

5        Ms. Barnes said, and I think this is the

6     curveball in the dirt, she said, "Well, we have this

7     report showing all the tickets assigned to Ed

8     Gordon's group after he left the Hardware Unit in

9     comparison to tickets assigned to Cheryl Johnson's

10    group.  Okay?  Let's do some numbers.  Cheryl

11    Johnson had three techs she had to manage to do all

12    those tickets.  And you know what's involved in

13    doing the work on the tickets, we've talked about

14    that throughout this trial.  How many did Ed Gordon

15    have?  He had eight.  While Cheryl Johnson was in

16    the Hardware Unit, she started with four techs, but

17    got down to three.  Ed Gordon, when he came in, had

18    five and got down to four.  So this whole notion of

19    Ed having all this work that he did and Cheryl not

20    having any comparable amount of work assigned to her

21    group is phony baloney.

22        I could go on.  I'm not going to do that.

23    Cheryl testified about some of the entries that were

24    in Mr. Gordon's document.  Didn't go through --

25    Mr. Nance's document, excuse me.  We didn't go

1  through all of them, but we highlighted some of the

2  big ones.

3       And I simply suggest to you if you take a look

4  at all the evidence, it's pretty clear that Cheryl

5  was treated differently.  And we don't have a

6  convincing explanation for why that was.  Cheryl was

7  the only African-American female in a management

8  position in the entire bureau.  Her performance was

9  fine in her first position; no issues.  And all of

10  the sudden, all of the sudden, it went to the tank.

11  If wasn't a matter of being gradual; it started day

12  one.

13       So ask yourself this:  If Cheryl Johnson was a

14  horrible employee that couldn't do anything right in

15  the Hardware Unit, and that started immediately,

16  which is the storyline they're attempting to

17  advance, why was it she completed her probation, she

18  got acceptable evaluations in her earlier position?

19  It just doesn't stack up.  Everything was good until

20  she went under Rod Nance.

21       Well, I can go on, but I think you get the

22  point.

23       Again, I want to thank you for your attention.

24  We appreciate your service, however you decide this

25  case.  And I'm gonna ask you to return a verdict in

1  favor of Cheryl.  Thank you very much.

2        THE COURT:  Thank you, Mr. Baker.

3     Thank you, Ms. Barnes.

4     All right, ladies and gentlemen, you have heard

5  the closing arguments of counsel, you have my

6  instructions as to the law.

7     Now, I will be sending into you a verdict form.

8  And I want you to recall all of my instructions and

9  admonitions.  And I want you to consider all of the

10  evidence in the case regardless of who or which

11  party produced it.  And I want you to consider all

12  of the closing arguments that we have heard.

13     So you will be going with the Marshal back to

14  the jury room to deliberate your verdict.

15     I would ask the Marshal to come forward.

16  Marshal, if you will turn, raise your right hand, be

17  sworn by Madam Clerk.

18     (The Court Security Officer was sworn.)

19        THE COURT:  All right.  Marshal, if you

20  will step up here to the bench, I will give you the

21  instructions of the Court you are to present to the

22  jury once they have gone to the courtroom -- I mean

23  to the deliberation room.

24     And I'm handing to the Marshal the forms of

25  instructions, all put together with a black clamp.

1    And you will recall, ladies and gentlemen, I said

2    that they are to be taken as a whole, not separating

3    out one from another to the exclusion of the others.

4    So keep them together, please.  They are the body of

5    your instructions.

6        And along with that will go two forms of

7    verdict, Form A and Form B in blank.  And, Marshal,

8    I'm handing them to you, you will hand these to the

9    jury once they have gone to the jury room.

10   Understood?

11            MARSHAL:  Yes, Your Honor.

12            THE COURT:  All right.  Very good.

13        All right, ladies and gentlemen, please follow

14   the Marshal and do your duty.

15            THE CLERK:  Your Honor, would the like the

16   exhibits that are going back to the jury made of

17   record?

18            THE COURT:  The exhibits will be brought

19   back to the jury in a cart.

20            THE CLERK:  All right.

21            THE COURT:  Please go ahead, ladies and

22   gentlemen.

23        (The jury left the courtroom.)

24            THE COURT:  All right.  The record may show

25   that it is seven minutes after two p.m., and the

1    jury has just retired to the jury room to deliberate

2    its verdict.

3         All right.  Now, everybody, please be seated.

4    You don't have to stand.

5         All right.  All of counsel and parties are

6    present.  Do we need to bring anything up at this

7    juncture or this moment?

8              MR. BAKER:  I believe not.

9              MS. BARNES:  No, Your Honor.

10             THE COURT:  Now, counsel, I have no idea,

11   as do any of us, how long the jury will take on the

12   deliberation of this verdict, but please make sure

13   that Madam Clerk has a contact for you so that you

14   may be contacted as soon as we have something to

15   report.

16        Now, today, of course, is Thursday afternoon.

17   It is eight, nine minutes after 2:00 in the

18   afternoon.  And we can only expect to hear from the

19   jury whenever it finished its deliberation.  So

20   don't be too awfully far away if you can manage it.

21        What's that?

22             MARSHAL:  That was my radio.

23             THE COURT:  Is that your radio going off?

24   Okay, let's keep it down.

25        Any questions, any observations, anything you

1    want to state?

2        That includes Madam Reporter, who has a

3    question, I see.

4            THE COURT REPORTER:  Did you want to make a

5    record of which exhibits are going back to the jury

6    or are they all going back?

7            THE COURT:  Thank you very much, Madam

8    Reporter.  Any problem with any of them going back?

9        All the exhibits, I think, were admitted

10   without objection, or very little discussion.  You

11   want -- want us to have Madam Clerk simply put them

12   all into the jury -- into the exhibit cart and then

13   have it wheeled in there?  What do you think?

14       I'm opening it up to you, counsel.  You are my

15   guideposts.

16           MS. BARNES:  Well, this is what we've got.

17   We do have a disk that is going to be entered into

18   the record, and I think Madam Clerk was going to

19   talk to IT about --

20           THE CLERK:  Yes.  They have everything set

21   up there for them.

22           THE COURT:  They do?  In the jury room.

23           THE CLERK:  Yes, Your Honor.

24           THE COURT:  Okay.  Well, I'll leave it to

25   counsel.  If there's anything that you want to make

1    of record here regarding those exhibits going to the

2    jury room; otherwise, I will normally simply ask

3    Madam Clerk to take the exhibit cart with the

4    exhibits that have been admitted by the Court into

5    evidence and simply wheel them in and let them have

6    them in there.

7        And then if there's anything that needs to have

8    electronic assistance, she's available to help them

9    with that at any time that they request it.

10       Now, usually, that is sent out in the form of a

11   question, I immediately confer with counsel about

12   it.  But if we can agree in advance that if they

13   make the inquiry regarding that tape or something of

14   that nature, she can go back there and plug it in.

15               MS. BARNES:  That's fine with me.

16               THE COURT:  That's okay with CMS.  Is it

17   you, Mr. Baker?

18               MR. BAKER:  Yes.

19               THE COURT:  All right, fine.  That's it

20   then, Madam Clerk.

21               THE CLERK:  Yes, sir.

22               THE COURT:  Okay, good.  So just get them

23   all together in the cart and take them back in

24   there.  And I think that we need to do that pretty

25   quick.

1          THE CLERK:  Yes.

2          THE COURT:  And get them back there.

3  Mr. Baker --

4          MR. BAKER:  I was gonna hand you one of the

5  exhibits that's at our table.

6          THE COURT:  All right.  Do you have

7  anything on your table, Ms. Barnes?

8          MS. BARNES:  No.

9          THE COURT:  Okay.  Let's get it all to

10  them.  Put them there on the desk and get the

11  evidence cart.  Wait a minute, whether's the

12  evidence cart.

13          THE CLERK:  Judge, there's a cart in the

14  Clerk's Office.

15          THE COURT:  Okay.  You get that cart and

16  take it around --

17          THE CLERK:  Okay.

18          THE COURT:  -- and do it that way.

19          THE CLERK:  Okay.

20          THE COURT:  Or you can do it right through

21  here.

22          THE CLERK:  Okay.

23          THE COURT:  Which I think probably would be

24  better.

25      He's got them all.  Counsel, make sure that

1    what goes into that cart are the exhibits that were

2    admitted and nothing else.  Okay?

3         All right.  Anything further that we need to

4    discuss at this moment?

5         Now, if the jury comes back with a verdict for

6    plaintiff, we will go right into the question of

7    damages and proceed immediately.  We're not gonna

8    delay any further time.  Then we pick up again

9    tomorrow.  Okay?

10        Now, any problem with any of that?

11             MS. BARNES:  No, Your Honor.

12             THE COURT:  All right.  Swell.

13        Very good.  Okay, let's stand in recess.  And

14   make yourselves available, make sure that Madam

15   Clerk knows where she can contact you all when the

16   jury returns, indicates it has a verdict.

17        Very good.  Thank you.

18        (A recess was taken.)

19             THE COURT:  Thank you, everyone.  Please be

20   seated.

21        The record may show that the counsel for both

22   parties are in the courtroom.  And it's been my

23   understanding, or is my understanding, that the jury

24   has reached its verdict and has so indicated to

25   Madam Clerk.  Is that correct?

1          THE CLERK:  That is correct, Judge.

2          THE COURT:  Very well.  Any reason then,

3    counsel, why we should not ask the jury to return to

4    the courtroom and return its verdict?

5          MR. BAKER:  No.

6          MS. BARNES:  No.

7          THE COURT:  Very well.  Everybody in

8    agreement.  Marshal, would you please open the door

9    and ask the jury to come in.

10          MARSHAL:  Yes, Judge.

11       (The jury entered the courtroom.)

12          THE COURT:  Thank you, ladies and

13    gentlemen, very much.  And please be seated.

14       ██████████, you are number -- Jury 60; isn't that

15    correct?

16          ██████████:  Yes, sir.

17          THE COURT:  And I note by the fact -- or at

18    least I assume by the fact that you have documents

19    in your hand, that you have been selected as the

20    foreperson of this jury.  Is that correct?

21          ██████████:  Yes, sir.

22          THE COURT:  And has this jury reached its

23    verdict in this matter?

24          ██████████:  We have, Your Honor.

25          THE COURT:  Would you be good enough to

1    hand those, please, to the Marshal; your documents

2    and your form of verdict.

3         Bring them up to me, if you would, Marshal.

4         Thank you very much.

5         The Marshal has handed to me the instructions

6    of the Court, all of the pages thereof, as well as

7    two forms of verdict; one has been signed and one is

8    blank.

9         I will read the form of verdict that reads as

10   follows:

11        Verdict Form B, as in boy.  We, the jury, find

12   for the defendant Illinois Department of Central

13   Management Services, and against the plaintiff

14   Cheryl Johnson.

15        ███████ has signed as foreperson, and there

16   appear one, two, three, four, five, six, seven

17   additional signatures thereafter.

18        The blank form of verdict is verdict Form A,

19   and has not been signed.

20        As I have read verdict Form B, ████████, is

21   that the verdict of this jury?

22             ████████: Yes, Your Honor.

23        THE COURT:  And did each of the members of

24   this jury sign this form of verdict?

25             ████████: Yes, Your Honor.

1          THE COURT:  Very well.

2      Then those are all signed in ink.  And the

3  Court does accept this verdict as the verdict of

4  this jury.  You will, Madam Clerk, enter the jury

5  verdict accordingly.

6      Ladies and gentlemen, thank you very much for

7  your services in this cause.  I know that this is a

8  new experience for many of you.  And, you know, each

9  time -- I've been at this game 52 years, state and

10 federal, trial and appellate.  And you know, each

11 time, it is a new experience, because no jury trial

12 is exactly the same.  Never.  And of course, we have

13 different players, we have different counsel, we

14 have different judges, we have different jurors.  So

15 we're all in a learning experience every time we do

16 this.

17     But it is a great experience.  And I'm sure

18 that each one of you, if you have not sat on one

19 before, will acknowledge that this is really

20 something that you -- you're proud to do and that

21 you're glad, even though it was an inconvenience,

22 that you had an opportunity to participate in the

23 system of justice that we have.

24     Not perfect by a long shot, but it's the best

25 that we can devise.

1          So we thank you very, very much for your

2    services here as jurors.  And look at this, it's

3    just after 5:00, so you're starting in on another

4    day.  We thank you very much, and I hereby discharge

5    you as the jury in this cause.

6          But before I do, I want to, in your presence,

7    compliment counsel for both the plaintiff and for

8    the defense for their excellent conduct in the well

9    of this court.  I have had them both a number of

10   times, and they are very able and very proper ladies

11   and gentlemen.  So we thank you, counsel, very much.

12              MR. BAKER:  Thank you, Your Honor.

13              THE COURT:  Is there -- what have I missed,

14   Mr. Baker?

15              MR. BAKER:  Your Honor, may I again thank

16   the jury for its service.  Obviously, we're

17   disappointed with the result, but what I said

18   before, we wanted a fair verdict, and we appreciate

19   everything you've done.  Thanks.

20              THE COURT:  Thank you, Mr. Baker.  That was

21   very nice of you.  Since you have had that comment,

22   and since I feel confident that Ms. Barnes will not

23   be volunteering comments, I would like to tell this

24   jury that Ms. Barnes tried her first jury case

25   before me many years ago, and today is her last jury

1  case before she retires on the last day of this

2  month.

3      So every best wishes to you, Ms. Barnes.

4          MS. BARNES:  Thank you, Judge.

5          THE COURT:  All right.  We thank you all

6  very much for your courtesies to the Court.  And

7  judgment is entered on this verdict in favor of the

8  defendant Illinois Department of Central Management

9  Services.  And this case is now dismissed.

10     Thank you very much, ladies and gentlemen.

11  You're free to leave, and we thank you again.

12     We will stand in recess.

13     (The jury left the courtroom)

14          THE COURT:  All right.  The jury has left

15  the courtroom.  Is there anything else we need to

16  tackle at this moment?

17          MR. BAKER:  I don't believe so.

18          MS. BARNES:  I don't believe so.

19          THE COURT:  Thank you again, counsel, for

20  your fine conduct in the well of this court as

21  always.

22          MR. BAKER:  Thank you, Judge.

23          THE COURT:  And also nice to meet you

24  Mr. Okon.

25          MR. OKON:  Correct.  Thank you, Your Honor.

1             THE COURT:  Very well.  We stand adjourned.

2        (Court was adjourned in this case.)

3

4   I, KATHY J. SULLIVAN, CSR, RPR, CRR, Official Court

5   Reporter, certify that the foregoing is a correct

6   transcript from the record of proceedings in the

7   above-entitled matter.

8

9

10

11

12                  This transcript contains the

13                  digital signature of:

14

15                  Kathy J. Sullivan, CSR, RPR, CRR

16                  License #084-002768

17

18

19

20

21

22

23

24

25